Honorable Jamal N. Whitehead

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JOHN KETCHAM, an individual,<br><br>        Plaintiff,<br><br>  v.<br><br>RODGER MAY, an individual; and<br>FISH TANK, LLC, an Alaska limited liability company.<br><br>        Defendants. | Case No. 2:25-cv-01291-JNW<br><br>FIRST AMENDED COMPLAINT |

John Ketcham ("**Plaintiff**" or "**Ketcham**"), alleges and claims as follows:

## I. PARTIES

1. Ketcham is an individual residing in the state of California.

2. Rodger May ("**Defendant**" or "**May**") is an individual residing in Washington state.

3. Fish Tank, LLC ("**Fish Tank**") is a limited liability company organized under the laws of the State of Alaska.

## II. JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because it involves citizens of different states and the amount in controversy exceeds $75,000.

5. This Court has personal jurisdiction over May and Fish Tank.

6. The Western District of Washington is a proper venue under 28 U.S.C. §§ 1391(b) because, among other things, a substantial part of the events and omissions giving rise to Ketcham's claims occurred in the Western District of Washington.

## III.  FACTS

**A.  Peter Pan Ownership Structure**

7. Peter Pan Seafood Company, LLC ("**Peter Pan**") is a Washington limited liability corporation with assets and operations in both Alaska and Washington. Upon information and belief, May owns and controls May Holding Company ("**May Holding**"). At all times relevant to this First Amended Complaint, May Holding owned 50% of Alaska Fish Holdings, LLC ("**Alaska Fish**"). Alaska Fish, in turn, owned 100% of Peter Pan's outstanding membership interests.

**B.  The Port Moller Property**

8. Prior to July 2023, May loaned money to Peter Pan. May's loans to Peter Pan are in part secured by a lien against certain real property located in Port Moller, Alaska (the "**Port Moller Property**"), evidenced by that certain Deed of Trust, Assignment of Rents and Security Agreement and Fixture Filing, which was recorded in the Recording District 305 – Aleutian Island, Alaska on May 23, 2023 under Instrument No. 2023-000120-0 (the "**May Deed of Trust**").

9. The Port Moller Property is a substantial fish processing facility, previously described on Peter Pan's website as follows:

> Peter Pan Seafoods Port Moller facility is a remote salmon processing (freezing) plant located 550 air miles SW of Anchorage on the north side of the Alaska Peninsula. It primarily processes sockeye (red) salmon but also produces small amounts of king, coho, and chum salmon. The plant can process about 250,000 lbs. of salmon per day. The product forms include; frozen headed and gutted, fillets, teien (salted fillets) and sujiko (salted salmon eggs). During peak production there is a crew of 140 people. Being a remote facility it must be self-sufficient in providing for all housing, food, electricity, water and other supplies. Peter Pan buys fish from and supports a fleet of 105 drift gill netters and 30 set netters, both resident and non-resident fishermen. The North Peninsula area is somewhat unique in that the sockeye salmon runs are spread out over the summer from early June through mid-September. This long season and the moderate rate of the harvest over its length provide us the opportunity to concentrate on producing very high quality salmon products.

**C.    The Ketcham Loan**

10.    During the summer of 2023, Peter Pan solicited an infusion of additional cash to support operations.

11.    At the request of Peter Pan's ownership, including May, Ketcham agreed to loan $10 million to Peter Pan ("**Ketcham Loan**") pursuant to that certain Loan Agreement dated July 12, 2023 (the "**Ketcham Loan Agreement**"). To secure Peter Pan's obligation to repay the Ketcham Loan, Peter Pan granted Ketcham a lien and security interest in the Port Moller Property, evidenced by that certain Deed of Trust, Assignment of Rents and Security Agreement (and Fixture Filing), which was recorded in the Recording District 305 – Aleutian Island, Alaska on August 14, 2023 under Instrument No. 2023-000209-0 (the "**Ketcham Deed of Trust**").

**D.    The Ketcham Subordination Agreement**

12.    In connection with the Ketcham Loan Agreement, and in order to induce Ketcham to loan Peter Pan $10 million, May and Peter Pan entered into that certain Subordination Agreement dated July 12, 2023 (the "**Ketcham Subordination Agreement**"). The Ketcham Subordination Agreement subordinated existing indebtedness and liens—including indebtedness owed to May and the lien securing such indebtedness—to Ketcham's indebtedness and lien in and to the Port Moller Property. In the Ketcham Subordination Agreement, May, Peter Pan, and certain other pre-existing lenders expressly agreed that Ketcham's payment rights and Ketcham's lien against the Port Moller Property arising under the Ketcham Loan Agreement and the Ketcham Deed of Trust would have priority over theirs in every respect and without regard for whether May's or the other pre-existing lenders rights and liens had arisen before or been recorded prior to the making of the Ketcham Loan. The purpose of the Ketcham Subordination Agreement was to ensure that Ketcham would hold, as among the parties to the agreement, a first-priority right to payment and a first-priority lien against the Port Moller Property, with the other parties to the agreement being junior in both right of payment and lien priority to Ketcham's position.

13.    To this end, the Ketcham Subordination Agreement unequivocally subordinates the

May Deed of Trust to the lien created by the Ketcham Deed of Trust. For example, the agreement provides:

    a. "[May] subordinate[s] [his] lien on the Port Moller Real Property created by the Existing Deed of Trust to the lien created by the Ketcham Deed of Trust…" [Ketcham Subordination Agreement, § 4]

    b. "[May's] lien under the Existing Deed of Trust shall be and shall remain, at all times, and in each and every respect, subject and subordinate to the lien of the Ketcham Deed of Trust and the Note…" [Ketcham Subordination Agreement, § 7] (emphasis added)

14. Section 8 of the Ketcham Subordination Agreement unambiguously provides that Ketcham is entitled to look to the Port Moller Property to satisfy his loan to Peter Pan, and that no proceeds of the Port Moller Property can be paid to May unless and until the Ketcham Loan has been fully satisfied. In particular, the Ketcham Subordination Agreement provides:

    a. "Ketcham Lender and Existing Lenders, each of the parties hereto hereby acknowledge and agree that all proceeds of any exercise of remedies with respect to the Ketcham Deed of Trust or Existing Deed of Trust shall be paid (i) first, to [Wells Fargo] for application to the Senior debt… (ii) second, to Ketcham Lender for application to the Ketcham Indebtedness Debt… (iii) third, to the Existing Lenders [defined to include May] for application to the Existing Indebtedness…" [Ketcham Subordination Agreement, § 8] (emphasis added)

15. Section 13 of the Ketcham Subordination Agreement prohibits May from doing anything to "impede, interfere with or restrict or restrain" Ketcham's lien rights:

The Subordinating Parties [defined to include May] agree that they will not take any action that will impede, interfere with or restrict or restrain the exercise by the Ketcham Lender of rights and remedies under the Ketcham Deed of Trust and will take such commercially reasonable actions as the holder of the Existing Deed of Trust as may be reasonably necessary or appropriate to effectuate the subordination provided in this Agreement.

16. Other provisions of the Ketcham Subordination Agreement confirm the

unconditional and absolute nature of May's continuing agreement not to impede, interfere with or restrict Ketcham's rights and remedies under the Ketcham Deed of Trust. For example, Section 11 of the Ketcham Subordination Agreement provides in pertinent part:

> All rights and interest of [Ketcham] hereunder, and all agreements and obligations of [May] hereunder, shall remain in full force and effect irrespective of:
>
> (a)  any lack of validity or enforceability of any document evidencing any of the Ketcham Indebtedness;
>
> …
>
> (c)  any exchange, subordination, release or non-perfection of any collateral for all or any of the Ketcham Indebtedness;
>
> …
>
> (e)  any reduction, limitation, impairment or termination of the Ketcham Indebtedness for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to (and [May] hereby waive[s] any right to or claim of) any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of invalidity, illegality, nongenuiness, irregularity, compromise unenforceability of, or any other event or occurrence affecting, any Ketcham Indebtedness; and
>
> (f)  any other circumstance which might otherwise constitute a defense available to, or a discharge of, Borrower in respect of the Ketcham Indebtedness or Subordinated Indebtedness in respect of this Agreement.
>
> …
>
> The Ketcham Indebtedness shall continue to be treated as senior secured debt … and the provisions of this Agreement *shall continue to govern the relative rights and priorities of the Ketcham Lender and [May]* even if all or part of the Ketcham Indebtedness or the security interests securing the Ketcham Indebtedness are subordinated, set aside, avoided, invalidated or disallowed. [emphasis added]

**E.    May's Breach of the Ketcham Subordination Agreement**

17.   In April 2024, Stapleton Group, Inc. (the "**Receiver**") was appointed as receiver over Peter Pan's assets, including the Port Moller Property, by the King County Superior Court in case number 24-2-08809-1SEA.

18.   On July 30, 2024, the Receiver filed its Motion for Order (1) Approving Bid and Auction Procedures; (2) Scheduling Hearing to Approve Sale of Assets; and (3) Approving

FIRST AMENDED COMPLAINT - 5

Assumption and Assignment of Executory Contracts ("**Bid Procedures Motion**").

19. On August 21, 2024, the King County Superior Court entered its Order (1) Approving Bid and Auction Procedures; (2) Scheduling Hearing to Approve Sale of Assets; and (3) Approving Assumption and Assignment of Executory Contracts ("**Bid Procedures Order**").

20. RCW 7.60.260(3) authorizes lienholders to "credit bid" by offsetting against their purchase price the amount of their allowed secured claim.

21. As required by RCW 7.60.260(3), Section 2(e) of the Bid Procedures Order expressly contemplated credit bidding by lienholders:

> **Secured Creditors as Qualified Bidders: Credit Bids**. Subject to the last sentence of this Section 2(e), secured creditors whose claims are either (i) not disputed by the Receiver, OR (ii) have been allowed by order of the Superior Court prior to the start of the Auction, shall be entitled to participate in the Auction and credit bid the amount of their allowed secured claims with respect to the Assets that secure such claims (a "Credit Bid"), subject to RCW 7.60.260(3). Such a creditor is a Qualified Bidder for purposes of these Bid and Auction Procedures, unless such bid is rejected pursuant to Section 2 (d)(vii) or Section 2(d)(viii) above. Notwithstanding the foregoing, in order to participate in the Auction the holder of such an allowed secured claim must deliver a letter to the Receiver by the Bid Deadline stating the amount of its Credit Bid, the particular Assets that are the subject of the Credit Bid, and certification that it has the financial ability to satisfy its obligations under RCW 7.60.260(3). Moreover, Credit Bids valued below the Reserve Price (as defined in Section 3(g) below) may be disallowed by the Receiver.

22. On September 4, 2024, counsel for Ketcham delivered to Receiver's counsel a detailed description of Ketcham's claim and indebtedness.

23. On September 6, 2024, the Receiver's counsel confirmed that the Receiver did not dispute Ketcham's claim, including his security and right to credit bid under RCW 7.60.260(3). Accordingly, pursuant to Section 2(e) of the Bid Procedures Order Ketcham was entitled to participate in the Auction as a "Qualified Bidder."

24. On September 10, 2024, Ketcham submitted his credit bid for the Port Moller Property in the amount of $11,743,320.

FIRST AMENDED COMPLAINT - 6

Snell & Wilmer
600 University Street, Suite 310
Seattle, Washington 98101
206.741.1420

25.     Also on September 10, 2024, counsel for Silver Bay Seafoods, LLC ("**Silver Bay**") delivered to Receiver's counsel clean and marked-up copies of a Purchase and Sale Agreement ("**Silver Bay-Ketcham PSA**") pursuant to which Silver Bay submitted a cash bid for certain of Peter Pan's assets, and Ketcham submitted a credit bid for the Port Moller Property (as defined below). The Silver Bay-Ketcham PSA makes clear that Silver Bay's and Ketcham's respective bids thereunder were severable, stand-alone bids. Specifically, Section 33.3 (titled "Stand-Alone Bids") provides:

> If for whatever reason Silver Bay will not close on the purchase of assets other than the Port Moller Property pursuant to this Agreement (including, without limitation, because the Seller has not identified Silver Bay as the successful bidder following the auction described in Section 8.6), the Seller shall be authorized, but not obligated, to sever Ketcham's obligations hereunder from those of Silver Bay and to treat Ketcham's having executed this Agreement as a stand-alone bid to purchase the Port Moller Property for the Port Moller Purchase Price, which (i) shall be enforceable against Ketcham, provided the Seller applies cash paid by a successful bidder or bidders other than Silver Bay, in combination with other cash that may be available to the Receivership Estate, to the full and complete satisfaction of the claim asserted by Wells Fargo Bank in the Receivership at closing, and (ii) shall be incorporated into an amended Purchase and Sale Agreement between the Seller and Ketcham that pertains only to the Port Moller Property.

26.     On September 10, 2024, Receiver's counsel acknowledged that Ketcham had satisfied the conditions of the Bid Procedures Order, and was therefore authorized to assert his credit bid rights, stating:

> On behalf of the Receiver, I hereby confirm that Mr. Ketcham has met the requirements under the Bid Procedures Order, including Section 2(e) to assert his credit bid rights, subject to the preconditions previously discussed that sufficient cash to pay all senior liens is received through the auction process, including those of Wells Fargo, as Agent for the lender group and the Alaska Business taxes. We acknowledge receipt of the Silver Bay PSA and Mr. Ketcham's participant (sic) in the PSA.

27.     An auction (the "**Auction**") took place September 16-18, 2024.

28.     At the Auction, May submitted a "package bid" for Peter Pan's assets, including the Port Moller Property. May's package bid consisted of a cash component precisely equal to the $25,324,000 cash component reflected in the Silver Bay-Ketcham PSA, plus a $12 million credit

FIRST AMENDED COMPLAINT - 7

Snell & Wilmer
600 University Street, Suite 310
Seattle, Washington 98101
206.741.1420

bid. Thus, while there was no distinction between the Silver Bay-Ketcham PSA and the May bid in terms of the amount of cash consideration, the amount of May's "package bid" exceeded the Silver Bay-Ketcham bid by approximately $257,000, the entirety of which consisted of credit associated with Peter Pan's payment obligation to May.

29. May's "package bid" initially allocated only $750,000 to the Port Moller Property, despite May being aware of substantial recent valuation data suggesting the value of the Port Moller Property exceeded the amount of Ketcham's bid.

30. During the Auction, Ketcham repeatedly objected to any bid, including May's, that would have the effect of impairing Ketcham's ability to realize the value of the Port Moller Property on account of his first-priority lien against the Port Moller Property.

31. On September 18, 2024, Ketcham notified May that he was in violation of the terms of the Ketcham Subordination Agreement, stating in pertinent part:

> May has submitted a bid for Peter Pan's assets, pursuant to which he allocates $750,000.00 to the Port Moller Property. Ketcham has submitted a credit bid for the Port Moller Property in the amount of $11,743,000.00. May has taken the position that, notwithstanding Ketcham's credit bid, if May's bid for Peter Pan's assets is the prevailing bid, he is entitled to take the Port Moller Property free and clear of the Ketcham Deed of Trust, regardless of whether Ketcham realizes any value on account of his lien against the Port Moller Property. May's approach is both intended to, and has the effect of, frustrating Ketcham's exercise of his statutorily-conferred right to credit bid to protect his investment. Here, as you know, the amount of Ketcham's bid—which is to say, the bid May is working to frustrate—dwarfs the value May is trying to force Ketcham to accept.
>
> May therefore has taken an action—submission of a bid for Peter Pan's assets, the effect of which he contends would deprive Ketcham of his statutory and contractual rights as a lienholder secured by the Port Moller Property—that appears designed to "impede, interfere with or restrict or restrain the exercise by [Ketcham] of rights and remedies under the Ketcham Deed of Trust." This is a clear violation of May's obligations under the Subordination Agreement. Your client should immediately revise its bid to omit Port Moller or allocate sufficient cash to Port Moller to satisfy Ketcham's secured claim. Ketcham reserves all of his rights relating to the Subordination Agreement and May's actions.

32. Neither the Receiver nor May, nor their respective counsel, responded to the September 18 letter. Instead, May pressed forward with his bid for the purpose of acquiring the

Port Moller Property without providing for payment in full to Ketcham (or of anything to Ketcham), and for the purpose of attempting (i) to extinguish Ketcham's rights in and to the Port Moller Property under the Ketcham Deed of Trust (e.g., via foreclosure or credit bidding) and (ii) to deprive Ketcham of the value of the Port Moller Property.

33. Despite Ketcham's objection, and in derogation of its duties and obligations under RCW 7.60 et seq. and the operation of the Ketcham Subordination Agreement, the Receiver deemed May's "package bid" the prevailing bid at the conclusion of the Auction.

34. The Purchase and Sale Agreement that May ultimately executed reflected a downward adjustment of the allocation for the Port Moller Property from $750,000 to $250,000. In doing so, May purposefully sought to implement a transaction designed to result both in the transfer of the Port Moller Property to May and the extinguishment of Ketcham's lien against the Port Moller Property, all with the intention of defeating Ketcham's credit bid and imposing upon Ketcham an apparent price ($250,000) that is roughly 2% of Ketcham's $11,7343,000 bid.

35. On October 3, 2024, King County Superior Court Commissioner Pro Tem Steve Olsen entered an order approving the May "package bid," and authorized the sale of the Port Moller Property to May for $250,000, "free and clear" of Ketcham's lien (the "Sale Order"). Ketcham has disputed, among other things, the Superior Court's subject matter jurisdiction over the Port Moller Property.

36. The Receiver has refused, despite requests, to specifically allocate any cash proceeds to the Port Moller Property or to Ketcham's first-priority lien against the Port Moller Property, and May now purports to hold unencumbered fee title to the Port Moller Property, free from Ketcham's first-priority lien, while disclaiming any payment or other obligation to Ketcham. May purports to do so despite, among other things, Section 9.a of the Ketcham Subordination Agreement, which provides that May will hold any "Distributions or other proceeds of any Enforcement Action" – in this case, the Port Moller Property, which May purports to have acquired as a result of the exercise of his rights as a secured party – in trust for Ketcham's benefit.

FIRST AMENDED COMPLAINT - 9

37. Had May withdrawn his "package bid" altogether, or simply omitted the Port Moller Property from his "package bid," Ketcham would have taken title to the Port Moller Property in exchange for his $11,743,320 credit bid or via foreclosure.

38. At all times material hereto May has been aware of valuation data that supports a valuation of the Port Moller Property between nearly $9 million on the very low end, and well above $20 million, on the high end. Neither May nor the Receiver has ever submitted any evidence that could support a $250,000 valuation for the Port Moller Property.

39. Positions taken by the Receiver, together with the lack of cash presently available to the receivership estate, cause it to be unlikely that Ketcham will receive any payment on account of the Receiver's sale of the Port Moller Property to May.

40. At some point after entry of the Sale Order, May appears to have authorized Fish Tank to take title to the Port Moller Property from the Receiver in his stead. On October 16, 2024, a Quitclaim Deed was recorded in the Aleutian Island Recording District at No. 2024-000200-0. On its face, this Quitclaim Deed had the effect of transferring title to the Port Moller Property to Fish Tank.

41. Fish Tank is not a party to the Ketcham Subordination Agreement.

42. At the time May authorized Fish Tank to take title to Port Moller Property in his stead, Ketcham had put May on notice of May's breaches of the Ketcham Subordination Agreement. Fish Tank is an insider of May's, and May exercises control over both it and its property, including the Port Moller Property. Upon information and belief, Fish Tank paid no consideration to May in exchange for May's having authorized Fish Tank to take title to the Port Moller Property in his stead.

//

//

//

//

## IV. CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Breach of Contract

43. Ketcham reasserts and realleges each of the foregoing numbered paragraphs as fully restated herein.

44. The Ketcham Subordination Agreement is a binding and enforceable contract.

45. May's promises to Ketcham represented personal contractual commitments running from May to Ketcham, and included May's personal promise to Ketcham that in no circumstance, including by virtue of a distribution in a receivership, would May receive any value in connection with Port Moller until Ketcham had been paid in full. Ketcham relied upon these promises when he made the Ketcham Loan.

46. May has breached the Ketcham Subordination Agreement by taking actions that impeded, interfered with, restricted and/or restrained Ketcham's exercise of his rights and remedies under the Ketcham Deed of Trust, including, without limitation, pressing forward with his acquisition of the Port Moller Property with knowledge that doing so would deprive Ketcham of his right to take title to the Port Moller Property by credit bid or otherwise, and pursuing a course of action intended to result in the extinguishment of Ketcham's lien against the Port Moller Property without Ketcham realizing reasonable (or any) value.

47. May's breach of the Agreement has harmed Ketcham.

48. Accordingly, Ketcham is entitled to a judgment against May for breach of contract in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### Confirmation of Ketcham's Continuing Priority and Imposition of Lien or Constructive Trust

49. Ketcham reasserts and realleges each of the foregoing numbered paragraphs as fully restated herein.

50. Section 11 of the Ketcham Subordination Agreement provides that May's obligation to recognize Ketcham's priority survives any purported avoidance, invalidation, or disallowance of the Ketcham Deed of Trust.

51. Consistent with the terms of the Ketcham Subordination Agreement, Ketcham is entitled to an order confirming that nothing about the Receivership or the entry of the Sale Order affected May's continuing obligation to acknowledge the priority of Ketcham's rights and interests under the Subordination Agreement and with respect to the Port Moller Property, such that the Ketcham Indebtedness remains, as against May, the senior secured indebtedness with, among other things, priority over May's, Fish Tank's, or their successors' interests in or claims against the Port Moller Property or its proceeds.

52. In keeping with the above, Ketcham is entitled to any of (i) reinstatement of the lien created by the Ketcham Deed of Trust for the purpose of implementing Section 11 of the Ketcham Subordination Agreement, whether the Port Moller Property is held by May or Fish Tank, (ii) imposition of an equitable lien against the Port Moller Property, whether held by May or Fish Tank, and/or (iii) a determination that the Port Moller Property is held in trust for Ketcham's benefit pursuant to the terms of the Ketcham Subordination Agreement.

## THIRD CAUSE OF ACTION

**Void or Voidable Transfer**

53. Ketcham reasserts and realleges each of the foregoing numbered paragraphs as fully restated herein.

54. May's having authorized Fish Tank to take title to the Port Moller Property in his stead constituted a transfer from May to Fish Tank of title, or the right to take title, to the Port Moller Property with actual intent to hinder, delay or defraud Ketcham. At the time of the transfer, May knew that Ketcham had asserted his rights against May under the Ketcham Subordination Agreement; May knew that Fish Tank was not a party to the Ketcham Subordination Agreement; and May knew, and intended, that Fish Tank's taking title to the Port Moller Property in his stead

would hinder, delay, and frustrate the enforcement of Ketcham's contractual remedies with respect to the Port Moller Property.

55. Because Fish Tank's having taken title to the Port Moller Property was a product of a transfer from May made with the intent to hinder, delay and defraud Ketcham, Ketcham is entitled to a determination that the transfer is void or voidable and to the remedies that follow, including, without limitation, an avoidance of the transfer of the Port Moller Property to Fish Tank and/or an award of damages.

### V. PRAYER FOR RELIEF

WHEREFORE, having alleged and claimed the foregoing, Ketcham respectfully requests the following relief:

1. Entry of judgment in favor of Ketcham and against May, in an amount to be proven at trial, including reasonable attorney fees and costs as may be allowed by law or equity;

2. Entry of an order confirming Ketcham's continuing status as the senior secured creditor under the Ketcham Subordination Agreement with, among other things, priority over Ketcham's, Fish Tank's, or their successors' interests in or claims against the Port Moller Property or its proceeds;

3. In keeping with the foregoing, entry of an order effecting any or all of (i) reinstatement of the lien created by the Ketcham Deed of Trust, (ii) imposition of an equitable lien in favor of Ketcham against the Port Moller Property, or (iii) imposition of a constructive trust with respect to the Port Moller Property, to the extent necessary to afford Ketcham an effective remedy;

//

//

//

//

//

FIRST AMENDED COMPLAINT - 13

4. A determination that Fish Tank's having taken title to the Port Moller Property is the product of a transfer from May made with actual intent to hinder, delay or defraud Ketcham in the assertion of his rights under the Ketcham Subordination Agreement and that the transfer was void or voidable, together with the formulation of appropriate remedies, including, without limitation, avoidance of the pertinent transfer(s) and an award of damages; and

5. Such other relief as the Court deems just and proper.

Dated: October 23, 2025                     SNELL & WILMER L.L.P.


By:  *s/Josh Rataezyk*
     *s/Zachary Cooper*
Josh Rataezyk, WSBA No. 33046
Zachary Cooper, WSBA No. 53526
600 University Ave., Suite 310
Seattle, WA 98101
Tel: 206-741-1420
jrataezyk@swlaw.com
zcooper@swlaw.com

Attorneys for Plaintiff John Ketcham

DUNCAN LAW NW, P.S.


By:  *s/Bradley R. Duncan*
Bradley R. Duncan, WSBA No. 36436
PO Box 1620
Coupeville, Washington 98239
Tel: 206-305-4907
bduncan@bduncanlaw.com

Attorneys for Plaintiff John Ketcham

4904-4541-0677