HONORABLE JAMAL N. WHITEHEAD

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9   JOHN KETCHAM, an individual,

10                     Plaintiff,

11          v.

12   RODGER MAY, an individual; and FISH
     TANK, LLC, an Alaska limited liability
13   company,

14                     Defendants.

15

CASE NO. 2:25-cv-01291-JNW

**REQUEST FOR JUDICIAL NOTICE
IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS**

16   TO THE COURT AND ALL PARTIES OF INTEREST:

17          PLEASE TAKE NOTICE that, pursuant to Federal Rule of Evidence 201, Defendants

18   Rodger May and Fish Tank, LLC request the Court take judicial notice of the following

19   documents in connection with Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. Proc.

20   12(b)(6):

21          1.      The April 25, 2024, Order Appointing General Receiver which was entered at Dkt.

22   22 in *Wells Fargo Bank, National Association v. Northwest Fish Company, LLC, et al.*, King County

23   Superior Court Case No. 24-2-08809-1 SEA (the "Receivership Proceeding"), a true and correct

24   copy of which is attached as **Exhibit 1**.

25          2.      The July 30, 2024 Motion for Order:  (1) Approving Bid and Auction Procedures;

26   (2) Scheduling Hearing to Approve Sale of Assets; and (3) Approving Assumption and Assignment

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS - 1
CASE NO. 2:25-cv-01291-JNW

of Executory Contracts, which was filed at Dkt. 141 by the Stapleton Group, Inc., in its capacity as the court-appointed general receiver for Peter Pan Seafoods Company, LLC ("Receiver") in the Receivership Proceeding, a true and correct copy of which is attached as **Exhibit 2**.

3.    The August 21, 2024 Order (1) Approving Bid and Auction Procedures; (2) Scheduling Hearing to Approve Sale of Assets; and (3) Approving Assumption and Assignment of Executory Contracts, which was entered at Dkt. 191 in the Receivership Proceeding, a true and correct copy of which is attached as **Exhibit 3**.

4.    The Receiver's September 19, 2024, Notice of Conclusion of Auction and Determination of Prevailing Bid and Back-Up Bid which was filed at Dkt. 199 in the Receivership Proceeding, a true and correct copy of which is attached as **Exhibit 4**.

5.    Wells Fargo's October 1, 2024, Response to Sale Objections and In Support Of Sale Approval which was filed at Dkt. 241 in the Receivership Proceeding, a true and correct copy of which is attached as **Exhibit 5**.

6.    The October 3, 2024, Order (1) Approving the Prevailing Bidder, the Prevailing Bid and the Terms of the Purchase and Sale Agreement, (2)d Approving the Sale of Assets Free and Clear of Liens, Claims, Security Interests, Encumbrances, and Rights of Redemption, (3) Approving Assumption and Assignment of Executory Contracts, (4) Approving the Back-Up Bid and the Back-Up Bidder, and (5) Granting Related Relief, which was entered at Dkt. 264 in the Receivership Proceeding, a true and correct copy of which is attached as **Exhibit 6**.

7.    The Receiver's November 20, 2024, Omnibus Motion Allowing Claims and Claim Amounts and Establishing Relative Priority of Secured and Other Claims, which was filed at Dkt. 336 in the Receivership Proceeding, a true and correct copy of which is attached at **Exhibit 7.**

8.    The January 8, 2025, Order on the Receiver's Omnibus Motion Allowing Claims and Claim Amounts and Establishing Relative Priority of Secured and Other Claims, which was entered at Dkt. 397 in the Receivership Proceeding, a true and correct copy of which is attached as **Exhibit 8**.

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS - 2
CASE NO. 2:25-cv-01291-JNW

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

Federal Rule of Evidence 201(b) provides that "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)-(2). Federal Rule of Evidence 201(c)(2) provides that "[t]he court: … must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2); *see also* Fed. R. Evid. 201(d) ("The court may take judicial notice at any stage of the proceeding.").

"Courts may take judicial notice of undisputed matters of public record." *Upstream Holdings, LLC v. Brekunitch*, C.A. No. 22-CV-03513-MCS-RAO, 2022 WL 19296350, at *3 (C.D. Cal. Sept. 30, 2022) (citing *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1131-32 (9th Cir. 2012)). This includes "proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *Mahoney v. Holder*, 62 F. Supp. 3d 1215, 1219 (W.D. Wash. 2014) (quoting *Bias v. Moynihan,* 508 F.3d 1212, 1225 (9th Cir. 2007)).

The above-mentioned pleadings are appropriate for judicial notice because they (a) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned (*i.e.*, the King County Superior Court docket) and (b) relate to the allegations in the First Amended Complaint and the arguments raised in Defendants' Motion to Dismiss.

DATED this 19th day of November, 2025.

SUMMIT LAW GROUP, PLLC
*Attorneys for Defendants Rodger May and Fish Tank, LLC*

By s/ Christopher T. Wion
Christopher T. Wion, WSBA #33207
chrisw@summitlaw.com
Molly J. Gibbons, WSBA #58357
mollyg@summitlaw.com
315 Fifth Avenue S., Suite 1000
Seattle, WA 98104-2682
Tel: 206-676-7000

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS - 3
CASE NO. 2:25-cv-01291-JNW

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

# EXHIBIT 1

EXP01

1

2

**FILED**

KING COUNTY, WASHINGTON

3

APR 2 5 2024

4

SUPERIOR COURT CLERK
BY Dustin Zabala
DEPUTY

5

6

7            SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

8  WELLS FARGO BANK, NATIONAL          )
   ASSOCIATION, a national banking     )   Case No. 24-2-08809-1 SEA
9  association, in its capacity as Agent )
                                        )   **ORDER APPOINTING GENERAL**
10              Petitioner,             )   **RECEIVER**
                                        )
11      v.                              )   [Clerk's Action Required]
                                        )
12 NORTHWEST FISH COMPANY, LLC, a       )
   Washington corporation, PETER PAN    )
13 SEAFOOD COMPANY, LLC, an Alaska      )
   limited liability company, ALASKA FISH )
14 HOLDINGS, LLC, a Delaware limited liability )
   company, and RAYMOND MACHINE SHOP, )
15 LLC, a Washington limited liability company, )
                                        )
16              Respondents.            )
                                        )
17 _____ )

18        THIS MATTER having come before the Court upon the motion (the "Motion") of Wells

19 Fargo Bank, National Association, a national banking association, as agent for certain lenders

20 under the Credit Agreement (as defined below) (in such capacity, together with its successors

21 and assigns, collectively, "Agent" or "Petitioner"), a secured creditor of Northwest Fish

22 Company, LLC, a Washington limited liability company, Peter Pan Seafood Company, LLC,

23 an Alaska limited liability company, Alaska Fish Holdings, LLC, a Delaware limited liability

24 company, and Raymond Machine Shop, LLC, a Washington limited liability company

25 (collectively, "Debtors" or "Respondents"), by and through Agent's counsel, Gregory R. Fox

26 of Lane Powell PC, for appointment of a general receiver; due and proper notice of the Motion

27 having been given to all parties entitled thereto; the Court having duly considered the records

ORDER APPOINTING GENERAL RECEIVER - 1

105727.2184/9700547.12

May Notice Exhibits' Page 2

1  and files herein, including the Motion, the Declarations of Gary Harrigian, Gregory R. Fox and

2  David Stapleton, and corresponding exhibits thereto; a show-cause hearing having been held

3  and the Court being fully advised in the premises, the Court hereby finds as follows:

4      A.     Debtors, Agent, and the lender parties thereto from time to time (collectively,

5  "Lenders") entered into that certain Amended and Restated Credit Agreement dated as of July

6  19, 2022 (as amended, modified and supplemented from time to time, the "Credit Agreement";

7  capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto

8  in the Credit Agreement; for the avoidance of doubt, the term "Obligations" as used herein,

9  shall mean the Obligations as defined in the Credit Agreement), pursuant to which Agent and

10  the Lenders made Revolving Loans and extended other financial accommodations to the

11  Debtors. The Revolving Loans and the other Obligations are secured by a first priority security

12  interest granted by Debtors to Agent in substantially all of their personal property assets,

13  including, without limitation, all of Debtors' accounts receivable and other rights to payment,

14  general intangibles, inventory and equipment, and proceeds thereof (collectively, the

15  "Collateral"), pursuant to, and as more fully described in, (i) that certain Amended and Restated

16  Security Agreement dated as of July 19, 2022, among Agent, Debtors, and the other parties

17  party thereto from time to time, (ii) that certain Trademark Security Agreement dated December

18  31, 2020 by Peter Pan Seafood Company, LLC in favor of Agent, filed with the US Patent and

19  Trademark Office on January 4, 2021 at Reel/Frame 7154/040 and (iii) the other security

20  agreements executed in connection with the Credit Agreement (as each such agreements

21  described in subclauses (i) through (iii) are amended, modified and supplemented from time to

22  time, collectively, the "Security Agreements"). Petitioner's security interest in the Collateral is

23  properly perfected. Accordingly, Petitioner has an interest in Respondent's business, assets,

24  and the Collateral that is a subject of the action.

25      B.     The Loan Documents and Bank Product Agreements evidence and govern the

26  Obligations (including, without limitation, the Bank Product Obligations) and the financing

27  relationship among the Debtors and Agent and the Lenders; the Debtors are in default under the

ORDER APPOINTING GENERAL RECEIVER - 2

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

105727.2184/9700547.12

Credit Agreement; the Obligations constitute the legal, valid and binding obligations of the Debtors, enforceable in accordance with the terms of the Loan Documents and Bank Product Agreements; and no offsets, defenses, right of recoupment, or counterclaims to the payment of the Obligations exist, and no portion of the Obligations is subject to avoidance or subordination under applicable law.

C.      The Debtors lack the ability to pay their debts as they come due, or to continue operations in the ordinary course and to maintain and preserve the Collateral.

D.      The Collateral and its revenue producing potential are in danger of being lost or materially injured or impaired.

E.      A receiver is reasonably necessary to protect and preserve and sell the Collateral.

F.      Stapleton Group, Inc. is qualified to act as a general receiver for the Respondent and its assets, including but not limited to the Collateral.

THEREFORE, IT IS HEREBY ORDERED THAT:

1.      Appointment.  Stapleton Group, Inc. (hereinafter referred to as the "Receiver") is appointed as the general receiver with respect to Debtors' operations (the "Business"), assets and all tangible and intangible real and personal property, including but not limited to the Collateral (together, with the Business, the "Assets"), wherever located and with respect to all products and proceeds thereof, with authority to take exclusive possession and control of the Assets pursuant to the terms of this Order and RCW 7.60 *et. seq.* (the "Receivership"). All persons or entities now in possession of any part of the Assets shall deliver immediately to the possession and control of Receiver all rents, profits, proceeds, income, accounts receivable, bank accounts and other income or monies whatsoever relating to the Receivership. The Receiver is an independent, court-appointed fiduciary and shall not be subject to the control of any party to this proceeding but shall be subject only to the Court's direction in the fulfillment of the Receiver's duties.  The appointment of the Receiver shall be effective on the date that the Receiver files the bond required under paragraph 2 below (the "Effective Date").

ORDER APPOINTING GENERAL RECEIVER - 3

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

105727.2184/9700547.12

May Notice Exhibits' Page 4

2.    Bond.  Within five (5) court days following entry of this Order, the Receiver shall execute and file with the Court either cash or a bond in the amount of $20,000.00 with a surety authorized by the Washington Commissioner of Insurance to engage in the business of suretyship in the state of Washington, in favor of the Clerk of the King County Superior Court, on the condition that the Receiver will faithfully discharge the duties of Receiver in this action and obey the orders of the Court herein.  The Receiver is authorized to pay (or be reimbursed for) any premium or other fee of the surety providing such bond from the Assets, as an expense of the Receiver, without further order of this Court.

3.    Schedules.  To the extent the Receiver is unable to meet the deadline to file schedules imposed by RCW 7.60.090, the Receiver shall have an additional thirty (30) days to complete these tasks, provided the Receiver advises Agent that the Receiver requires additional time.

4.    Authority of the Receiver.  Unless and until otherwise ordered by the Court, the Receiver shall be a General Receiver as defined in RCW 7.60.015, and with the power, rights and authority vested in it by RCW 7.60.060.  In addition:

a.    The Receiver is authorized to (i) sell or lease the Assets, whether in bulk, or in parts, and whether as a going concern or by liquidation, and wherever located and to seek adjunct proceedings in other states or jurisdictions in furtherance of such authority, and/or (ii) wind up Debtors' affairs, pursuant to RCW 7.60.260; provided that without the prior written consent of the Agent and notice and a hearing pursuant to RCW 7.60 *et seq*., Receiver shall not (x) sell or dispose of the Assets outside of the ordinary course of business unless the proceeds from the sale of such Assets are sufficient to pay in full the Obligations in accordance with the Credit Agreement and the other Loan Documents, or, in the case of inventory, the proceeds from the sale or other disposition exceed fifty percent (50%) of the cost of inventory, (y) purchase any new machinery or equipment, or (z) discount, sell or otherwise compromise any accounts receivable, where the discount results in payment less than seventy percent (70%) of the subject invoice. Except as otherwise set forth herein, all proceeds from the sale or lease of

ORDER APPOINTING GENERAL RECEIVER - 4

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

105727.2184/9700547.12

Assets (other than any collections projected to be received, retained and used by Debtors in accordance with paragraph 8) shall be paid to Agent and applied in accordance with the terms of the Credit Agreement and the other Loan Documents (including the Permitted Holder Subordination Agreement and any other subordination agreement), the Bank Product Agreements until the Obligations are paid in full in accordance with the Credit Agreement; provided that the Receiver shall obtain court approval after notice and a hearing before distributing to any person other than Agent the proceeds of a sale or lease of Assets outside the ordinary course of business. Subject to the provisions of RCW 7.60.260, the Receiver's sale(s) of the Assets in accordance with this Order shall be effected free and clear of liens and of all rights of redemption, whether or not the sale will generate proceeds sufficient to fully satisfy all claims secured by the Assets. Upon any sale free and clear of liens in accordance with this Order, all security interests and other liens encumbering such Assets shall attach to the proceeds of the sale, net of reasonable expenses incurred in the disposition of such Assets and Receivership expenses allocated to the disposition of such Assets set forth in the Budget, or subject to Agent's prior written consent, in the same order, priority, and validity as any liens had with respect to the property immediately before the conveyance or as otherwise set forth in any subordination agreements.

        b.      The Receiver may, but is not required to, open and maintain such bank accounts and enter into any Bank Product Agreements (and any amendments, supplements or modifications to any Bank Product Agreements) as may be necessary or desirable for the deposit of monies collected or received by the Receiver, and may use the Debtors' EIN(s) to open any bank accounts in the Debtors' name or enter into any Bank Product Agreements (and any amendments, supplements or modifications thereto) in the Debtors' name or otherwise. The deposits or proceeds of deposits deposited in Debtors' bank accounts may be transferred to the Receiver's account. To the extent that any account is opened by the Receiver in its name, the account, the proceeds therein and any Bank Product Obligations shall be subject to the security interest of Agent, without the need for Agent to take any further action to perfect its

ORDER APPOINTING GENERAL RECEIVER - 5

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

May Notice Exhibits' Page 6

1    security interest; provided, however, that the Receiver shall execute any document reasonably

2    requested by Agent to ensure the perfection of the security interest in its favor.

3          c.     Subject to the Budget, the Receiver, in the performance of the Receiver's

4    duties, may employ such persons as the Receiver deems appropriate, including current

5    employees of Debtors, in connection with the Receiver's management and operation of the

6    Business and the sale of Assets. All such persons, including any persons who may also be

7    directors, officers or employees shall be subject to the management and direction of the

8    Receiver in connection with their performance of any duties associated with such employment

9    by the Receiver. The Receiver shall be free at all times to terminate the employ of any such

10   person.

11         d.     The Receiver is authorized, but not required, to bring and prosecute

12   actions for the recovery of Assets in the possession of third parties and for collection of any

13   sums now or hereafter owing to Debtors or the Receiver. The Receiver may undertake its

14   collection duties in Debtors' and/or the Receiver's name in assisting him with the collection of

15   Debtors' uncollected accounts receivable and other claims. Subject to paragraph 4(a), the

16   Receiver may alter the place of payment, settle, compromise, and otherwise take all actions

17   necessary to collect all outstanding accounts receivable of Debtors, without further order of the

18   Court and to liquidate all other Assets, including without limitation, notifying account debtors

19   to pay the Receiver directly the proceeds of all outstanding accounts receivable. A copy of this

20   Order may be remitted to account debtors and may be relied upon by account debtors as

21   authority to pay the Receiver solely and directly. Any account debtor who makes payment to

22   the Receiver shall have full credit in the amount of such payment with respect to its obligations

23   owing to Debtors.

24         e.     The Receiver shall have the power to do all things which the owner of

25   the Assets might do in the ordinary course of business as a going concern or use of the Assets

26   including but not limited to, and without further order of the Court, subject to the Budget (as

27   amended from time to time with the written consent of Agent), the purchase or acquisition of

ORDER APPOINTING GENERAL RECEIVER - 6

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

105727.2184/9700547.12

1  such goods, materials, services and supplies as the Receiver deems to be necessary or

2  appropriate to preserve and protect the Assets.  Payment of expenses incurred in the ordinary

3  course of the Business, including but not limited to payroll, payroll taxes, employee benefits,

4  property maintenance and management, as applicable, utilities, insurance, taxes, landscaping,

5  janitorial services, and maintenance the Assets shall not require prior approval of the Court,

6  provided that such expenses are consistent with the Budget.

7          f.      The Receiver, without further order of the Court, in its sole discretion, is

8  authorized to perform or contract for accounting, consulting and tax services with respect to the

9  Business, as necessitated by this proceeding or as may be required by law in the performance

10  of the Receiver's duties.

11          g.      The Receiver, in its discretion, may delegate performance of certain of

12  the Receiver's clerical and accounting duties and functions, and may employ such attorneys or

13  other professionals as the Receiver may require in connection with the proper performance of

14  the Receiver's duties.  The Receiver will obtain Court approval of employment of attorneys and

15  other professionals as required by RCW 7.60 *et. seq.*

16          h.      The Receiver is authorized to make such repairs, replacements,

17  alterations or improvements to the Assets as the Receiver determines to be prudent or necessary.

18  Unless otherwise ordered by the Court, the Receiver is not obligated to undertake, and will have

19  no liability for any remediation or cleanup with respect to hazardous materials presently

20  existing under, on or about any real property used, occupied or operated by Debtors.

21      5.    Investigation. The Receiver, to the extent that sufficient funds are available, may

22  investigate the Business, financial condition and other circumstances and prospects of operating

23  the Business or disposing of the Assets by sale or lease and shall, subject to the terms of this

24  Order, be authorized without further order of this Court, to have the exclusive power and

25  authority to manage, operate, lease, maintain and control the Assets.

26      6.    Records Systems. The Receiver shall establish and maintain such accounting,

27  bookkeeping and record-keeping systems as the Receiver determines to be advisable in the

ORDER APPOINTING GENERAL RECEIVER - 7

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

105727.2184/9700547.12

1    Receiver's business judgment in connection with its operation and management of the Business

2    and Collateral.

3        7.    Continuing Validity of Credit Agreement, the Other Loan Documents and the

4    Bank Product Agreements. Except as otherwise specifically set forth in this Order, Receiver

5    and the Debtors shall remain bound at all times by the terms and conditions of the Credit

6    Agreement, the other Loan Documents and the Bank Product Agreements (including, for the

7    avoidance of doubt, the cash management, corporate credit card and merchant banking services

8    agreements that any Debtor is a party to with Agent and certain of Agent's affiliates).

9        8.    Use of Cash Collateral. Agent holds a first priority perfected security interest

10   against substantially all the personal property assets of Debtors, including, but not limited to,

11   the Cash Collateral (as defined below). In order to prevent immediate and irreparable harm to

12   Debtors' Assets, until the Termination Date (as defined below), all Cash Collateral shall be

13   turned over to Agent for application in accordance with paragraph 9 or as otherwise agreed to

14   by Agent. As used herein, "Cash Collateral" has the meaning set forth in 11 U.S.C. § 363(a)

15   with respect to all Assets in which Agent has an interest, including all deposits subject to setoff

16   rights in favor of Agent, and all cash arising from the collection or other conversion to cash of

17   the Assets.  The Receiver is authorized and directed to remit all Cash Collateral in its possession

18   or under its control to Agent promptly (but no less frequently than daily) upon receipt thereof

19   in order to reduce the outstanding amount of the Obligations (including the Receiver

20   Obligations (defined below)). Agent shall apply such Cash Collateral in accordance with the

21   terms of the Loan Documents, the Bank Product Agreements and this Order.

22       9.    Receiver's Authority to Incur Indebtedness.  Receiver is authorized to incur

23   additional Revolving Loans, Bank Product Obligations and all other Obligations in respect of

24   the foregoing pursuant to the terms of the Credit Agreement, the other Loan Documents, the

25   Bank Product Agreements, and the other terms hereof, subject to the approval of Agent in its

26   sole and absolute discretion, and solely to pay the amounts set forth in a budget to be prepared

27   by Receiver and approved by Agent in its sole discretion (as the same may be amended or

ORDER APPOINTING GENERAL RECEIVER - 8

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

105727.2184/9700547.12

otherwise modified as agreed to in writing by Receiver and Agent, the "Budget") or such other amounts as Agent may agree, as and when such amounts are due and payable (such Revolving Loans, the "Receiver Advances"; such Receiver Advances, Bank Product Obligations incurred after the date hereof, and other such Obligations incurred after the date hereof, the "Receiver Obligations"; and the outstanding amount of "Receiver Obligations" owing as of any date of determination, the "Agent Priority Amount"). Receiver is further authorized to enter into such amendments and modifications to the existing Loan Documents and Bank Product Agreements, and such financing statements, mortgages, instruments and other documents as Agent may request, in order to evidence such additional Revolving Loans and other Receiver Obligations. All Receiver Obligations shall be entitled to a first and paramount security interest and lien against the Business and Collateral (the "Agent Receivership Financing Lien"). All such Receiver Advances shall be deemed to be Revolving Loans under the Credit Agreement and subject to the terms thereof (including, without limitation, the settlement provisions set forth in Section 2.2(e)); provided, however, (x) if and to the extent the aggregate amount of Receiver Advances advanced in any week exceeds 120% of an amount equal to the aggregate amount of disbursements projected in the Budget to be made during such week, or (y) during the period commencing on the Effective Date and ending on the date Agent has approved in writing a proposed budget to constitute the "Budget" for purposes of this Order (such period, the "Initial Period"), which Initial Period shall not exceed ten (10) days, the Receiver may request Receiver Advances solely to pay critical expenses up to an aggregate amount not to exceed $5,000,000 for such Initial Period necessary to preserve and protect the Assets (in the determination of Receiver and Agent) and payroll to the extent required to be paid during such Initial Period, such excess Receiver Advances described in the foregoing subclauses (x) and (y) shall be deemed to constitute Protective Advances (under and as defined in the Credit Agreement) and will be for Agent's sole and separate account and not for the account of any Lender. Any proceeds generated from the sale, lease or other disposition of Assets (including all Cash Collateral) shall be applied as follows: (i) first, to repayment of all Obligations (excluding Bank

ORDER APPOINTING GENERAL RECEIVER - 9

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

105727.2184/9700547.12

May Notice Exhibits' Page 10

Product Obligations but including Receiver Obligations) up to an amount not to exceed the Agent Priority Amount, (ii) second to the payment of costs, and those amounts due pursuant to paragraph 12 herein to the extent consistent with the Budget, (iii) third, to repayment of all Obligations (excluding Bank Product Obligations) not already paid pursuant to clause (i) above, (iv) fourth, to repayment of all Bank Product Obligations, and (v) fifth to Debtors' other secured and unsecured creditors in accordance with the respective order or priorities of such creditors under applicable law; provided, however, for the avoidance of doubt, any repayment of the Obligations pursuant to the foregoing shall be applied as follows: (1) first, to repayment of all Obligations (other than Receiver Obligations and Bank Product Obligations) in the manner and order as provided in the Credit Agreement, (2) second, to the repayment of all interest, fees, costs and other charges relating to Receiver Advances made after the date hereof, (3) third, to the repayment of Receiver Advances made after the date hereof, (4) fourth, to the repayment of all other Receiver Obligations (including any Bank Product Obligations incurred after the date hereof), and (5) fifth, to the repayment of all other Obligations (including any Bank Product Obligation). Prior to making a distribution to any creditor (other than distributions in respect of Receiver Obligations and in respect of the Obligations), Receiver shall independently analyze the documents and filings of such creditor to ascertain and verify (a) the validity, priority, and extent of such creditor's claimed security interest in the Assets or claimed priority status; and (b) the amount of such creditor's claim. All such distributions to creditors (other than distributions in respect of the Obligations (including without limitation the Receiver Obligations)) are subject to prior approval of the Court.

     a.    Receiver shall not, without Agent's prior written consent, or the prior payment and satisfaction in full of the Obligations (including all Receiver Obligations) in accordance with the terms of the Credit Agreement and this Order: (a) grant or impose, or request that the Court grant or impose, liens on or security interests in any Asset equal or superior to Agent's liens on and security interests in such Assets (including Agent's Receivership Financing Lien); (b) incur or seek to incur debt secured by such liens or security

ORDER APPOINTING GENERAL RECEIVER - 10

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

105727.2184/9700547.12

May Notice Exhibits' Page 11

interests described in subclause (a) or which is given superpriority administrative expense status, (c) use Cash Collateral other than as provided in this Order; or (d) modify or affect any Agent's rights under this Order, the Credit Agreement, the other Loan Documents, or the Bank Product Obligations. Furthermore, Receiver may not seek to impose any other claim or surcharge of any cost of administration of the Receivership against the Collateral or Agent (except as expressly set forth in paragraph 13).

b. Measured as of the last day of the first week after the Effective Date and the last day of each week thereafter, the Receiver shall not permit (i) the aggregate amount of all disbursements made during the Measurement Period ending on such day to exceed one hundred and ten percent (110%) of the budgeted amount of disbursements set forth in the Budget for such Measurement Period, or (ii) the aggregate amount of all receipts during the Measurement Period ending on such day to be less than ninety (90%) of the budgeted amount of receipts set forth in the Budget for such Measurement Period. As used herein, "Measurement Period" shall mean (i) the period of one week ending on Sunday of the first full week after the Effective Date, (ii) the period of two consecutive weeks ending on Sunday of the second full week after the Effective Date, (iii) the period of three consecutive weeks ending on Sunday of the third full week after the Effective Date and (iv) each period of four consecutive weeks ending on Sunday of the fourth full week after the Effective Date and on Sunday of each week thereafter.

c. Unless extended by the Court this Order and Receiver's authorization to use Cash Collateral pursuant to this Order and incur additional Revolving Loans will automatically terminate on the Termination Date without further notice or order of Court. The "Termination Date" means the earliest to occur of: (i) October 31, 2024; (ii) notice from Agent (which notice may be given for any reason in Agent's sole discretion) or (iii) further Court order. Upon the Termination Date, without further notice or order of the Court, at Agent's election: (1) the Obligations, including all Receiver Obligations incurred by Receiver, shall be

ORDER APPOINTING GENERAL RECEIVER - 11

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

105727.2184/9700547.12

immediately due and payable; (2) Agent shall be entitled to apply or set off any cash in such Agent's possession or control to the Obligations in accordance with the Credit Agreement, until such Obligations are indefeasibly and finally paid in full in accordance with the Credit Agreement; and (3) Receiver shall be prohibited from using any Cash Collateral for any purpose other than application to the Obligations in accordance with the Credit Agreement, the other Loan Documents, the Bank Product Agreements and this Order, until such Obligations are indefeasibly and finally paid in full in accordance with the Credit Agreement.

       d.      Neither Agent, any Lender nor any of the Collateral shall be subject to the doctrine of marshaling.

10.    <u>Receiver's Compensation</u>. The Receiver is authorized to pay itself compensation, including for pre-petition work preparing for its appointment, at its current regular hourly rates, including the rates of $545 per hour for David Stapleton, President, $545 per hour for David Kieffer, Senior Managing Director, $545 per hour for Neal Gluckman, Senior Managing Director, $495 per hour for Jake DiIorio, Managing Director, and between $175 and $495 per hour for other positions at their current regular hourly rates as needed, and to reimburse the Receiver's expenses as set forth in the Budget and pursuant to paragraphs 12-13 below.

11.    <u>Professionals/Attorneys</u>. The Receiver may retain attorneys, accountants, investment bankers, and other professional service providers to assist the Receiver in carrying out its duties and obligations. The law firm of Schwabe, Williamson & Wyatt is hereby authorized and appointed to act as attorneys for the Receiver and, subject to paragraph 12-13 below, shall be paid for all services at their standard hourly rates, not to exceed $695 per hour. Should the Receiver conclude that it is in the best interests of the receivership estate to retain additional legal counsel or other professionals, the terms thereof shall be established by separate motion pursuant to RCW 7.60.180.

ORDER APPOINTING GENERAL RECEIVER - 12

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

105727.2184/9700547.12

12.    <u>Payment of the Receiver's and Professionals' Fees and Costs</u>.  Following the Effective Date and Agent's approval of a Budget, the Receiver is authorized to disburse funds from the Receivership estate, including, without limitation, the Collateral, as payment for its fees and costs and for the fees and costs of its professionals, including for pre-petition work preparing for appointment, on a periodic basis and solely to the extent set forth in the Budget, but in any event not more than monthly, as follows:

a.    The Receiver shall file with the Court a notice of compensation the Receiver and of professionals (the "<u>Compensation Notice</u>") and serve such Compensation Notice, together with a reasonably detailed description of the relevant time periods, services rendered, and amount of compensation requested on: (i) Agent, (ii) Debtors, (iii) all persons that have requested notice in the Receivership; and (iv) any person that has, to the Receiver's actual knowledge, asserted any lien against the Assets.  If no person objects to the proposed disbursement within ten (10) calendar days following the date of service of the Compensation Notice, the proposed disbursement shall be deemed approved as being fully and finally earned without further order or leave of the Court.

b.    If any person wishes to object to a proposed disbursement described in the Compensation Notice, or any portion thereof, such person shall deliver a written objection to the Receiver, and its counsel, that details the nature of the objection within the ten-day objection period set forth above.  If the Receiver or affected professionals cannot consensually resolve the dispute with the objecting person or if the dispute is not resolved within thirty (30) days of the date of the objection, the objecting party may file a motion with the Court to resolve the objection.  If the objecting party does not file such motion within forty-five (45) days after the date of service of the Compensation Notice, the objection will be deemed withdrawn and the Receiver may pay itself and all other professionals as set forth in the Compensation Notice.

c.    In the event of a Termination Date pursuant to paragraph 9 above, or if the Receivership estate is without sufficient liquid cash funds to defray on a current basis the reasonable fees and costs earned and incurred by the Receiver and its professionals and the

ORDER APPOINTING GENERAL RECEIVER - 13

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

105727.2184/9700547.12

expenses of the Receivership or any of the projected future fees, costs, and expenses of the Receivership, and Agent elects not to advance such funds, good cause for termination of the Receivership shall be deemed to exist and, upon application by the Receiver and/or any of its professionals, establishing such lack of funding for the Receivership, the appointment of the Receiver and/or its professionals shall be terminated and control over the Assets shall revert back to the Debtors, subject to existing liens in the same order, priority, and validity, or the Assets shall be distributed as the Court may then direct.

d.    Any secured creditor who receives notice of the Receivership pursuant to RCW 7.60.200 and fails to seek the removal of the Receiver or dismissal of the Receivership, within thirty (30) days following the date upon which notice is mailed to creditors, shall be deemed to have consented to the Receivership only for the purposes of RCW 7.60.230(l)(b); provided, however, that pursuant to the provisions of this Order and the applicable provisions contained in RCW 7.60 *et seq.*, any secured creditor shall have the right to object to the amount of any administrative expenses, including, without limitation, the fees, charges and expenses of the Receiver, its attorneys and other professional persons, entitled to priority over the claims of such secured creditor pursuant to RCW 7.60.230(1)(b).

13.    Surcharging Lien. Pursuant to RCW 7.60.230(1)(b), the approved fees and costs of the Receiver and its attorneys or other professionals employed by it pursuant to the authority granted by this court, together with all other necessary and reasonable expenses incurred by the Receivership in connection with preserving, protecting or disposing of Assets, solely to the extent consistent with the Budget, shall be a first and paramount surcharging lien against the Assets, with priority over all other persons claiming an interest in or lien upon the Assets (the "Receiver Lien"), with the exception of any liens in favor of Agent securing the Obligations up to an amount not to exceed the Agent Priority Amount. Agent consents to the use of its Cash Collateral for the approved costs and fees of the Receiver, its counsel and employees solely in the amounts set forth in the attached Budget or such amended Budget as may be agreed to in advance in writing by Agent.

ORDER APPOINTING GENERAL RECEIVER - 14

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

105727.2184/9700547.12

May Notice Exhibits' Page 15

14.    Receiver Reports.  The Receiver shall file with the Court a monthly report of the Receiver's operations and financial affairs of Debtors in accordance with RCW 7.60.100.  Each report of the Receiver shall be due by the last day of the subsequent month and shall include the following:

a.    A balance sheet;

b.    A statement of income and expenses;

c.    A statement of cash receipts and disbursements;

d.    A statement of accrued accounts receivable of the Receiver, which shall disclose amounts considered to be uncollectable; and

e.    A summarized statement of accounts payable of the Receiver, including professional fees.

The first such report shall be due on the last day of the month following entry of this Order, for the period after the Receivership is commenced.

In addition to the statutory reporting requirements, the Receiver shall supply Agent with:

aa.    No later than Wednesday of each week, the Receiver shall supply Agent with (i) an updated proposed budget for the upcoming 13 week period (or such other period as may be required by Agent) in form and substance satisfactory to Agent (it being understood and agreed that such proposed budget shall not constitute the "Budget" for purposes of this Order until agreed to in writing by Agent) and (ii) a variance report setting forth Budget-to-actual comparisons on a week-by-week basis;

bb.    a weekly Borrowing Base Certificate no later than Wednesday of every other week, and monthly, not later than the 15th day of each month, together with weekly or monthly, as applicable, aging of accounts report, sales journals, cash receipts journals, schedules of credits issued, perpetual inventory reports including aging of inventory, aging of accounts payable as of week-end or month-end, as applicable, and bank statements;

ORDER APPOINTING GENERAL RECEIVER - 15

105727.2184/9700547.12

May Notice Exhibits' Page 16

1     cc. copies of all reports filed with the Court; and

2     dd. any other documents or information that Agent may reasonably request.

3   15. Executory Contracts and Unexpired Leases. The Receiver is authorized to

4 assume or reject executory contracts and unexpired leases of Debtors, as the Receiver deems to

5 be in the best interests of the creditors generally, provided such assumption or rejection shall

6 require a further order of this Court upon appropriate notice to the parties in accordance with

7 RCW 7.60.130.

8   16. Abandonment. In accordance with RCW 7.60.150, the Receiver, upon order of

9 the Court following notice and a hearing, and upon the conditions or terms the Court considers

10 just and proper, may abandon any estate property that is burdensome to the Receiver or is of

11 inconsequential value or benefit. Property that is abandoned shall no longer constitute estate

12 property.

13   17. Services/Tax Returns. The Receiver is authorized to perform and/or direct

14 performance of legal, accounting, consulting and tax services with respect to the Assets, as

15 necessitated by this proceeding or by law in connection with the performance of the Receiver's

16 duties. Subject to the availability of funds and solely to the extent set forth in the Budget, the

17 Receiver shall cause to be paid when due all taxes and withholdings, and all workers'

18 compensation, industrial insurance or similar premiums or payments, which any Debtor incurs

19 and becomes obligated to pay after the Effective Date as regards the Business or Collateral.

20 Nothing in this Order shall be construed as imposing any liability on the Receiver for: (a) any

21 taxes, of any kind, which accrued prior to the date of the entry of this Order, and (b) any

22 obligations of any Debtor arising prior to the date of the entry of this Order. The Receiver shall

23 have no obligation to file tax returns on behalf of any Debtor.

24   18. Preservation of Licenses. The Receiver in its sole discretion is authorized to

25 acquire or renew, or seek reinstatement of all governmental licenses, permits or other

26 authorizations, either in the Receiver's name or in the name of Debtors, pertaining to the

27 Collateral or any aspect of the Business, and all licenses, permits or other authorizations held

ORDER APPOINTING GENERAL RECEIVER - 16

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

105727.2184/9700547.12

May Notice Exhibits' Page 17

1    by Debtors shall be deemed to automatically transfer to the Receiver.

2        19.    Insurance.  The Receiver in its sole discretion is authorized to review all existing

3    insurance coverage with respect to the Assets and to procure and/or maintain such insurance as

4    the Receiver deems to be necessary to preserve and protect the Assets.  With respect to any

5    insurance coverage in existence or obtained, the Receiver shall be named as an additional

6    insured on the policies for the period of the Receivership.  If sufficient insurance coverage does

7    not exist, the Receiver shall procure sufficient all-risk and liability insurance on the Assets

8    (excluding earthquake and flood insurance) provided, however, that if the Receiver does not

9    have sufficient funds to do so, the Receiver shall seek instructions from the Court with regard

10   to adequately insuring the Assets.  The Receiver shall not be responsible for claims arising from

11   the lack of procurement or inability to obtain insurance.

12       20.    Preservation of Assets.  Unless and until otherwise ordered by the Court, and

13   except as otherwise expressly provided by this Order or by other order of this Court, the

14   Receiver is authorized to do all other things determined by the Receiver to be reasonably

15   necessary or incidental to the performance of the Receiver's duties, for the purpose of

16   protecting, enhancing and preserving the Assets.

17       21.    No Receiver Liability.  No obligation incurred by the Receiver in the good faith

18   performance of the Receiver's duties, whether pursuant to contract, by reason of any tort, or

19   otherwise, shall be the Receiver's personal obligation.  Rather, the recourse of any person or

20   entity to whom the Receiver becomes obligated in the good faith performance of the Receiver's

21   duties shall be solely against the Assets.  Notwithstanding any provisions of this Order which

22   may be construed otherwise, the Receiver shall not be required to expend any of its own funds

23   to comply with any of the provisions of this Order.

24       22.    Duty of Cooperation.  Each Debtor, and its officers, directors, managers,

25   employees, agents, accountants and attorneys, shall cooperate with the Receiver in connection

26   with the Receiver's assumption and performance of the Receiver's duties, so as to enable the

27   Receiver to assume and perform the Receiver's duties without jeopardy to the Assets, and each

ORDER APPOINTING GENERAL RECEIVER - 17

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

105727.2184/9700547.12

1   Debtor, and its officers, directors, managers, employees, agents, accountants and attorneys are

2   hereby prohibited from taking any act for or on behalf of any or all of the Debtors without the

3   prior written consent of the Receiver.  Each Debtor and its directors, officers, managers,

4   employees, agents, accountants and attorneys shall provide the Receiver promptly upon request

5   with all documents and records (including but not limited to financial records) and all

6   information and with access to the Assets, and all employees of such Debtor (both within or

7   without the state of Washington), which the Receiver at any time may request from it, though

8   none of the foregoing shall be required to expend any funds in complying with these provisions.

9   Debtors and their directors, officers, managers, employees, agents, accountants and attorneys

10  are hereby enjoined from obstructing, delaying or interfering with the Receiver in the

11  performance of the Receiver's duties and from in any way, manner, or means, wasting,

12  disposing of, transferring, selling, assigning, pledging, canceling, concealing, or hypothecating

13  any portion of the Assets and any of the books, records, computer hardware and software,

14  money, accounts, stocks, bonds, assets, notes, funds, accounts receivable, or other assets,

15  whether real, personal, tangible, intangible or mixed, wherever situated, belonging to, owned

16  by, in the possession of or claimed by the Debtors or Receiver.

17      23.    No Appraisal or Inventory Required.  The Receiver is excused from seeking an

18  independent professional appraisal of the Assets or filing an inventory, absent a further order

19  of this Court and unless necessary to support the Receiver's proposed sale or disposition of

20  Assets.

21      24.    Utilities.  Any utility company providing services to Debtors, including gas,

22  electricity, water, sewer, trash collection, telephone, communications or similar services, shall

23  be prohibited from discontinuing service based upon unpaid bills incurred by Debtors.  Further,

24  such utilities shall transfer any deposits held by the utility to the exclusive control of such

25  Receiver and be prohibited from demanding that the Receiver deposit additional funds in

26  advance to maintain or secure such services.

27

ORDER APPOINTING GENERAL RECEIVER - 18

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

105727.2184/9700547.12

1  25. <u>Mail</u>.  Receiver may issue demand that the U. S. Postal service grant exclusive

2 possession and control of mail including postal boxes as may have been used by Debtors, and

3 may direct that certain mail related to Debtors and the Assets be redirected to Receiver.

4  26. <u>Consent</u>.  The Debtors, all other persons duly notified of this Order, and any

5 other person contemplated by RCW 7.60.190, shall be bound by the terms of this Order;

6 *provided, however*, creditors whose rights are affected by the terms of this Order shall have

7 thirty (30) days following the date of its entry to note an objection with the Court and seek

8 revision of any term of this Order that impairs such person's rights, to the extent such term

9 conflicts with RCW 7.60 *et. seq*., which objection shall be served on Agent, the Receiver and

10 other parties in interest, with an opportunity for such parties to respond and be heard.

11  27. <u>Further Construction</u>.  If the Receiver is at any time uncertain as to the scope of

12 the Receiver's authority or as to any matter affecting or relating to the performance of the

13 Receiver's duties, the Receiver shall be free to seek and obtain instructions from this Court with

14 respect to such matters upon motion and notice to the parties.  The Receiver at any time may

15 apply for a modification of this Order or for further powers, if such a modification or further

16 powers are considered by the Receiver to be necessary for the performance of the Receiver's

17 duties or for the preservation or protection of the Assets.

18  28. <u>Discharge/Final Report</u>.  The Receiver shall continue to perform the duties

19 provided for by this Order until the Receiver is discharged by order of this Court.  Upon

20 distribution or disposition of all property of the estate, or the completion of the Receiver's duties

21 with respect to estate property, the Receiver shall move the Court to be discharged.  The

22 Receiver shall file a final report and accounting setting forth all receipts and disbursements of

23 the estate which shall be annexed to the petition for discharge and filed with the court.  Upon

24 approval of the final report, the court shall discharge the Receiver and exonerate the Receiver's

25 bond.  The Receiver's discharge shall release the Receiver from any further duties and

26 responsibilities as receiver under RCW 7.60 *et. seq.*

27

ORDER APPOINTING GENERAL RECEIVER - 19

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

105727.2184/9700547.12

29.     Jurisdiction.  This Court shall retain jurisdiction over any disputes arising from the Receivership, or relating to the Receiver, which jurisdiction shall be exclusive and shall survive the termination of the Receivership.

30.     Ancillary Receiverships.  The Receiver may commence an ancillary action in any jurisdiction the Receiver deems necessary to fulfill its duties hereunder, and Washington's Receivership Act (RCW 7.60 et seq.) shall apply in any such ancillary receivership action.

31.     Stay of Actions. In accordance with RCW 7.60.110, the entry of this Order appointing a general receiver with respect to the Debtors and Assets shall operate as a stay of the following acts, applicable to all persons except as provided in paragraph 32 below, until this receivership is terminated, until and unless such person seeks and obtains affirmative relief from this Court:

a.     The commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the persons over whose property the Receiver is appointed or any Assets that was or could have been commenced before the entry of the order of appointment, or to recover a claim against the person that arose before the entry of the order of appointment;

b.     The enforcement against the persons over whose property the Receiver is appointed, or any Assets of a judgment obtained before the order of appointment;

c.     Any act to obtain possession of the Assets from the Receiver, or to interfere with, or exercise control over, Assets, including, without limitation, any act to terminate any unexpired contract or lease;

d.     Any act to create, perfect, or enforce any lien or claim against the Assets except by exercise of a right of setoff, to the extent that the lien secures a claim against the person that arose before the entry of the order of appointment; or

e.     Any act to collect, assess, or recover a claim against the persons over whose property the Receiver is appointed or any Assets that arose before the entry of the order of appointment.

ORDER APPOINTING GENERAL RECEIVER - 20

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

105727.2184/9700547.12

May Notice Exhibits' Page 21

1      32.   <u>No Agent Stay</u>.   This Order shall not stay or otherwise impact Agent's

2 enforcement of its security interest in the Collateral and rights under the Security Instruments.

3      ENTERED this _2 5_ day of April, 2024.

4

5                              ~~JUDGE~~ COURT COMMISSIONER

6 Presented by:                        **HENRY H. JUDSON**

7 LANE POWELL PC                 **APR 2 5 2024**

8                           **COURT COMMISSIONER**

9 By _/s/Gregory R. Fox_
   Gregory R. Fox, WSBA No. 30559

10    James B. Zack, WSBA No. 48122
Attorneys for Petitioner Wells Fargo Bank,

11 National Association

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

ORDER APPOINTING GENERAL RECEIVER - 21

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

105727.2184/9700547.12

# EXHIBIT 2

Ex Parte: Civil and Other Motions
Hearing Date: August 21, 2024
Hearing Time: 1:30 p.m

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

FOR THE COUNTY OF KING

| | |
|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, a national banking association, in its capacity as Agent,<br><br>               Petitioner,<br><br>   vs.<br><br>NORTHWEST FISH COMPANY, LLC, a Washington corporation; PETER PAN SEAFOOD COMPANY, LLC, an Alaska limited liability company, ALASKA FISH HOLDINGS, LLC, a Delaware limited liability company, and RAYMOND MACHINE SHOP, LLC, a Washington limited liability company,<br><br>               Respondents. | No. 24-2-08809-1 SEA<br><br>RECEIVER'S MOTION FOR ORDER: (1) APPROVING BID AND AUCTION PROCEDURES; (2) SCHEDULING HEARING TO APPROVE SALE OF ASSETS; AND (3) APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS |

## I.    <u>MOTION</u>

The Stapleton Group, Inc. ("<u>Receiver</u>" or "Stapleton Group"), for and on behalf of Respondents Northwest Fish Company, LLC ("<u>NWF</u>"), Peter Pan Seafood Company, LLC ("<u>PPSF</u>"), Alaska Fish Holdings, LLC ("AFH"), and Raymond Machine Shop, LLC ("RMS") (collectively, the "<u>Receivership Estate</u>" or "Respondents"), hereby moves the Court (the

"Motion") for the entry of orders pursuant to RCW 7.60 *et seq*., as follows:

1.    The Receiver moves the Court for immediate entry of the Bid and Auction Procedures Order[1], which includes the following relief:

    a.    Establish dates for the following bid and auction events:

        i.    September 10, 2024 as the Bid Deadline;

        ii.    September 16-17, 2024 as the date of the live auction(s) to be held, if applicable;

        iii.    September 19, 2024 as the date for the filing of the Prevailing Bid Notice, identifying the Prevailing Bidder(s), Prevailing Bid(s), Back-Up Bidder(s) and Back-Up Bid(s);

        iv.    September 25, 2024 as the Objection/Response Deadline (notwithstanding any local rule that would provide for a different response date or time); and

        v.    October 3, 2024 at 1:30 p.m. Pacific time, or as otherwise scheduled by the Court (the "Sale Approval Hearing"), authorizing and approving one or more sales of certain of the assets of the Receivership Estate as identified on Schedule 1 attached hereto ("Assets") and all other transactions set forth in and contemplated in the submitted Purchase and Sale Agreement(s) (the "Sale Approval Order");

    b.    Approve the Bid and Auction Procedures (defined below); and

    c.    Provide that if only one Qualified Bid is received by the Bid Deadline, then the auction and the Sale Approval Hearing may be cancelled by the Receiver, and the Sale Approval Order submitted for approval upon notice

---

[1] Capitalized terms not otherwise defined in this Motion have the meanings ascribed to them in the Bid and Auction Procedures, detailed below.

and hearing.

2.    At the Sale Approval Hearing, the Receiver will ask the Court for entry of the Sale Approval Order which, in addition to other relief, will:

    a.   Authorize the sale of the Assets under the terms and conditions of one or more approved Purchase and Sale Agreements to the Final Buyer(s), free and clear of all liens, claims, encumbrances, and interests ("<u>Liens</u>"), with such Liens attaching to the proceeds of sale to the same extent, priority, and validity as they attached to the Assets;

    b.   Approve the assumption and assignment of executory contracts to the Final Buyer(s);

    c.   Approve the Back-Up Bid and the Back-Up Bidder, if any; and

    d.   Authorize any additional relief consistent with the foregoing and the Bid and Auction Procedures, and as may be necessary to allow the approved transaction to be consummated.

3.    At the Sale Approval Hearing, the Receiver will also request that the Court find:

    a.   That the proposed sale(s) to the Final Buyer(s) is in the best interests of the Receivership Estate, and its creditors; and

    b.   That the proposed sale(s) is being proposed and, if approved, will be consummated in good faith and pursuant to the terms of the approved Purchase and Sale Agreement(s).

This Motion is based upon the records and files herein and the accompanying Declaration of Jake DiIorio ("DiIorio Decl.").

## II.    <u>RELEVANT FACTS</u>

### A.    *Procedural and Factual Background*

AFH is the parent company and sole owner of Respondents PPSF, NWF, and RMS.

DiIorio Decl., ¶ 2. PPSF is an Alaska limited liability company with its principal place of business located in Bellevue, Washington. *Id*., ¶ 3. The Respondents own personal property assets in connection with certain facilities in Alaska and Washington, as well as the real property on which they are sited, for the purpose of processing seafood, distributing its product, storing its product, and supporting operations of fishing fleets based in Bristol Bay and the Aleutian Islands. *Id*., ¶ 4.

The Respondents own three seafood processing facilities, including associated processing equipment and other personal property, not including leased property. The facility located in Dillingham, Alaska is a crucial processing facility that supports over 180 fishing vessels and 30 tenders (which transport products to other processing facilities). *Id*., ¶ 5. The Port Moller facility is the Respondents' newest and most modern processing facility, with $50,000,000 worth of upgrades and renovations completed in 2019. *Id*., ¶ 6. It is known for producing high quality salmon products. *Id*. The King Cove, Alaska facility is the Respondents' largest processing facility, and it houses various essential operations of the Respondents including processing, warehousing, storage, and a fuel facility. *Id.*, ¶ 7. The fuel facility has historically served as critical fuel supply for local residents. *Id*.

The Respondents also own four support facilities, three in Alaska located in Dillingham, Naknek, and Sand Point, and one in Seattle. The Dillingham facility offers a full-service boat yard to support the local salmon fleet. *Id*., ¶ 9. The Naknek facility supports the local fishing fleet with storage, housing, meals, parts stock, and other services. *Id*., ¶ 10. The Sand Point facility operates as a parts stock room and bookkeeping facility. *Id*., ¶ 11. This warehouse facility serves primarily as a receiving and shipping facility supporting the other facilities. The Seattle facility is a warehouse that acts as a primary receiving and shipping facility for the processing facilities. *Id*., ¶ 12.

In addition to the above real property and affixed personal property, the Respondents

also own a wide variety of other personal property. This includes a crab quota, various brand names and intellectual property, an American Fisheries Act permit, inventory, supplies, equipment, general intangibles, and other miscellaneous assets. *Id.*, ¶ 13.

In 2021, the current equity owners acquired the Respondents and their assets from Maruha Capital Investment. *Id.*, ¶ 14. Following this purchase, the Respondents experienced a series of adverse factors that caused reduced performance, strained liquidity, and ultimately caused defaults under its senior credit facility with Petitioner Wells Fargo Bank, National Association ("Wells Fargo"). *Id.*, ¶ 15. In particular, Respondents also experienced significant effects from strains caused to the Alaska seafood industry through changes in consumer spending following the COVID-19 pandemic, competition with foreign competitors, rising costs of fuel and labor, and an increase in interest rates. *Id.*, ¶ 16. Following the 2021 acquisition, the Respondents also engaged in an aggressive expansion, which resulted in an inventory imbalance. *Id.*, ¶ 17. Taken together, the Respondents were unable to meet their financial obligations, resulting in the initiation of this receivership proceeding on April 22, 2024.

B.     *Receiver's Analysis*

On April 25, 2024, the Court appointed the Stapleton Group as the Receiver. Pursuant to the Receivership Order, the Receiver has, among other things, undertaken to determine the nature, location, and value of all assets of the Receivership Estate. Based on its analysis, the Receiver believes that a sale of all of Respondents' Assets is in the best interests of the Receivership Estate, and the creditors. *Id.*, ¶ 19. It is the intention of the Receiver to ensure that all of the Receivership Estate's Assets will be sold following the conclusion of the bid and auction process described herein. The Receivership Estate's Assets provide access to a significant opportunity in a rebounding Alaska seafood market. Moreover, continuing operation of the facilities are crucial to the local economies and the livelihoods of hundreds of

Alaskan fishermen. Because these facilities are capable of continued operations, they will provide significant value to the Receivership Estate upon sale. The Receiver is confident an open, competitive sale process will result in the best realized value to the creditors.

To ensure that the Assets realize the highest value, the Receiver requests that the Court first enter an order approving the Bid and Auction Procedures so that the Receiver may subject the Assets to a competitive bid and auction process. *Id*., ¶ 20. The Receiver has taken certain steps since entry of the Receivership Order to analyze and prepare the Assets for sale, including: (a) engaging the services of Hilco Corporate Finance as the Receiver's investment banker ("Hilco"), (b) identifying and categorizing the Assets from available records, (c) targeting, qualifying, and soliciting prospective buyers, and (d) preparing a buyer data room with data accessible by prospective buyers under non-disclosure agreements. *Id*., ¶ 21. To date, the Receiver's efforts has resulted in solicitations of 58 qualified buyer targets, execution of 19 non-disclosure agreements, and active participation of potential buyers in the data room and other due diligence materials established by the Receiver. *Id*., ¶ 22. Prior to the Receivership, the Respondents hired Hilco in January 2024 to run a going concern process that resulted in Hilco contacting approximately 102 potential buyers, including some of the same parties.

To the best of the Receiver's knowledge, the Liens against the Assets are those alleged by the entities identified in the amended Schedule A filed by the Receiver. (collectively, the "Lien Claimants"). See [cite to filed amended Schedule A], Item 1.

    *C.    Proposed Terms of Sale*

As set forth above, Respondents, by and through the Receiver, seek to sell the Assets through a bid and auction process. Qualified Bidders may bid on some or all of Receivership Estate's Assets in any combination, so there may be multiple Prevailing Bids. The sale(s) of the Assets shall be free and clear of any and all Liens, including but not limited to those alleged

by the Lien Claimants. All Liens, recorded or not as of the date of the closing of the sale(s), shall be released as against the Assets, and shall attach to the proceeds of the sale(s) to the same extent, validity, and priority as they attached to the Assets as of the date of the Receivership.

Pursuant to the Bid and Auction Procedures, each Qualified Bidder will be required to submit both a marked up version and a clean, signed version of a Purchase and Sale Agreement ("PSA"), a form of which will be available for review and use in the data room.  The form PSA will be substantially in the form with terms the Receiver expects will be appropriate and necessary to consummate the sale(s) in accordance with these bid procedures.  As set out in the Purchase and Sale Agreement, the assets to be sold may include, but are not limited to, the Receivership Estate's real property, inventory, equipment, furniture and fixtures, causes of action, prepaid expenses and deposits, intellectual property rights, general intangibles, certain executory contracts and unexpired leases, and other assets (the "Assets").  Certain material terms of the Purchase and Sale Agreement are summarized as follows:

    a) Property to be Sold: The Assets to be purchased include, but are not limited to, the property identified on Schedule 1.

    b) Owners of the Assets: PPSF, NWF, AFH, or RMS, as applicable.

    c) Purchase Price: To be determined as of the Bid Deadline, and subject to increase at the time of the Auction (if any), and as may be subject to additional adjustments for, among other things, prorated expenses, taxes, inventory count reconciliation, and assumption of liabilities.

    d) Assumption and Assignment of Executory Contract and Leases: Respondents will assume and assign the Assumed Contracts (if any) to the Final Buyer(s). Final Buyer(s) shall bear the cost of curing any existing defaults under any Assumed Contract that is assigned to such Final

Buyer(s).

e)  <u>Good Faith Deposit</u>: Qualified Bidders will provide the Receiver with a deposit of ten percent (10.0%) of the cash component of their bids.

f)  <u>Closing Deadline</u>: Not later than October 15, 2024, unless extended by the Receiver in its sole discretion.

g)  Limited representations and warranties from the Receivership Estate. In no event is the Receiver or the Receivership Estate responsible or liable for any costs, expenses, penalties, or other financial considerations resulting from the failure to consummate a sale.

D.  *The Bid and Auction Procedures[2]*

As detailed above, the Receiver believes that it is in the best interests of the Receivership Estate, and the creditors to institute a bid and auction process. Consequently, this Motion seeks entry of an order (the "<u>Bid and Auction Procedures Order</u>") approving certain bid and auction procedures, as set out in Sections 1–6 below (the "<u>Bid and Auction Procedures</u>"):

**1.    <u>Bid Procedures</u>**

(a)  <u>Notice of Bid Procedures</u>. Within five (5) business days after its entry by the Court, the Receiver shall send a copy of the Bid and Auction Procedures Order, by electronic service or regular mail, to:

(i)    all parties who have appeared in this case;

(ii)   all parties who have submitted a proof of claim to the Receiver; and

(iii)  all persons or entities that have expressed an interest to the Respondents or to Hilco in acquiring the Assets and those which the Receiver reasonably believes may have an interest in bidding for the Assets.
The Receiver will also provide a courtesy copy of the Bidding Procedures Order

---

[2] If there is any inconsistency or contradiction between the Bid and Auction Procedures described in this Motion and the Bid and Auction Procedures set forth in the Bid and Auction Procedures Order, the terms of the Bid and Auction Procedures Order shall control.

to those parties who have requested receipt of courtesy copies via email.

(b)     <u>Due Diligence</u>.  Northwest Fish Company, LLC, Peter Pan Seafood Company, LLC, Alaska Fish Holdings, LLC, and Raymond Machine Shop, LLC (collectively, the "Respondents"), by and through their duly appointed general receiver, the Stapleton Group (the "<u>Receiver</u>"), has created a data room and has afforded and, except as otherwise provided in these Bid and Auction Procedures, will continue to afford potential purchasers due diligence access and information as may be reasonably requested and, in the Receiver's business judgment, as the Receiver determines to be reasonable and appropriate upon execution of the Receiver's non-disclosure agreement.  The Receiver and Hilco will coordinate all reasonable requests for additional information and due diligence access from potential purchasers.  Unless otherwise determined by the Receiver in its discretion, the availability of additional due diligence to a Qualified Bidder (defined below) will cease from and after the Bid Deadline (defined below).

(c)     <u>Qualified Bid</u>.  A bid received by the Bid Deadline that meets the requirements in Sections 1 and 2 of these Bid and Auction Procedures is considered a "<u>Qualified Bid</u>." A party submitting a Qualified Bid is a "<u>Qualified Bidder</u>." The Receiver reserves the right to waive noncompliance with any one or more of these requirements and deem any otherwise non-qualifying bid to be a Qualified Bid. A Qualified Bid will be evaluated based upon factors that include, but are not limited to, the following: (a) the purported amount of the Qualified Bid and the Assets subject to the Qualified Bid; (b) the fair, net value to be provided to the Receivership Estate under the Qualified Bid; (c) the ability to close or the likelihood of closing the proposed sale transaction without delay; (d) the ability of the Qualified Bidder to effectively manage the Assets as determined by the sole discretion of the Receiver; and (e) any other factors that the Receiver may deem relevant, in its sole discretion.

(d)     <u>Non-Qualified Bidders</u>.  Any potential bidder that is not designated as a Qualified Bidder in accordance with the foregoing shall be disqualified from further participation in the bidding process ("<u>Non-Qualified Bidder</u>"). A Non-Qualified Bidder will not be permitted to conduct due diligence, make a bid for some or all of Receivership Estate's assets described on Schedule 1 attached hereto ("<u>Assets</u>")[3] under these Bid and Auction Procedures or participate in the Auction (defined below).

---

[3] Nothing in this Motion should be construed to limit the Receiver's ability to sell individual assets outside the context of these bid procedures as permitted by the Receivership Order, the Order Amending the Receivership Order, and/or RCW 7.60 *et. seq*. The Receiver reserves the right to amend Schedule 1 as necessary prior to the auction.

(e)    Purchase and Sale Agreement.  A form of Asset Purchase and Sale Agreement ("PSA" or "Purchase and Sale Agreement") will be uploaded into the data room. All bids must be submitted using the form PSA and include **both** (a) a marked up PSA, compared against the form PSA, **and** (b) a clean, duly executed version of their PSA.

(f)    Bid Deadlines.

(i)    **Bid Deadline:** All bids must be submitted by **12:00 Noon Pacific Time on September 10, 2024 (the "Bid Deadline")**.

(ii)    **Method of Submitting a Bid**: A potential purchaser that desires to make a Qualified Bid shall (a) deliver its marked and clean bid to Teri Stratton at tsratton@hilcocf.com and Kyle Herman at kherman@hilcocf.com at Hilco and (b) deliver copies to David P. Stapleton at peterpan@stapletoninc.com and Lawrence Ream at lream@schwabe.com.

## 2.    **Bid Requirements**

(a)    Assets.  Qualified Bidders may make a bid for all of the Assets or some subset or combination thereof. The Receiver reserves the right, in its discretion, to consider bids for all of the Assets or any combination of the Assets, but is not required to do so.

(b)    Form and Content of Bid. A bid must include:

(i)    A signed PSA from a Qualified Bidder stating that:

(A)    The Qualified Bidder offers to purchase the subject Assets for cash.  The PSA must clearly delineate all components of the proposed purchase price and whether any or all of the subject Assets will be purchased subject to Liens relating to assumed obligations, if any;

(B)    The Qualified Bidder's offer is open and irrevocable through the conclusion of the Sale Approval Hearing and Closing unless (1) extended by agreement of the parties or the terms of these Bid and Auction Procedures, or (2) the Qualified Bid is designated a Back-Up Bid, which shall then remain open until twenty (20) calendar days following the date that the Closing of the Prevailing Bid;

(C)    The Qualified Bidder's offer is a firm offer and is not subject to any additional due diligence, board approval or financing contingency and does not contain any other material conditions to closing, as determined by the Receiver in its sole discretion exercised in good faith;

(D)    If the Qualified Bidder's offer includes the assumption and assignment of any unexpired leases or executory contracts (each, an "Assumed Contract"), the PSA must identify which Assumed Contract(s) the Qualified Bidder wishes to assume, and whether the Qualified Bidder shall be responsible for paying for any and all costs to cure such Assumed Contract at closing or pursuant to any agreement reached between the Qualified Bidder and the counterparty to the relevant Assumed Contract; and

(E)    Financial information for the prospective bidder, including but not limited to, financial statements including the prospective bidder's balance sheet, and most recent three months of bank statements or other financial information sufficient to enable the Receiver, or any other party in interest to determine such bidder's creditworthiness and ability to close a sale of the identified Assets, provided however, determination that the bidder has met this qualification shall be in the sole discretion of the Receiver, which shall be confidential to the Receiver and Receiver's Professionals.

(ii)    To the extent not previously provided to the Receiver, be accompanied by evidence satisfactory to the Receiver, in its sole discretion, that the purchaser is willing, authorized, capable, and qualified (financially, legally, and otherwise), of unconditionally performing all obligations under its PSA in the event that it submits the Prevailing Bid (defined below) at the Auction.

(iii)    Identify the proponent of the Qualified Bid and an officer or representative who is duly authorized in all respects to appear, act on behalf of, and legally bind such proponent (an "Authorized Representative").

(c)    Required Good Faith Deposit. By the Bid Deadline, a Qualified Bidder must deposit with the Receiver a good faith deposit (the "Good Faith Deposit") in the amount of 10% of the cash component of its bid.  The Good Faith Deposit must be made by wire transfer to the Stapleton Group, Receiver (wiring instructions are available upon request).  The Good Faith Deposit will be held

by the Receiver subject to Section 5 (below).

(d)    <u>Rejection of Bid</u>. Notwithstanding the foregoing, the Receiver shall have the discretion and authority to reject any bid if such bid:

(i)    is on terms that are materially more burdensome or conditional than those set out in these Bid and Auction Procedures and the form PSA,

(ii)    requires any indemnification of such Qualified Bidder in its PSA,

(iii)    is not received by the Bid Deadline,

(iv)    includes a non-cash instrument or similar consideration,

(v)    requires any regulatory or other approval that would delay the closing,

(vi)    contains any material conditions to closing,

(vii)    is proposed by an entity that is not in good-standing with local and federal requirements, or that the Receiver, in its sole discretion and business judgment, determines is unlikely to consummate the sale, and

(viii)    is rejected by the Receiver for any other reason subject to the Receiver's sole discretion and business judgment.

(e)    <u>Secured Creditors as Qualified Bidders; Credit Bids</u>.    Subject to the last sentence of this Section 2(e), secured creditors whose claims are **either** (i) not disputed by the Receiver, **OR** (ii) have been allowed by order of the Superior Court prior to the start of the Auction, shall be entitled to participate in the Auction and credit bid the amount of their allowed secured claims with respect to the Assets that secure such claims (a "<u>Credit Bid</u>"), subject to RCW 7.60.260(3).  Such a creditor is a Qualified Bidder for purposes of these Bid and Auction Procedures, unless such bid is rejected pursuant to Section 2 (d)(vii) or Section 2(d)(viii) above. Notwithstanding the foregoing, in order to participate in the Auction the holder of such an allowed secured claim must deliver a letter to the Receiver by the Bid Deadline stating the amount of its Credit Bid, the particular Assets that are the subject of the Credit Bid, and certification that it has the financial ability to satisfy its obligations under RCW 7.60.260(3). Moreover, Credit Bids valued below the Reserve Price (as defined in Section 3(g) below) may be disallowed by the Receiver.

**3.**    **<u>Pre-Auction and Auction Procedures</u>**

(a)    <u>Bid Negotiations</u>.  Upon the receipt of Qualified Bids, the Receiver may, at its

discretion, negotiate with one or more Qualified Bidders regarding the terms of the applicable Qualified Bids.

(b)     Pre-Auction Notice of Highest and Best Bid(s).

(i)     After the Bid Deadline passes, the Receiver will identify the prevailing highest and best Qualified Bid(s) (each a "Highest Pre-Auction Qualified Bid").

(ii)    In the event that there is only one Qualified Bid for one or more of the Assets after the Bid Deadline passes, the Receiver may cancel the auction as to those Assets. If the sole Qualified Bid is for all of the Receivership Estate's Assets and satisfies the [aggregate] Reserve Price of all the Assets, then the Receiver will cancel the Auction and will submit the Highest Pre-Auction Qualified Bid to the Court for approval not later than the Sale Approval Hearing.

(iii)   If more than one Qualified Bid is received for the same Asset(s), then the Receiver shall conduct an auction, as set out below (the "Auction").

(c)     Auction. **The Auction(s), if any, will be conducted on September 16-17, 2024, at 9:00 a.m. Pacific time** at the offices of Schwabe, Williamson & Wyatt, PC, 1420 Fifth Avenue, Suite 3400, Seattle, Washington 98101, or at such other time(s) and location as may be designated by the Receiver. The following procedures shall apply to the conduct of the Auction:

(i)     Qualified Participants. Unless otherwise ordered by the Superior Court overseeing this receivership case (the "Receivership Case"), for cause shown, only Qualified Bidders (and their counsel) are eligible to attend and participate in the Auction (each a "Qualified Participant"). Prior to the start of the Auction the Authorized Representative of each Qualified Participant shall certify, in writing or on the record, as follows:

(A)     Each bid it makes at the Auction shall constitute a binding and legally enforceable contract of the bidder to timely close a purchase of the Assets according to the terms of the bid in the event an order of the Court is entered approving a sale based upon such bid.

(B)     No bids made, whether before or during the Auction, shall be subject to any conditions or contingencies related to due diligence, financing, or any other further approval other than the Authorized Representative present at the Auction.

(C) The Authorized Representative present for the Qualified Participant at the Auction has the full power and authority to act on behalf of and to legally bind the Qualified Participant for any bids made, and any agreements entered into at or in connection with the Auction.

(D) Each Qualified Participant that participates in the Auction shall authorize the Receiver to conditionally accept such bidder's second-highest bid at the Auction as a back-up to the Prevailing Bid, which shall become binding upon and enforceable against such back-up bidder in the event that the Prevailing Bid is not approved by the Court, such Prevailing Bidder fails or otherwise refuses to close its purchase of the Assets for any reason other than a material failure of performance by the Receivership Estate.

(E) That the Qualified Participant has at all times proceeded in good faith in submitting its bids, and has not engaged in any collusion with any other person or bidder with respect to the Auction and related proceedings.

(F) Each Qualified Participant must disclose at or before the Auction, (1) whether the bidder is bidding on its own behalf or on behalf of others, or on behalf of itself and others, (2) if the bidder is bidding other than on its own behalf, the identity of each entity on whose behalf the bidder is acting, and (3) whether the bidder is a party to any agreement limiting the bidders at the auction.

(ii) Only Qualified Participants, including through their counsel, shall be permitted to make any additional bids ("Subsequent Bids") at the Auction.

(iii) Each Qualified Participant that participates in the Auction shall have their Authorized Representative (i) physically present or (ii) via zoom, if pre-approved in writing by the Receiver, for all bidding, with the understanding that the true identity of each Qualified Participant shall be fully disclosed to all other Qualified Participants and that all material terms, including but not limited to the amount, of each bid will be fully disclosed to all other bidders throughout the entire Auction.

(d) The Receiver shall have reasonable discretion with respect to the conduct of the Auction.  Among other things, the Receiver may announce at the Auction

additional procedural rules that it determines to be reasonable under the circumstances (e.g. the amount of time allotted to make subsequent alternative bids, the grouping of Assets into lots, or the allocation of Bids amongst the Assets in each lot) for conducting the Auction so long as such additional rules are not materially inconsistent with these Bid and Auction Procedures and the terms, deadlines, and intent of the Purchase and Sale Agreement(s).

(i)    At the Auction, bidding shall begin with the Highest Pre-Auction Qualified Bid(s). Any Subsequent Bids must be in increments to be established by the Receiver at the Auction, and each such increment must be payable in cash.

(ii)    The Auction, at the discretion of the Receiver, shall be recorded by stenographer or other reliable means of preserving the record of the Auction proceedings, and shall continue in one or more rounds of "open cry," or publicly announced bidding and shall conclude after each participating bidder has had the opportunity, within any time period specified by the Receiver, to submit an additional Subsequent Bid with full knowledge of the then-existing highest bid.

(iii)    For the purpose of evaluating the value of the consideration provided by each Subsequent Bid, the value shall be the net consideration payable to the Receivership Estate.

(iv)    The Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had the opportunity to submit a Subsequent Bid with full knowledge and written confirmation of the then-existing highest bid, signed by the Receiver's counsel and identifying the party or parties making the then highest bid.

(v)    On September 19, 2024, the Receiver shall announce its determination (pursuant to the following paragraph) as to the bidder(s) (the "Prevailing Bidder(s)") submitting the highest and best bid(s) (the "Prevailing Bid(s)"), which shall be submitted to the Court for approval at the Sale Approval Hearing.

(vi)    In determining the Prevailing Bid(s) to submit to the Court for approval, the Receiver, in its sole discretion and in consultation with its professionals, shall determine whether a Subsequent Bid constitutes a higher and better offer than the Pre-Auction Highest Bid. In making that determination, the Receiver may consider any and all factors associated with all Qualified Bids and Qualified Bidders, including but not limited to factors such as the likelihood and ability of the proposed buyer(s) to immediately consummate and timely close the proposed

transactions, other timing issues, employment issues, overall value of the Qualified Bids, the Receiver's business judgment, and any other material factors.

(vii)    If, following the entry of the Sale Approval Order approving a sale or sales to the Prevailing Bidder(s), such Prevailing Bidder(s) fails or otherwise refuses to consummate such sale, then the next highest or best bid shall be deemed as the back-up bid (the "Back-Up Bid" and, such bidder, the "Back-Up Bidder") and the Respondent(s) will be obligated to effectuate a sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without further order of the Court. The Back-Up Bid shall remain open until twenty (20) calendar days following the date that the Sale Approval Order becomes a final, non-appealable order or the Closing of the Prevailing Bid, whichever is later. All Qualified Bids (other than the Successful Bid and the Back-Up Bid) shall be deemed rejected by the Receiver on and as of the date of entry of the Sale Approval Order by the Court.

(e)    The "Final Buyer(s)" shall be the party or parties that submit the Prevailing Bid(s) at the Auction. No bids may be received after the announced conclusion of the Auction.

(f)    Prevailing Bid Notice. If an Auction is conducted, then on September 19, 2024, the Receiver will file with the Superior Court and serve (via email on the parties to the Receivership Case, persons who have filed a notice of appearance in the Receivership Case, and parties to executory contracts or unexpired leases that are to be assumed and assigned pursuant to the sale(s)) a notice identifying the Final Buyer(s), and the amount and other material terms of the Prevailing Bid(s), if any (the "Prevailing Bid Notice"). The Receiver shall also include in the Prevailing Bid Notice disclosure of the Back-Up Bids, as may be applicable. Such Back-Up Bid(s) will be submitted for Court approval in case the Final Buyer(s) fails to close. The Prevailing Bid Notice and Sale Approval Order will provide that, if for any reason the Final Buyer(s) fails to consummate the transaction contemplated by its Prevailing Bid, the Back-Up Bidder will automatically be deemed to be a Final Buyer and will be obligated to consummate the transaction proposed in its Back-Up Bid, without further notice or order of the Superior Court.

(g)    Reserve Price. The Reserve Price, if any, for each Asset shall be set forth in the data room, at the sole discretion of the Receiver. The Receiver may decline to consummate the sale should the Prevailing Bid not exceed the Receiver's designated minimum purchase price (the "Reserve Price").

**4.**    **Superior Court Approval and Jurisdiction**

(a)    The Receiver and the Final Buyer(s) shall each use their commercially reasonable efforts, and shall cooperate, assist and consult with each other, to secure the entry of an order (the "Sale Approval Order"), in form reasonably acceptable to the Receiver and the Final Buyer(s), such acceptance not to be unreasonably withheld, by the Superior Court in the Receivership Case (a) approving the applicable PSA, (b) authorizing the sale of the Assets pursuant to RCW 7.60.260, free and clear of all liens, claims, interests and encumbrances ("Liens"), except as otherwise provided in the PSA, (c) relieving the Final Buyer(s) of any claim of successor liability, (d) authorizing the assumption and assignment of the applicable Assumed Contracts pursuant to RCW 7.60.130, and (e) other appropriate relief.  The Receiver and the Final Buyer(s) shall consult with one another regarding pleadings that either of them intends to file or positions either of them intend to take, with the Superior Court in connection with or that reasonably affect, the Superior Court's entry of the Sale Approval Order. The Sale Approval Order shall further provide that if for any reason a Final Buyer is unable or unwilling to consummate an approved sale because of breach or failure, without legal excuse, to perform on the part of the Final Buyer(s), it (1) will forfeit its Good Faith Deposit to the Receiver and the Receiver may pursue any and all of its options at law and in equity with respect to such breach, and (2) the Qualified Bidder making the Back-Up Bid shall be deemed to be the Final Buyer, the purchase price shall be the amount of such Back-Up Bid, and Responsdent(s) shall be authorized to effectuate the sale(s) without further notice or order of the Superior Court.

(b)    Sale Approval Hearing and Objection Deadline.

(i)    Hearing. A hearing to consider the proposed sale(s) will take place on October 3, 2024, at 1:30 p.m., in the Superior Court for King County, Seattle, Washington (or at another date and time established by the Superior Court) (the "Sale Approval Hearing"). If one or more Final Buyers is selected by the Receiver, the Receiver shall seek the entry of a Sale Approval Order from the Superior Court at the Sale Approval Hearing, authorizing the proposed sale(s) to the Final Buyer(s) on terms and conditions substantially consistent with and in accordance with these Bid and Auction Procedures and the applicable PSA.

(ii)    Objection/Response Deadline. Objections to approval of any proposed sale(s) and entry of the Sale Approval Order(s) (including but not limited to any objection based on any alleged irregularities in the conduct of the Auction) or other responses must be both filed with the Court and served on (A) Schwabe Williamson & Wyatt, PC, 1420 Fifth Avenue, Suite 3400, Seattle, Washington 98101, Attn: Lawrence Ream;

(B) Lane Powell, PC, 1420 Fifth Avenue, Suite 4100, Seattle, Washington 98101, Attn: Greg Fox, and (C) All other parties who have filed a notice of appearance, by not later than 12:00 noon Pacific Time, on September 26, 2024.

(iii)   Failure to Object. The failure of any party to file and serve an objection as provided herein shall be deemed the consent of such a party to the granting of the Motion and the sale and transfer of the some or all of the Assets to one or more Final Buyers (including the assumption and assignment of Assumed Contracts).

(iv)   Jurisdiction. All potential and Qualified Bidders will be deemed to have submitted to the jurisdiction of this Court with respect to all matters related to their bids, the Motion, or the Auction.

**5.    Return of Good Faith Deposit**

The Good Faith Deposit, together with all interest accrued thereon, if any, shall be returned to any bidder whose bid was not the Prevailing Bid or the Back-up Bid within five (5) business days of the Auction. The Good Faith Deposit submitted by the Final Buyer, together with all interest thereon, if any, shall be applied against the payment of the purchase price, as defined in the relevant PSA, at the closing of the sale to the Final Buyer. Upon closing of the Prevailing Bid, the deposit of the Back-up Bid will be returned, or if the Final Buyer fails to consummate the Prevailing Bid in accordance with the terms of the PSA, the Receiver will retain the Good Faith Deposit of the Final Buyer and the Receiver may pursue any and all of its options at law and in equity with respect to such breach, and the Back-up Bidder will become the Final Buyer.

**6.    Executory Contracts and Unexpired Leases**

(a)   Information Available Upon Request. Upon request, the Receiver will provide on a confidential basis to each counterparty to a proposed Assumed Contract or executory contract (each, an "Assumed Contract Party") the identity of (1) the relevant Qualified Bidder, and (2) the Receiver's calculation of the cure amount, if any, applicable to the relevant Assumed Contract to be assumed and assigned pursuant to RCW 7.60.130 (the "Cure Amount").

(b)   Treatment of Objections. If an objection is raised by an Assumed Contract Party solely regarding the Cure Amount, and such dispute cannot be resolved by the parties prior to the Sale Approval Hearing, Receiver may seek to assume such Assumed Contract and assign it to the Final Buyer, provided that both (1) the undisputed portion of the Cure Amount must be immediately paid by the Final Buyer to the Assumed Contract Party upon assumption and assignment, and (2) the disputed portion of the Cure Amount must simultaneously be paid by the

Final Buyer to the Receivership Estate . Receiver shall hold the disputed portion of the Cure Amount pending resolution of the dispute by the Superior Court or mutual consent of the parties. Upon resolution, the previously disputed portion of the Cure Amount shall be distributed to the Final Buyer and/or Assumed Contract Party in accordance with their agreement or the order of the Superior Court.

### III.    STATEMENT OF ISSUES

Should the Court: (A) enter the Bid and Auction Procedures Order; (B) approve the Bid and Auction Procedures; (C) schedule the Sale Approval Hearing for October 3, 2024 or such other date as determined by the Court, and (D) approve the assignment and assumption of executory contracts implicated in the sale? *Yes*.

### IV.    EVIDENCE RELIEF UPON

This Motion is supported by the record and files herein, the Receivership Order, and the accompanying DiIorio Decl.

### V.    ARGUMENT

A.    *Sale of Assets and Bid and Auction Procedures.*

The receivership statute provides that "[t]he receiver, with the court's approval after notice and a hearing, may use, sell or lease estate property other than in the ordinary course of business."  RCW 7.60.260(1).  Further, with limited exceptions, the statute also authorizes the court to approve of the sale "free and clear of liens and of all rights of redemption, whether or not the sale will generate proceeds sufficient to fully satisfy all claims secured by the property…."  RCW 7.60.260(2).  "Upon such a sale free and clear of liens, all security interests and other liens encumbering the property conveyed transfer and attach to the proceeds of sale…in the same order, priority, and validity as the liens had with respect to the property immediately before the conveyance."

In addition to this statutory authority the Receiver's authority to sell the Assets is established in the Receivership Order, which provides that "[t]he Receiver is authorized to (i) sell the Assets, whether in bulk, or in parts, and whether as a going concern or by liquidation…." (Receivership Order, at Section 4(a)).

1.   There is Substantial Business Justification for the Sale

The decision to sell the Assets has substantial business justification. The Respondents have ceased operations. DiIorio Decl., ¶ 24. Further, the Respondents had sold off significant assets prior to the initiation of this Receivership. There is no ready source for new debt or equity financing to resume operations as a going concern. *Id*., ¶ 26. Rather than allow the value of the Assets to continue to deteriorate over time, the Receiver has determined that it is in the best interests of the Receivership Estate and its creditors to sell all of the Assets pursuant to the Bid and Auction Procedures in order to maximize the recovery for the Receivership Estate and its creditors.

2.   The Sale is Proposed in Good Faith

The Receiver's proposed sale of the Assets free and clear of Liens is comparable to a bankruptcy trustee's sale of assets in a bankruptcy proceeding under Section 363 of the Bankruptcy Code. 11 USC § 363. That section authorizes a trustee, "after notice and a hearing, [to] use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 USC § 363(b)(1). This provision generally allows a trustee to sell property of the estate outside the ordinary course of business where the proposed sale is within the sound exercise of the trustee's business judgment and when the sale is proposed in good faith and for fair value. *See In re Lionel Corp.*, 722 F.2d 1063, 1070-71 (2d Cir. 1983). When a trustee articulates a

reasonable basis for its business decisions, the "court will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 BR 612, 616 (Bankr SDNY 1986).

The Receiver is proposing this sale in good faith. The Receiver is employing a bid and auction process to increase value and protect the best interests of the Receivership Estate and the creditors. All terms of any sale will be disclosed, and no side agreements exist between any party and the Receivership Estate. Further, any Qualified Bid is subject to higher or better offers. Moreover, as described above, during the pendency of this receivership the Receiver solicited and received expressions of interest from industry participants and other interested parties. Finally, the Receiver has fully disclosed, and is requesting the Court's approval of, all of the terms and conditions of the sale, notice, and Bid and Auction Procedures. Accordingly, the sale has been proposed in good faith.

      3.     <u>The Bid and Auction Procedures are in the Best Interests of the Creditors</u>

The proposed Bid and Auction Procedures are in the best interests of the Receivership Estate and its creditors. The Bid and Auction Procedures are designed to strike a balance between inviting competing bids and enabling the Receiver to close a sale within a reasonable time frame. Moreover, the Bid and Auction Procedures provide the Receiver with sufficient discretion to timely consummate the sale and pay the creditors, while also providing a fair process to any potential buyers. The Bid and Auction Procedures thus are fair, reasonable, and necessary to promote the highest and best sale price, without imposing undue obstacles to the competitive bid process. Furthermore, receivers and debtors often employ bidding protections in order to encourage the making of an original offer subject to higher and/or better offers and ultimately to increase the value for the Receivership Estate.

B.      *Sale Free and Clear of Liens, Claims, Encumbrances, and Interests*

The Receiver requests that the Court authorize the sale of the Assets free and clear of all Liens which may be asserted against the Assets, with any such Liens attaching to the proceeds of the sale to the same extent, priority and validity as they attach to the Assets. Washington law and the Receivership Order authorize the Receiver to sell estate property outside of the ordinary course of business. *See* RCW 7.60.260(1).

Buyers of assets from insolvent entities frequently require that the assets be sold "free and clear" of liens. Here, the Assets can be sold free and clear of Liens and any rights of redemption, whether or not the sale will generate proceeds sufficient to fully satisfy all claims secured by the Assets. *See* RCW 7.60.260(2).

C.      *Assumption and Assignment of Executory Contracts and Unexpired Leases*

A general receiver is authorized to assume and assign executory contracts and unexpired leases, subject to such conditions at this Court may determine are "just and proper" under the circumstances. RCW 7.60.130(1). Here, the potential purchasers have not yet identified the agreements that they may want the Receiver to assume and assign. However, assumption and assignment should be allowed under the circumstances of this case because, pursuant to the terms of the PSA and the Bid and Auction Procedures, the buyer(s) will be required to cure any monetary defaults existing as of the date of the sale(s), or on such other terms as the buyer(s) and Assumed Contract counterparties may mutually agree.

Under comparable federal bankruptcy law, Section 365 of the Bankruptcy Code,[4] the standard to be applied in determining whether an executory contract should be assumed or

---

[4] 11 USC § 365.

rejected is the "business judgment" test, which is premised upon the Receiver's business judgment that assumption would be beneficial to the estate. *See Durkin v. Benedor Corp. (In re G.I. Indus.)*, 204 F.3d 1276 (9th Cir. 2000); *PG&E Corp. v. FERC (In re PG&E Corp.)*, Nos. 19-30088-DM, 19-03003, 2019 Bankr. LEXIS 1820, at *43 (Bankr. N.D. Cal. June 12, 2019). "Except in extraordinary situations, court approval should be granted as a matter of course." *In re Summit Land Co.*, 13 BR 310, 315 (Bankr. D. Utah 1981). Here, the business judgment test is met because an executory contract will only be assumed in order to enhance the return to the Receivership Estate, for the benefit of its creditors.

## VI.  <u>CONCLUSION</u>

Sale of all of the Receivership Estate's Assets will benefit all involved parties. The Bid and Auction Procedures set forth above will ensure that the Assets will be sold for the highest possible value, within a reasonable time frame, in order to maximize recovery by the Receivership Estate. The Receiver asks that the Court grant this Motion.

I certify that this memorandum contains 3345 words*, in compliance with the Local Civil Rules.  *Not including bid procedures which are only included for the courts convenience and review.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

Dated this 30th day of July, 2024.

SCHWABE, WILLIAMSON & WYATT, P.C.


By:   _/s/ Davis Leigh_____
      Lawrence R. Ream, WSBA #18159
      Email: lream@schwabe.com
      Davis Leigh, WSBA #58825
      Email: dbleigh@schwabe.com
      1420 5th Avenue, Suite 3400
      Seattle, WA 98101

      *Attorneys for General Receiver,*
      *Stapleton Group, Inc.*

## CERTIFICATE OF SERVICE

The undersigned declares under penalty of perjury, under the laws of the State of Washington, that the following is true and correct:

I hereby certify that on the 30th day of July, 2024, I caused to be served the foregoing RECEIVER'S MOTION FOR ORDER: (1) APPROVING BID AND AUCTION PROCEDURES; (2) SCHEDULING HEARING TO APPROVE SALE OF ASSETS; and (3) APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS; on the following party at the following address:

| | |
|---|---|
| **Wells Fargo Bank, National Association**<br>Gregory R. Fox, WSBA # 30559<br>James B. Zack, WSBA #48122<br>Lane Powell, P.C.<br>1420 Fifth Avenue, Suite 4200<br>Seattle, WA 98101-2375<br>Telephone: (206) 223-7000<br>Facsimile: (206) 223-7107<br>E-Mail: FoxG@LanePowell.com<br>          zackj@lanepowell.com | **Delta Western, LLC**<br>David C. Neu, WSBA #33143<br>Miller Nash LLP<br>2801 Alaskan Way, Suite 300<br>Seattle, WA 98121-1128<br>Telephone: (206) 777-7516<br>Facsimile: (206) 340-9599<br>E-Mail: david.neu@millernash.com |
| **North Coast Electric Company**<br>Nancy K Cary, WSBA # 32262<br>Hershner Hunter LLP<br>PO Box 1475<br>675 Oak Street, Suite 400<br>Eugene, OR 97401<br>Telephone: (541) 686-8511<br>Facsimile: (541) 344-2025<br>E-Mail: ncary@hershnerhunter.com | **Kirk Koch**<br>Erin S. Norgaard, WSBA #32789<br>Brian L. Dolman, WSBA #32365<br>Winthrop W. Hubbard , WSBA #56458<br>HKM Employment Attorneys, LLP<br>600 Stewart Street, Suite 901<br>Seattle, WA 98101<br>E-mail: enorgaard@hkm.com<br>          bdolman@hkm.com<br>          whubbard@hkm.com |
| **Attorney for Debtors**<br>Armand J. Kornfeld, WSBA #17214<br>Bush Kornfeld LLP<br>601 Union Street, Suite 5000<br>Seattle, Washington 98101<br>Phone: 206 292-2110<br>E-mail: jkornfeld@bskd.com | **Rodger May**<br>Christopher T. Wion, WSBA #33207<br>Molly J. Gibbons, WSBA #58357<br>Summit Law Group. PLLC<br>315 Fifth Avenue S., Suite 1000<br>Seattle, WA 98104<br>E-mail: chrisw@summitlaw.com<br>          mollyg@summitlaw.com |

| | |
|---|---|
| **Cold Locker Storage & Processing, LLC**<br>John R. Rizzardi, WSBA #9388<br>Cairncross & Hempelmann, P.S.<br>524 Second Avenue, Suite 500<br>Seattle, WA 98104<br>E-mail: jrizzardi@cairncross.com | **Koch Fisheries, LLC; Lone Sheldon, LLC;  Northern Seas, Inc.; Ocean Fury, LLC; Pacman, LLC; Rollo Fisheries, LLC; and Winterhawk, LLC**<br>Daniel A. S. Foe, WSBA #42876<br>Aaron J. Naff, WSBA #51200<br>Mullavey, Prout, Grenley & Foe, LLP<br>2401 NW 65th Street<br>Seattle, WA 98127<br>Telephone: 206-789-2511<br>E-mail: dfoe@ballardlawyers.com<br>       anaff@ballardlawyers.com |
| **Integrity Express Logistics**<br>J. Todd Tracy<br>The Tracy Law Group PLLC<br>1601 5th Avenue, Suite 610<br>Seattle, WA 98101<br>E-mail: todd@thetracylawgroup.com | **Victory Venture, LLC**<br>Laurie M. Thornton, WSBA #35030<br>Daniel J. Bugbee, WSBA #42412<br>DBS Law<br>155 NE 100th Street, Suite 205<br>Seattle, WA 98125<br>Tel: (206)489-3802<br>Fax: (206) 464-0125<br>E-mail: lthornton@lawdbs.com<br>       dbugbee@lawdbs.com |
| **Kent Warehouse and Labeling, LLC**<br>Faye C. Rasch<br>Wenokur Riordan PLLC<br>600 Stewart Street, Suite 1300<br>Seattle, WA 98101<br>E-mail: faye@wrlawgroup.com | **Summer Bay, LLC and Fortune Sea, LLC**<br>R. Isaak Hurst, WSBA #43679<br>Lauren B. Mauer, WSBA #61503<br>International Maritime Group PLLC<br>701 Fifth Ave., 42nd Floor<br>Seattle, WA 98104<br>Telephone: 206-707-8338<br>E-mail: hurst@maritime.law<br>       mauer@maritime.law |
| **OBI Seafoods, LLC**<br>Michael S. DeLeo, WSBA #22037<br>Gregory L. Russell, WSBA #17280<br>Peterson Russell Kelly Livengood PLLC<br>10900 NE 4th Street, Suite 1850<br>Bellevue, WA 98004-8341<br>Telephone: 425.462.4700<br>Facsimile: 425.451.0714<br>E-mail: mdeleo@prklaw.com<br>       grussell@prklaw.com | **F/V Marahute, LLC; RLB Vessel, LLC; and F/V Winter Bay, LLC**<br>Markus B.G. Oberg, WSBA #34914<br>Le Gros, Buchanan & Paul<br>4025 Delridge Way SW, Suite 500<br>Seattle, WA 98106<br>Telephone: 206-623-4990<br>E-mail: moberg@legros.com |

| Smith Berger Marine, Inc. and Alaska Marine Lines, Inc. | Triple B Corporation, dba Charles Produce |
|---|---|
| Alan D. Smith, WSBA #24964<br>Perkins Coie LLP<br>1201 Third Avenue, Suite 4900<br>Seattle, WA 98101<br>Telephone: (206) 259-8000<br>E-mail: asmith@perkinscoie.com | Jeffrey C. Misley, WSBA #33397<br>Joshua G. Flood, WSBA #62175<br>Sussman Shank LLP<br>1000 SW Broadway, Suite 1400<br>Portland, OR 97205<br>Email: jmisley@sussmanshank.com<br>jflood@sussmanshank.com |
| **Bristol Bay Borough** | **Frontier Packaging, Inc.** |
| Joseph N. Levesque<br>Landye Bennett Blumstein LLP<br>701 W 8th Ave, Ste 1100<br>Anchorage, AK 99501<br>Telephone: 907-276-5152<br>Facsimile: 907-276-8433<br>Email: josephl@lbblawyers.com | Laurie M. Thornton<br>Dominique R. Scalia<br>DBS Law<br>155 NE 100th Street, Suite 205<br>Seattle, WA 98125<br>Telephone: 206-489-3802<br>Facsimile: 206-973-8737<br>Email: lthornton@lawdbs.com<br>dscalia@lawdbs.com |

by:    ☐    U.S. Postal Service, ordinary first class mail
        ☑    electronic service
        ☑    other (specify) <u>via email</u> _____

Jennifer Haverkamp, Legal Assistant

CERTIFICATE OF SERVICE- 3

SCHWABE, WILLIAMSON & WYATT, P.C.<br>Attorneys at Law<br>1420 5th Avenue, Suite 3400<br>Seattle, WA 98101<br>Telephone 206-622-1711

134382\285395\46088711.v8

SCHEDULE 1

The Assets subject to the Bid and Auction Procedures, as more fully set forth in the Motion, are divided into the following asset classes:

1.      All real property owned by the Respondents as of the auction date, including but not limited to, the following;

      a.      The seafood processing facilities at Dillingham, Port Moller, and King Cove;

      b.      The support facilities at Dillingham, Naknek, Sand Point, and Seattle;

2.      All equipment, inventory, and other personal property located within the real property as of the auction date, except for any property leased to the Respondents by a non-Respondent entity; and

3.      All other personal property owned by the Respondents as of the auction date, including but not limited to, any remaining brand names, intellectual property, general intangibles, crab quota, other miscellaneous personal property, and an American Fisheries Act permit.

Nothing in this Schedule or the accompanying Motion should be construed to limit the Receiver's ability sell any individual asset in any of the three assets classes as permitted by the Receivership Order and RCW 7.60 *et. seq.* The Receiver shall be expressly permitted to modify and amend this schedule as necessary. Additional detail regarding the specific assets subject to the Bid and Auction procedures will be available in the data room.

# EXHIBIT 3

EXP01

<br>

Ex Parte: Civil and Other Motions
Hearing Date: August 21, 2024
Hearing Time: 1:30 p.m.

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

FOR THE COUNTY OF KING

| | |
|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, a national banking association, in its capacity as Agent,<br><br>            Petitioner,<br><br>vs.<br><br>NORTHWEST FISH COMPANY, LLC, a Washington corporation; PETER PAN SEAFOOD COMPANY, LLC, an Alaska limited liability company, ALASKA FISH HOLDINGS, LLC, a Delaware limited liability company, and RAYMOND MACHINE SHOP, LLC, a Washington limited liability company,<br><br>            Respondents. | No. 24-2-08809-1 SEA<br><br>[~~PROPOSED~~] ORDER (1) APPROVING BID AND AUCTION PROCEDURES; (2) SCHEDULING HEARING TO APPROVE SALE OF ASSETS; AND (3) APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS<br><br>**[Clerk's Action Required]** |

THIS MATTER came before the court upon the Receiver's Motion for an Order (1) Approving Bid and Auction Procedures; (2) Scheduling Hearing to Approve Sale of Assets; and (3) Approving Assumption and Assignment of Executory Contracts. The Court is fully advised, having specifically reviewed the following:

      1.      Receiver's Motion for an Order (1) Approving Bid and Auction Procedures; (2) Scheduling Hearing to Approve Sale of Assets; and (3) Approving Assumption and

[~~PROPOSED~~] ORDER GRANTING
RECEIVER'S MOTION - 1

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

134382\285395\46118120.v1

1  Assignment of Executory Contracts;

2      2.      Declaration of David Stapleton in Support of Receiver's Motion for an Order

3  (1) Approving Bid and Auction Procedures; (2) Scheduling Hearing to Approve Sale of Assets;

4  and (3) Approving Assumption and Assignment of Executory Contracts, and any exhibits

5  thereto;

6      3.      _____

7      4.      _____ and

8      5.      _____.

9

10     The COURT hereby ORDERS, ADJUDGES, AND DECREES that Receiver's Motion

11  for an Order (1) Approving Bid and Auction Procedures; (2) Scheduling Hearing to Approve

12  Sale of Assets; and (3) Approving Assumption and Assignment of Executory Contracts is

13  GRANTED as follows:

14     THE COURT FINDS as follows:

15     A.      The Stapleton Group ("Receiver"), gave appropriate notice of the Motion

16         and the Bid and Auction Procedures Hearing. No other further notice in connection

17  with the entry of this Order is or shall be required.

18     B.      The Bid and Auction Procedures were proposed by the Receiver in good faith

19  with the goal of maximizing the value of the assets delineated in Schedule 1 as attached to the

20  Motion (the "Assets"), for the benefit of the receivership estate and its creditors.  The Bid and

21  Auction Procedures provide for a competitive bidding process, including an auction if qualified

22  bids are received from multiple bidders for the same assets.

23     C.      The Bid and Auction Procedures are fair and reasonable, were proposed in the

24  exercise of the Receiver's reasonable business judgment, and are in the best interests of the

25  receivership estate, its creditors, and other parties in interest.

26     D.      Any objections, if any, to the Motion with respect to the Bid and Auction

[PROPOSED] ORDER GRANTING
RECEIVER'S MOTION - 2

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

134382\285395\46118120.v1

Procedures, if not previously withdrawn, are hereby overruled.

NOW THEREFORE, IT IS HEREBY ORDERED THAT:

1.    The Motion is granted in its entirety.

2.    The following Bid and Auction Procedures are hereby approved and shall apply in connection with the proposed sale of Assets.

1.    **Bid Procedures**

(a)    <u>Notice of Bid Procedures</u>. Within five (5) business days after its entry by the Court, the Receiver shall send a copy of the Bid and Auction Procedures Order, by electronic service or regular mail, to:

(i)    all parties who have appeared in this case;

(ii)    all parties who have submitted a proof of claim to the Receiver; and

(iii)    all persons or entities that have expressed an interest to the Respondents or to Hilco in acquiring the Assets and those which the Receiver reasonably believes may have an interest in bidding for the Assets.
The Receiver will also provide a courtesy copy of the Bidding Procedures Order to those parties who have requested receipt of courtesy copies via email.

(b)    <u>Due Diligence</u>. Northwest Fish Company, LLC, Peter Pan Seafood Company, LLC, Alaska Fish Holdings, LLC, and Raymond Machine Shop, LLC (collectively, the "Respondents"), by and through their duly appointed general receiver, the Stapleton Group (the "<u>Receiver</u>"), has created a data room and has afforded and, except as otherwise provided in these Bid and Auction Procedures, will continue to afford potential purchasers due diligence access and information as may be reasonably requested and, in the Receiver's business judgment, as the Receiver determines to be reasonable and appropriate upon execution of the Receiver's non-disclosure agreement. The Receiver and Hilco will coordinate all reasonable requests for additional information and due diligence access from potential purchasers. Unless otherwise determined by the Receiver in its discretion, the availability of additional due diligence to a Qualified Bidder (defined below) will cease from and after the Bid Deadline (defined below).

(c)    <u>Qualified Bid</u>. A bid received by the Bid Deadline that meets the requirements in Sections 1 and 2 of these Bid and Auction Procedures is considered a "<u>Qualified Bid</u>." A party submitting a Qualified Bid is a "<u>Qualified Bidder</u>."

[PROPOSED] ORDER GRANTING
RECEIVER'S MOTION - 3

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

134382\285395\46118120.v1

The Receiver reserves the right to waive noncompliance with any one or more of these requirements and deem any otherwise non-qualifying bid to be a Qualified Bid. A Qualified Bid will be evaluated based upon factors that include, but are not limited to, the following: (a) the purported amount of the Qualified Bid and the Assets subject to the Qualified Bid; (b) the fair, net value to be provided to the Receivership Estate under the Qualified Bid; (c) the ability to close or the likelihood of closing the proposed sale transaction without delay; (d) the ability of the Qualified Bidder to effectively manage the Assets as determined by the sole discretion of the Receiver; and (e) any other factors that the Receiver may deem relevant, in its sole discretion.

(d)     <u>Non-Qualified Bidders</u>.  Any potential bidder that is not designated as a Qualified Bidder in accordance with the foregoing shall be disqualified from further participation in the bidding process ("<u>Non-Qualified Bidder</u>"). A Non-Qualified Bidder will not be permitted to conduct due diligence, make a bid for some or all of Receivership Estate's assets described on Schedule 1 attached hereto ("<u>Assets</u>")[1] under these Bid and Auction Procedures or participate in the Auction (defined below).

(e)     <u>Purchase and Sale Agreement</u>.  A form of Asset Purchase and Sale Agreement ("<u>PSA</u>" or "<u>Purchase and Sale Agreement</u>") will be uploaded into the data room. All bids must be submitted using the form PSA and include **both** (a) a marked up PSA, compared against the form PSA, **and** (b) a clean, duly executed version of their PSA.

(f)     <u>Bid Deadlines</u>.

(i)     **Bid Deadline:** All bids must be submitted by **12:00 Noon Pacific Time on September 10, 2024 (the "<u>Bid Deadline</u>")**.

(ii)    **Method of Submitting a Bid**: A potential purchaser that desires to make a Qualified Bid shall (a) deliver its marked and clean bid to Teri Stratton at tsratton@hilcocf.com and Kyle Herman at kherman@hilcocf.com at Hilco and (b) deliver copies to David P. Stapleton at peterpan@stapletoninc.com and Lawrence Ream at lream@schwabe.com.

// 

//

---

[1] Nothing in this Motion should be construed to limit the Receiver's ability to sell individual assets outside the context of these bid procedures as permitted by the Receivership Order, the Order Amending the Receivership Order, and/or RCW 7.60 *et. seq*. The Receiver reserves the right to amend Schedule 1 as necessary prior to the auction.

[PROPOSED] ORDER GRANTING
RECEIVER'S MOTION - 4

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

134382\285395\46118120.v1

2.    **Bid Requirements**

(a)    <u>Assets</u>. Qualified Bidders may make a bid for all of the Assets or some subset or combination thereof. The Receiver reserves the right, in its discretion, to consider bids for all of the Assets or any combination of the Assets, but is not required to do so.

(b)    <u>Form and Content of Bid</u>. A bid must include:

    (i)    A signed PSA from a Qualified Bidder stating that:

        (A)    The Qualified Bidder offers to purchase the subject Assets for cash. The PSA must clearly delineate all components of the proposed purchase price and whether any or all of the subject Assets will be purchased subject to Liens relating to assumed obligations, if any;

        (B)    The Qualified Bidder's offer is open and irrevocable through the conclusion of the Sale Approval Hearing and Closing unless (1) extended by agreement of the parties or the terms of these Bid and Auction Procedures, or (2) the Qualified Bid is designated a Back-Up Bid, which shall then remain open until twenty (20) calendar days following the date that the Closing of the Prevailing Bid;

        (C)    The Qualified Bidder's offer is a firm offer and is not subject to any additional due diligence, board approval or financing contingency and does not contain any other material conditions to closing, as determined by the Receiver in its sole discretion exercised in good faith;

        (D)    If the Qualified Bidder's offer includes the assumption and assignment of any unexpired leases or executory contracts (each, an "<u>Assumed Contract</u>"), the PSA must identify which Assumed Contract(s) the Qualified Bidder wishes to assume, and whether the Qualified Bidder shall be responsible for paying for any and all costs to cure such Assumed Contract at closing or pursuant to any agreement reached between the Qualified Bidder and the counterparty to the relevant Assumed Contract; and

        (E)    Financial information for the prospective bidder, including but not limited to, financial statements including the prospective bidder's balance sheet, and most recent three months of bank

[PROPOSED] ORDER GRANTING
RECEIVER'S MOTION - 5

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

134382\285395\46118120.v1

statements or other financial information sufficient to enable the Receiver, or any other party in interest to determine such bidder's creditworthiness and ability to close a sale of the identified Assets, provided however, determination that the bidder has met this qualification shall be in the sole discretion of the Receiver, which shall be confidential to the Receiver and Receiver's Professionals.

(ii)     To the extent not previously provided to the Receiver, be accompanied by evidence satisfactory to the Receiver, in its sole discretion, that the purchaser is willing, authorized, capable, and qualified (financially, legally, and otherwise), of unconditionally performing all obligations under its PSA in the event that it submits the Prevailing Bid (defined below) at the Auction.

(iii)    Identify the proponent of the Qualified Bid and an officer or representative who is duly authorized in all respects to appear, act on behalf of, and legally bind such proponent (an "<u>Authorized Representative</u>").

(c)    <u>Required Good Faith Deposit</u>. By the Bid Deadline, a Qualified Bidder must deposit with the Receiver a good faith deposit (the "<u>Good Faith Deposit</u>") in the amount of 10% of the cash component of its bid. The Good Faith Deposit must be made by wire transfer to the Stapleton Group, Receiver (wiring instructions are available upon request). The Good Faith Deposit will be held by the Receiver subject to Section 5 (below).

(d)    <u>Rejection of Bid</u>. Notwithstanding the foregoing, the Receiver shall have the discretion and authority to reject any bid if such bid:

(i)     is on terms that are materially more burdensome or conditional than those set out in these Bid and Auction Procedures and the form PSA,

(ii)    requires any indemnification of such Qualified Bidder in its PSA,

(iii)   is not received by the Bid Deadline,

(iv)    includes a non-cash instrument or similar consideration,

(v)     requires any regulatory or other approval that would delay the closing,

(vi)    contains any material conditions to closing,

[PROPOSED] ORDER GRANTING
RECEIVER'S MOTION - 6

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

134382\285395\46118120.v1

(vii)    is proposed by an entity that is not in good-standing with local and federal requirements, or that the Receiver, in its sole discretion and business judgment, determines is unlikely to consummate the sale, and

(viii)    is rejected by the Receiver for any other reason subject to the Receiver's sole discretion and business judgment.

(e)    <u>Secured Creditors as Qualified Bidders; Credit Bids</u>.    Subject to the last sentence of this Section 2(e), secured creditors whose claims are **either** (i) not disputed by the Receiver, **OR** (ii) have been allowed by order of the Superior Court prior to the start of the Auction, shall be entitled to participate in the Auction and credit bid the amount of their allowed secured claims with respect to the Assets that secure such claims (a "<u>Credit Bid</u>"), subject to RCW 7.60.260(3).    Such a creditor is a Qualified Bidder for purposes of these Bid and Auction Procedures, unless such bid is rejected pursuant to Section 2 (d)(vii) or Section 2(d)(viii) above. Notwithstanding the foregoing, in order to participate in the Auction the holder of such an allowed secured claim must deliver a letter to the Receiver by the Bid Deadline stating the amount of its Credit Bid, the particular Assets that are the subject of the Credit Bid, and certification that it has the financial ability to satisfy its obligations under RCW 7.60.260(3). Moreover, Credit Bids valued below the Reserve Price (as defined in Section 3(g) below) may be disallowed by the Receiver.

3.    **Pre-Auction and Auction Procedures**

(a)    <u>Bid Negotiations</u>.    Upon the receipt of Qualified Bids, the Receiver may, at its discretion, negotiate with one or more Qualified Bidders regarding the terms of the applicable Qualified Bids.

(b)    <u>Pre-Auction Notice of Highest and Best Bid(s)</u>.

(i)    After the Bid Deadline passes, the Receiver will identify the prevailing highest and best Qualified Bid(s) (each a "<u>Highest Pre-Auction Qualified Bid</u>").

(ii)    In the event that there is only one Qualified Bid for one or more of the Assets after the Bid Deadline passes, the Receiver may cancel the auction as to those Assets. If the sole Qualified Bid is for all of the Receivership Estate's Assets and satisfies the [aggregate] Reserve Price of all the Assets, then the Receiver will cancel the Auction and will submit the Highest Pre-Auction Qualified Bid to the Court for approval not later than the Sale Approval Hearing.

[PROPOSED] ORDER GRANTING
RECEIVER'S MOTION - 7

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

134382\285395\46118120.v1

(iii)    If more than one Qualified Bid is received for the same Asset(s), then the Receiver shall conduct an auction, as set out below (the "Auction").

(c)    Auction. **The Auction(s), if any, will be conducted on September 16-17, 2024, at 9:00 a.m. Pacific time** at the offices of Schwabe, Williamson & Wyatt, PC, 1420 Fifth Avenue, Suite 3400, Seattle, Washington 98101, or at such other time(s) and location as may be designated by the Receiver. The following procedures shall apply to the conduct of the Auction:

(i)    Qualified Participants. Unless otherwise ordered by the Superior Court overseeing this receivership case (the "Receivership Case"), for cause shown, only Qualified Bidders (and their counsel) are eligible to attend and participate in the Auction (each a "Qualified Participant"). Prior to the start of the Auction the Authorized Representative of each Qualified Participant shall certify, in writing or on the record, as follows:

(A)    Each bid it makes at the Auction shall constitute a binding and legally enforceable contract of the bidder to timely close a purchase of the Assets according to the terms of the bid in the event an order of the Court is entered approving a sale based upon such bid.

(B)    No bids made, whether before or during the Auction, shall be subject to any conditions or contingencies related to due diligence, financing, or any other further approval other than the Authorized Representative present at the Auction.

(C)    The Authorized Representative present for the Qualified Participant at the Auction has the full power and authority to act on behalf of and to legally bind the Qualified Participant for any bids made, and any agreements entered into at or in connection with the Auction.

(D)    Each Qualified Participant that participates in the Auction shall authorize the Receiver to conditionally accept such bidder's second-highest bid at the Auction as a back-up to the Prevailing Bid, which shall become binding upon and enforceable against such back-up bidder in the event that the Prevailing Bid is not approved by the Court, such Prevailing Bidder fails or otherwise refuses to close its purchase of the Assets for any reason other than a material failure of performance by the Receivership Estate.

[PROPOSED] ORDER GRANTING
RECEIVER'S MOTION - 8

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

134382\285395\46118120.v1

(E) That the Qualified Participant has at all times proceeded in good faith in submitting its bids, and has not engaged in any collusion with any other person or bidder with respect to the Auction and related proceedings.

(F) Each Qualified Participant must disclose at or before the Auction, (1) whether the bidder is bidding on its own behalf or on behalf of others, or on behalf of itself and others, (2) if the bidder is bidding other than on its own behalf, the identity of each entity on whose behalf the bidder is acting, and (3) whether the bidder is a party to any agreement limiting the bidders at the auction.

(ii) Only Qualified Participants, including through their counsel, shall be permitted to make any additional bids ("Subsequent Bids") at the Auction.

(iii) Each Qualified Participant that participates in the Auction shall have their Authorized Representative (i) physically present or (ii) via zoom, if pre-approved in writing by the Receiver, for all bidding, with the understanding that the true identity of each Qualified Participant shall be fully disclosed to all other Qualified Participants and that all material terms, including but not limited to the amount, of each bid will be fully disclosed to all other bidders throughout the entire Auction.

(d) The Receiver shall have reasonable discretion with respect to the conduct of the Auction. Among other things, the Receiver may announce at the Auction additional procedural rules that it determines to be reasonable under the circumstances (e.g. the amount of time allotted to make subsequent alternative bids, the grouping of Assets into lots, or the allocation of Bids amongst the Assets in each lot) for conducting the Auction so long as such additional rules are not materially inconsistent with these Bid and Auction Procedures and the terms, deadlines, and intent of the Purchase and Sale Agreement(s).

(i) At the Auction, bidding shall begin with the Highest Pre-Auction Qualified Bid(s). Any Subsequent Bids must be in increments to be established by the Receiver at the Auction, and each such increment must be payable in cash.

(ii) The Auction, at the discretion of the Receiver, shall be recorded by stenographer or other reliable means of preserving the record of the Auction proceedings, and shall continue in one or more rounds of "open cry," or publicly announced bidding and shall conclude after each participating bidder has had the opportunity, within any time period

[PROPOSED] ORDER GRANTING
RECEIVER'S MOTION - 9

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

134382\285395\46118120.v1

specified by the Receiver, to submit an additional Subsequent Bid with full knowledge of the then-existing highest bid.

(iii)    For the purpose of evaluating the value of the consideration provided by each Subsequent Bid, the value shall be the net consideration payable to the Receivership Estate.

(iv)    The Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had the opportunity to submit a Subsequent Bid with full knowledge and written confirmation of the then-existing highest bid, signed by the Receiver's counsel and identifying the party or parties making the then highest bid.

(v)    On September 19, 2024, the Receiver shall announce its determination (pursuant to the following paragraph) as to the bidder(s) (the "Prevailing Bidder(s)") submitting the highest and best bid(s) (the "Prevailing Bid(s)"), which shall be submitted to the Court for approval at the Sale Approval Hearing.

(vi)    In determining the Prevailing Bid(s) to submit to the Court for approval, the Receiver, in its sole discretion and in consultation with its professionals, shall determine whether a Subsequent Bid constitutes a higher and better offer than the Pre-Auction Highest Bid. In making that determination, the Receiver may consider any and all factors associated with all Qualified Bids and Qualified Bidders, including but not limited to factors such as the likelihood and ability of the proposed buyer(s) to immediately consummate and timely close the proposed transactions, other timing issues, employment issues, overall value of the Qualified Bids, the Receiver's business judgment, and any other material factors.

(vii)    If, following the entry of the Sale Approval Order approving a sale or sales to the Prevailing Bidder(s), such Prevailing Bidder(s) fails or otherwise refuses to consummate such sale, then the next highest or best bid shall be deemed as the back-up bid (the "Back-Up Bid" and, such bidder, the "Back-Up Bidder") and the Respondent(s) will be obligated to effectuate a sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without further order of the Court. The Back-Up Bid shall remain open until twenty (20) calendar days following the date that the Sale Approval Order becomes a final, non-appealable order or the Closing of the Prevailing Bid, whichever is later. All Qualified Bids (other than the Successful Bid and the Back-Up Bid) shall be deemed rejected by the Receiver on and as of the date of entry of the Sale Approval Order by the Court.

[PROPOSED] ORDER GRANTING
RECEIVER'S MOTION - 10

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

134382\285395\46118120.v1

(e)    The "<u>Final Buyer(s)</u>" shall be the party or parties that submit the Prevailing Bid(s) at the Auction. No bids may be received after the announced conclusion of the Auction.

(f)    <u>Prevailing Bid Notice</u>. If an Auction is conducted, then on September 19, 2024, the Receiver will file with the Superior Court and serve (via email on the parties to the Receivership Case, persons who have filed a notice of appearance in the Receivership Case, and parties to executory contracts or unexpired leases that are to be assumed and assigned pursuant to the sale(s)) a notice identifying the Final Buyer(s), and the amount and other material terms of the Prevailing Bid(s), if any (the "<u>Prevailing Bid Notice</u>"). The Receiver shall also include in the Prevailing Bid Notice disclosure of the Back-Up Bids, as may be applicable. Such Back-Up Bid(s) will be submitted for Court approval in case the Final Buyer(s) fails to close. The Prevailing Bid Notice and Sale Approval Order will provide that, if for any reason the Final Buyer(s) fails to consummate the transaction contemplated by its Prevailing Bid, the Back-Up Bidder will automatically be deemed to be a Final Buyer and will be obligated to consummate the transaction proposed in its Back-Up Bid, without further notice or order of the Superior Court.

(g)    <u>Reserve Price</u>. The Reserve Price, if any, for each Asset shall be set forth in the data room, at the sole discretion of the Receiver. The Receiver may decline to consummate the sale should the Prevailing Bid not exceed the Receiver's designated minimum purchase price (the "Reserve Price").

4.    **<u>Superior Court Approval and Jurisdiction</u>**

(a)    The Receiver and the Final Buyer(s) shall each use their commercially reasonable efforts, and shall cooperate, assist and consult with each other, to secure the entry of an order (the "<u>Sale Approval Order</u>"), in form reasonably acceptable to the Receiver and the Final Buyer(s), such acceptance not to be unreasonably withheld, by the Superior Court in the Receivership Case (a) approving the applicable PSA, (b) authorizing the sale of the Assets pursuant to RCW 7.60.260, free and clear of all liens, claims, interests and encumbrances ("<u>Liens</u>"), except as otherwise provided in the PSA, (c) relieving the Final Buyer(s) of any claim of successor liability, (d) authorizing the assumption and assignment of the applicable Assumed Contracts pursuant to RCW 7.60.130, and (e) other appropriate relief. The Receiver and the Final Buyer(s) shall consult with one another regarding pleadings that either of them intends to file or positions either of them intend to take, with the Superior Court in connection with or that reasonably affect, the Superior Court's entry of the Sale Approval Order. The Sale Approval Order shall further provide that if for any reason a Final Buyer is unable or unwilling to consummate an approved sale because of

[PROPOSED] ORDER GRANTING
RECEIVER'S MOTION - 11

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

134382\285395\46118120.v1

breach or failure, without legal excuse, to perform on the part of the Final Buyer(s), it (1) will forfeit its Good Faith Deposit to the Receiver and the Receiver may pursue any and all of its options at law and in equity with respect to such breach, and (2) the Qualified Bidder making the Back-Up Bid shall be deemed to be the Final Buyer, the purchase price shall be the amount of such Back-Up Bid, and Respondent(s) shall be authorized to effectuate the sale(s) without further notice or order of the Superior Court.

(b)    Sale Approval Hearing and Objection Deadline.

(i)    Hearing. A hearing to consider the proposed sale(s) will take place on October 3, 2024, at 1:30 p.m., in the Superior Court for King County, Seattle, Washington (or at another date and time established by the Superior Court) (the "Sale Approval Hearing"). If one or more Final Buyers is selected by the Receiver, the Receiver shall seek the entry of a Sale Approval Order from the Superior Court at the Sale Approval Hearing, authorizing the proposed sale(s) to the Final Buyer(s) on terms and conditions substantially consistent with and in accordance with these Bid and Auction Procedures and the applicable PSA.

(ii)    Objection/Response Deadline. Objections to approval of any proposed sale(s) and entry of the Sale Approval Order(s) (including but not limited to any objection based on any alleged irregularities in the conduct of the Auction) or other responses must be both filed with the Court and served on (A) Schwabe Williamson & Wyatt, PC, 1420 Fifth Avenue, Suite 3400, Seattle, Washington 98101, Attn: Lawrence Ream; (B) Lane Powell, PC, 1420 Fifth Avenue, Suite 4100, Seattle, Washington 98101, Attn: Greg Fox, and (C) All other parties who have filed a notice of appearance, by not later than ~~12:00 noon~~ Pacific Time, on September ~~28~~ 25, 2024. 4:30 p.m.

(iii)    Failure to Object. The failure of any party to file and serve an objection as provided herein shall be deemed the consent of such a party to the granting of the Motion and the sale and transfer of the some or all of the Assets to one or more Final Buyers (including the assumption and the assignment of Assumed Contracts).

(iv)    Jurisdiction. All potential and Qualified Bidders will be deemed to have submitted to the jurisdiction of this Court with respect to all matters related to their bids, the Motion, or the Auction.

//

//

[PROPOSED] ORDER GRANTING
RECEIVER'S MOTION - 12

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

134382\285395\46118120.v1

5.    **Return of Good Faith Deposit**

The Good Faith Deposit, together with all interest accrued thereon, if any, shall be returned to any bidder whose bid was not the Prevailing Bid or the Back-up Bid within five (5) business days of the Auction. The Good Faith Deposit submitted by the Final Buyer, together with all interest thereon, if any, shall be applied against the payment of the purchase price, as defined in the relevant PSA, at the closing of the sale to the Final Buyer. Upon closing of the Prevailing Bid, the deposit of the Back-up Bid will be returned, or if the Final Buyer fails to consummate the Prevailing Bid in accordance with the terms of the PSA, the Receiver will retain the Good Faith Deposit of the Final Buyer and the Receiver may pursue any and all of its options at law and in equity with respect to such breach, and the Back-up Bidder will become the Final Buyer.

6.    **Executory Contracts and Unexpired Leases**

(a)    Information Available Upon Request. Upon request, the Receiver will provide on a confidential basis to each counterparty to a proposed Assumed Contract or executory contract (each, an "Assumed Contract Party") the identity of (1) the relevant Qualified Bidder, and (2) the Receiver's calculation of the cure amount, if any, applicable to the relevant Assumed Contract to be assumed and assigned pursuant to RCW 7.60.130 (the "Cure Amount").

(b)    Treatment of Objections. If an objection is raised by an Assumed Contract Party solely regarding the Cure Amount, and such dispute cannot be resolved by the parties prior to the Sale Approval Hearing, Receiver may seek to assume such Assumed Contract and assign it to the Final Buyer, provided that both (1) the undisputed portion of the Cure Amount must be immediately paid by the Final Buyer to the Assumed Contract Party upon assumption and assignment, and (2) the disputed portion of the Cure Amount must simultaneously be paid by the Final Buyer to the Receivership Estate . Receiver shall hold the disputed portion of the Cure Amount pending resolution of the dispute by the Superior Court or mutual consent of the parties. Upon resolution, the previously disputed portion of the Cure Amount shall be distributed to the Final Buyer and/or Assumed Contract Party in accordance with their agreement or the order of the Superior Court.

3.    As set forth in the Bid and Auction Procedures, the Sale Approval Hearing is hereby scheduled for October 3, 2024, at 1:30 p.m. Pacific Time, in this Court.

4.    As set forth above, objections, if any, to the relief requested by Receiver in the Motion, including approval of any Prevailing Bid and Back-Up Bid, sale of any or all of the Assets to the Final Buyer(s), or any proposed assumption and assignment of executory

[PROPOSED] ORDER GRANTING
RECEIVER'S MOTION - 13

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

134382\285395\46118120.v1

contracts and unexpired leases, must be (a) made in writing; (b) filed with this Court by **not later than 4:30 p.m. Pacific Time on September 25, 2024 (the "Objection Deadline"), notwithstanding any local rule that would provide for a different response time**; and (c) served so as to be received by the Objection Deadline by (i) Schwabe Williamson & Wyatt, PC, 1420 Fifth Avenue, Suite 3400, Seattle, Washington 98101, Attn: Lawrence Ream (email: lream@schwabe.com); (ii) all Prevailing Bidders and their counsel (if any); and (iii) all other parties who have filed a notice of appearance. Any party filing an objection to the Motion must attend the Sale Approval Hearing and advocate its objection at such hearing. Service of any objection under this paragraph 5 to the above-listed counsel may be made solely by e-mail using the addresses set forth above. Service of any response to an objection served by e-mail may also be served solely by e-mail to the objecting party or its counsel.

5.    Any objection not filed, served, and/or advocated in accordance with this Order shall be deemed waived and be forever barred

DATED this _____ day of ___8/21/___, 2024.

_____
JUDGE / COURT COMMISSIONER

**HENRY H. JUDSON**

**AUG 2 1 2024**

**COURT COMMISSIONER**

/ /
/
/
/
/
/
/

[PROPOSED] ORDER GRANTING
RECEIVER'S MOTION - 14

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

134382\285395\46118120.v1

1    Presented by:

2    SCHWABE, WILLIAMSON & WYATT, P.C.

3

4    By: */s/ Davis Leigh*
          Lawrence R. Ream, WSBA #18159
5         Email: lream@schwabe.com
          Davis Leigh, WSBA #58825
6         Email: dbleigh@schwabe.com
          Daniel R. Kubitz, WSBA #55512
7         Email: dkubitz@schwabe.com
          Schwabe, Williamson & Wyatt, P.C.
8         1420 5th Avenue, Suite 3400
          Seattle, WA 98101
9         Tel: 206-622-1711
          Fax: 206-292-0460
10

11   *Attorneys for Stapleton Group, Inc*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

[PROPOSED] ORDER GRANTING
RECEIVER'S MOTION - 15

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

134382\285395\46118120.v1

# EXHIBIT 4

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

FOR THE COUNTY OF KING

| | |
|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, a national banking association, in its capacity as Agent,<br><br>Petitioner,<br><br>vs.<br><br>NORTHWEST FISH COMPANY, LLC, a Washington corporation; PETER PAN SEAFOOD COMPANY, LLC, an Alaska limited liability company, ALASKA FISH HOLDINGS, LLC, a Delaware limited liability company, and RAYMOND MACHINE SHOP, LLC, a Washington limited liability company,<br><br>Respondents. | No. 24-2-08809-1 SEA<br><br>NOTICE OF CONCLUSION OF AUCTION AND DETERMINATION OF PREVAILING BID AND BACK-UP BID |

Pursuant to the Order (1) Approving Bid and Auction Procedures; (2) Scheduling Hearing to Approve Sale of Assets; and (3) Approving Assumption and Assignment of Executory Contracts ("Bid Procedures Order"), Peter Pan Seafoods, LLC ("Peter Pan"), by and through the Stapleton Group, Inc. ("Receiver"), hereby provides notice that it has concluded the auction contemplated by the Bid Procedures Order and has determined that the

bid in the amount of $37,324,000.00 submitted by Rodger May (the "Prevailing Bidder") constitutes the Prevailing Bid,[1] and that the bid in the amount of $37,067,320.00 submitted by Silver Bay Seafoods, L.L.C. (the "Back-Up Bidder") constitutes the Back-Up Bid.

Attached hereto as <u>Exhibit A</u> is a true copy of the asset purchase agreement conforming to the Prevailing Bid. Attached hereto as <u>Exhibit B</u> is a true copy of the bid confirmation sheet, asset purchase agreement, and schedules submitted by Silver Bay Seafoods, L.L.C.

Dated this 19th day of September, 2024.

SCHWABE, WILLIAMSON & WYATT, P.C.


By:     *s/ Lawrence R. Ream*                `
Lawrence R. Ream, WSBA #18159
Email: lream@schwabe.com
Davis Leigh, WSBA #58825
Email: dbleigh@schwabe.com
1420 5th Avenue, Suite 3400
Seattle, WA 98101

*Attorneys for General Receiver,*
*Stapleton Group, Inc.*

---

[1] Capitalized terms not defined herein have the meanings assigned to them in the Bid Procedures Order.

# EXHIBIT A

**PURCHASE AND SALE AGREEMENT**

BY AND BETWEEN

PETER PAN SEAFOOD COMPANY, LLC,
BY AND THROUGH ITS COURT-APPOINTED GENERAL RECEIVER ("**SELLER**")

AND

RODGER MAY ("**BUYER**")

DATED September 19, 2024

EXHIBITS002

PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "**Agreement**") is made as of September 19, 2024 (the "**Effective Date**"), by and between PETER PAN SEAFOOD COMPANY, LLC, an Alaska limited liability company, and ALASKA FISH HOLDINGS, LLC, a Delaware limited liability company, and through its Court appointed General Receiver ("**Seller**") and RODGER MAY ("**Buyer**").  This Agreement is made with reference to the following recitals:

RECITALS

WHEREAS, on April 25, 2024, the Superior Court of Washington in and for King County (the "**Court**") entered an order appointing Stapleton Group, Inc. as General Receiver (the "**Receiver**") for Seller and several related entities in Case No. 24-2-08809-1 SEA, as amended and restated by the Stipulated Order Amending Order Appointing General Receiver entered by the Court on June 25, 2024 (collectively the "**Order Appointing Receiver**");

WHEREAS, on August 21, 2024, the Court entered an Order Approving Bid and Auction Procedures ("**Order Approving Bid and Auction Procedures**");

WHEREAS, pursuant to the Order Appointing Receiver, the Receiver has the express authority to sell Seller's tangible and intangible real and personal property ("**Receivership or Receivership Estate**");

WHEREAS, Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, the rights and obligations of Seller to the Property and the Assumed Liabilities (as defined below), subject to the terms and conditions set forth herein, including approval of this Agreement by the Court ("**Sale Approval Order**") (collectively the Order Appointing Receiver, Order Approving Bid and Auction Procedures, Sales Approval Order, and any other orders issued by the Court may be referred to as the "**Orders**").

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

AGREEMENT

1.    Purchase and Sale.  Upon the terms and conditions set forth herein, Buyer agrees to buy from Seller and Seller agrees to sell to Buyer the Property, as defined below.

The "**Property**" as defined herein is comprised of the following:

(i)    The certain parcels of land located in Dillingham, AK; King Cove, AK; Naknek, AK; Port Moller, AK; Sand Point, AK; Seattle, WA; and as legally described on Exhibit A (the "**Land**"**)**;

EXHIBITS003

(ii)    The buildings, structures, improvements and fixtures located on the Property (collectively, the "**Improvements**");

(iii)    All rights, privileges, easements, rights and rights-of-way appurtenant to or used in connection with the Land, including without limitation all minerals, oil, gas and other hydrocarbon substances on or under the Land owned by Seller (if any), air rights, water, water rights and water stock relating to the Land (if any), and any and all other appurtenances and rights of Seller in and to public streets, walkways, driveways, parking, and any land lying in the bed of any existing or proposed public ways adjacent to the Land (all of which are collectively referred to as the "**Appurtenances**").

(iv)    Those executory contract and unexpired leases in effect with respect to the Property as of the Closing (the "**Executory Contracts**"), if any, for which Buyer voluntarily agrees to the assignment and assumption thereof, together with all security deposits, guarantees and other items given as security therefor.  Buyer is assuming, and being assigned by Seller, the following contracts:

- May 25, 1982, Lease between Peter Pan Seafoods and Alascom, Inc. for King Cove, AK Communications Site, with 1998 extension.

- July 20, 2012, Lease between Peter Pan Seafoods, Inc. and Heuker, Inc. in Alaska.

- December 28, 2018, Lease Renewal Option between Peter Pan Seafoods, Inc. and Heuker Brothers, Inc. for Alaska.

- March 10, 2022, Amendment to Lease Agreement between Peter Pan Seafoods, Inc. and Heuker Brothers, Inc. for July 20, 2012, Lease.

- 2022 Lease Agreement between Telco Properties and Peter Pan Seafoods Company, LLC for King Cove, Alaska [unsigned].

- October 1, 2008, Lease Real Property between Dave Bash and Peter Pan Seafoods, Inc. for Bash Warehouse at King Cove, AK. Amendment No. 1 to Lease Real Property between Dave Bash and Peter Pan Seafoods, Inc. for Bash Warehouse at King Cove, AK.

- Lease Agreement effective September 1, 2014 between the State of Alaska, Department of Natural Resources, as Lessor, and Peter Pan Seafoods, Inc., as Lessee, recorded on November 20, 2015 as Reception No. 2015-000417-0, records of the Aleutian Islands Recording District, Third Judicial District, State of Alaska.

Buyer shall bear the full cost and expense of curing any existing monetary and non-monetary defaults under any assumed and assigned Executory Contracts, if any.

EXHIBITS004

(v)    All assignable development rights, entitlements, permits, approvals, warranties and other documents associated with the Property which the Buyer accepts assignment thereof;

(vi)    The personal property and intangible property owned by Seller, located at the Land and used solely in connection with Seller's ownership and operation of the Land (subject to depletion and consumption prior to the Closing Date) identified in the table below which may not be located on the Land:  (collectively the "**Personal and Intellectual Property**");

| Type or Category: | Description: |
|---|---|
| Crab Quota | Individual Processing Quota (IPQ) Permit for Bristol Bay Red King Crab (BBR), and Eastern Bering Sea Tanner crab (EBT) and Western Bering Sea Tanner crab (WBT) |
| Cod Quota | Pacific Cod Trawl Cooperative Program QS Permit for BSAI Pacific Cod |
| Peter Pan Seafoods Fish Brand | Registered and unregistered intellectual property rights for the Peter Pan Seafoods Fish brand, including trademark registrations listed on Schedule 1.vi. |
| Peter Pan Seafoods Branded Fish Supplies | Primarily packaging for fish sales that carries the Peter Pan Seafoods brand |
| Peter Pan Seafoods Ikura Brand | Registered and unregistered intellectual property rights for the Peter Pan Seafoods Ikura (salmon roe) brand, including trademark registrations listed on Schedule 1.vi. |
| Peter Pan Seafoods Branded Ikura Supplies | Primarily packaging for Ikura sales that carries the Peter Pan Seafoods brand |
| Supplies located at the Dillingham processing plant | Packaging, labels, housewares, consumables for plant personnel, etc. |
| Supplies located at the Port Moller processing plant | Packaging, labels, housewares, consumables for plant personnel, etc. |
| Supplies located at the King Cove processing plant | Packaging, labels, housewares, consumables for plant personnel, etc. |
| American Fisheries Act Processor Permit 5358 | Cooperative fleet Pollack processing rights related to the King Cove processing facility |
| Membership Interest in Kent Warehouse and Labeling, LLC | 100 Units of Kent Warehouse and Labeling, LLC, a Washington limited liability company ("KWL"), which |

| | represents 33.33% of the outstanding membership interests of the company.<br><br>*For the avoidance of doubt*, neither the KWL Membership Interest nor any other Property sold pursuant to this Agreement includes any rights to past due member distribution from KWL, which rights shall remain with Seller. |
|---|---|
| Membership Interest in Peter Pan Harvest LLC | 8,000 Units of Peter Pan Harvest, LLC, an Alaska limited liability company ("**Harvest**"), which represents 100% of the outstanding membership interests of the company (the "**Harvest Membership Interest**") |
| Rights Related to KWL Membership Interest and Harvest Membership Interest | Rights, claims or defenses with respect to the initiated transfer of the KWL Membership Interest from Seller to Harvest pursuant to the Transfer and Assignment of Membership Interests dated April 25, 2024.<br><br>Rights, claims or defenses (including the right to proceeds) should KWL and/or OBI Seafoods, LLC exercise or attempt to exercise any redemption right, right of first refusal or similar right with respect to the KWL Membership Interest. |

       (vii)    All assignable licenses, plans, specifications, engineering reports, environmental reports or other work product related to the Property, including without limitation, copies of all data uploaded to the virtual data room in connection with this sale transaction by the Receiver and its advisors.

       2.    <u>Price</u>.

       2.1.    <u>Purchase Price</u>.  The aggregate purchase price for the Property shall be Thirty Seven Million Three Hundred Twenty Four Thousand and No/100 Dollars ($37,324,00.00) (the "**Purchase Price**"), which Buyer shall pay to Seller at Closing (as defined herein) as follows, subject to prorations and closing adjustments:

       (i) a "**Cash Component**" in the amount of Twenty Five Million Three Hundred Twenty Four Thousand and No/100 Dollars ($25,324,000.00) (estimated by Seller to equal the amount of all senior secured claims and administrative claims as of September 16, 2024), subject to the provisions of Section 2.3.  The Cash Component will be paid by Buyer to Seller at Closing, with a credit for the Good Faith Deposit as provided in Section 3 below, which shall be payable in good and immediately available funds at Closing.

       (ii) a "**Credit Component**" consisting of a credit bid in the amount of $12,000,000 associated with Buyer's secured debt.

2.2.    [Intentionally Omitted]

2.3.    <u>Minimum Cash Component</u>.   At Closing, the Cash Component of the Buyer's Purchase Price must meet or exceed the amount of (a) the Administrative Claims (as defined below) plus (b) the Senior Secured Claim Balance (as defined below), minus (c) Receiver's actual collections between September 16, 2024, and the Closing (the "**Minimum Cash Component**").   In the event that, at Closing, the Buyer's Cash Component of the Purchase Price is less than the Minimum Cash Component, the Buyer shall increase the Cash Component of the Purchase Price to meet or exceed the Minimum Cash Component.   Conversely, in the event that, at Closing, the Buyer's Cash Component of the Purchase Price exceeds the Minimum Cash Component (a "**Surplus**"), Buyer and Seller will negotiate in good faith the terms of a credit towards the Cash Component in the amount of such Surplus, a refund of such Surplus, or other mutually acceptable arrangement to prevent an unintended overpayment of such Surplus.

2.4    <u>Purchase Price Allocation</u>.  Seller has required, as a non-negotiable term of this Agreement, that Buyer complete the following Purchase Price Allocation table ("Table 1").

<u>TABLE 1</u>

| Asset | Purchase Price Allocation[1] |
|---|---|
| Dillingham Processing Plant, including all real property, equipment, machinery, and fixtures, but excluding supplies | Cash Amount:  $3,000,000<br>Credit Bid:  $8,000,000<br>Total Purchase Price: $11,000,000 |
| Supplies located at the Dillingham processing plant, inventory for which is posted in the VDR | Cash Amount:  $600,000<br>Credit Bid:  $1,000,000<br>Total Purchase Price: $1,600,000 |
| Port Moller Processing Plant, including all real property, equipment, machinery, and fixtures, but excluding supplies | *(Real Property & Fixtures)*<br>Cash Amount:  $250,000<br>Credit Bid:<br>Total Purchase Price: $250,000<br>*(Equipment & Machinery)*<br>Cash Amount:  $8,750,000<br>Credit Bid:<br>Total Purchase Price: $8,750,000 |
| Supplies located at the Port Moller processing plant, inventory for which is posted in the VDR | Cash Amount:  $1,300,000<br>Credit Bid:  $1,000,000<br>Total Purchase Price: $2,300,000 |
| King Cove Processing Plant, including all real property, equipment, machinery, and fixtures, but excluding supplies | Cash Amount:  $200,000[2]<br>Credit Bid:<br>Total Purchase Price: $200,000 |

---

[1] Subject to Buyer's reallocation at Closing, including without limitation, to account for changes made pursuant to Section 2.3.

[2] Further allocated as follows:  $1 for the real property and fixtures; $199,999 for the equipment and machinery.

EXHIBITS007

| | |
|---|---|
| Supplies located at the King Cove processing plant, inventory for which is posted in the VDR | Cash Amount: $1,250,000<br>Credit Bid:<br>Total Purchase Price: $1,250,000 |
| Dillingham "PAF" boat yard storage facility, including all real property, equipment, machinery, fixtures, and supplies | Cash Amount: $2,000,000<br>Credit Bid: $100,000<br>Total Purchase Price: $2,100,000 |
| NakNek support facility, including all real property, equipment, machinery, fixtures, and supplies | Cash Amount: $200,000<br>Credit Bid:<br>Total Purchase Price: $200,000 |
| Sand Point support facility, including all real property, equipment, machinery, fixtures, and supplies | Cash Amount: $300,000<br>Credit Bid:<br>Total Purchase Price: $300,000 |
| Seattle Ballard Warehouse, including all real property, equipment, machinery, fixtures, and supplies | Cash Amount: $2,400,000<br>Credit Bid: $100,000<br>Total Purchase Price: $2,500,000 |
| Crab Quota | Cash Amount:<br>Credit Bid: $100,000<br>Total Purchase Price: $100,000 |
| Peter Pan Seafoods Fish Brand | Cash Amount: $100,000<br>Credit Bid:<br>Total Purchase Price: $100,000 |
| Peter Pan Seafoods Branded Fish Supplies, inventory for which is posted in the VDR | Cash Amount: $100,000<br>Credit Bid:<br>Total Purchase Price: $100,000 |
| Peter Pan Seafoods Ikura Brand | Cash Amount: $100,000<br>Credit Bid:<br>Total Purchase Price: $100,000 |
| Peter Pan Seafoods Branded Ikura Supplies, inventory for which is posted in the VDR | Cash Amount: $274,000<br>Credit Bid:<br>Total Purchase Price: $274,000 |
| American Fisheries Act Permit 5358 | Cash Amount: $700,000<br>Credit Bid: $300,000<br>Total Purchase Price: $1,000,000 |
| Cod Quota | Cash Amount:<br>Credit Bid: $200,000<br>Total Purchase Price: $200,000 |
| KWL Membership Interest, Harvest Membership Interest and Related Rights | Cash Amount: $3,800,000<br>Credit Bid: $1,200,000<br>Total Purchase Price: $5,000,000 |

**TOTAL: $37,324,000**

2.4    Package Deal. Notwithstanding anything in Section 2.3, Buyer is agreeing to purchase the Property as a package deal, with Buyer's express purpose in entering into this Agreement to acquire either all, or none, of the Property.

EXHIBITS008

2.5.    Surety Bond for Port Moller.

If required to do so by the King County Superior Court ("**Court**") in connection with its entry of an order approving the transactions contemplated hereby, Buyer shall make, execute and post one or more surety bonds ("**Bond**") with the Court at Closing, in an amount determined by the Court, as the principal to the Bond, with respect to the deed of trust on the Port Moller Property (305 Aleutian Islands Recording District No. 2023-000209-0) ("**Deed of Trust**") held by John Ketcham, as the obligee to the Bond. The surety company ("**Surety Company**") issuing the Bond shall be a company duly and legally authorized to do business in the State of Washington and acceptable to the Seller. Nothing in this Section 2.5 or elsewhere in this Agreement is intended to restrict, limit, or otherwise impair Buyer's arguments to the Court why no such Bond should be required.

2.6    Application of Sale Proceeds; Payment of Senior Secured Claims and Administrative Expenses. As of September 16, 2024, Seller estimated all administrative expenses (including but not limited to wind down costs and professional fees) ("**Administrative Claims**") to be $8,181,000. As of September 16, 2024, Seller estimated senior secured claims to be $32,512,000 and expected collections prior to Closing to be $15,369,000, which would be applied towards such senior secured claims, resulting in an estimated balance of $25,324,000 at Closing ("**Senior Secured Claim Balance**").

2.6.1.  Seller will apply the sale proceeds first to pay off the Senior Secured Claim Balance in accordance with this Section 2.5.1. Within five (5) days after Closing, Seller shall provide Buyer with an updated and itemized list of all claims and claim amounts comprising the Senior Secured Claim Balance, which Seller intends to pay with proceeds from the sale. Buyer will have three (3) days within which to notify Seller in writing of any disputed claim. Buyer and Seller agree to negotiate any such disputed claim in good faith, and to escalate any issue that cannot be resolved through negotiation to the court for resolution.[3]

2.6.2.  Seller will then apply the remainder of the sale proceeds to pay off Administrative Claims. Upon termination of the Receivership, any remaining funds will be returned to Buyer (as such funds will at that point be among the assets of the estate being acquired by Buyer pursuant to the terms of this Agreement).

3.    Good Faith Deposit. Seller acknowledges that, prior to the Bid Deadline, Buyer deposited in cash with the Receiver a Good Faith Deposit of $2,700,000 (the "**Good Faith Deposit**").

---

[3] By way of example only, Buyer expressly disputes that the Seafood Marketing Assessment by the State of Alaska for $507,740.79 (as reflected in a Statement of Account dated August 12, 2024) is senior to Buyer's secured debt. Accordingly, Buyer and Seller agree to engage in a good faith discussion regarding the relative priority of the Seafood Marketing Assessment before any disbursement to the State of Alaska associated with such debt and further agree that, if Buyer and Seller are unable to agree on the relative priority of the Seafood Marketing Assessment, Buyer shall have the right to seek court guidance before any such disbursement by Seller.

EXHIBITS009

The Good Faith Deposit shall be held and disbursed as provided in this Agreement. The Good Faith Deposit, together with all interest accrued thereon, shall be fully applicable to the Purchase Price at Closing.

4.    Title.

4.1    Preliminary Commitment and Title Insurance. Buyer shall, at Buyer's sole cost and expense, seek a standard form ALTA Standard Coverage Owner's Policy of Title Insurance issued by a title company in the amount of the Purchase Price showing title to the Property vested in Buyer (the "**Title Policy**"), subject to the standard printed exceptions for standard coverage policies and any encumbrances, restrictions, easements or other matters contained in the Preliminary Commitment or on the Survey (the "**Permitted Exceptions**"). The Title Policy shall also include such endorsements as Buyer may reasonably request. The cost of any endorsements requested by Buyer, the cost of the premium increase for extended coverage if Buyer elects to obtain extended coverage (or for coverage in excess of the Purchase Price), and the cost of any survey required for extended coverage shall be paid by Buyer.

4.2    Survey. If Seller possesses a survey for the Property ("**Survey**"), Seller shall provide Buyer with a copy of any Survey in the VDR, which Buyer may review prior to the Bid Deadline. Buyer may, at Buyer's sole cost and expense, seek to update such Survey or recertify such Survey.

5.    Review of Property.

5.1    Review Materials. Buyer acknowledges that Seller has made available to Buyer certain review materials related to the Property (the "**Review Materials**") in the VDR including, but not limited to: (a) copies of service contracts and leases for the Property, if any, in the Receiver's possession; (b) copies of a litigation guarantee for the Property, if any, obtained by the Receiver and in the Receiver's possession; (c) any reports, surveys, agreements relating to the Property, if any, in the Receiver's possession, including but not limited to any document related to the presence of Hazardous Substances on, in, under, or migrating from the Property, whether a draft or final version, which includes reports, agreements, studies, data, cost estimates, scopes of work, and rough orders of magnitude; (d) copies of permits, approvals, authorizations, insurance policies, and property tax bills relating to the Property, if any, in the Receiver's possession; and (e) the Consent Decree entered by the United States District Court for the District of Alaska on July 11, 2024, in *United States v. PSF, Inc.*, Civil Action No. 3:24-cv-00112-HRH, including any subsequent amendment or modification (the "**Consent Decree**").

5.2    Review Period. Buyer had the opportunity to inspect said Review Materials and the Property prior to the Bid Deadline (the "**Review Period**"), including all books, records, legal documents and other information in the VDR. Following the Review Period, Buyer has determined, in Buyer's sole and absolute discretion, that it desires to acquire the Property in its existing condition.

5.3    Indemnification for Entry on the Property. Buyer hereby indemnifies and agrees to defend and hold harmless Seller and Seller's partners, employees, licensees, contractors, agents, and invitees (individually, each a "**Seller Party**" and collectively,

EXHIBITS010

"**Seller Parties**") from and against any and all obligations, losses, injuries, damages, claims, liens, costs, expenses, demands, liabilities, penalties and investigation costs, including reasonable attorneys' fees and costs, incurred in connection with or arising out of any entry on the Property by Buyer or any of Buyer's Consultants, except to the extent caused, or contributed to, by Seller or Seller Parties' negligence or willful misconduct.  The provisions of this Paragraph shall survive the termination of this Agreement or Closing.

6.    Closing and Escrow Instructions.

6.1    Escrow Instructions.  Upon execution of this Agreement, the parties hereto shall deposit an executed counterpart of this Agreement with First American Title Insurance Company  ("**Title Company**"), and this instrument shall serve as the instructions to the Title Company as the escrow holder for consummation of the purchase and sale contemplated hereby. Seller and Buyer agree to execute such reasonable additional and supplementary escrow instructions as may be appropriate to enable the Title Company to comply with the terms of this Agreement; provided, however, that in the event of any conflict between the provisions of this Agreement and any supplementary escrow instructions, the terms of this Agreement shall supersede and control.

6.2    Time and Place of Closing.  Subject to the terms and conditions herein, the transactions contemplated hereby shall be consummated (the "**Closing**") by October 15, 2024 (the "**Outside Closing Date**"), or such other date and time as may be set by the Receiver in its sole discretion.  For purposes hereof, the Closing shall be deemed to occur at 12:01 a.m. Pacific Time on the Closing Date.  As used in this Agreement, "**Closing**" or "**Closing Date**" means the date on which all appropriate documents are recorded and the proceeds of sale are available for disbursement to Seller.

6.3    Title; Risk of Loss.  Title to and risk of loss with respect to the Property shall remain with Seller until Closing and thereafter shall vest in Buyer in accordance with the terms and conditions of this Agreement. Pursuant to the Order Appointing Receiver, the Receiver has the right to sell the Property free and clear of all such liens, claims, security interests, or encumbrances ("**Liens**"), except as otherwise provided for in the Agreement, with the proceeds from the purchase and sale contemplated herein attaching to the Liens in their respective order of priority as determined by applicable law.

6.4    Release of All Liens.  Upon receipt by Seller of the Purchase Price and entry of the Sale Approval Order (defined below), the Property shall be deemed automatically released from all Liens without further action by any person; provided, however, it being understood that the Liens attached to the Property shall attach to the proceeds received for the Property to the same extent, validity, and priority as existed on April 22, 2024.  Aside from the Liens, all Permitted Exceptions set forth in the Commitment shall survive Closing, including but not limited to the Consent Decree, permits, authorizations, and approvals in connection with the Property and all renewals, replacements, extensions, transfers of the same.

6.5    Closing Costs.

EXHIBITS011

(a)     <u>Seller's Costs at Closing</u>.  At Closing, Seller shall pay one-half of Title Company's escrow fees and charges.

(b)     <u>Buyer's Costs at Closing</u>.   At Closing, Buyer shall pay (i) the premium for standard coverage policy of title insurance and the cost of the increased title premium for extended coverage, (ii) the costs of any title insurance endorsements required by Buyer, (iii) one-half of Title Company's escrow fees and charges, and (iv) the costs of any city, county and/or state transfer taxes associated with the transfer of the Property and Personal Property, and recording charges.

(c)     Each party shall be responsible for its own legal, accounting, and consultant fees.

6.6     <u>Prorations</u>.  All real property taxes, special taxes, any similar taxes and assessments imposed on the Property, utilities, and any income or expense related to the Property shall be apportioned as of 12:01 a.m. on the Closing Date, as if Buyer were vested with title to the Property during the entire Closing Date, such that Buyer shall have the benefit of the income and the burden of expenses for the Closing Date.  Any income and other revenue and expenses of the Property shall be prorated based upon the income and expenses actually collected or paid for the month in which Closing occurs.

6.7     <u>Sale Approval Order as a Condition to Closing</u>. The obligations of the parties to consummate the transactions contemplated by this Agreement shall be subject to Approval of this Agreement by the Court ("**Sale Approval Order**"), which Seller and Buyer shall use commercially reasonable efforts to obtain upon Seller's acceptance of Buyer's bid.  If the Court will not approve a sale to Buyer by entry of a Sale Approval Order by the Closing Date, the Seller may terminate this Agreement and seek to enter into a purchase and sale agreement for the Property for the designated Back-Up Bid (as defined in the Orders). No Court order, dispute, or appeal shall excuse Buyer from its obligation to close on the Property.

6.8     <u>Failure to Close</u>.  If for any reason Buyer is unable or unwilling to consummate an approved sale because of breach or failure, without legal excuse, to perform on the part of the Buyer, (1) the Receiver may terminate this Agreement and, upon termination, Buyer will forfeit its Good Faith Deposit to the Receiver; (2) the Receiver may pursue any and all of its options at law and in equity with respect to such breach; and (3) the Receiver shall be entitled to enter into a purchase and sale agreement for the Property for the designated Back-Up Bid (as defined in the Orders).

7.     <u>Deliveries at Closing</u>.

7.1     <u>Seller's Deliveries</u>.  At Closing, Seller shall deliver the following:

7.1.1     **Deed**.  An executed Quit Claim Deed, in the form attached hereto as <u>Exhibit B</u>, conveying title to the Property to Buyer (the "**Deed**").

7.1.2     **FIRPTA Affidavit**.  A sworn FIRPTA Affidavit stating under penalty of perjury that Seller is not a "foreign person" as such term is defined in Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended ("**Code**"), or such other evidence as Buyer and

EXHIBITS012

Escrow Holder may require showing that Buyer is not required to withhold taxes from the Purchase Price under Section 1445(a) of the Code.

           7.1.3   **Bill of Sale**.  An executed Bill of Sale, in the form attached hereto as <u>Exhibit C,</u> assigning to Buyer the Personal Property items identified in Section 1(vi) above (the "**Bill of Sale**").

           7.1.4  **Assignment and Assumption of Executory Contracts and Unexpired Leases**.  An executed Assignment and Assumption of Executory Contracts and Leases in the form attached to this Agreement as <u>Exhibit D</u> (the "**Assignment of Executory Contracts and Unexpired Leases**").

           7.1.5  **Assignment and Assumption of Permits/Approvals.**  An executed Assignment and Assumption of Permits and Approvals in the form attached to this Agreement as Exhibit E (the "Assignment of Permits and Approvals").

           7.1.6  **Closing Statement**.  A final closing statement prepared by the Title Company showing the application of the Good Faith Deposit against the Purchase Price, the allocation of the Closing Costs and other prorations and closing adjustments set forth in this Agreement, all consistent with the terms and conditions of this Agreement (the "**Closing Statement**").

        7.2   <u>Buyer's Deliveries</u>.  At each Closing, Buyer shall deliver the following:

           7.2.1  **Purchase Price**. The portion of the Purchase Price payable pursuant to Section 2, as adjusted pursuant to Sections 3, 6.5 and 6.6, and such other amounts as may be due from Buyer pursuant to the Settlement Statement, by wire transfer of immediately available funds to Seller. The Good Faith Deposit shall be applied to and credited against the Purchase Price and shall be disbursed to Seller by Escrow Agent at Closing (or as otherwise set forth in this Agreement).

           7.2.2  A Bond, as provided for in Section 2.5, if ordered by and in the amount determined by the Court in the Sale Approval Order, if any.

           7.2.3  **Evidence of Authority**. Such authorizing documents of Buyer as shall be reasonably required by the Title Company to evidence Buyer's authority to consummate the transactions contemplated by this Agreement.

           7.2.4  **Bill of Sale**.  An executed counterpart of the Bill of Sale.

           7.2.5  **Assignment and Assumption of Executory Contracts and Unexpired Leases**.  An executed counterpart of the Assignment and Assumption of Executory Contracts and Unexpired Leases.

           7.2.6  **Assignment and Assumption of Permits/Approvals.**  An executed counterpart of the Assignment and Assumption of Permits and Approvals.

EXHIBITS013

7.2.7 **Closing Statement**. An executed counterpart of the Closing Statement.

8. <u>Representations and Warranties</u>.

8.1 <u>Representations and Warranties of Seller</u>. Seller represents and warrants to Buyer as follows:

8.1.1 **Authority; No Conflicts or Consents**. Subject to the Sale Approval Order, the Receiver has the full power and authority to execute, deliver and perform Seller's obligations under this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby.

8.1.2 **No Other Representations and Warranties**. Except for the representations and warranties contained herein, neither Seller nor Receiver or its agents and professionals has made or makes any other express or implied representation or warranty, either written or oral, for or on behalf of Seller.

8.1.3 **Termination of Seller's Representations and Warranties at Closing**. All of the representations and warranties of Seller set forth in this Agreement shall terminate at Closing.

8.2 <u>Representations and Warranties of Buyer</u>. Buyer represents and warrants to Seller as follows:

8.2.1 **Organization and Authority of Buyer; Enforceability**. Buyer has full power and authority to enter into and perform his obligations under this Agreement. Buyer does not need approval of its creditors or any other third party to enter into this Agreement and perform his obligations hereunder. This Agreement is a binding obligation of Buyer enforceable in accordance with its terms.

8.2.2 **No Conflicts; Consents**. The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (i) violate or conflict with the certificate of formation or other organizational documents of Buyer; or (ii) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Buyer. No consent, approval, waiver or authorization is required to be obtained by Buyer from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby.

8.3 <u>Acknowledgement and Assumption of Liabilities.</u> Buyer acknowledges and agrees that upon Closing, Buyer shall assume and agrees to fulfill, perform, pay and discharge (or cause to be fulfilled, performed, paid and discharged) any and all rights, liabilities, and obligations known or unknown, associated with the Property regardless of whether such rights, liabilities, or obligations arose prior to, on or after Closing (all of said obligations and liabilities, the "**Assumed Liabilities**"). To avoid doubt, Buyer's Assumed Liabilities include, but are not limited to, the terms and conditions of the Consent Decree as modified or amended. Buyer further acknowledges

EXHIBITS014

and agrees that the United States has jurisdiction and authority to enforce the Consent Decree directly against the Buyer without the participation, intervention, or involvement of Seller whatsoever. Buyer of the King Cove Facility further agrees to submit to the jurisdiction of the United States Federal District Court for the District of Alaska and be named as a defendant to the Consent Decree, including any modification or amendment thereto, entered in *U.S. v. PSF, Inc. et al*, civ. no 3:24-cv-00112-HRH.

8.4     <u>Acknowledgement and Assumption of Permits and Approvals.</u>  Buyer acknowledges and agrees that upon Closing, Buyer shall assume and agrees to fulfill, perform, pay and discharge (or cause to be fulfilled, performed, paid and discharged) any and all rights, liabilities, and obligations known or unknown, arising from or related to any Permit or Approval regardless of whether such rights, liabilities or obligations arose prior to, on or after Closing (all of said obligations and liabilities, the "**Assumed Permits and Approvals**"). The Assumed Permits and Approvals include, but are not limited to, the permits and approvals listed on <u>Schedule 8.4</u>. Buyer agrees to execute the Assignment and Assumption of Permits and Approvals at the time of closing attached hereto as <u>Exhibit E</u>.

8.5     <u>Reasonably Equivalent Value.</u>    The consideration given and to be exchanged by Buyer and to be received by Seller as provided in this Agreement, shall constitute a contemporaneous or substantially contemporaneous exchange of reasonably equivalent value for the Property transferred by Seller to Buyer, (ii) Buyer entered into this Agreement in good faith, (iii) Buyer does not require any further information, facts, research, evidence, or third party analysis or opinion in connection with Buyer's decision to execute this Agreement and (iv) Buyer shall not have the right to benefit in any manner, either directly or indirectly, from the assertion by any person or entity that the receipt by Buyer of consideration to be exchanged pursuant to this Agreement, shall constitute or shall have constituted less than reasonably equivalent value for the consideration given pursuant to this Agreement, or a preferential payment with respect to any debts or obligations resolved pursuant to this Agreement.

8.6     <u>[Intentionally Omitted]</u>

9.     <u>Post Closing Inspection and True-Up</u>.  In the case of the Dillingham, Port Moller, and King Cove properties, if the Buyer makes a written request for a physical count ("True-Up Inspection") of the supplies inventory or the appraised machinery and equipment ("M&E") within three (3) days of Closing, Seller shall conduct a True-Up Inspection within fourteen (14) days of Buyer's written request, the cost of such True-Up Inspection to be shared equally between the Seller and the Buyer.

9.1     <u>Supplies Inventory True-Up</u>. If the Seller's True-Up Inspection reveals that greater than ten percent (10%) of the book value is not available to transfer to the Buyer in comparison to what Seller had represented as available in the VDR (the "Unavailable Supplies"), the Buyer shall be entitled to a credit to its purchase price ("Purchase Price Credit") for the book value of Unavailable Supplies that exceeds ten percent (10%), calculated by multiplying the dollar book value in excess of 10% times the percent of book value at which the Buyer purchased the supplies.

EXHIBITS015

9.2    <u>Appraised M&E True-Up.</u>  If the Seller's True-Up Inspection reveals that an M&E asset is not available to transfer to the Buyer in comparison to what Seller had represented as available per the *Hilco Valuation Services M&E Appraisal Report, dated May 12, 2023* (the "Appraisal Report") and posted in the VDR (the "Unavailable Appraised Equipment"), the Buyer shall be entitled to a Purchase Price Credit, calculated by multiplying a) the Net Forced Liquidation Value (or "NFLV", as defined in the Appraisal Report) of the Unavailable Appraised Equipment times b) the purchase price for the property, including its M&E, divided by c) the sum of the NFLV for the property and the NFLV for the M&E.

For both the Supplies Inventory True-Up and Appraised M&E True-Up, if, following the True-Up Inspection, a credit is owed to the Buyer, the Purchase Price Credit shall first be deducted from the Buyer's credit bid, if any, that the Buyer submitted as part of the Purchase Price, and, following such deduction, the Buyer shall be entitled to a cash reimbursement for the remaining Purchase Price Credit true-up.

For the sake of clarification, the true-up provisions provided for in this Section shall not be applicable to any properties other than Dillingham, Port Moller and King Cove, nor shall the true-up provisions be applicable to any M&E or other asset for which no appraisal exists.

10.    <u>Indemnification Post-Closing.</u>  Buyer hereby agrees to indemnify, defend, and hold harmless Seller, Receiver, and its professionals from and against any and all losses, liability, claims, agency orders or requirements, damages, and expenses ("Claims"), relating to or arising out of, directly or indirectly, the Property, the Receivership, and the auction process, including, without limitation, those Claims relating to the actual or threatened release, discharge, disposal, deposit, seepage, migration, or escape of any Pollutant at, from, into, or underneath the Property, and the compliance or noncompliance of the Property with applicable federal, state, county, and local laws and regulations including, without limitation, Environmental Laws and regulations. For purposes of this Agreement, the term "Pollutant" means any hazardous substance, dangerous waste, solid waste, pollutant, contaminant, or other material that now or in the future becomes regulated or defined under any local, state, or federal Environmental Law. For purposes of this Agreement, "Environmental Law" means any federal, state, or local statute, regulation, code, rule, ordinance, order, judgment, decree, injunction, or common law, pertaining in any way to the protection of human health, safety, water quality, or any other aspect of the environment, including without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 et seq. ("CERCLA"); the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq. ("RCRA"); the Federal Water Pollution Control Act ("Clean Water Act"), 33 U.S.C. § 1251 et seq., the Clean Air Act, 42 U.S.C. § 7401 et seq., their respective rules and regulations, and any laws concerning above ground or underground storage tanks.  To avoid doubt, Buyer's obligation to indemnify, defend, and hold harmless includes Claims arising from or related to the Assumed Liabilities and Assumed Permits and Approvals.

11.    <u>AS-IS PURCHASE.</u>

11.1    <u>Independent Investigation.</u>  Buyer has conducted its own independent investigation, review and analysis of the Property.  Buyer acknowledges and agrees that: (i) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and (ii) neither Seller nor any other

EXHIBITS016

person has made any representation or warranty as to Seller, the Property or this Agreement, except as expressly set forth in Section 8.1 of this Agreement.

11.2 "AS IS, WHERE IS." EXCEPT FOR THE SITE PREPARATION WORK, BUYER IS PURCHASING THE PROPERTY "AS IS, WHERE IS" IN ITS PRESENT CONDITION. BUYER HAS THE OPPORTUNITY TO INSPECT THE PROPERTY AND THE REVIEW MATERIALS AS PROVIDED HEREIN. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT AND IN THE CONVEYANCE DOCUMENTS INCLUDING WITHOUT LIMITATION SELLER'S REPRESENTATIONS AND WARRANTIES IN SECTION 8, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO: (A) THE CONDITION OF THE PROPERTY OR THE SUITABILITY OF THE PROPERTY FOR BUYER'S INTENDED USE; (B) ANY APPLICABLE BUILDING, ZONING OR FIRE LAWS OR REGULATIONS OR WITH RESPECT TO COMPLIANCE THEREWITH OR WITH RESPECT TO THE EXISTENCE OF OR COMPLIANCE WITH ANY REQUIRED PERMITS, IF ANY, OF ANY GOVERNMENTAL AGENCY. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS EXPRESSLY SET FORTH HEREIN, SELLER SHALL HAVE NO LIABILITY WITH RESPECT TO THE CONDITION OF THE PROPERTY UNDER COMMON LAW, OR ANY FEDERAL, STATE, OR LOCAL LAW OR REGULATION. BUYER ACKNOWLEDGES THAT BUYER IS GIVEN THE OPPORTUNITY UNDER THIS AGREEMENT TO FULLY INSPECT THE PROPERTY AND BUYER ASSUMES THE RESPONSIBILITY AND RISKS OF ALL DEFECTS AND CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUCH DEFECTS AND CONDITIONS, IF ANY, THAT CANNOT BE OBSERVED BY CASUAL INSPECTION.

12. Brokers and Finders. In the event of a claim for broker's fee, finder's fee, commission or other similar compensation in connection with this Agreement, Buyer, if such claim is based upon any agreement alleged to have been made by Buyer, hereby agrees to indemnify Seller against any and all damages, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and costs) that Seller may sustain or incur by reason of such claim. Seller, if such claim is based upon any agreement alleged to have been made by Seller, hereby agrees to indemnify Buyer against any and all damages, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and costs) that Buyer may sustain or incur by reason of such claim. The provisions of this Section 12 shall survive the termination of this Agreement or the Closing.

13. Possession. Buyer shall be entitled to possession of the Property on the Closing Date, free and clear of other parties in possession.

14. Default and Remedies.

14.1 Default by Buyer. If Buyer fails without legal excuse to complete the purchase of the Property in accordance with the terms of this Agreement, the Good Faith Deposit deposited by Buyer shall be forfeited as liquidated damages to Seller. Buyer and Seller expressly agree that the delivery to and retention of the Good Faith Deposit by Seller represents a reasonable estimation of the damages in the event of Buyer's default, that actual damages would be difficult to ascertain as of the date hereof, and this provision does not constitute a penalty. However, the

provisions of this Section 14.1 shall not limit or reduce any indemnification obligation of Buyer in this Agreement.

                  14.2    <u>Default by Seller</u>.  If Seller fails without legal excuse to complete the sale of the Property in accordance with the terms of this Agreement, Buyer may pursue specific performance of Seller's obligations under this Agreement or terminate this Agreement and be refunded its Good Faith Deposit.

        15.    <u>Negotiation and Construction</u>.   This Agreement and each of the terms and provisions hereof are deemed to have been explicitly negotiated between the parties, and the language in all parts of this Agreement shall, in all cases, be construed according to its fair meaning and not strictly for or against either party.

        16.    <u>Governing Law, Attorneys' Fees</u>.  This Agreement shall be construed according to the laws of the state of Washington and Buyer consents to the jurisdiction of the Court (defined above).  If either Buyer or Seller should find it necessary to employ an attorney to enforce a provision of the Agreement or to recover damages for the breach hereof (including proceedings in bankruptcy), the prevailing party shall be entitled to be reimbursed for its court costs and reasonable attorneys' fees, in addition to all damages, through all levels of appeal.

        17.    <u>Notices</u>.  All notices, demands, requests, consents and approvals that may, or are required to, be given by any party to any other party hereunder shall be in writing and shall be deemed to have been duly given if (a) delivered personally, (b) sent by a nationally recognized overnight delivery service, (c) electronically transmitted via email, or (d) if mailed or deposited in the United States mail and sent by registered or certified mail, return receipt requested, postage prepaid to:

            SELLER:                  Peter Pan Seafood Company, LLC
                                          Attn: David Stapleton, Court Appointed Receiver
                                          514 Via De La Valle, Suite 210
                                          Solano Beach, CA 92075

            BUYER:                   Rodger May
                                          c/o Summit Law Group, PLLC
                                          Attn:  Chris Wion
                                          Telephone: (206) 767-7019
                                          Email: chrisw@summitlaw.com

        Either party hereto may by proper notice made by the other party designate such other address for giving of notices.  All notices shall be deemed given on the day such notice is delivered (or if refused, the date of such refusal) or transmitted by email (provided that confirmation of email transmission is before 5:00 p.m. on a Business Day, and, if after such time, then on the next Business Day) or on the third Business Day following the date such notice is mailed in accordance with this Section.

        18.    <u>Assignment</u>.   Buyer may assign and delegate all of its rights, interests and obligations under this Agreement without the prior approval or consent of Seller to any entity of

EXHIBITS018

which Buyer has financial control and responsibility for day-to-day management. Only for purposes of setting up a single-purpose-entity, Buyer may assign this Agreement to a wholly-owned single-purpose entity, so long as Buyer remains liable hereunder. Except as set forth above, Buyer shall not assign any right, interest or obligation under this Agreement without Seller's express prior written consent, which consent may be granted or withheld by Seller, in its sole discretion.

19.　　Cooperation; Further Assurances.  From the date hereof until the Closing, the parties shall reasonably cooperate with one another in connection with any steps required to be taken by either of them to carry out or otherwise fulfill the intent of this Agreement.  Upon the request of the other party, each party shall also furnish upon request any further information, execute and deliver any other documents, and do other acts and things as are reasonably necessary for the purpose of carrying out the intent of this Agreement.

20.　　Business Days; Time.  A "Business Day" means any day other than a Saturday or Sunday on which banks in Alaska are authorized or required to be closed for business.  If any deadline or day for performance is not a Business Day, then the time period shall be extended to the next Business Day.  All times herein refer to Pacific Time.

21.　　Entire Agreement.  This Agreement contains the entire understanding between the parties and supersedes any prior agreements between them respecting the subject matter hereof.

22.　　No Recording.  Neither this Agreement nor any memorandum of this Agreement shall be recorded.

23.　　Time of the Essence.  Time is of the essence of this Agreement.

24.　　Counterparts.  This Agreement may be executed in several counterparts, which shall be treated as originals for all purposes, and all counterparts so executed shall constitute one agreement, binding on all the parties hereto, notwithstanding that all the parties are not signatory to the original or to the same counterpart.  Any such counterpart shall be admissible into evidence as an original hereof against the person who executed it.

25.　　Limitation of Liability.  Notice is hereby given that all persons dealing with Buyer and Seller shall look to the assets of Buyer and Seller for the enforcement of any claim against either party.  None of the trustees, officers, directors, employees, members, owners, partners or shareholders of Buyer and Seller shall have any personal liability for any of the liability or obligations of arising from this Agreement.

26.　　Amendment, Waiver.  No modification, termination or amendment of this Agreement may be made except by written agreement of the parties.  No failure by Seller or Buyer to insist upon the strict performance of any covenant, agreement, or condition of this Agreement or to exercise any right or remedy shall constitute a waiver of any such breach or any other covenant, agreement, term or condition.  No waiver shall affect or alter this Agreement, and each and every covenant, agreement, term and condition of this Agreement shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

EXHIBITS019

27.    <u>Waiver of Jury Trial</u>.    IN ANY LAWSUIT OR OTHER PROCEEDING INITIATED BY A PARTY HERETO UNDER OR WITH RESPECT TO THIS AGREEMENT, SELLER AND BUYER EACH WAIVE ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY.

28.    <u>Survival</u>.  The provisions of this Agreement that contemplate performance after the Closing, the obligations of the parties not fully performed at the Closing, and all indemnities set forth in this Agreement shall survive the Closing and shall not be deemed to be merged into or waived by the instruments of Closing.

29.    <u>Headings</u>.    The article and paragraph headings of this Agreement are for convenience only and in no way limit or enlarge the scope or meaning of the language hereof.

30.    <u>Cumulative Remedies</u>.  The rights and remedies of the parties that are specified in this Agreement are cumulative and not exclusive of any other rights and remedies available at law or in equity.

31.    <u>Exhibits</u>.  All exhibits attached hereto or referenced herein are incorporated in this Agreement.

32.    <u>Severability</u>.  In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such provisions had not been contained herein.

33.    <u>Termination of Receivership</u>.  Seller shall use commercially reasonable efforts to obtain Court approval to terminate this Receivership in accordance with RCW 7.60.290 as soon as reasonably practicable.

*(signatures to follow)*

EXHIBITS020

DATED as of the day and year first above written.

**SELLER:**          **Peter Pan Seafood Company, LLC,**
an Alaska limited liability company,
by and through its Court appointed General Receiver

By: _____

Name: David P. Stapleton

Title: Receiver

**BUYER:**          **Rodger May**

By:_____

**Exhibits**

Exhibit A      Legal Description of the Property
Exhibit B      Quit Claim Deed
Exhibit C      Bill of Sale
Exhibit D      Assignment and Assumption of Executory Contracts and Unexpired
                    Leases
Exhibit E      Assignment and Assumption of Permits and Approvals

**Schedules**

Schedule 1.vi. Registered Trademarks
Schedule 8.4    Permits and Approvals (listed by Property)

EXHIBITS021

DATED as of the day and year first above written.

**SELLER:**         **Peter Pan Seafood Company, LLC,**
              an Alaska limited liability company,
              by and through its Court appointed General Receiver

              By:_____
              Name:_____
              Title:_____

**BUYER:**          **Rodger May**

              By:  *Rodger May*
              _____

**Exhibits**
Exhibit A       Legal Description of the Property
Exhibit B       Quit Claim Deed
Exhibit C       Bill of Sale
Exhibit D       Assignment and Assumption of Executory Contracts and Unexpired
                Leases
Exhibit E       Assignment and Assumption of Permits and Approvals

**Schedules**
Schedule 1.vi. Registered Trademarks
Schedule 8.4   Permits and Approvals (listed by Property)

EXHIBITS022

# EXHIBIT A

## Legal Description of the Property

## Fee Simple Interest in Real Property

**DILLINGHAM, AK**

• United States Survey No. 155, according to the official survey thereof, records of the Bristol Bay Recording District, Third Judicial District, State of Alaska as described in Homestead Certificate #42, except those portions thereof described as follows:

a. Commencing at a point on the Easterly line of U.S. Survey No. 155, which point bears N 07°15' W and is 150 feet distant from Corner No. 1 of U.S. Survey No. 2262; thence S 82°45' W a distance of 200 feet; thence N 07°15' W a distance of 400 feet; thence N 82°45' E a distance of 200 feet; thence S 07°15' E a distance of 400 feet to the point of beginning, as conveyed by deed recorded April 15, 1959 in Book 11, Page 45.

b. Beginning at a point on the line common to said U.S. Survey No. 155 and to U.S. Survey 2732-A in unsurveyed Section 21, said point being S 06°48'01" E along said common line a distance of 262 feet from Corner No. 11 of said U.S. Survey 2732-A; thence N 46°59'33" W a distance of 384.29 feet; thence S 89°33'01" E a distance of 39 feet to a point on the Northerly right of way line for Alaska Project S-0411(2), Dillingham to Kanakanak; thence S 47°55'14" along said Northerly right of way line a distance of 318.28 feet; thence S 06°48'01" E along said line common to U.S. Survey 155 and U.S. Survey 2732-A a distance of 48.86 feet to the true point of beginning, as conveyed by deed recorded September 24, 1975 in Book 20, Page 114.

c. Beginning at the SE Corner at a point on the East boundary (3-4 line) of U.S. Survey No. 155, 600 feet from Corner No. 3 thereof; thence S 82°45' W 200 feet to the SW Corner; thence N 07°15' W 300 feet to the NW Corner; thence N 82°45' E 200 feet to the NE Corner on the East boundary line of U.S. Survey No. 155; thence S 07°15' E 300 feet along the East boundary (3-4 line) of U.S. Survey No. 155, to the point of beginning, as conveyed by deed recorded May 20, 1960 in Book 11, Page 155.

d. Starting at a point 1050 feet NNW from Corner No. 4 at CS2262, thence approximately WSW 250 feet to a point on the Dillingham-Kanakanak Road, thence 390 feet SSE to a point on Survey No. 2262, thence approximately 262 feet to the point of beginning at Corner No. 11 or C12262, as conveyed by deed recorded April 26, 1966 in Book 16, Page 84.

e. That portion thereof, reserved in Patent from the United States dated December 12, 1904 as follows: "a roadway sixty feet in width parallel to the shoreline as near as may be practicable shall be reserved for the use of the public as a highway"

f. Beginning at the SE Corner at a point on the East boundary (3-4 line) of U.S. Survey No. 155, 300 feet from Corner No. 3 thereof; thence S 82°45' E 200 feet to the NE corner (being Corner number 3); thence S 07°15' E 300 feet along the East boundary (3-4 line) of U.S. Survey 155 to the true point of beginning as conveyed by deed recorded June 21, 1978 in Book 21, Page 532.

EXHIBITS023

g. Beginning at a point on a line common to said U.S. Survey 155 and U.S. Survey 2732-A in unsurveyed Section 21, said point being S 06º48'01" E along said common line a distance of 262.0 feet from Corner No. 11 of said U.S. Survey 2732-A; thence continuing S 06º45'01" E a distance of 103.14 feet; thence N 47º55'14" W, along the Southerly right of way line for Alaska Project S-0411(2), Dillingham to Kanakanak, a distance of 705.74 feet; thence continuing along said Southerly right of way line being a curve to the left (radius equals 553.11 feet) through an arc of 52º48'30" a distance of 509.79 feet; thence continuing along said Southerly right of way line S 79º16'16" W a distance of 388 feet, more or less, to a point on the Westerly line for said U.S. Survey 155; thence N 06º48'01" W along said Westerly line a distance of 100.24 feet; thence N 79º16'16" W along the Northerly right of way line for said Alaska Project S-0411(2) a distance of 381.13 feet, more or less; thence continuing along said Northerly right of way line being a curve to the right (radius equals 653.11) through an arc of 52º48'30" a distance of 601.96 feet; thence continuing along said Northerly right of way line S 47º55'14" E a distance of 273.00 feet; thence N 89º33'01" W a distance of 39.06 feet; thence S 46º59'33" E a distance of 384.29 feet, more or less, to the point of beginning, as conveyed by deed recorded December 22, 1975 in Book 20, Page 324.

h. That portion conveyed to the State of Alaska, Department of Transportation & Public Facilities by that certain Warranty Deed recorded March 10, 2017 under Serial Number 2017-000090-0.U.S. Survey No. 157, according to the official survey thereof, records of the Bristol Bay Recording District, Third Judicial District, State of Alaska.

• U.S. Survey No. 1571, according to the official survey thereof, records of the Bristol Bay Recording District, Third Judicial District, State of Alaska.

• Those portions of U.S. Survey No. 1793, according to the official survey thereof, records of the Bristol Bay Recording District, Third Judicial District, State of Alaska, more particularly described as follows:

a. Beginning at Corner 1MC identical with Corner No. 1MC of the U.S. Survey No. 1793 on the West shore of Nushagak Bay at the line of mean high tide North 86º13' East 42 links (27.72 feet to Corner No. 2MC of this tract; thence N 7º32' West 3.20 chains (211.20 feet) to Corner No. 3 of this tract, identical with Corner No. 6 of U.S. Survey No. 1793 and Corner No. 3 of U.S. Survey No. 1571; thence South 3.20 Chains (211.20 feet) along line 3-2 of U.S. Survey No. 1571 identical with line 6-1 of U.S. Survey No. 1793 to the place of beginning.

b. Beginning at Corner No. 1 identical with Corner No. 4 U.S. Survey No. 1571 and Corner No. 5 U.S. Survey No. 1793; thence East 53 links (34.98 feet) to Corner No. 2 of this tract, identical with Corner No. 6 of U.S. Survey No. 1793 and Corner No. 3 of U.S. Survey No. 1571; thence North 8º00' West 3.02 chains (199.32 feet) to Corner No. 3 of this tract in line 3-4 of U.S. Survey No. 1793; thence West 49 links (32.24 feet) along line 3-4 of U.S. Survey 1793 to Corner No. 4 of this tract identical with Corner No. 4 of U.S. survey No. 1793; thence South 7º 15' East along line 4-5 of U.S. Survey No. 1793 3.01 chains (198.66 feet) to the point of beginning.

• U.S. Survey No. 2543, according to the official survey thereof, records of the Bristol Bay Recording District, Third Judicial District, State of Alaska.

• U.S. Survey No. 2864, according to the official survey thereof, records of the Bristol Bay Recording District, Third Judicial District, State of Alaska.

EXHIBITS024

• Alaska Tideland Survey No. 101, according to the official plat thereof, filed under Plat No. 64-136, records of the Bristol Bay Recording District, Third Judicial District, State of Alaska.

## KING COVE, AK

• UNITED STATES SURVEY NO. 189, according to the original plat thereof, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska.
EXCEPTING THEREFROM those portions conveyed to the City of King Cove by Deeds recorded June 24, 1977 in Book 17 at Page 811 and July 30, 2004 under Serial No. 2004-000388-0.

• UNITED STATES SURVEY NO. 2831, according to the original plat thereof, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska

• UNITED STATES SURVEY NO. 2832, according to the original plat thereof, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska.

• UNITED STATES SURVEY NO. 2834, according to the original plat thereof, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska.
EXCEPTING THEREFROM those portions conveyed to the City of King Cove by Deeds recorded July 27, 1977 in Book 17 at Page 831, April 22, 1980 in Book 19 at Page 495, March 06, 1987 in Book 26 at Page 509, July 30, 2004 under Serial No. 2004-000386-0 and June 19, 2014 under Serial No. 2014-000245-0 and that portion described in Quitclaim Deed recorded December 27, 1984 in Book 23 at Page 871.

• TRACT "A" and TRACT "B", TIDELANDS SURVEY NO. 316(A), as shown on the official plat of Alaska Tidelands Survey No. 316, filed under Plat No. 64-184, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska.

## NAKNEK, AK

• U.S. Survey No. 232, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

• U.S. Survey No. 191, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

• U.S. Survey No. 233, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

• U.S. Survey No. 234, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

• U.S. Survey No. 235, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

• U.S. Survey No. 1105, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

EXHIBITS025

• U.S. Survey No. 1925, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

• U.S. Survey No. 1926, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

• U.S. Survey No. 2300, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

• U.S. Survey No. 2301, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

• U.S. Survey No. 2445, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

EXCEPTING THEREFROM that portion conveyed to the Bristol Bay Borough by that certain Warranty Deed recorded July 28, 2014 under Serial Number 2014-000212-0.

• U.S. Survey No. 2446, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

• U.S. Survey No. 2489, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

• Lot 5, Section 10, Township 17 South, Range 47 West, Seward Meridian, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

## PORT MOLLER, AK

• AMENDED UNITED STATES SURVEY NO. 1147, according to the original plat thereof, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska.

• ALASKA TIDELANDS SURVEY NO. 92, according to Plat No. 64-130, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska.

• UNITED STATES SURVEY NO. 662, according to the original plat thereof, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska. EXCEPTING THEREFROM that portion conveyed to the State of Alaska Department of Transportation and Public Facilities by Deed recorded May 28, 1996 in Book 43 at Page 893.

• UNITED STATES SURVEY NO. 663, according to the original plat thereof, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska. EXCEPTING THEREFROM those portions conveyed to the State of Alaska Department of Transportation and Public Facilities by Deeds recorded January 5, 1979 in Book 18 at Page 824 and May 28, 1996 in Book 43 at Page 888.

• UNITED STATES SURVEY NUMBERS 237, 664, 665, 744, 746, 1104, 1148, 1215 AND 1218, according to the original plats thereof, located in the Aleutian Islands Recording District, Third

EXHIBITS026

Judicial District, State of Alaska.

• LOTS ONE (1) AND FOUR (4), PORT MOLLER CANNERY SUBDIVISION, all according to Plat No. 2018-6, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska.

## SAND POINT, AK

• UNITED STATES SURVEY NO. 1400, according to the original thereof located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska.

EXCEPTING THEREFROM the following portions or partial portions thereof:

Commencing at a point, which point of beginning is 160 feet due West of Corner No. 3 of said United States Survey No. 1400;

Thence West, 406.00 feet;
Thence North 9°52' West, 811.75 feet;
Thence North, 86°38' East, 91.27 feet;
Thence North 82°44' East, 309.64 feet;
Thence South 9°52' East 856.94 feet, to the point of beginning;

A tract of land on the Sand Point sandspit, on the West coast of Popof Island, in Southwestern Alaska, near the Sand Point Airport, identified as Tract "Ill" on the Airport Property Plan dated September 14, 1990, described as follows:

From a point beginning with an iron post with brass cap marked Corner No. 6, United States Survey No. 3584;
Thence East a distance of 104.79 feet to the True Point of Beginning;
Thence North 9° 52' West a distance of 190.00 feet;
Thence North 80° 08' East a distance of 196.00 feet;
Thence South 9° 52' East a distance of 225.10 feet; Thence West a distance of 199.10 feet to the Point of Beginning, an area of 0.934+ acres.

Commencing at a B.L.M. iron post, being common to Corner No. 2, United States Survey No. 2185, Alaska, Corner No. 3, United States Survey No. 1400, Alaska, and Corner No. 1, Lot 1, United States Survey No. 3584, Alaska (dependent resurvey of portions of Adjoining United States Survey No. 1400 and 1109, Alaska);
Thence North a record bearing along a portion of survey line 2-1, United States Survey No. 2185, being common to a portion of survey line 3-2, United States Survey No. 1400, a distance of 336.26 feet to the True Point of Beginning of Tract "IX";'
Thence North 85°51'37" West a distance of 221.85 feet;
Thence North 9°52'00" West, a distance of 51.53 feet;
Thence South 85°51'37" East a distance of 230.70 feet;
Thence South 50.13 feet to the True Point of Beginning.

A tract of land on the Sand Point sandspit, on the West Coast of Popof Island, in Southwestern Alaska, near the Sand Point Airport, identified as Tract "VIII", Parcel "A", on the Airport Property Plan dated September 14, 1990, described as follows:
From a point beginning with an iron post with brass cap marked Corner No. 6, United States Survey

EXHIBITS027

No. 3584, which is the True Point of Beginning;
Thence West a distance of 135.30 feet; Thence North a distance of 782.10 feet;
Thence North 86°38' East a distance of 302.09 feet; Thence South 9°52' East a distance of 586.65 feet;
Thence South 80°08' West a distance of 196.00 feet;
Thence South 9°52' East a distance of 190.00 feet; Thence West a distance of 104.79 feet to the Point of Beginning.

• TRACT "B" OF ALASKA TIDELANDS SURVEY NO. 144, according to Plat No. 63-34, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska.

• THAT PORTION OF UNITED STATES SURVEY NO. 1400 WITHIN AN AREA IDENTIFIED AS TRACT "II" ON THE SAND POINT AIRPORT PROPERTY PLAN, DESCRIBED AS LOT 1 OF THE SAND POINT AIRPORT SUBDIVISION, ADDITION NO. 1, filed as Plat No. 93-573, in the Aleutian Islands Recording office on August 03, 1993 and more particularly described as follows:

Commencing at a point marked with a 3" iron pipe with a 30-30 cartridge protruding from the top, the side of said pipe being stamped S2185, COR2; S1400, COR3; said point being common with United States Survey No. 2185, COR NO. 2; United States Survey No. 1400, COR. NO. 3, United States Survey No. 3584 COR NO. 1, as shown on the plat of United States Survey No. 3584, Alaska;

Thence North 89°51'13" West along the property line of Sand Point Airport a distance of 160.07 feet, said line being common with line 3-4, United States Survey No. 1400 and line 6-1, United States Survey No. 3584;
Thence North 9°52' West along said property line a distance of 409.10 feet to a point, said point being 1197.69 feet left of and at right angles to new runway 13/31 Centerline Station 26+80.09 and the True Point of Beginning;
Thence South 58°35'33" West a distance of 122.69 feet to a point, said point being 1075.00 feet left of and at right angles to said runway 13/31 Centerline Station 26+80.09;
Thence North 31°24'27" West on a line left of and parallel with said runway centerline a distance of 225.00 feet to a point, said point being 1075.00 feet left of and at right angles to new runway 13/31 Centerline Station 24+55.09;
Thence South 58°35'33" West a distance of 100.00 feet to a point, said point being 975.00 feet left of and at right angles to said runway Centerline Station 24+55.09;
Thence North 31°24'27" West a distance of 300.29 feet on a line 975.00 feet left of and parallel with said runway centerline to a point;
Thence North 9°52' West a distance of 39.17 feet, more or less, to the point of intersection with the mean high water line;
Thence North 83°40'25" East along said mean high water line a distance of 42.71 feet;
Thence North 89°30'20" East along said mean high water line a distance of 45.59 feet;
Thence North 80°19'44" East along said mean high water line a distance of 187.94 feet; Thence North 74°26'33" East along said mean high water line a distance of 79.11 feet;
Thence South 85°47'42" East along said mean high water line a distance of 47.15 feet, more or less, to the point of intersection with the Easterly property line of sand point airport;
Thence South 9°52' East along said Easterly property line a distance of 431.68 feet, more or less, to the True Point of the Beginning, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska.

EXHIBITS028

**SEATTLE, WA**

• Lots 22 and 23, Block 1, Gilman's Addition to the City of Seattle, according to the plat thereof recorded in Volume 5 of Plats, Page 93, in King County, Washington.

## Leasehold Interest in Real Property

**KING COVE, AK**

• The leasehold estate created by that certain unrecorded Lease Real Property effective October 1, 2008 between Dave Bash, as Lessor, and Peter Pan Seafoods, Inc., as amended by a document titled "Lease Real Property Amendment No. 1" dated February 20, 2019, for a term of one year commencing October 1, 2008 with an evergreen renewal clause for successive periods of one year, the term of which currently expires on February 28, 2021: Lot Two (2) of Tract One (1), HARBOR VIEW SUBDIVISION, ADDITION NO. 1, according to Plat No. 93-20, records of the Aleutian Islands Recording District, Third Judicial District, State of Alaska.

**SAND POINT, AK**

• The leasehold estate created by that certain Lease Agreement effective September 1, 2014 between the State of Alaska, Department of Natural Resources, as Lessor, and Peter Pan Seafoods, Inc., as Lessee for a term of twenty (20) years commencing as of September 1, 2014 and terminating on August 31, 2034, recorded on November 20, 2015 as Reception No. 2015-000417-0, records of the Aleutian Islands Recording District, Third Judicial District, State of Alaska affecting the following described property:

ALASKA TIDELANDS SURVEY NO. 1393, according to Plat No. 91-6, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska.

**BELLEVUE, WA**

• The leasehold estate created by that certain unrecorded Office Lease dated for reference December 2, 2016 by and between The Realty Associates Fund X, L.P., a Delaware limited partnership, as landlord, and Maruha Capital Investment, Inc., a Washington corporation, as tenant, for that certain office space for a ten (10) year and eight (8) month term starting on November 1, 2017, as amended by that certain First Amendment to Lease dated April 9, 2018; affecting the following described real property:

THE SOUTH HALF OF THE NORTWEST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 20, TOWNSHIP 25 NORTH, RANGE 5 EAST, WILLAMETTE MERIDIAN, in King County, Washington, lying westerly of Primary State Highway No. 1, as condemned under King County Superior Court Case Number 618225 and 618230.

Commonly known as: 3015 112th Avenue NE, Suite 100, Bellevue, Washington 98004

EXHIBITS029

**RAYMOND, WA**

• The leasehold estate created by that certain letter dated October 1, 2020 from Jim Johnson to various members of leadership at Peter Pan Seafoods, Inc. regarding the rental of a shop located at 436 Monohon Landing Road, Raymond, WA for a term of seven (7) months commencing on October 1, 2020 and expiring on April 30, 2021 with the right to leave tools and parts on the site after May 1, 2021 in exchange for payment of the power bill.

EXHIBITS030

EXHIBIT B

**Quit Claim Deed**

WHEN RECORDED MAIL TO:

_____

_____

_____

# QUIT CLAIM DEED

PETER PAN SEAFOOD COMPANY, LLC, an Alaska limited liability company, by and through its Court appointed General Receiver ("Grantor"), for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration in hand paid, does hereby convey and quitclaim to [NAME OF BUYER], a [STATE OF INCORPORATION] [TYPE OF ENTITY] ("Grantee"), whose address is [ADDRESS OF BUYER], all that land situated in [NAME OF COUNTY] County, Alaska, described as follows (hereinafter, the "Property"):

SEE EXHIBIT "A"

Together with all improvements located thereon, any and all rights, benefits, privileges, easements, tenements, hereditaments, rights-of-way and other appurtenances thereon or in any way appertaining thereto, including any mineral rights, development rights, air and water rights owned by Grantor, and Grantor's right, title and interest, if any, all strips and gores and any land lying in the bed of any street, road or alley, open or proposed, adjoining such Property.

Together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining, subject to real property taxes and assessments for the current fiscal year, reservations, easements, covenants, conditions, surveys, and agreements now of record or ascertainable from an inspection of the Property, and the matters shown on attached Exhibit "B" attached hereto.

**[Executed and acknowledged on the following page]**

EXHIBITS031

IN WITNESS WHEREOF, Grantor executes this Deed on the date of acknowledgement set forth below.

Dated: _____ _____, 2024

PETER PAN SEAFOOD COMPANY, LLC,
an Alaska limited liability company,
by and through its Court appointed General Receiver

By: _____

Name: _____

Its: _____

EXHIBITS032

EXHIBIT C

**BILL OF SALE**

This Bill of Sale (the "**Bill of Sale**") is made and entered into _____ ____, 2024, by and between PETER PAN SEAFOOD COMPANY, LLC, an Alaska limited liability company, by and through its Court appointed General Receiver ("**Assignor**"), and RODGER MAY ("**Assignee**").

In consideration of the sum of Ten Dollars ($10) and other good and valuable consideration paid by Assignee to Assignor, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby unconditionally, absolutely and irrevocably assign, transfer, convey and deliver to Assignee, its successors and assigns, all items of Tangible Personal Property (as defined in the Agreement referred to below), if any, owned by Assignor and situated upon and used exclusively in connection with the Property (as defined in the Agreement) and more particularly described on **Exhibit A** attached hereto and made a part hereof for all purposes, including, without limitation, the Tangible Personal Property identified in **Exhibit B**, if any, attached hereto and made a part hereof for all purposes (the "**Personal Property**").

This Bill of Sale is made subject, subordinate and inferior to the easements, covenants and other matters and exceptions set forth on Exhibit C, if any, attached hereto and made a part hereof for all purposes.

ASSIGNEE ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED IN, AND SUBJECT TO THE LIMITATIONS CONTAINED IN, THAT CERTAIN AGREEMENT OF PURCHASE AND SALE DATED _____, 2024, BY AND BETWEEN ASSIGNOR AND ASSIGNEE (THE "**AGREEMENT**"), ASSIGNOR HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE NATURE, QUALITY OR CONDITIONS OF THE PERSONAL PROPERTY, (B) THE INCOME TO BE DERIVED FROM THE PERSONAL PROPERTY, (C) THE SUITABILITY OF THE PERSONAL PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH ASSIGNEE MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PERSONAL PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE QUALITY, HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF ANY OF THE PERSONAL PROPERTY, OR (F) ANY OTHER MATTER WITH RESPECT TO THE PERSONAL PROPERTY.   ASSIGNEE FURTHER ACKNOWLEDGES AND AGREES THAT, HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PERSONAL PROPERTY, ASSIGNEE IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PERSONAL PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY ASSIGNOR, EXCEPT AS SPECIFICALLY PROVIDED IN THE AGREEMENT.   ASSIGNEE FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PERSONAL PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT ASSIGNOR HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION. ASSIGNEE FURTHER ACKNOWLEDGES AND AGREES THAT THE SALE OF THE PERSONAL PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "**AS IS, WHERE IS**" CONDITION AND

EXHIBITS033

BASIS "**WITH ALL FAULTS,**" EXCEPT AS SPECIFICALLY PROVIDED IN, AND SUBJECT TO THE LIMITATIONS CONTAINED IN, THE AGREEMENT.

The obligations of Assignor are intended to be binding only on the property of Assignor and shall not be personally binding upon, nor shall any resort be had to, the private properties of any Seller Related Parties (as defined in the Agreement).

IN WITNESS WHEREOF, Assignor and Assignee have caused this Bill of Sale to be executed on the date and year first above written.

*Assignor*:

**Peter Pan Seafood Company, LLC,**
an Alaska limited liability company,
by and through its Court appointed General Receiver

By:_____
Name:_____
Title:_____

*Assignee*:

_____,
a _____

By:_____
Name:_____
Title:_____

EXHIBITS034

<u>EXHIBIT D</u>

**Assignment and Assumption of Executory Contracts and Unexpired Leases**

       THIS ASSIGNMENT AND ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES (the "<u>Assignment</u>") is made and entered into as of _____, 2024 (the "<u>Effective Date</u>"), by and between **PETER PAN SEAFOOD COMPANY, LLC,** an Alaska limited liability company, by and through its Court appointed General Receiver ("<u>Assignor</u>"), and **RODGER MAY**, ("<u>Assignee</u>").

**RECITALS:**

       A. Assignor and Assignee have entered into a Purchase and Sale Agreement dated as of _____ _____, 2024 (if and as amended, the "<u>Purchase Agreement</u>"), pursuant to which Assignee has agreed to purchase certain real property more particularly described on <u>Exhibit A</u> attached hereto (the "<u>Property</u>") from Assignor.

       B. In connection with the transactions contemplated by the Purchase Agreement, the Assignor has agreed to assign to the Assignee all of its right, title and interest in, to and under all executory contracts and unexpired leases currently in effect with respect to the Property, as identified on <u>Exhibit B</u> (collectively, the "<u>Executory Contracts</u>").

       NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged,

Assignor and Assignee agree as follows:

       1. <u>Assignment</u>. Effective as of the Effective Date, Assignor hereby assigns, transfers, conveys and sets over to Assignee all of Assignor's right, title and interest in and to the Executory Contracts.

       2. <u>Acceptance</u>. Assignee hereby accepts the assignment of the Executory Contracts and agrees to assume, keep, perform and fulfill all liabilities and obligations of the landlord under the Executory Contracts whenever accrued. Assignee agrees to indemnify Assignor against and hold Assignor harmless from any and all cost, liability, loss, damage or expense, including without limitation, attorneys' fees, arising during Assignor's period of ownership and arising out of Assignee's obligations under the Executory Contracts. Assignor agrees to indemnify Assignee against and hold Assignee harmless from any and all cost, liability, loss, damage or expense, including without limitation, attorneys' fees, arising during Assignee's period of ownership and arising out of Assignor's obligations under the Executory Contracts.

       3. <u>Exculpation</u>. The recourse of either party or its successors or assigns against the other party, and it members, officers, employees, agents and representatives, with respect to any alleged breach by or on the part of the other party of any representation, warranty, covenant, undertaking, indemnity or agreement contained in this Assignment is subject to the terms of the Purchase Agreement.

EXHIBITS035

4.  Binding Effect. This Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

5.  No Modification. This Assignment shall not be altered, amended or otherwise modified, except as set forth in a written document executed by the parties hereto.

6.  Governing Law. This Assignment and all questions arising in connection herewith shall be governed by and construed in accordance with the internal laws of the State of Alaska.

7.  Counterparts; Electronic Execution. This Assignment may be executed in a number of identical counterparts which, taken together, shall constitute collectively one agreement. In making proof of this Assignment, it shall not be necessary to produce or account for more than one such counterpart with each party's signature. This Assignment may be executed by facsimile or other electronic means and (when so executed) shall be deemed an original for all purposes.

IN WITNESS WHEREOF, Assignor and Assignee have executed and delivered this Assignment as of the Effective Date.

*Assignor*:

**Peter Pan Seafood Company, LLC,**
an Alaska limited liability company,
by and through its Court appointed General Receiver

By:_____
Name:_____
Title:_____

*Assignee*:

_____,
a _____

By:_____
Name:_____
Title:_____

EXHIBITS036

EXHIBIT E

**Assignment and Assumption of Permits and Approvals**

THIS ASSIGNMENT AND ASSUMPTION OF PERMITS AND APPROVALS (the "Assignment") is made and entered into as of _____, 2024 (the "Effective Date"), by and between PETER PAN SEAFOOD COMPANY, LLC, an Alaska limited liability company by and through its Court appointed General Receiver ("Assignor"), and RODGER MAY, ("Assignee").

**RECITALS:**

A. Assignor and Assignee have entered into a Purchase and Sale Agreement dated as of _____ _____, 2024 (if and as amended, the "Purchase Agreement"), pursuant to which Assignee has agreed to purchase certain real property more particularly described on Exhibit 1 attached hereto (the "Property") from Assignor.

B. In connection with the transactions contemplated by the Purchase Agreement, the Assignor has agreed to assign to the Assignee all of its right, title and interest in, to and under all permits and approvals currently in effect with respect to the Property, as identified on Schedule 8.4 attached hereto as Exhibit 2 (collectively, the "Permits/Approvals").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged,

Assignor and Assignee agree as follows:

1. Assignment. Effective as of the Effective Date, Assignor hereby assigns, transfers, conveys and sets over to Assignee all of Assignor's right, title and interest in and to the Permits/Approvals.

2. Acceptance. Assignee hereby accepts the assignment of the Permits/Approvals and agrees to assume, keep, perform and fulfill all liabilities and obligations of the Permits/Approvals whenever accrued. Assignee is further solely responsible for obtaining any government approval necessary to complete the transfer of said Permits/Approvals, if any. Assignee agrees to defend and indemnify Assignor against and hold Assignor harmless from any and all cost, liability, loss, damage or expense, including without limitation, attorneys' fees, arising during Assignor's period of ownership and arising out of Assignee's obligations under the Permits/Approvals.

3. Exculpation. The recourse of either party or its successors or assigns against the other party, and it members, officers, employees, agents and representatives, with respect to any alleged breach by or on the part of the other party of any representation, warranty, covenant, undertaking, indemnity or agreement contained in this Assignment is subject to the terms of the Purchase Agreement.

4. Binding Effect. This Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

5. <u>No Modification</u>. This Assignment shall not be altered, amended or otherwise modified, except as set forth in a written document executed by the parties hereto.

6. <u>Governing Law</u>. This Assignment and all questions arising in connection herewith shall be governed by and construed in accordance with the internal laws of the State of Alaska.

7. <u>Counterparts; Electronic Execution</u>. This Assignment may be executed in a number of identical counterparts which, taken together, shall constitute collectively one agreement. In making proof of this Assignment, it shall not be necessary to produce or account for more than one such counterpart with each party's signature. This Assignment may be executed by facsimile or other electronic means and (when so executed) shall be deemed an original for all purposes.

IN WITNESS WHEREOF, Assignor and Assignee have executed and delivered this Assignment as of the Effective Date.

*Assignor*:

**Peter Pan Seafood Company, LLC,**
an Alaska limited liability company,
by and through its Court appointed General Receiver

By:_____
Name:_____
Title:_____

*Assignee*:

_____,
a _____

By:_____
Name:_____
Title:_____

EXHIBITS038

Exhibit 1    Legal Description of the Property
Exhibit 2    Schedule of Permits/Approvals

## EXHIBIT 1

EXHIBITS039

<u>EXHIBIT 2</u>

**Schedule of Permits and Approvals**

EXHIBITS040

SCHEDULE 1.vi

**Registered Trademarks**

EXHIBITS041

SCHEDULE 8.4

**Permits and Approvals  (listed by Property)**

| ID | Permit/Approval | | Permit Type |
|---|---|---|---|
| 1 | Permittee: | Peter Pan Seafood Company, LLC | NPDES Individual Permit Seafood Processor |
| | Facility Name: | King Cove Facility | |
| | Permit No.: | AK0052388 | |
| | Approval No.: | N/A | |
| | Issuing Agency: | ADEC | |
| | Facility Address: | 500 Cannery Row, King Cove, AK, 99612 | |
| | Effective Date: | 1/1/2024 | |
| 2 | Permittee: | Peter Pan Seafood Company, LLC | NPDES General Permit for Storm Water Discharges for Multi-Sector General Permit Activity |
| | Facility Name: | King Cove Facility | |
| | Permit No.: | AKR060000 | |
| | Authorization No.: | AKR06GC19 | |
| | Issuing Agency: | ADEC | |
| | Facility Address: | 500 Cannery Row, King Cove, AK, 99612 | |
| | Effective Date: | 10/31/2023 | |
| 3 | Permittee: | Peter Pan Seafood Company, LLC | CAA Title V Operating Permit |
| | Facility Name: | King Cove Facility | |
| | Permit No.: | AQ0243TVP05 | |
| | Approval No.: | N/A | |
| | Issuing Agency: | ADEC | |
| | Facility Address: | 500 Cannery Row, King Cove, AK, 99612 | |
| | Effective Date: | 3/1/2023 | |
| 4 | Permittee: | Peter Pan Seafood Company, LLC | CAA Minor Source Specific |
| | Facility Name: | King Cove Facility | |
| | Permit No.: | AQ0243MSS02 (AQ0243MSS02) Rev. 1 | |
| | Approval No.: | N/A | |
| | Issuing Agency: | ADEC | |

EXHIBITS042

| | Facility Address: | 500 Cannery Row,<br>King Cove, AK, 99612 | |
|---|---|---|---|
| | Effective Date: | 3/8/2012 (Amend. 11/13/2014) | |

| ID | Permit/Approval | | Permit Type |
|---|---|---|---|
| 5 | Permittee: | Peter Pan Seafood Company, LLC | CAA<br>Minor Source Specific |
| | Facility Name: | King Cove Facility | |
| | Permit No.: | AQ0243MSS03 | |
| | Approval No.: | N/A | |
| | Issuing Agency: | ADEC | |
| | Facility Address: | 500 Cannery Row,<br>King Cove, AK, 99612 | |
| | Effective Date: | 5/2/2017 (Amend. 12/31/2020) | |
| 6 | Permittee: | Peter Pan Seafood Company, LLC | Solid Waste General Permit for Remote Camps and Lodges with Less than 50 Residents |
| | Facility Name: | Port Moller Camp GP | |
| | Permit No.: | SWGPCAMP-28 | |
| | Authorization No.: | SWGPCAMP002-28 | |
| | Issuing Agency: | ADEC | |
| | Facility Address: | 181 Port Moller Avenue<br>Cold Bay, AK, 99571 | |
| | Effective Date: | 12/21/2022 | |
| 7 | Permittee: | Peter Pan Seafood Company, LLC | CAA<br>Pre-Approved Emission Limit - Diesel Generator |
| | Facility Name: | Port Moller Power Plant | |
| | Permit No.: | AQ0019PL202 | |
| | Approval No.: | N/A | |
| | Issuing Agency: | ADEC | |
| | Facility Address: | 181 Peter Pan St<br>Port Moller AK, 99571-8999 | |
| | Effective Date: | 1/1/2021 | |
| 8 | Permittee: | Peter Pan Seafood Company, LLC | SDWA<br>Transient Non-Community |
| | Facility Name: | Port Moller | |
| | Permit No.: | AK2261216 | |
| | Approval No.: | N/A | |
| | Issuing Agency: | ADEC | |
| | Facility Address: | 181 Peter Pan St<br>Port Moller AK, 99571-8999 | |

EXHIBITS043

| Effective Date: | 1/1/1997 |
|---|---|

EXHIBITS044

| ID | Permit/Approval | | Permit Type |
|----|----|----|----|
| 9 | Permittee: | Peter Pan Seafood Company, LLC | SDWA<br>Transient Non-Community |
| | Facility Name: | Dillingham Facility | |
| | Permit No.: | AK2260838 | |
| | Approval No.: | N/A | |
| | Issuing Agency: | ADEC | |
| | Facility Address: | 1 Denny Way<br>Dillingham, AK 99576 | |
| | Effective Date: | N/A | |
| 10 | Permittee: | Peter Pan Seafood Company, LLC | Registered Buyer Permit for Alaska Halibut/Sablefish IFQ, and Halibut CDQ |
| | Facility Name: | N/A | |
| | Permit No.: | 60932 | |
| | NMFS ID No. | 118320 | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Permittee Address: | 3015 112TH Ave NE Suite 150<br>Bellevue, WA 98004 | |
| | Effective Date: | 2024 | |
| 11 | Permittee: | Peter Pan Seafood Company, LLC | Registered Buyer Permit for Alaska Halibut/Sablefish IFQ, and Halibut CDQ |
| | Facility Name: | N/A | |
| | Permit No.: | 60964 | |
| | NMFS ID No. | 118320 | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Permittee Address: | 3015 112TH Ave NE Suite 150<br>Bellevue, WA 98004 | |
| | Effective Date: | 2024 | |
| 12 | Permittee: | Peter Pan Seafood Company, LLC | Registered Buyer Permit for Alaska Halibut/Sablefish IFQ, and Halibut CDQ |
| | Facility Name: | N/A | |
| | Permit No.: | 60931 | |
| | NMFS ID No. | 118320 | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Permittee Address: | 3015 112TH Ave NE Suite 150<br>Bellevue, WA 98004 | |
| | Effective Date: | 2024 | |

EXHIBITS045

| ID | Permit/Approval | | Permit Type |
|---|---|---|---|
| 13 | Permittee: | Peter Pan Seafood Company, LLC | Registered Buyer Permit for Alaska Halibut/Sablefish IFQ, and Halibut CDQ |
| | Facility Name: | N/A | |
| | Permit No.: | 60928 | |
| | NMFS ID No. | 118320 | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Permittee Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024 | |
| 14 | Permittee: | Peter Pan Seafood Company, LLC | Registered Buyer Permit for Alaska Halibut/Sablefish IFQ, and Halibut CDQ |
| | Facility Name: | N/A | |
| | Permit No.: | 60929 | |
| | NMFS ID No. | 118320 | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Permittee Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024 | |
| 15 | Permittee: | Peter Pan Seafood Company, LLC | Registered Buyer Permit for Alaska Halibut/Sablefish IFQ, and Halibut CDQ |
| | Facility Name: | N/A | |
| | Permit No.: | 60930 | |
| | NMFS ID No. | 118320 | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Permittee Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024 | |
| 16 | Permittee: | Peter Pan Seafoods Inc. | AFA Permit for Inshore Processors (Unrestricted) |
| | Facility Name: | N/A | |
| | Permit No.: | 5358 | |
| | NMFS ID No.: | 491 | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Permittee Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |

EXHIBITS046

| ID | Permit/Approval | | Permit Type |
|---|---|---|---|
| 17 | Holder name: | Peter Pan Seafood Company, LLC | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 118320 | |
| | Fishery: | BBR | |
| | Region: | S | |
| | Start Serial: | 292279714 | |
| | End Serial: | 313416730 | |
| | QS Units: | 21137017 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 18 | Holder name: | Peter Pan Seafood Company, LLC | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 118320 | |
| | Fishery: | EBT | |
| | Region: | U | |
| | Start Serial: | 1617802815 | |
| | End Serial: | 1621575949 | |
| | QS Units: | 3773135 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 19 | Holder name: | Peter Pan Seafood Company, LLC | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 118320 | |
| | Fishery: | WBT | |
| | Region: | U | |
| | Start Serial: | 3752536280 | |
| | End Serial: | 3756309414 | |
| | QS Units: | 3773135 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |

EXHIBITS047

| ID | Permit/Approval | | Permit Type |
|---|---|---|---|
| 20 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | BBR | |
| | Region: | S | |
| | Start Serial: | 260999197 | |
| | End Serial: | 275931789 | |
| | QS Units: | 14932593 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 21 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | BBR | |
| | Region: | S | |
| | Start Serial: | 275931790 | |
| | End Serial: | 292279713 | |
| | QS Units: | 16347924 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 22 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | BBR | |
| | Region: | S | |
| | Start Serial: | 313416731 | |
| | End Serial: | 326861049 | |
| | QS Units: | 13444319 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |

EXHIBITS048

| ID | Permit/Approval | | Permit Type |
|---|---|---|---|
| 23 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | BBR | |
| | Region: | S | |
| | Start Serial: | 326861050 | |
| | End Serial: | 332258412 | |
| | QS Units: | 5397363 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 24 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | BSS | |
| | Region: | N | |
| | Start Serial: | 332258413 | |
| | End Serial: | 338326264 | |
| | QS Units: | 6067852 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 25 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | BSS | |
| | Region: | N | |
| | Start Serial: | 338326265 | |
| | End Serial: | 378137242 | |
| | QS Units: | 39810978 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |

EXHIBITS049

| ID | Permit/Approval | | Permit Type |
|---|---|---|---|
| 26 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | BSS | |
| | Region: | N | |
| | Start Serial: | 378137243 | |
| | End Serial: | 395238194 | |
| | QS Units: | 17100952 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 27 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | BSS | |
| | Region: | S | |
| | Start Serial: | 395238195 | |
| | End Serial: | 395372959 | |
| | QS Units: | 134765 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 28 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | BSS | |
| | Region: | S | |
| | Start Serial: | 395372960 | |
| | End Serial: | 424725886 | |
| | QS Units: | 29352927 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |

EXHIBITS050

| ID | Permit/Approval | | Permit Type |
|---|---|---|---|
| 29 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | BSS | |
| | Region: | S | |
| | Start Serial: | 424725887 | |
| | End Serial: | 487598453 | |
| | QS Units: | 62872567 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 30 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | EBT | |
| | Region: | U | |
| | Start Serial: | 1588227143 | |
| | End Serial: | 1617802814 | |
| | QS Units: | 29575672 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 31 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | PIK | |
| | Region: | N | |
| | Start Serial: | 487598454 | |
| | End Serial: | 490815294 | |
| | QS Units: | 3216841 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |

EXHIBITS051

| ID | Permit/Approval | | Permit Type |
|---|---|---|---|
| 32 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | PIK | |
| | Region: | S | |
| | Start Serial: | 490815295 | |
| | End Serial: | 491954027 | |
| | QS Units: | 1138733 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 33 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | SMB | |
| | Region: | N | |
| | Start Serial: | 491954028 | |
| | End Serial: | 492010106 | |
| | QS Units: | 56079 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 34 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | SMB | |
| | Region: | N | |
| | Start Serial: | 492143783 | |
| | End Serial: | 492644563 | |
| | QS Units: | 500781 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |

EXHIBITS052

| ID | Permit/Approval | | Permit Type |
|---|---|---|---|
| 35 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | SMB | |
| | Region: | N | |
| | Start Serial: | 492644564 | |
| | End Serial: | 492778238 | |
| | QS Units: | 133675 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 36 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | SMB | |
| | Region: | N | |
| | Start Serial: | 492778239 | |
| | End Serial: | 499354502 | |
| | QS Units: | 6576264 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 37 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | WBT | |
| | Region: | U | |
| | Start Serial: | 3722960608 | |
| | End Serial: | 3752536279 | |
| | QS Units: | 29575672 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |

EXHIBITS053

| ACRONYM | TERM |
|---------|------|
| ADEC | Alaska Department of Environmental Conservation |
| AFA | American Fisheries Act |
| BBR | Bristol Bay red king crab |
| BSAI | Bering Sea/Aleutian Islands King and Tanner Crabs |
| BSS | Bering Sea snow crab |
| CAA | Clean Air Act |
| CDQ | Western Alaska Community Development Quota |
| EBT | Eastern Bering Sea Tanner crab |
| IFQ | Individual Fishing Quota |
| NPDES | National Pollutant Discharge Elimination System |
| PIK | Pribilof Islands red and blue king crab |
| QS | Quota Share |
| SDWA | Safe Drinking Water Act |
| SMB | St. Matthew blue king crab |
| WBT | Western Bering Sea Tanner crab |

EXHIBITS054

# EXHIBIT B

EXHIBITS055

**PURCHASE AND SALE AGREEMENT**

BY AND BETWEEN

PETER PAN SEAFOOD COMPANY, LLC,
BY AND THROUGH ITS COURT-APPOINTED GENERAL RECEIVER ("**SELLER**")

AND

JOHN KETCHAM ("**KETCHAM**")

AND

SILVER BAY SEAFOODS, L.L.C. ("**SILVER BAY**")

DATED September ___, 2024

EXHIBITS056

PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "**Agreement**") is made as of September \_\_\_\_, 2024 (the "**Effective Date**"), by and between PETER PAN SEAFOOD COMPANY, LLC, an Alaska limited liability company, by and through its Court appointed General Receiver ("**Seller**"), Silver Bay Seafoods L.L.C., an Alaska limited liability company ("**Silver Bay**"), and John Ketcham, an individual resident of the State of California ("**Ketcham**"). As further described in Section 33 below, each of Silver Bay and Ketcham may be referred to herein as "**Buyer**," depending on the context. This Agreement is made with reference to the following recitals:

RECITALS

WHEREAS, on April 25, 2024, the Superior Court of Washington in and for King County (the "**Court**") entered an order appointing Stapleton Group, Inc. as General Receiver (the "**Receiver**") for Seller and several related entities in Case No. 24-2-08809-1 SEA, as amended and restated by the Stipulated Order Amending Order Appointing General Receiver entered by the Court on June 25, 2024 (collectively the "**Order Appointing Receiver**");

WHEREAS, on August 21, 2024, the Court entered an Order Approving Bid and Auction Procedures ("**Order Approving Bid and Auction Procedures**").

WHEREAS, pursuant to the Order Appointing Receiver, the Receiver has the express authority to sell Seller's tangible and intangible real and personal property ("**Receivership or Receivership Estate**");

WHEREAS, Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller (subject to the terms of Section 33 below), the rights and certain obligations of Seller to the Property and the Assumed Liabilities (as defined below), subject to the terms and conditions set forth herein, including approval of this Agreement by the Court ("**Sale Approval Order**") (collectively the Order Appointing Receiver, Order Approving Bid and Auction Procedures, Sale Approval Order, and any other orders issued by the Court may be referred to as the "**Orders**").

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

AGREEMENT

1.     Purchase and Sale.  Upon the terms and conditions set forth herein, Buyer agrees to buy from Seller and Seller agrees to sell to Buyer the Property, as defined below.

The "**Property**" as defined herein is comprised of the following:

(i)     The certain parcel(s) of land referred to and described on Exhibit A-1 (the "**Owned Real Property**") and the leasehold rights and interests under the lease agreements

described on <u>Exhibit A-2</u> (the "**Leasehold Interests**", and together with the Owned Real Property, the "**Land**");

        (ii)     The buildings, structures, improvements and fixtures located on the Land (collectively, the "**Improvements**");

        (iii)    All rights, privileges, easements, rights and rights-of-way appurtenant to or used in connection with the Land, including without limitation all minerals, oil, gas and other hydrocarbon substances on or under the Land owned by Seller (if any), air rights, water, water rights and water stock relating to the Land (if any), and any and all other appurtenances and rights of Seller in and to public streets, walkways, driveways, parking, and any land lying in the bed of any existing or proposed public ways adjacent to the Land (all of which are collectively referred to as the "**Appurtenances**").

        (iv)    Those executory contract and unexpired leases in effect with respect to the Property as of the Closing and set forth on <u>Schedule 1(iv)</u> hereto (the "**Executory Contracts**"), if any, for which Buyer voluntarily agrees to the assignment and assumption thereof, together with all security deposits, guarantees and other items given as security therefor. Buyer shall bear the full cost and expense of curing any existing monetary and non-monetary defaults under any assumed and assigned Executory Contracts, if any.

        (v)     All assignable development rights, entitlements, permits, approvals, warranties and other documents associated with the Property which the Buyer accepts assignment thereof;

        (vi)    The personal property and intangible property owned by Seller, located at the Land and used solely in connection with Seller's ownership and operation of the Land (subject to depletion and consumption prior to the Closing Date), together with those items identified in the table below which may be intangible or otherwise not located on the Land: (collectively the "**Personal and Intellectual Property**");

| Type or Category: | Description: |
|---|---|
| Crab Quota | Individual Processing Quota (IPQ) Permit for Bristol Bay Red King Crab (BBR), and Eastern Bering Sea Tanner crab (EBT) and Western Bering Sea Tanner crab (WBT) |
| Cod Quota | Pacific Cod Trawl Cooperative Program QS Permit for BSAI Pacific Cod |
| Peter Pan Seafoods Fish Brand | Registered and unregistered intellectual property rights for the Peter Pan Seafoods Fish brand, including trademark registrations listed on Schedule 1.vi. |
| Peter Pan Seafoods Branded Fish Supplies | Primarily packaging for fish sales that carries the Peter Pan Seafoods brand |

EXHIBITS058

| Peter Pan Seafoods Ikura Brand | Registered and unregistered intellectual property rights for the Peter Pan Seafoods Ikura (salmon roe) brand, including trademark registrations listed on Schedule 1.vi. |
|---|---|
| Peter Pan Seafoods Branded Ikura Supplies | Primarily packaging for Ikura sales that carries the Peter Pan Seafoods brand |
| Supplies located at the Dillingham processing plant | Packaging, labels, housewares, consumables for plant personnel, etc. |
| Supplies located at the Port Moller processing plant | Packaging, labels, housewares, consumables for plant personnel, etc. |
| Supplies located at the King Cove processing plant | Packaging, labels, housewares, consumables for plant personnel, etc. |
| American Fisheries Act Processor Permit 5358 | Cooperative fleet Pollack processing rights related to the King Cove processing facility |
| Membership Interest In Kent Warehouse and Labeling, LLC | 100 Units of Kent Warehouse and Labeling, LLC, a Washington limited liability company ("**KWL**"), which represents 33.33% of the outstanding membership interests of KWL; including any rights to proceeds from OBI/KWL should it exercise its right of first refusal or redemption with respect to the proposed sale by Seller, but excluding any rights to past due member distributions from KWL |

(vii)    All assignable licenses, plans, specifications, engineering reports, environmental reports or other work product related to the Property, if any.

2.    Price. The purchase price for the Property, including any cash amount and credit bid, shall be as follows in the table below, subject to prorations and closing adjustments (the "**Purchase Price**"). The cash portion of the Purchase Price for the Property, with a credit for the Good Faith Deposit as provided in Section 3 below, shall be payable in good and immediately available funds at the Closing.

| Asset | Purchase Price Allocation |
|---|---|
| Dillingham Processing Plant, including all real property, equipment, machinery, and fixtures, but excluding supplies | Cash Amount:  $14,500,000<br>Credit Bid: $0.00<br>Total Purchase Price:  $14,500,000 |
| Supplies located at the Dillingham processing plant, inventory for which is posted in the VDR | Cash Amount: $600,000<br>Credit Bid: $0.00<br>Total Purchase Price:  $600,000 |

EXHIBITS059

| | |
|---|---|
| Port Moller Processing Plant, including all real property, equipment, machinery, and fixtures, but excluding supplies (the "**Port Moller Property**") | Cash Amount:  $TBD<br>Credit Bid: $11,743,320<br>Total Purchase Price:  $11,743,320 |
| Supplies located at the Port Moller processing plant, inventory for which is posted in the VDR | Cash Amount: $200,000<br>Credit Bid: $0.00<br>Total Purchase Price: $200,000 |
| King Cove Processing Plant and fuel business, including all real property, equipment, machinery, and fixtures, but excluding supplies | Cash Amount:  $450,000<br>Credit Bid: $0.00<br>Total Purchase Price:  $450,000 |
| Supplies located at the King Cove processing plant, inventory for which is posted in the VDR | Cash Amount: $1,750,000<br>Credit Bid: $0.00<br>Total Purchase Price:  $1,750,000 |
| Dillingham "PAF" boat yard storage facility, including all real property, equipment, machinery, fixtures, and supplies | Cash Amount: $1,000,000<br>Credit Bid: $0.00<br>Total Purchase Price:  $1,000,000 |
| NakNek support facility, including all real property, equipment, machinery, fixtures, and supplies | Cash Amount: $200,000<br>Credit Bid: $0.00<br>Total Purchase Price: $200,000 |
| Sand Point support facility, including all real property, equipment, machinery, fixtures, and supplies | Cash Amount: $0.00<br>Credit Bid: $0.00<br>Total Purchase Price: $0.00 |
| Seattle Ballard Warehouse, including all real property, equipment, machinery, fixtures, and supplies | Cash Amount: $1,750,000<br>Credit Bid: $0.00<br>Total Purchase Price:  $1,750,000 |
| Crab Quota | Cash Amount: $300,000<br>Credit Bid: $0.00<br>Total Purchase Price:  $300,000 |
| Peter Pan Seafoods Fish Brand and Ikura Brand | Cash Amount: $350,000<br>Credit Bid: $0.00<br>Total Purchase Price: $350,000 |
| Peter Pan Seafoods Branded Fish Supplies and Ikura Supplies, inventory for which is posted in the VDR | Cash Amount: $25,000<br>Credit Bid: $0.00<br>Total Purchase Price:  $25,000 |
| Peter Pan Seafoods Ikura Brand (included above) | Included above |
| Peter Pan Seafoods Branded Ikura Supplies, inventory for which is posted in the VDR (included above) | Included above |
| American Fisheries Act Permit 5358 | Cash Amount:  $250,000<br>Credit Bid: $0.00<br>Total Purchase Price: $250,000 |
| Cod Quota | Cash Amount: $25,000<br>Credit Bid: $0.00<br>Total Purchase Price: $25,000 |
| Membership Interest In Kent Warehouse and Labeling, LLC | Cash Amount: $2,100,000<br>Credit Bid: $0.00<br>Total Purchase Price: $2,100,000 |

EXHIBITS060

3.    Good Faith Deposit.  Prior to the Bid Deadline, Buyer shall deposit in cash with the Receiver a Good Faith Deposit in an amount equal to ten percent (10%) of the cash component of Buyer's total Purchase Price (the "**Good Faith Deposit**").  The Good Faith Deposit shall be made by wire transfer to the Stapleton Group (wiring instructions available upon request) and will be held by the Receiver, subject to the terms and conditions of this Agreement.

The Good Faith Deposit shall be held and disbursed as provided in this Agreement.  The Good Faith Deposit, together with all interest accrued thereon, if any, shall be returned to Buyer if Buyer's bid was not the Prevailing Bid or the Back-up Bid within five (5) business days of the Auction. The Good Faith Deposit submitted by the Buyer, together with all interest thereon, if any, shall be fully applicable to the Purchase Price at Closing.  Upon execution of this Agreement by Seller, the Receiver shall promptly deliver the Good Faith Deposit with Title Company so that it may be credited against the Purchase Price as contemplated by Section 7.1.6.

4.    Title.

4.1    Preliminary Commitment and Title Insurance.  Buyer has received preliminary commitments for title insurance for the Owned Real Property as provided for in the VDR, which Buyer may update prior to Closing (the "**Preliminary Commitments**").  Buyer may, at Buyer's sole cost and expense, seek (i) a standard form ALTA Standard Coverage Owner's Policy or policies of Title Insurance issued by a title company in any amount the Buyer desires showing title to the Owned Real Property vested in Buyer and (ii) a standard form ALTA Leasehold Coverage Policy for the Leasehold Interests (collectively, the "**Title Policy**"), subject to the standard printed exceptions for standard coverage policies and any encumbrances, restrictions, easements or other matters contained in the Preliminary Commitments or on the Surveys other than the Liens (the "**Permitted Exceptions**").  The Title Policy may also include such endorsements as Buyer may reasonably request.  The cost of any endorsements requested by Buyer, the cost of the premium increase for extended coverage if Buyer elects to obtain extended coverage, and the cost of any survey required for extended coverage shall be paid by Buyer.

4.2    Survey.  If Seller possesses any survey(s) for the Land ("**Surveys**"), Seller shall provide Buyer with a copy of any Survey in the VDR, which Buyer may review prior to the Bid Deadline.  Buyer may, at Buyer's sole cost and expense, seek to update such Surveys or recertify such Surveys.

5.    Review of Property.

5.1    Review Materials.  Buyer acknowledges that Seller has made available to Buyer certain review materials related to the Property (the "**Review Materials**") in the VDR including, but not limited to: (a) copies of service contracts and leases for the Property, if any, in the Receiver's possession; (b) copies of a litigation guarantee for the Property, if any, obtained by the Receiver and in the Receiver's possession; (c) any reports,  surveys,  agreements relating to the Property, if any, in the Receiver's possession, including but not limited to any document related to the presence of Hazardous Substances on, in, under, or migrating from the Property, whether a draft or final version, which includes reports, agreements, studies, data, cost estimates, scopes of work, and rough orders of magnitude; (d) copies of permits, approvals, authorizations, insurance policies, and property tax bills relating to the Property, if any, in the Receiver's possession; and

EXHIBITS061

(e) the Consent Decree  entered by the United States District Court for the District of Alaska on July 11, 2024, in *United States v. PSF, Inc.*, Civil Action No. 3:24-cv-00112-HRH, including any subsequent amendment or modification (the "**Consent Decree**").

    5.2 <u>Review Period</u>.  Buyer had the opportunity to inspect said Review Materials and the Property prior to the Bid Deadline (the "**Review Period**"), including all books, records, legal documents and other information in the VDR.  Following the Review Period, Buyer has determined, in Buyer's sole and absolute discretion, that it desires to acquire the Property in its existing condition.

    5.3 <u>Indemnification for Entry on the Property</u>.  Buyer hereby indemnifies and agrees to defend and hold harmless Seller and Seller's partners, employees, licensees, contractors, agents, and invitees (individually, each a "**Seller Party**" and collectively, "**Seller Parties**") from and against any and all obligations, losses, injuries, damages, claims, liens, costs, expenses, demands, liabilities, penalties and investigation costs, including reasonable attorneys' fees and costs, incurred in connection with or arising out of any entry on the Property by Buyer or any of Buyer's Consultants, except to the extent caused, or contributed to, by Seller or Seller Parties' negligence or willful misconduct.  The provisions of this Paragraph shall survive the termination of this Agreement or Closing.

   6. <u>Closing and Escrow Instructions.</u>

    6.1 <u>Escrow Instructions</u>.  Upon execution of this Agreement, the parties hereto shall deposit an executed counterpart of this Agreement with First American Title Insurance Company (Seattle Office) ("**Title Company**"), and this instrument shall serve as the instructions to the Title Company as the escrow holder for consummation of the purchase and sale contemplated hereby.  Seller and Buyer agree to execute such reasonable additional and supplementary escrow instructions as may be appropriate to enable the Title Company to comply with the terms of this Agreement; provided, however, that in the event of any conflict between the provisions of this Agreement and any supplementary escrow instructions, the terms of this Agreement shall supersede and control.

    6.2 <u>Time and Place of Closing</u>.  Subject to the terms and conditions herein, the transactions contemplated hereby shall be consummated (the "**Closing**") by October 15, 2024 (the "**Outside Closing Date**"), or such other date and time as may be set by the Receiver in its sole discretion; provided the Receiver shall have one (1) option to extend the Outside Closing Date for an additional thirty (30) days by providing the Buyer with written notice thereof prior to the Outside Closing Date.  For purposes hereof, the Closing shall be deemed to occur at 12:01 a.m. Pacific Time on the Closing Date.  As used in this Agreement, "**Closing**" or "**Closing Date**" means the date on which all appropriate documents are recorded and the proceeds of sale are available for disbursement to Seller.  Unless otherwise agreed by the parties hereto, this Agreement shall terminate if the Closing has not occurred on or before the Outside Closing Date, as may be extended.  Upon such termination, the Good Faith Deposit shall be returned to Buyer within five (5) business days.

    6.3 <u>Title; Risk of Loss</u>.  Title to and risk of loss with respect to the Property shall remain with Seller until Closing and thereafter shall vest in Buyer in accordance with the

terms and conditions of this Agreement.  Pursuant to the Order Appointing Receiver, the Receiver has the right to sell the Property free and clear of any and all liens, claims, security interests, and encumbrances of any type or nature (collectively, "**Liens**"), except the Permitted Exceptions or as otherwise provided for in the Agreement, with the proceeds from the purchase and sale contemplated herein attaching to the Liens in their respective order of priority as determined by applicable law.  For clarification, any and all deeds of trust, assignments of rents, security agreements, lis pendens, fish packer's liens, processor's liens, fishermen's liens, the order appointing general receiver, the liens and encumbrances set forth on Schedule 6.3 hereto, and other liens and encumbrances for money owed set forth on the Preliminary Commitments and/or Surveys shall be deemed Liens and not Permitted Exceptions for purposes hereof and shall be terminated and of no further force and effect with respect to the Property and Buyer's right and title to the Property from and after Closing, with such Liens to attach to the proceeds of the sale, in the disposition of the Property, in the same order, priority, and validity as the liens had with respect to the Property as existed on April 22, 2024.

   6.4 <u>Release of All Liens</u>.  Upon receipt by Seller of the Purchase Price and entry of the Sale Approval Order (defined below), the Property shall be deemed automatically released from all Liens without further action by any person; provided, however, it being understood that the Liens attached to the Property shall attach to the proceeds received for the Property to the same extent, validity, and priority as existed on April 22, 2024.  Aside from the Liens, all Permitted Exceptions set forth in the Commitment shall survive Closing, including but not limited to the Consent Decree, permits, authorizations, and approvals in connection with the Property and all renewals, replacements, extensions, transfers of the same.

   6.5 <u>Closing Costs</u>.

   (a) <u>Seller's Costs at Closing</u>.  At Closing, Seller shall pay one-half of Title Company's escrow fees and charges.

   (b) <u>Buyer's Costs at Closing</u>.  At Closing, Buyer shall pay (i) the premium for standard coverage policy of title insurance and the cost of the increased title premium for extended coverage, (ii) the costs of any title insurance endorsements required by Buyer, (iii) one-half of Title Company's escrow fees and charges, and (iv) the costs of any city, county and/or state transfer taxes associated with the transfer of the Property and Personal Property, and recording charges.

   (c) Each party shall be responsible for its own legal, accounting, and consultant fees.

   6.6 <u>Prorations</u>.  All real property taxes, special taxes, any similar taxes and assessments imposed on the Property, utilities, and any income or expense related to the Property shall be apportioned as of 12:01 a.m. on the Closing Date, as if Buyer were vested with title to the Property during the entire Closing Date, such that Buyer shall have the benefit of the income and the burden of expenses for the Closing Date.  Any income and other revenue and expenses of the Property shall be prorated based upon the income and expenses actually collected or paid for the month in which Closing occurs.

EXHIBITS063

6.7    <u>Sale Approval Order as a Condition to Closing</u>. The obligations of the parties to consummate the transactions contemplated by this Agreement shall be subject to Approval of this Agreement by the Court ("**Sale Approval Order**"), which Seller and Buyer shall use commercially reasonable efforts to obtain upon Seller's acceptance of Buyer's bid.  If the Court will not approve a sale of the Property to Buyer by entry of a Sale Approval Order by the Outside Closing Date, as may be extended under this Agreement, the Seller may terminate this Agreement and seek to enter into a purchase and sale agreement for the Property for the designated Back-Up Bid (as defined in the Orders).  Similarly, if the Court will not approve a sale of the Property to Buyer by entry of a Sale Approval Order by the Outside Closing Date, as may be extended, Buyer may terminate this Agreement by providing written notice to Seller.  Upon any such termination by Seller or Buyer, the Good Faith Deposit shall be returned to Buyer within five (5) business days of termination.

6.8    <u>Failure to Close</u>.  If for any reason Buyer is unable or unwilling to consummate purchase of the Property following a Sale Order Approval because of breach or failure, without legal excuse, to perform on the part of the Buyer, (1) the Receiver may terminate this Agreement and, upon termination, Buyer will forfeit its Good Faith Deposit to Seller as liquidated damages in accordance with Section 14.1; and (2) the Receiver shall be entitled to enter into a purchase and sale agreement for the Property for the  designated Back-Up Bid (as defined in the Orders).

7.    <u>Deliveries at Closing</u>.

7.1    <u>Seller's Deliveries</u>.  At Closing, Seller shall deliver the following:

7.1.1    **Deeds**.  Executed Quit Claim Deeds, in the form attached hereto as <u>Exhibit B</u>, conveying title to the Owned Real Property to Buyer.

7.1.2    **FIRPTA Affidavit**.  A sworn FIRPTA Affidavit stating under penalty of perjury that Seller is not a "foreign person" as such term is defined in Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended ("**Code**"), or such other evidence as Buyer and Escrow Holder may require showing that Buyer is not required to withhold taxes from the Purchase Price under Section 1445(a) of the Code.

7.1.3    **Bill of Sale**.  An executed Bill of Sale, in the form attached hereto as <u>Exhibit C,</u> assigning to Buyer the Personal Property items identified in Section 1(vi) above (the "**Bill of Sale**").

7.1.4    **Assignment and Assumption of Executory Contracts and Unexpired Leases**.  If Buyer is assuming any Executory Contracts hereunder, an executed Assignment and Assumption of Executory Contracts and Leases in the form attached to this Agreement as <u>Exhibit D</u> (the "**Assignment of Executory Contracts and Unexpired Leases**").

7.1.5    **Assignment and Assumption of Permits/Approvals.** An executed Assignment and Assumption of Permits and Approvals in the form attached to this Agreement as <u>Exhibit E</u> (the "**Assignment of Permits and Approvals**").

EXHIBITS064

7.1.6    **Closing Statement**.  A final closing statement prepared by the Title Company showing the application of the Good Faith Deposit against the Purchase Price, the allocation of the Closing Costs and other prorations and closing adjustments set forth in this Agreement, all consistent with the terms and conditions of this Agreement (the "**Closing Statement**").

7.1.7    **Evidence of Authority**.  Such authorizing documents of Seller and/or Receiver as shall be reasonably required by the Title Company to evidence Seller and Receiver's authority to consummate the transactions contemplated by this Agreement.

7.2    Buyer's Deliveries.  At each Closing, Buyer shall deliver the following:

7.2.1    **Purchase Price**. The portion of the Purchase Price payable pursuant to Section 2, as adjusted pursuant to Sections 3, 6.5 and 6.6, and such other amounts as may be due from Buyer pursuant to the Settlement Statement, by wire transfer of immediately available funds to Seller. The Good Faith Deposit shall be applied to and credited against the Purchase Price and shall be disbursed to Seller by Title Company at Closing (or as otherwise set forth in this Agreement).

7.2.2    **Evidence of Authority**.  Such authorizing documents of Buyer as shall be reasonably required by the Title Company to evidence Buyer's authority to consummate the transactions contemplated by this Agreement.

7.2.3    **Bill of Sale**.  An executed counterpart of the Bill of Sale.

7.2.4    **Assignment and Assumption of Executory Contracts and Unexpired Leases**.  An executed counterpart of the Assignment and Assumption of Executory Contracts and Unexpired Leases.

7.2.5    **Assignment and Assumption of Permits/Approvals.**  An executed counterpart of the Assignment and Assumption of Permits and Approvals.

7.2.6    **Closing Statement**.  An executed counterpart of the Closing Statement.

8.    Representations and Warranties.

8.1    Representations and Warranties of Seller.  Seller represents and warrants to Buyer as follows, effective as of the date hereof and the Closing Date:

8.1.1    **Authority; No Conflicts or Consents**.  Subject only to the Sale Approval Order: (a) the Receiver has the full power and authority to execute, deliver and perform Seller's obligations under this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby; and (b) the execution and performance of this Agreement by Seller will not result in any violation of any federal, state, or local statute, ordinance, or regulation.

EXHIBITS065

8.1.2    **Title**.  Seller has title to the Property, subject to the Liens.  Upon payment of the Purchase Price, the Property will be free and clear of all Liens (other than Permitted Exceptions), and clear title will vest in Buyer (subject to the Permitted Exceptions).  Buyer shall be entitled to possession of the Property on the Closing Date, free and clear of other parties in possession, other than rights of lessees under unexpired leases involving the Property.

8.1.3    **No Other Representations and Warranties**.  Except for the representations and warranties contained herein, neither Seller nor Receiver or its agents and professionals has made or makes any other express or implied representation or warranty, either written or oral, for or on behalf of Seller.

8.1.4    **Termination of Seller's Representations and Warranties at Closing**.  All of the representations and warranties of Seller set forth in this Agreement shall terminate at Closing, and Buyer will not have any rights or claims as a result of those representations and warranties after the Closing.

8.2    <u>Representations and Warranties of Buyer</u>.  Buyer represents and warrants to Seller as follows:

8.2.1    **Organization and Authority of Buyer; Enforceability**.  Buyer is incorporated and in good standing under the laws of its state of incorporation, with full power and authority to enter into and perform its obligations under this Agreement.  Buyer has complied with all corporate formalities and procedures necessary to authorize the execution, delivery and performance of this Agreement. Buyer does not need approval of its creditors or any other third party to enter into this Agreement and perform its obligations hereunder.  This Agreement is a binding obligation of Buyer enforceable in accordance with its terms.

8.2.2    **No Conflicts; Consents**.  The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (i) violate or conflict with the certificate of formation or other organizational documents of Buyer; or (ii) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Buyer.  No consent, approval, waiver or authorization is required to be obtained by Buyer from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby.

8.3    <u>Acknowledgement and Assumption of Liabilities.</u> Buyer acknowledges and agrees that upon Closing, Buyer shall assume and agrees to fulfill, perform, pay and discharge (or cause to be fulfilled, performed, paid and discharged) any and all rights, liabilities, and obligations known or unknown, associated with the Property and set forth on <u>Schedule 8.3</u> hereto, regardless of whether such rights, liabilities, or obligations arose prior to, on or after Closing (all of said obligations and liabilities, the "**Assumed Liabilities**"). To avoid doubt, Buyer's Assumed Liabilities include, but are not limited to, the terms and conditions of the Consent Decree as modified or amended.  Buyer further acknowledges and agrees that the United States has jurisdiction and authority to enforce the Consent Decree directly against the Buyer without the participation, intervention, or involvement of Seller whatsoever.  Buyer of the King Cove Facility

further agrees to submit to the jurisdiction of the United States Federal District Court for the District of Alaska and be named as a defendant to the Consent Decree, including any modification or amendment thereto, entered in *U.S. v. PSF, Inc. et al*, civ. no 3:24-cv-00112-HRH.

8.4    Acknowledgement and Assumption of Permits and Approvals.   Buyer acknowledges and agrees that upon Closing, Buyer shall assume and agrees to fulfill, perform, pay and discharge (or cause to be fulfilled, performed, paid and discharged) any and all rights, liabilities, and obligations known or unknown, arising from or related to any Permit or Approval set forth on Schedule 8.4, regardless of whether such rights, liabilities or obligations arose prior to, on or after Closing (all of said obligations and liabilities, the "**Assumed Permits and Approvals**"). Buyer agrees to execute the Assignment and Assumption of Permits and Approvals at the time of closing attached hereto as Exhibit E.

8.5    Reasonably Equivalent Value.    The consideration given and to be exchanged by Buyer and to be received by Seller as provided in this Agreement, shall constitute a contemporaneous or substantially contemporaneous exchange of reasonably equivalent value for the Property transferred by Seller to Buyer, (ii) Buyer entered into this Agreement in good faith, (iii) Buyer does not require any further information, facts, research, evidence, or third party analysis or opinion in connection with Buyer's decision to execute this Agreement and (iv) Buyer shall not have the right to benefit in any manner, either directly or indirectly, from the assertion by any person or entity that the receipt by Buyer of consideration to be exchanged pursuant to this Agreement, shall constitute or shall have constituted less than reasonably equivalent value for the consideration given pursuant to this Agreement, or a preferential payment with respect to any debts or obligations resolved pursuant to this Agreement.

8.6    Buyer Acknowledgement Of Potential Auction and Subsequent Bids. Buyer hereby acknowledges and agrees that the sale of the Property is subject to the Orders, and all applicable laws, rules, and regulations related thereto. The sale of the Property may be subject to an auction between Qualified Bids and Subsequent Bids, if any.  Seller, in its sole discretion and after considering any Qualified Bids and Subsequent Bids, shall determine the Prevailing Bidder (as such terms are defined in the Orders) and enter into a purchase and sale agreement with the Prevailing Bidder as Buyer.

9.    Post Closing Inspection and True-Up.  In the case of the Dillingham, Port Moller, and King Cove properties, if the Buyer makes a written request for a physical count ("True-Up Inspection") of the supplies inventory or the appraised machinery and equipment ("M&E") within three (3) days of Closing, Seller and Buyer shall conduct a True-Up Inspection within fourteen (14) days of Buyer's written request, the cost of such True-Up Inspection to be shared equally between Seller and Buyer.

9.1    Supplies Inventory True-Up.  If the True-Up Inspection reveals that greater than ten percent (10%) of the book value of supplies inventory is not available to transfer to Buyer in comparison to what Seller had represented as available in the VDR (the "**Unavailable Supplies**"), Buyer shall be entitled to a credit to the Purchase Price ("**Purchase Price Credit**") for the book value of Unavailable Supplies that exceeds ten percent (10%), calculated by multiplying the dollar book value in excess of 10% times the percent of book value at which the Buyer purchased the supplies.

EXHIBITS067

9.2    <u>Appraised M&E True-Up.</u>  If the True-Up Inspection reveals that an M&E asset is not available to transfer to the Buyer in comparison to what Seller had represented as available per the *Hilco Valuation Services M&E Appraisal Report, dated May 12, 2023* (the "Appraisal Report") and posted in the VDR (the "**Unavailable Appraised Equipment**"), Buyer shall be entitled to a Purchase Price Credit, calculated by multiplying a) the Net Forced Liquidation Value (or "**NFLV**", as defined in the Appraisal Report) of the Unavailable Appraised Equipment times b) the purchase price for the property, including its M&E, divided by c) the sum of the NFLV for the property and the NFLV for the M&E.

For both the Supplies Inventory True-Up and Appraised M&E True-Up, if, following the True-Up Inspection, a credit is owed to the Buyer, the Purchase Price Credit shall first be deducted from the Buyer's credit bid, if any, that the Buyer submitted as part of the Purchase Price, and, following such deduction, the Buyer shall be entitled to a cash reimbursement for the remaining Purchase Price Credit true-up, payable within ten (10) business days of the True-Up Inspection.

For the sake of clarification, the true-up provisions provided for in this Section shall not be applicable to any properties other than Dillingham, Port Moller and King Cove, nor shall the true-up provisions be applicable to any M&E asset for which no appraisal exists.

10.    <u>Indemnification Post-Closing.</u>  From and after Closing, Buyer hereby agrees to indemnify, defend, and hold harmless Seller, Receiver, and its professionals from and against any and all losses, liability, claims, agency orders or requirements, damages, and expenses ("**Claims**"), relating to or arising out of, directly or indirectly: (i) any inaccuracy or breach of any of the representations or warranties of Buyer contained in this Agreement; (ii) any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement; (iii) any Assumed Permits and Approvals; (iv) any Assumed Liabilities; and (v) the actual or threatened release, discharge, disposal, deposit, seepage, migration, or escape of any Pollutant at, from, into, or underneath the Property, and the compliance or noncompliance of the Property with applicable federal, state, county, and local laws and regulations including, without limitation, Environmental Laws and regulations. For purposes of this Agreement, the term "Pollutant" means any hazardous substance, dangerous waste, solid waste, pollutant, contaminant, or other material that now or in the future becomes regulated or defined under any local, state, or federal Environmental Law. For purposes of this Agreement, "Environmental Law" means any federal, state, or local statute, regulation, code, rule, ordinance, order, judgment, decree, injunction, or common law, pertaining in any way to the protection of human health, safety, water quality, or any other aspect of the environment, including without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 et seq. ("CERCLA"); the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq. ("RCRA"); the Federal Water Pollution Control Act ("Clean Water Act"), 33 U.S.C. § 1251 et seq., the Clean Air Act, 42 U.S.C. § 7401 et seq., their respective rules and regulations, and any laws concerning above ground or underground storage tanks.  To avoid doubt, Buyer's obligation to indemnify, defend, and hold harmless from and after Closing includes Claims arising from or related to the Assumed Liabilities and Assumed Permits and Approvals.

11.    <u>AS-IS PURCHASE.</u>

EXHIBITS068

11.1    <u>Independent Investigation</u>.   Buyer has conducted its own independent investigation, review and analysis of the Property.  Buyer acknowledges and agrees that: (i) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and (ii) neither Seller nor any other person has made any representation or warranty as to Seller, the Property or this Agreement, except as expressly set forth in Section 8.1 of this Agreement.

11.2    <u>"AS IS, WHERE IS."</u>   EXCEPT AS EXPRESSLY SET FORTH IN THE SELLER'S REPRESENTATIONS AND WARRANTIES (SECTION 8.1) AND IN THE CONVEYANCE DOCUMENT(S), BUYER IS PURCHASING THE PROPERTY "AS IS, WHERE IS" IN ITS PRESENT CONDITION.   BUYER HAS THE OPPORTUNITY TO INSPECT THE PROPERTY AND THE REVIEW MATERIALS AS PROVIDED HEREIN.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT AND IN THE CONVEYANCE DOCUMENTS INCLUDING WITHOUT LIMITATION SELLER'S REPRESENTATIONS AND WARRANTIES IN <u>SECTION 8</u>, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO: (A) THE CONDITION OF THE PROPERTY OR THE SUITABILITY OF THE PROPERTY FOR BUYER'S INTENDED USE; (B) ANY APPLICABLE BUILDING, ZONING OR FIRE LAWS OR REGULATIONS OR WITH RESPECT TO COMPLIANCE THEREWITH OR WITH RESPECT TO THE EXISTENCE OF OR COMPLIANCE WITH ANY REQUIRED PERMITS, IF ANY, OF ANY GOVERNMENTAL AGENCY.   WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS EXPRESSLY SET FORTH HEREIN, SELLER SHALL HAVE NO LIABILITY WITH RESPECT TO THE CONDITION OF THE PROPERTY UNDER COMMON LAW, OR ANY FEDERAL, STATE, OR LOCAL LAW OR REGULATION.   BUYER ACKNOWLEDGES THAT BUYER IS GIVEN THE OPPORTUNITY UNDER THIS AGREEMENT TO FULLY INSPECT THE PROPERTY AND BUYER ASSUMES THE RESPONSIBILITY AND RISKS OF ALL DEFECTS AND CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUCH DEFECTS AND CONDITIONS, IF ANY, THAT CANNOT BE OBSERVED BY CASUAL INSPECTION.

12.    <u>Brokers and Finders</u>.   In the event of a claim for broker's fee, finder's fee, commission or other similar compensation in connection with this Agreement, Buyer, if such claim is based upon any agreement alleged to have been made by Buyer, hereby agrees to indemnify Seller against any and all damages, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and costs) that Seller may sustain or incur by reason of such claim. Seller, if such claim is based upon any agreement alleged to have been made by Seller, hereby agrees to indemnify Buyer against any and all damages, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and costs) that Buyer may sustain or incur by reason of such claim.  The provisions of this <u>Section 12</u> shall survive the termination of this Agreement or the Closing.

13.    <u>Possession</u>.   Buyer shall be entitled to possession of the Property on the Closing Date, free and clear of other parties in possession.

14.    <u>Default and Remedies</u>.

EXHIBITS069

14.1    <u>Default by Buyer</u>.  If, following a Sale Approval Order, Buyer fails without legal excuse to complete the purchase of the Property in accordance with the terms of this Agreement, Seller may terminate this Agreement by providing written notice to Buyer, in which event the Good Faith Deposit deposited by Buyer shall be forfeited to Seller as liquidated damages and Seller's sole remedy.  Buyer and Seller expressly agree that the delivery to and retention of the Good Faith Deposit by Seller represents a reasonable estimation of the damages in the event of Buyer's default, that actual damages would be difficult to ascertain as of the date hereof, and this provision does not constitute a penalty.

14.2    <u>Default by Seller</u>.  If, following a Sale Approval Order, Seller fails without legal excuse to complete the sale of the Property in accordance with the terms of this Agreement, Buyer may pursue specific performance of Seller's obligations under this Agreement or terminate this Agreement and be refunded its Good Faith Deposit within five (5) business days of termination.

15.    <u>Negotiation and Construction</u>.  This Agreement and each of the terms and provisions hereof are deemed to have been explicitly negotiated between the parties, and the language in all parts of this Agreement shall, in all cases, be construed according to its fair meaning and not strictly for or against either party.

16.    <u>Governing Law, Attorneys' Fees</u>.  This Agreement shall be construed according to the laws of the state of Washington and Buyer consents to the jurisdiction of the Court (defined above).  If either Buyer or Seller should find it necessary to employ an attorney to enforce a provision of the Agreement or to recover damages for the breach hereof (including proceedings in bankruptcy), the prevailing party shall be entitled to be reimbursed for its court costs and reasonable attorneys' fees, in addition to all damages, through all levels of appeal.

17.    <u>Notices</u>.  All notices, demands, requests, consents and approvals that may, or are required to, be given by any party to any other party hereunder shall be in writing and shall be deemed to have been duly given if (a) delivered personally, (b) sent by a nationally recognized overnight delivery service, (c) electronically transmitted via email, or (d) if mailed or deposited in the United States mail and sent by registered or certified mail, return receipt requested, postage prepaid to:

| | |
|---|---|
| SELLER: | Peter Pan Seafood Company, LLC |
| | Attn: David Stapleton, Court Appointed Receiver |
| | 514 Via De La Valle, Suite 210 |
| | Solano Beach, CA 92075 |
| | |
| SILVER BAY: | Silver Bay Seafoods L.L.C. |
| | 208 Lake Street, Suite 2E |
| | Sitka, AK 99835 |
| | Attention: Cora Campbell |
| | Email: cora.campbell@silverbayseafoods.com |
| | |
| | With a copy to: |

EXHIBITS070

> Stoel Rives LLP
> 600 University Street, Suite 3600
> Seattle, WA 98101
> Attention:  Brent L. Jones
> Email: brent.jones@stoel.com

KETCHAM:
> John Ketcham
> 626 Adelaide Dr.
> Santa Monica, CA 90402
> Email: johnkketcham@gmail.com
>
> With a copy to:
>
> Snell & Wilmer LLP
> 600 University Street, Suite 310
> Seattle, WA 98101
> Attention:  Josh Rataezyk
> Email: jrataezyk@swlaw.com

Either party hereto may by proper notice made by the other party designate such other address for giving of notices.  All notices shall be deemed given on the day such notice is delivered (or if refused, the date of such refusal) or transmitted by email (provided that confirmation of email transmission is before 5:00 p.m. on a Business Day, and, if after such time, then on the next Business Day) or on the third Business Day following the date such notice is mailed in accordance with this Section.

18.   Assignment.   Buyer may assign and delegate all of its rights, interests and obligations under this Agreement without the prior approval or consent of Seller to any entity of which Buyer has financial control and responsibility for day-to-day management.  Only for purposes of setting up a single-purpose-entity, Buyer may assign this Agreement to a wholly-owned single-purpose entity, so long as Buyer remains liable hereunder. Except as set forth above, Buyer shall not assign any right, interest or obligation under this Agreement without Seller's express prior written consent, which consent may be granted or withheld by Seller, in its sole discretion.

19.   Cooperation; Further Assurances.   From the date hereof until the Closing, the parties shall reasonably cooperate with one another in connection with any steps required to be taken by either of them to carry out or otherwise fulfill the intent of this Agreement, including without limitation, seeking the Sale Approval Order and any other Order necessary to effectuate the sale of the Property from Seller to Buyer as contemplated herein.  Upon the request of the other party, each party shall also furnish upon request any further information, execute and deliver any other documents, and do other acts and things as are reasonably necessary for the purpose of carrying out the intent of this Agreement. Further, following Closing, Seller shall cooperate with Buyer and provide any and all assistance and information, and execute such documents, as may be reasonably necessary to transfer the Property and associated Permits and Approvals to Buyer.

EXHIBITS071

20.     <u>Business Days; Time</u>.  A "Business Day" means any day other than a Saturday or Sunday on which banks in Alaska are authorized or required to be closed for business.  If any deadline or day for performance is not a Business Day, then the time period shall be extended to the next Business Day.  All times herein refer to Pacific Time.

21.     <u>Entire Agreement</u>.  This Agreement contains the entire understanding between the parties and supersedes any prior agreements between them respecting the subject matter hereof.

22.     <u>No Recording</u>.  Neither this Agreement nor any memorandum of this Agreement shall be recorded.

23.     <u>Time of the Essence</u>.  Time is of the essence of this Agreement.

24.     <u>Counterparts</u>.  This Agreement may be executed in several counterparts, which shall be treated as originals for all purposes, and all counterparts so executed shall constitute one agreement, binding on all the parties hereto, notwithstanding that all the parties are not signatory to the original or to the same counterpart.  Any such counterpart shall be admissible into evidence as an original hereof against the person who executed it.

25.     <u>Limitation of Liability</u>.  Notice is hereby given that all persons dealing with Buyer and Seller shall look to the assets of Buyer and Seller for the enforcement of any claim against either party.  None of the trustees, officers, directors, employees, members, owners, partners or shareholders of Buyer and Seller shall have any personal liability for any of the liability or obligations of arising from this Agreement.

26.     <u>Binding Amendment to Purchase and Sale Agreement, Waiver</u>.  No modification, termination or amendment of this Agreement may be made except by written agreement of the parties, which may include a Bid Confirmation signed by the Buyer and accepted by the Seller.  No failure by Seller or Buyer to insist upon the strict performance of any covenant, agreement, or condition of this Agreement or to exercise any right or remedy shall constitute a waiver of any such breach or any other covenant, agreement, term or condition.  No waiver shall affect or alter this Agreement, and each and every covenant, agreement, term and condition of this Agreement shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

27.     <u>Waiver of Jury Trial</u>.   IN ANY LAWSUIT OR OTHER PROCEEDING INITIATED BY A PARTY HERETO UNDER OR WITH RESPECT TO THIS AGREEMENT, SELLER AND BUYER EACH WAIVE ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY.

28.     <u>Survival</u>.  The provisions of this Agreement that contemplate performance after the Closing, the obligations of the parties not fully performed at the Closing, and all indemnities set forth in this Agreement shall survive the Closing and shall not be deemed to be merged into or waived by the instruments of Closing.

29.     <u>Headings</u>.   The article and paragraph headings of this Agreement are for convenience only and in no way limit or enlarge the scope or meaning of the language hereof.

EXHIBITS072

30.    <u>Cumulative Remedies</u>.  Except as otherwise stated herein, the rights and remedies of the parties that are specified in this Agreement are cumulative and not exclusive of any other rights and remedies available at law or in equity.

31.    <u>Exhibits</u>.  All exhibits attached hereto or referenced herein are incorporated in this Agreement.

32.    <u>Severability</u>.  In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such provisions had not been contained herein.

33.    <u>Port Moller Buyer</u>.

33.1    By his execution of this Agreement, Ketcham agrees to buy the Port Moller Property only and Seller agrees to sell to Ketcham the Port Moller Property only for (i) cash in the amount of $TBD and (ii) a credit bid of an amount owed to Ketcham and secured by the Port Moller Property equal to $11,743,320 (the "**Port Moller Purchase Price**").  Ketcham is not agreeing to and shall not be obligated hereunder to acquire any tangible or intangible property other than the Port Moller Property, and Silver Bay is not agreeing to and shall not be obligated hereunder to acquire the Port Moller Property.

33.2    <u>Conditions to Ketcham's Obligations</u>.    Ketcham shall be obligated to pay the Port Moller Purchase Price and to close on the purchase of the Port Moller Property only if at Closing the Seller has applied the cash paid by Silver Bay in a way that, in combination with other cash that may be available to the Receivership Estate, results in the full and complete satisfaction of the claim asserted by Wells Fargo Bank in the Receivership.  If at Closing the Seller does not apply cash sufficient to satisfy the claim of Wells Fargo Bank in full, Ketcham shall have the option, exercisable in his sole and absolute discretion, to decline to close on the purchase of the Port Moller Property and to terminate his obligations under this Agreement without recourse to any party, including the Seller.  Any such termination by Ketcham shall not affect the rights or obligations hereunder of Seller or Silver Bay with respect to all Property other than the Port Moller Property.

33.3    <u>Stand-Alone Bids</u>.    If for whatever reason Silver Bay will not close on the purchase of assets other than the Port Moller Property pursuant to this Agreement (including, without limitation, because the Seller has not identified Silver Bay as the successful bidder following the auction described in Section 8.6), the Seller shall be authorized, but not obligated, to sever Ketcham's obligations hereunder from those of Silver Bay and to treat Ketcham's having executed this Agreement as a stand-alone bid to purchase the Port Moller Property for the Port Moller Purchase Price, which (i) shall be enforceable against Ketcham, provided the Seller applies cash paid by a successful bidder or bidders other than Silver Bay, in combination with other cash that may be available to the Receivership Estate, to the full and complete satisfaction of the claim asserted by Wells Fargo Bank in the Receivership at closing, and (ii) shall be incorporated into an amended Purchase and Sale Agreement between the Seller and Ketcham that pertains only to the Port Moller Property.

EXHIBITS073

Similarly, if for whatever reason Ketcham will not close on the Port Moller Property pursuant to this Agreement (including, without limitation, because Wells Fargo Bank was not paid in full), the Seller shall be authorized, but not obligated, to sever Ketcham's obligations hereunder from those of Silver Bay and to treat Silver Bay as having executed this Agreement as a stand-alone bid to purchase all Property other than the Port Moller Property for the cash portion of the Purchase Price set forth in Section 2, which (i) shall be enforceable against Silver Bay, and (ii) shall be incorporated into an amended Purchase and Sale Agreement between the Seller and Silver Bay that pertains to all Property other than the Port Moller Property. A severance of Ketcham's obligations under this paragraph shall not impact Silver Bay's rights hereunder with respect to the Good Faith Deposit.

33.4    <u>No Joint Venture, Etc</u>.    It being the intention of Ketcham and Silver Bay that the incorporation into this Agreement of Ketcham's purchase of the Port Moller Property for the Port Moller Purchase Price (subject to the conditions described above) is for ease of presentation only and to facilitate the Seller's understanding of Ketcham's purchase of the Port Moller Property in the context of Silver Bay's purchase of assets other than the Port Moller Property, the parties agree that Ketcham and Silver Bay have not formed a joint venture or a partnership for any purpose, and that neither Ketcham nor Silver Bay have guaranteed the obligations of the other, whether under this Agreement or otherwise. Notwithstanding anything herein to the contrary, Silver Bay shall not be bound or obligated in any way with respect to the Port Moller Property, including without limitation, the Buyer indemnification obligations under Section 10. Similarly, Ketcham shall not be bound or obligated in any way with respect to any obligations associated with any Property other than the Port Moller Property.

33.5    <u>Meaning of "Buyer" Herein</u>.    Unless otherwise described or defined, references herein to "Buyer" in the context of rights and obligations pertaining to Property other than the Port Moller Property shall be to Silver Bay, and references pertaining to the Port Moller Property shall be to Ketcham.

33.6    <u>Priority of Terms</u>. Should the terms and conditions set forth in this Section 33 be inconsistent with terms and conditions set forth elsewhere in this Agreement, this Section 33 shall govern.

(*signatures to follow*)

EXHIBITS074

DATED as of the day and year first above written.

**SELLER:**　　　　**Peter Pan Seafood Company, LLC,**
　　　　　　　　an Alaska limited liability company,
　　　　　　　　by and through its Court appointed General Receiver

　　　　　　　　By:_____
　　　　　　　　Name:_____
　　　　　　　　Title:_____

**KETCHAM:**

　　　　　　　　By:_____
　　　　　　　　　John Ketcham

**SILVER BAY:**　　　**Silver Bay Seafoods L.L.C., an Alaska limited liability company**

　　　　　　　　By:_____
　　　　　　　　Name:_____
　　　　　　　　Title:_____

EXHIBITS075

**<u>Exhibits</u>**

Exhibit A-1    Legal Description of the Owned Real Property
Exhibit A-2    Leasehold Interests

Exhibit B        Quit Claim Deed
Exhibit C        Bill of Sale
Exhibit D        Assignment and Assumption of Executory Contracts and Unexpired
                 Leases
Exhibit E        Assignment and Assumption of Permits and Approvals

**<u>Schedules</u>**
Schedule 1.iv  Executory Contracts
Schedule 1.vi. Registered Trademarks
Schedule 6.3   Schedule of Liens
Schedule 8.3   Assumed Liabilities
Schedule 8.4   Permits and Approvals (listed by Property)

EXHIBITS076

EXHIBIT A-1

**Legal Description of the Owned Real Property**

**Fee Simple Interest in Real Property**

**DILLINGHAM, AK**

United States Survey No. 155, according to the official survey thereof, records of the Bristol Bay Recording District, Third Judicial District, State of Alaska as described in Homestead Certificate #42, except those portions thereof described as follows:

Commencing at a point on the Easterly line of U.S. Survey No. 155, which point bears N 07°15' W and is 150 feet distant from Corner No. 1 of U.S. Survey No. 2262; thence S 82°45' W a distance of 200 feet; thence N 07°15' W a distance of 400 feet; thence N 82°45' E a distance of 200 feet; thence S 07°15' E a distance of 400 feet to the point of beginning, as conveyed by deed recorded April 15, 1959 in Book 11, Page 45.

Beginning at a point on the line common to said U.S. Survey No. 155 and to U.S. Survey 2732-A in unsurveyed Section 21, said point being S 06°48'01" E along said common line a distance of 262 feet from Corner No. 11 of said U.S. Survey 2732-A; thence N 46°59'33" W a distance of 384.29 feet; thence S 89°33'01" E a distance of 39 feet to a point on the Northerly right of way line for Alaska Project S-0411(2), Dillingham to Kanakanak; thence S 47°55'14" along said Northerly right of way line a distance of 318.28 feet; thence S 06°48'01" E along said line common to U.S. Survey 155 and U.S. Survey 2732-A a distance of 48.86 feet to the true point of beginning, as conveyed by deed recorded September 24, 1975 in Book 20, Page 114.

Beginning at the SE Corner at a point on the East boundary (3-4 line) of U.S. Survey No. 155, 600 feet from Corner No. 3 thereof; thence S 82°45' W 200 feet to the SW Corner; thence N 07°15' W 300 feet to the NW Corner; thence N 82°45' E 200 feet to the NE Corner on the East boundary line of U.S. Survey No. 155; thence S 07°15' E 300 feet along the East boundary (3-4 line) of U.S. Survey No. 155, to the point of beginning, as conveyed by deed recorded May 20, 1960 in Book 11, Page 155.

Starting at a point 1050 feet NNW from Corner No. 4 at CS2262, thence approximately WSW 250 feet to a point on the Dillingham-Kanakanak Road, thence 390 feet SSE to a point on Survey No. 2262, thence approximately 262 feet to the point of beginning at Corner No. 11 or C12262, as conveyed by deed recorded April 26, 1966 in Book 16, Page 84.

That portion thereof, reserved in Patent from the United States dated December 12, 1904 as follows: "a roadway sixty feet in width parallel to the shoreline as near as may be practicable shall be reserved for the use of the public as a highway"

Beginning at the SE Corner at a point on the East boundary (3-4 line) of U.S. Survey No. 155, 300 feet from Corner No. 3 thereof; thence S 82°45' E 200 feet to the NE corner (being Corner number 3); thence S 07°15' E 300 feet along the East boundary (3-4 line) of U.S. Survey 155 to the true point of beginning as conveyed by deed recorded June 21, 1978 in Book 21, Page 532.

Beginning at a point on a line common to said U.S. Survey 155 and U.S. Survey 2732-A in

EXHIBITS077

unsurveyed Section 21, said point being S 06º48'01" E along said common line a distance of 262.0 feet from Corner No. 11 of said U.S. Survey 2732-A; thence continuing S 06º45'01" E a distance of 103.14 feet; thence N 47º55'14" W, along the Southerly right of way line for Alaska Project S-0411(2), Dillingham to Kanakanak, a distance of 705.74 feet; thence continuing along said Southerly right of way line being a curve to the left (radius equals 553.11 feet) through an arc of 52º48'30" a distance of 509.79 feet; thence continuing along said Southerly right of way line S 79º16'16" W a distance of 388 feet, more or less, to a point on the Westerly line for said U.S. Survey 155; thence N 06º48'01" W along said Westerly line a distance of 100.24 feet; thence N 79º16'16" W along the Northerly right of way line for said Alaska Project S-0411(2) a distance of 381.13 feet, more or less; thence continuing along said Northerly right of way line being a curve to the right (radius equals 653.11) through an arc of 52º48'30" a distance of 601.96 feet; thence continuing along said Northerly right of way line S 47º55'14" E a distance of 273.00 feet; thence N 89º33'01" W a distance of 39.06 feet; thence S 46º59'33" E a distance of 384.29 feet, more or less, to the point of beginning, as conveyed by deed recorded December 22, 1975 in Book 20, Page 324.

That portion conveyed to the State of Alaska, Department of Transportation & Public Facilities by that certain Warranty Deed recorded March 10, 2017 under Serial Number 2017-000090-0.U.S. Survey No. 157, according to the official survey thereof, records of the Bristol Bay Recording District, Third Judicial District, State of Alaska.

U.S. Survey No. 1571, according to the official survey thereof, records of the Bristol Bay Recording District, Third Judicial District, State of Alaska.

Those portions of U.S. Survey No. 1793, according to the official survey thereof, records of the Bristol Bay Recording District, Third Judicial District, State of Alaska, more particularly described as follows:

Beginning at Corner 1MC identical with Corner No. 1MC of the U.S. Survey No. 1793 on the West shore of Nushagak Bay at the line of mean high tide North 86º13' East 42 links (27.72 feet to Corner No. 2MC of this tract; thence North 7º32' West 3.20 chains (211.20 feet) to Corner No. 3 of this tract, identical with Corner No. 6 of U.S. Survey No. 1793 and Corner No. 3 of U.S. Survey No. 1571; thence South 3.20 Chains (211.20 feet) along line 3-2 of U.S. Survey No. 1571 identical with line 6-1 of U.S. Survey No. 1793 to the place of beginning.

Beginning at Corner No. 1 identical with Corner No. 4 U.S. Survey No. 1571 and Corner No. 5 U.S. Survey No. 1793; thence East 53 links (34.98 feet) to Corner No. 2 of this tract, identical with Corner No. 6 of U.S. Survey No. 1793 and Corner No. 3 of U.S. Survey No. 1571; thence North 8º00' West 3.02 chains (199.32 feet) to Corner No. 3 of this tract in line 3-4 of U.S. Survey No. 1793; thence West 49 links (32.24 feet) along line 3-4 of U.S. Survey 1793 to Corner No. 4 of this tract identical with Corner No. 4 of U.S. survey No. 1793; thence South 7º 15' East along line 4-5 of U.S. Survey No. 1793 3.01 chains (198.66 feet) to the point of beginning.

U.S. Survey No. 2543, according to the official survey thereof, records of the Bristol Bay Recording District, Third Judicial District, State of Alaska.

U.S. Survey No. 2864, according to the official survey thereof, records of the Bristol Bay Recording District, Third Judicial District, State of Alaska.

Alaska Tideland Survey No. 101, according to the official plat thereof, filed under Plat No. 64-136,

EXHIBITS078

records of the Bristol Bay Recording District, Third Judicial District, State of Alaska.

## KING COVE, AK

UNITED STATES SURVEY NO. 189, according to the original plat thereof, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska.
EXCEPTING THEREFROM those portions conveyed to the City of King Cove by Deeds recorded June 24, 1977 in Book 17 at Page 811 and July 30, 2004 under Serial No. 2004-000388-0.

UNITED STATES SURVEY NO. 2831, according to the original plat thereof, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska

UNITED STATES SURVEY NO. 2832, according to the original plat thereof, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska.

UNITED STATES SURVEY NO. 2834, according to the original plat thereof, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska.
EXCEPTING THEREFROM those portions conveyed to the City of King Cove by Deeds recorded July 27, 1977 in Book 17 at Page 831, April 22, 1980 in Book 19 at Page 495, March 06, 1987 in Book 26 at Page 509, July 30, 2004 under Serial No. 2004-000386-0 and June 19, 2014 under Serial No. 2014-000245-0 and that portion described in Quitclaim Deed recorded December 27, 1984 in Book 23 at Page 871.

TRACT "A" and TRACT "B", TIDELANDS SURVEY NO. 316(A), as shown on the official plat of Alaska Tidelands Survey No. 316, filed under Plat No. 64-184, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska.

## NAKNEK, AK

U.S. Survey No. 232, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

U.S. Survey No. 191, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

U.S. Survey No. 233, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

U.S. Survey No. 234, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

U.S. Survey No. 235, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

U.S. Survey No. 1105, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

U.S. Survey No. 1925, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

EXHIBITS079

U.S. Survey No. 1926, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

U.S. Survey No. 2300, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

U.S. Survey No. 2301, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

U.S. Survey No. 2445, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

EXCEPTING THEREFROM that portion conveyed to the Bristol Bay Borough by that certain Warranty Deed recorded July 28, 2014 under Serial Number 2014-000212-0.

U.S. Survey No. 2446, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

U.S. Survey No. 2489, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

Lot 5, Section 10, Township 17 South, Range 47 West, Seward Meridian, Records of the Kvichak Recording District, Third Judicial District, State of Alaska.

## PORT MOLLER, AK

AMENDED UNITED STATES SURVEY NO. 1147, according to the original plat thereof, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska.

ALASKA TIDELANDS SURVEY NO. 92, according to Plat No. 64-130, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska.

UNITED STATES SURVEY NO. 662, according to the original plat thereof, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska. EXCEPTING THEREFROM that portion conveyed to the State of Alaska Department of Transportation and Public Facilities by Deed recorded May 28, 1996 in Book 43 at Page 893.

UNITED STATES SURVEY NO. 663, according to the original plat thereof, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska. EXCEPTING THEREFROM those portions conveyed to the State of Alaska Department of Transportation and Public Facilities by Deeds recorded January 5, 1979 in Book 18 at Page 824 and May 28, 1996 in Book 43 at Page 888.

UNITED STATES SURVEY NUMBERS 237, 664, 665, 744, 746, 1104, 1148, 1215 AND 1218, according to the original plats thereof, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska.

LOTS ONE (1) AND FOUR (4), PORT MOLLER CANNERY SUBDIVISION, all according to Plat No. 2018-6, located in the Aleutian Islands Recording District, Third Judicial District, State of

EXHIBITS080

Alaska.

## SAND POINT, AK

UNITED STATES SURVEY NO. 1400, according to the original thereof located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska.

EXCEPTING THEREFROM the following portions or partial portions thereof:

Commencing at a point, which point of beginning is 160 feet due West of Corner No. 3 of said United States Survey No. 1400;

Thence West, 406.00 feet;
Thence North 9°52' West, 811.75 feet;
Thence North, 86°38' East, 91.27 feet;
Thence North 82°44' East, 309.64 feet;
Thence South 9°52' East 856.94 feet, to the point of beginning;

A tract of land on the Sand Point sandspit, on the West coast of Popof Island, in Southwestern Alaska, near the Sand Point Airport, identified as Tract "Ill" on the Airport Property Plan dated September 14, 1990, described as follows:

From a point beginning with an iron post with brass cap marked Corner No. 6, United States Survey No. 3584;
Thence East a distance of 104.79 feet to the True Point of Beginning;
Thence North 9° 52' West a distance of 190.00 feet;
Thence North 80° 08' East a distance of 196.00 feet;
Thence South 9° 52' East a distance of 225.10 feet; Thence West a distance of 199.10 feet to the Point of Beginning, an area of 0.934+ acres.

Commencing at a B.L.M. iron post, being common to Corner No. 2, United States Survey No. 2185, Alaska, Corner No. 3, United States Survey No. 1400, Alaska, and Corner No. 1, Lot 1, United States Survey No. 3584, Alaska (dependent resurvey of portions of Adjoining United States Survey No. 1400 and 1109, Alaska);
Thence North a record bearing along a portion of survey line 2-1, United States Survey No. 2185, being common to a portion of survey line 3-2, United States Survey No. 1400, a distance of 336.26 feet to the True Point of Beginning of Tract "IX";'
Thence North 85°51'37" West a distance of 221.85 feet;
Thence North 9°52'00" West, a distance of 51.53 feet;
Thence South 85°51'37" East a distance of 230.70 feet;
Thence South 50.13 feet to the True Point of Beginning.

A tract of land on the Sand Point sandspit, on the West Coast of Popof Island, in Southwestern Alaska, near the Sand Point Airport, identified as Tract "VIII", Parcel "A", on the Airport Property Plan dated September 14, 1990, described as follows:

From a point beginning with an iron post with brass cap marked Corner No. 6, United States Survey No. 3584, which is the True Point of Beginning;
Thence West a distance of 135.30 feet; Thence North a distance of 782.10 feet;
Thence North 86°38' East a distance of 302.09 feet; Thence South 9°52' East a distance of 586.65 feet;

EXHIBITS081

Thence South 80°08' West a distance of 196.00 feet;
Thence South 9°52' East a distance of 190.00 feet; Thence West a distance of 104.79 feet to the Point of Beginning.

TRACT "B" OF ALASKA TIDELANDS SURVEY NO. 144, according to Plat No. 63-34, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska.

THAT PORTION OF UNITED STATES SURVEY NO. 1400 WITHIN AN AREA IDENTIFIED AS TRACT "II" ON THE SAND POINT AIRPORT PROPERTY PLAN, DESCRIBED AS LOT 1 OF THE SAND POINT AIRPORT SUBDIVISION, ADDITION NO. 1, filed as Plat No. 93-573, in the Aleutian Islands Recording office on August 03, 1993 and more particularly described as follows:

Commencing at a point marked with a 3" iron pipe with a 30-30 cartridge protruding from the top, the side of said pipe being stamped S2185, COR2; S1400, COR3; said point being common with United States Survey No. 2185, COR NO. 2; United States Survey No. 1400, COR. NO. 3, United States Survey No. 3584 COR NO. 1, as shown on the plat of United States Survey No. 3584, Alaska;

Thence North 89°51'13" West along the property line of Sand Point Airport a distance of 160.07 feet, said line being common with line 3-4, United States Survey No. 1400 and line 6-1, United States Survey No. 3584;
Thence North 9°52' West along said property line a distance of 409.10 feet to a point, said point being 1197.69 feet left of and at right angles to new runway 13/31 Centerline Station 26+80.09 and the True Point of Beginning;
Thence South 58°35'33" West a distance of 122.69 feet to a point, said point being 1075.00 feet left of and at right angles to said runway 13/31 Centerline Station 26+80.09;
Thence North 31°24'27" West on a line left of and parallel with said runway centerline a distance of 225.00 feet to a point, said point being 1075.00 feet left of and at right angles to new runway 13/31 Centerline Station 24+55.09;
Thence South 58°35'33" West a distance of 100.00 feet to a point, said point being 975.00 feet left of and at right angles to said runway Centerline Station 24+55.09;
Thence North 31°24'27" West a distance of 300.29 feet on a line 975.00 feet left of and parallel with said runway centerline to a point;
Thence North 9°52' West a distance of 39.17 feet, more or less, to the point of intersection with the mean high water line;
Thence North 83°40'25" East along said mean high water line a distance of 42.71 feet;
Thence North 89°30'20" East along said mean high water line a distance of 45.59 feet;
Thence North 80°19'44" East along said mean high water line a distance of 187.94 feet; Thence North 74°26'33" East along said mean high water line a distance of 79.11 feet;
Thence South 85°47'42" East along said mean high water line a distance of 47.15 feet, more or less, to the point of intersection with the Easterly property line of sand point airport;
Thence South 9°52' East along said Easterly property line a distance of 431.68 feet, more or less, to the True Point of the Beginning, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska.

## SEATTLE, WA

 Lots 22 and 23, Block 1, Gilman's Addition to the City of Seattle, according to the plat thereof recorded in Volume 5 of Plats, Page 93, in King County, Washington.

EXHIBITS082

**EXHIBIT A-2**

**Leasehold Interest in Real Property**

**KING COVE, AK**

The leasehold estate created by that certain unrecorded Lease Real Property effective October 1, 2008 between Dave Bash, as Lessor, and Peter Pan Seafoods, Inc., as amended by a document titled "Lease Real Property Amendment No. 1" dated February 20, 2019, for a term of one year commencing October 1, 2008 with an evergreen renewal clause for successive periods of one year, the term of which currently expires on February 28, 2021: Lot Two (2) of Tract One (1), HARBOR VIEW SUBDIVISION, ADDITION NO. 1, according to Plat No. 93-20, records of the Aleutian Islands Recording District, Third Judicial District, State of Alaska.

**SAND POINT, AK**

The leasehold estate created by that certain Lease Agreement effective September 1, 2014 between the State of Alaska, Department of Natural Resources, as Lessor, and Peter Pan Seafoods, Inc., as Lessee for a term of twenty (20) years commencing as of September 1, 2014 and terminating on August 31, 2034, recorded on November 20, 2015 as Reception No. 2015-000417-0, records of the Aleutian Islands Recording District, Third Judicial District, State of Alaska affecting the following described property:

ALASKA TIDELANDS SURVEY NO. 1393, according to Plat No. 91-6, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska.

EXHIBITS083

EXHIBIT B

**Quit Claim Deed**

WHEN RECORDED MAIL TO:

_____

_____

_____


## QUIT CLAIM DEED

PETER PAN SEAFOOD COMPANY, LLC, an Alaska limited liability company, by and through its Court appointed General Receiver ("Grantor"), for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration in hand paid, does hereby convey and quitclaim to SILVER BAY SEAFOODS L.L.C., AN ALASKA LIMITED LIABILITY COMPANY ("Grantee"), whose address is 208 Lake Street, Suite 2E, Sitka, AK 99835, all that land situated in [NAME OF COUNTY] County, Alaska, described as follows (hereinafter, the "Property"):

SEE EXHIBIT "A"

Together with all improvements located thereon, any and all rights, benefits, privileges, easements, tenements, hereditaments, rights-of-way and other appurtenances thereon or in any way appertaining thereto, including any mineral rights, development rights, air and water rights owned by Grantor, and Grantor's right, title and interest, if any, all strips and gores and any land lying in the bed of any street, road or alley, open or proposed, adjoining such Property.

Together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining, subject to real property taxes and assessments for the current fiscal year, reservations, easements, covenants, conditions, surveys, and agreements now of record or ascertainable from an inspection of the Property, and the matters shown on attached Exhibit "B" attached hereto.

**[Executed and acknowledged on the following page]**

EXHIBITS084

IN WITNESS WHEREOF, Grantor executes this Deed on the date of acknowledgement set forth below.


Dated: _____ ____, 2024

       PETER PAN SEAFOOD COMPANY, LLC,
       an Alaska limited liability company,
       by and through its Court appointed General Receiver


       By:    _____

       Name: _____

       Its: _____

EXHIBITS085

<u>EXHIBIT C</u>

**BILL OF SALE**

This Bill of Sale (the "**Bill of Sale**") is made and entered into _____ ____, 2024, by and between PETER PAN SEAFOOD COMPANY, LLC, an Alaska limited liability company, by and through its Court appointed General Receiver ("**Assignor**"), and SILVER BAY SEAFOODS L.L.C., an Alaska limited liability company ("**Assignee**").

In consideration of the sum of Ten Dollars ($10) and other good and valuable consideration paid by Assignee to Assignor, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby unconditionally, absolutely and irrevocably assign, transfer, convey and deliver to Assignee, its successors and assigns, all items of Personal and Intellectual Property (as defined in the Agreement referred to below), if any, owned by Assignor and situated upon and used exclusively in connection with the Property (as defined in the Agreement) and more particularly described on **<u>Exhibit A</u>** attached hereto and made a part hereof for all purposes, including, without limitation, the Personal and Intellectual Property identified in **<u>Exhibit B</u>**, if any, attached hereto and made a part hereof for all purposes (the "**Personal Property**").

This Bill of Sale is made subject, subordinate and inferior to the easements, covenants and other matters and exceptions set forth on Exhibit C, if any, attached hereto and made a part hereof for all purposes.

ASSIGNEE ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED IN, AND SUBJECT TO THE LIMITATIONS CONTAINED IN, THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED SEPTEMBER [DAY], 2024, BY AND BETWEEN ASSIGNOR AND ASSIGNEE (THE "**AGREEMENT**"), ASSIGNOR HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE NATURE, QUALITY OR CONDITIONS OF THE PERSONAL PROPERTY, (B) THE INCOME TO BE DERIVED FROM THE PERSONAL PROPERTY, (C) THE SUITABILITY OF THE PERSONAL PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH ASSIGNEE MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PERSONAL PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE QUALITY, HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF ANY OF THE PERSONAL PROPERTY, OR (F) ANY OTHER MATTER WITH RESPECT TO THE PERSONAL PROPERTY. ASSIGNEE FURTHER ACKNOWLEDGES AND AGREES THAT, HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PERSONAL PROPERTY, ASSIGNEE IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PERSONAL PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY ASSIGNOR, EXCEPT AS SPECIFICALLY PROVIDED IN THE AGREEMENT. ASSIGNEE FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PERSONAL PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT ASSIGNOR HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION. ASSIGNEE FURTHER ACKNOWLEDGES AND AGREES THAT THE SALE OF THE PERSONAL

EXHIBITS086

PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "**AS IS, WHERE IS**" CONDITION AND BASIS "**WITH ALL FAULTS,**" EXCEPT AS SPECIFICALLY PROVIDED IN, AND SUBJECT TO THE LIMITATIONS CONTAINED IN, THE AGREEMENT.

The obligations of Assignor are intended to be binding only on the property of Assignor and shall not be personally binding upon, nor shall any resort be had to, the private properties of any Seller Related Parties (as defined in the Agreement).

IN WITNESS WHEREOF, Assignor and Assignee have caused this Bill of Sale to be executed on the date and year first above written.

*Assignor*:

**Peter Pan Seafood Company, LLC,**
an Alaska limited liability company,
by and through its Court appointed General Receiver

By:_____
Name:_____
Title:_____

*Assignee*:

**Silver Bay Seafoods, L.L.C.,**
an Alaska limited liability company

By:_____
Name:_____
Title:_____

EXHIBITS087

EXHIBIT D

**Assignment and Assumption of Executory Contracts and Unexpired Leases**

THIS ASSIGNMENT AND ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES (the "Assignment") is made and entered into as of _____, 2024 (the "Effective Date"), by and between **PETER PAN SEAFOOD COMPANY, LLC,** an Alaska limited liability company, by and through its Court appointed General Receiver ("Assignor"), and SILVER BAY SEAFOODS L.L.C., an Alaska limited liability company ("Assignee").

## RECITALS:

A. Assignor and Assignee have entered into a Purchase and Sale Agreement dated as of September _____, 2024 (if and as amended, the "Purchase Agreement"), pursuant to which Assignee has agreed to purchase certain real property more particularly described on Exhibit A attached hereto (the "Property") from Assignor.

B. In connection with the transactions contemplated by the Purchase Agreement, the Assignor has agreed to assign to the Assignee all of its right, title and interest in, to and under all executory contracts and unexpired leases currently in effect with respect to the Property, as identified on Exhibit B (collectively, the "Executory Contracts").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged,

Assignor and Assignee agree as follows:

1. Assignment. Effective as of the Effective Date, Assignor hereby assigns, transfers, conveys and sets over to Assignee all of Assignor's right, title and interest in and to the Executory Contracts.

2. Acceptance. Assignee hereby accepts the assignment of the Executory Contracts and agrees to assume, keep, perform and fulfill all liabilities and obligations of the landlord under the Executory Contracts whenever accrued. Assignee agrees to indemnify Assignor against and hold Assignor harmless from any and all cost, liability, loss, damage or expense, including without limitation, attorneys' fees, arising during Assignor's period of ownership and arising out of Assignee's obligations under the Executory Contracts. Assignor agrees to indemnify Assignee against and hold Assignee harmless from any and all cost, liability, loss, damage or expense, including without limitation, attorneys' fees, arising during Assignee's period of ownership and arising out of Assignor's obligations under the Executory Contracts.

3. Exculpation. The recourse of either party or its successors or assigns against the other party, and it members, officers, employees, agents and representatives, with respect to any alleged breach by or on the part of the other party of any representation, warranty, covenant, undertaking, indemnity or agreement contained in this Assignment is subject to the terms of the Purchase Agreement.

EXHIBITS088

4. <u>Binding Effect</u>. This Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

5. <u>No Modification</u>. This Assignment shall not be altered, amended or otherwise modified, except as set forth in a written document executed by the parties hereto.

6. <u>Governing Law</u>. This Assignment and all questions arising in connection herewith shall be governed by and construed in accordance with the internal laws of the State of Alaska.

7. <u>Counterparts; Electronic Execution</u>. This Assignment may be executed in a number of identical counterparts which, taken together, shall constitute collectively one agreement. In making proof of this Assignment, it shall not be necessary to produce or account for more than one such counterpart with each party's signature. This Assignment may be executed by facsimile or other electronic means and (when so executed) shall be deemed an original for all purposes.

IN WITNESS WHEREOF, Assignor and Assignee have executed and delivered this Assignment as of the Effective Date.

*Assignor*:

**Peter Pan Seafood Company, LLC,**
an Alaska limited liability company,
by and through its Court appointed General Receiver

By:_____
Name:_____
Title:_____

*Assignee*:

_____,
a _____

By:_____
Name:_____
Title:_____

EXHIBITS089

<u>EXHIBIT E</u>

**Assignment and Assumption of Permits and Approvals**

THIS ASSIGNMENT AND ASSUMPTION OF PERMITS AND APPROVALS (the "<u>Assignment</u>") is made and entered into as of _____, 2024 (the "<u>Effective Date</u>"), by and between PETER PAN SEAFOOD COMPANY, LLC, an Alaska limited liability company by and through its Court appointed General Receiver ("<u>Assignor</u>"), and [NAME OF BUYER], [FORM OF ENTITY AND STATE OF INCORPORATION], ("<u>Assignee</u>").

## RECITALS:

A. Assignor and Assignee have entered into a Purchase and Sale Agreement dated as of _____ _____, 2024 (if and as amended, the "<u>Purchase Agreement</u>"), pursuant to which Assignee has agreed to purchase certain real property more particularly described on <u>Exhibit A</u> attached hereto (the "<u>Property</u>") from Assignor.

B. In connection with the transactions contemplated by the Purchase Agreement, the Assignor has agreed to assign to the Assignee all of its right, title and interest in, to and under all permits and approvals currently in effect with respect to the Property, as identified on Schedule 8.4 (collectively, the "<u>Permits/Approvals</u>").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged,

Assignor and Assignee agree as follows:

1. <u>Assignment</u>. Effective as of the Effective Date, Assignor hereby assigns, transfers, conveys and sets over to Assignee all of Assignor's right, title and interest in and to the Permits/Approvals.

2. <u>Acceptance</u>. Assignee hereby accepts the assignment of the Permits/Approvals and agrees to assume, keep, perform and fulfill all liabilities and obligations of the Permits/Approvals whenever accrued. Assignee is further solely responsible for obtaining any government approval necessary to complete the transfer of said Permits/Approvals, if any.  Assignee agrees to defend and indemnify Assignor against and hold Assignor harmless from any and all cost, liability, loss, damage or expense, including without limitation, attorneys' fees, arising during Assignor's period of ownership and arising out of Assignee's obligations under the Permits/Approvals.

3. <u>Exculpation</u>. The recourse of either party or its successors or assigns against the other party, and it members, officers, employees, agents and representatives, with respect to any alleged breach by or on the part of the other party of any representation, warranty, covenant, undertaking, indemnity or agreement contained in this Assignment is subject to the terms of the Purchase Agreement.

4. <u>Binding Effect</u>. This Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

EXHIBITS090

5.  <u>No Modification</u>. This Assignment shall not be altered, amended or otherwise modified, except as set forth in a written document executed by the parties hereto.

6.  <u>Governing Law</u>. This Assignment and all questions arising in connection herewith shall be governed by and construed in accordance with the internal laws of the State of Alaska.

7.  <u>Counterparts; Electronic Execution</u>. This Assignment may be executed in a number of identical counterparts which, taken together, shall constitute collectively one agreement. In making proof of this Assignment, it shall not be necessary to produce or account for more than one such counterpart with each party's signature. This Assignment may be executed by facsimile or other electronic means and (when so executed) shall be deemed an original for all purposes.

IN WITNESS WHEREOF, Assignor and Assignee have executed and delivered this Assignment as of the Effective Date.

*Assignor*:

**Peter Pan Seafood Company, LLC,**
an Alaska limited liability company,
by and through its Court appointed General Receiver

By:_____
Name:_____
Title:_____

*Assignee*:

_____,
a _____

By:_____
Name:_____
Title:_____

EXHIBITS091

<u>SCHEDULE 1.iv</u>

**Executory Contracts**

1.      Lease Real Property effective October 1, 2008 between Dave Bash, as Lessor, and Peter Pan Seafoods, Inc., as amended by a document titled "Lease Real Property Amendment No. 1" dated February 20, 2019.

2.      Lease Agreement effective September 1, 2014 between the State of Alaska, Department of Natural Resources, as Lessor, and Peter Pan Seafoods, Inc., as Lessee, recorded on November 20, 2015 as Reception No. 2015-000417-0, records of the Aleutian Islands Recording District, Third Judicial District, State of Alaska.

EXHIBITS092

SCHEDULE 1.vi

**Registered Trademarks**

All trademarks registered in the name of Seller, anywhere in the world, including without limitation the following:

[Insert Schedule of Registered Trademarks]

EXHIBITS093

<u>SCHEDULE 6.3</u>

**Liens**

See attached.

[Attach Schedule of Liens from data room.]

SCHEDULE 8.3

**Assumed Liabilities**

Consent Decree.

EXHIBITS095

SCHEDULE 8.4

**Permits and Approvals (listed by Property)**

| ID | Permit/Approval | | Permit Type |
|---|---|---|---|
| 1 | Permittee: | Peter Pan Seafood Company, LLC | NPDES Individual Permit Seafood Processor |
| | Facility Name: | King Cove Facility | |
| | Permit No.: | AK0052388 | |
| | Approval No.: | N/A | |
| | Issuing Agency: | ADEC | |
| | Facility Address: | 500 Cannery Row, King Cove, AK, 99612 | |
| | Effective Date: | 1/1/2024 | |
| 2 | Permittee: | Peter Pan Seafood Company, LLC | NPDES General Permit for Storm Water Discharges for Multi-Sector General Permit Activity |
| | Facility Name: | King Cove Facility | |
| | Permit No.: | AKR060000 | |
| | Authorization No.: | AKR06GC19 | |
| | Issuing Agency: | ADEC | |
| | Facility Address: | 500 Cannery Row, King Cove, AK, 99612 | |
| | Effective Date: | 10/31/2023 | |
| 3 | Permittee: | Peter Pan Seafood Company, LLC | CAA Title V Operating Permit |
| | Facility Name: | King Cove Facility | |
| | Permit No.: | AQ0243TVP05 | |
| | Approval No.: | N/A | |
| | Issuing Agency: | ADEC | |
| | Facility Address: | 500 Cannery Row, King Cove, AK, 99612 | |
| | Effective Date: | 3/1/2023 | |
| | Permittee: | Peter Pan Seafood Company, LLC | |
| | Facility Name: | King Cove Facility | |

EXHIBITS096

| 4 | Permit No.: | AQ0243MSS02 (AQ0243MSS02) Rev. 1 | CAA Minor Source Specific |
|---|---|---|---|
| | Approval No.: | N/A | |
| | Issuing Agency: | ADEC | |
| | Facility Address: | 500 Cannery Row, King Cove, AK, 99612 | |
| | Effective Date: | 3/8/2012 (Amend. 11/13/2014) | |

| ID | Permit/Approval | | Permit Type |
|---|---|---|---|
| 5 | Permittee: | Peter Pan Seafood Company, LLC | CAA Minor Source Specific |
| | Facility Name: | King Cove Facility | |
| | Permit No.: | AQ0243MSS03 | |
| | Approval No.: | N/A | |
| | Issuing Agency: | ADEC | |
| | Facility Address: | 500 Cannery Row, King Cove, AK, 99612 | |
| | Effective Date: | 5/2/2017 (Amend. 12/31/2020) | |
| 6 | Permittee: | Peter Pan Seafood Company, LLC | Solid Waste General Permit for Remote Camps and Lodges with Less than 50 Residents |
| | Facility Name: | Port Moller Camp GP | |
| | Permit No.: | SWGPCAMP-28 | |
| | Authorization No.: | SWGPCAMP002-28 | |
| | Issuing Agency: | ADEC | |
| | Facility Address: | 181 Port Moller Avenue Cold Bay, AK, 99571 | |
| | Effective Date: | 12/21/2022 | |
| 7 | Permittee: | Peter Pan Seafood Company, LLC | CAA Pre-Approved Emission Limit - Diesel Generator |
| | Facility Name: | Port Moller Power Plant | |
| | Permit No.: | AQ0019PL202 | |
| | Approval No.: | N/A | |
| | Issuing Agency: | ADEC | |
| | Facility Address: | 181 Peter Pan St Port Moller AK, 99571-8999 | |
| | Effective Date: | 1/1/2021 | |
| | Permittee: | Peter Pan Seafood Company, LLC | SDWA |
| | Facility Name: | Port Moller | |
| | Permit No.: | AK2261216 | |

EXHIBITS097

| 8 | Approval No.: | N/A | Transient Non-Community |
|---|---|---|---|
| | Issuing Agency: | ADEC | |
| | Facility Address: | 181 Peter Pan St<br>Port Moller AK, 99571-8899 | |
| | Effective Date: | 1/1/1997 | |

| ID | Permit/Approval | | Permit Type |
|---|---|---|---|
| 9 | Permittee: | Peter Pan Seafood Company, LLC | SDWA<br>Transient Non-Community |
|  | Facility Name: | Dillingham Facility | |
|  | Permit No.: | AK2260838 | |
|  | Approval No.: | N/A | |
|  | Issuing Agency: | ADEC | |
|  | Facility Address: | 1 Denny Way<br>Dillingham, AK 99576 | |
|  | Effective Date: | N/A | |
| 10 | Permittee: | Peter Pan Seafood Company, LLC | Registered Buyer Permit for Alaska Halibut/Sablefish IFQ, and Halibut CDQ |
|  | Facility Name: | N/A | |
|  | Permit No.: | 60932 | |
|  | NMFS ID No. | 118320 | |
|  | Issuing Agency: | NOAA NMFS, Alaska Region | |
|  | Permittee Address: | 3015 112TH Ave NE Suite 150<br>Bellevue, WA 98004 | |
|  | Effective Date: | 2024 | |
| 11 | Permittee: | Peter Pan Seafood Company, LLC | Registered Buyer Permit for Alaska Halibut/Sablefish IFQ, and Halibut CDQ |
|  | Facility Name: | N/A | |
|  | Permit No.: | 60964 | |
|  | NMFS ID No. | 118320 | |
|  | Issuing Agency: | NOAA NMFS, Alaska Region | |
|  | Permittee Address: | 3015 112TH Ave NE Suite 150<br>Bellevue, WA 98004 | |
|  | Effective Date: | 2024 | |
| 12 | Permittee: | Peter Pan Seafood Company, LLC | Registered Buyer Permit for Alaska Halibut/Sablefish IFQ, and Halibut CDQ |
|  | Facility Name: | N/A | |
|  | Permit No.: | 60931 | |
|  | NMFS ID No. | 118320 | |
|  | Issuing Agency: | NOAA NMFS, Alaska Region | |
|  | Permittee Address: | 3015 112TH Ave NE Suite 150<br>Bellevue, WA 98004 | |
|  | Effective Date: | 2024 | |

EXHIBITS099

| ID | Permit/Approval | | Permit Type |
|---|---|---|---|
| 13 | Permittee: | Peter Pan Seafood Company, LLC | Registered Buyer Permit for Alaska Halibut/Sablefish IFQ, and Halibut CDQ |
| | Facility Name: | N/A | |
| | Permit No.: | 60928 | |
| | NMFS ID No. | 118320 | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Permittee Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024 | |
| 14 | Permittee: | Peter Pan Seafood Company, LLC | Registered Buyer Permit for Alaska Halibut/Sablefish IFQ, and Halibut CDQ |
| | Facility Name: | N/A | |
| | Permit No.: | 60929 | |
| | NMFS ID No. | 118320 | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Permittee Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024 | |
| 15 | Permittee: | Peter Pan Seafood Company, LLC | Registered Buyer Permit for Alaska Halibut/Sablefish IFQ, and Halibut CDQ |
| | Facility Name: | N/A | |
| | Permit No.: | 60930 | |
| | NMFS ID No. | 118320 | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Permittee Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024 | |
| 16 | Permittee: | Peter Pan Seafoods Inc. | AFA Permit for Inshore Processors (Unrestricted) |
| | Facility Name: | N/A | |
| | Permit No.: | 5358 | |
| | NMFS ID No.: | 491 | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Permittee Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |

EXHIBITS100

| ID | Permit/Approval | | Permit Type |
|----|-----------------|--|-------------|
| 17 | Holder name: | Peter Pan Seafood Company, LLC | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 118320 | |
| | Fishery: | BBR | |
| | Region: | S | |
| | Start Serial: | 292279714 | |
| | End Serial: | 313416730 | |
| | QS Units: | 21137017 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 18 | Holder name: | Peter Pan Seafood Company, LLC | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 118320 | |
| | Fishery: | EBT | |
| | Region: | U | |
| | Start Serial: | 1617802815 | |
| | End Serial: | 1621575949 | |
| | QS Units: | 3773135 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 19 | Holder name: | Peter Pan Seafood Company, LLC | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 118320 | |
| | Fishery: | WBT | |
| | Region: | U | |
| | Start Serial: | 3752536280 | |
| | End Serial: | 3756309414 | |
| | QS Units: | 3773135 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |

EXHIBITS101

| ID | Permit/Approval | | Permit Type |
|---|---|---|---|
| 20 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | BBR | |
| | Region: | S | |
| | Start Serial: | 260999197 | |
| | End Serial: | 275931789 | |
| | QS Units: | 14932593 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 21 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | BBR | |
| | Region: | S | |
| | Start Serial: | 275931790 | |
| | End Serial: | 292279713 | |
| | QS Units: | 16347924 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 22 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | BBR | |
| | Region: | S | |
| | Start Serial: | 313416731 | |
| | End Serial: | 326861049 | |
| | QS Units: | 13444319 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |

EXHIBITS102

| ID | Permit/Approval | | Permit Type |
|---|---|---|---|
| 23 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | BBR | |
| | Region: | S | |
| | Start Serial: | 326861050 | |
| | End Serial: | 332258412 | |
| | QS Units: | 5397363 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 24 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | BSS | |
| | Region: | N | |
| | Start Serial: | 332258413 | |
| | End Serial: | 338326264 | |
| | QS Units: | 6067852 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 25 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | BSS | |
| | Region: | N | |
| | Start Serial: | 338326265 | |
| | End Serial: | 378137242 | |
| | QS Units: | 39810978 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |

EXHIBITS103

| ID | Permit/Approval | | Permit Type |
|---|---|---|---|
| 26 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | BSS | |
| | Region: | N | |
| | Start Serial: | 378137243 | |
| | End Serial: | 395238194 | |
| | QS Units: | 17100952 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 27 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | BSS | |
| | Region: | S | |
| | Start Serial: | 395238195 | |
| | End Serial: | 395372959 | |
| | QS Units: | 134765 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 28 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | BSS | |
| | Region: | S | |
| | Start Serial: | 395372960 | |
| | End Serial: | 424725886 | |
| | QS Units: | 29352927 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |

EXHIBITS104

| ID | Permit/Approval | | Permit Type |
|----|----|----|----|
| 29 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | BSS | |
| | Region: | S | |
| | Start Serial: | 424725887 | |
| | End Serial: | 487598453 | |
| | QS Units: | 62872567 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 30 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | EBT | |
| | Region: | U | |
| | Start Serial: | 1588227143 | |
| | End Serial: | 1617802814 | |
| | QS Units: | 29575672 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 31 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | PIK | |
| | Region: | N | |
| | Start Serial: | 487598454 | |
| | End Serial: | 490815294 | |
| | QS Units: | 3216841 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |

EXHIBITS105

| ID | Permit/Approval | | Permit Type |
|---|---|---|---|
| 32 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | PIK | |
| | Region: | S | |
| | Start Serial: | 490815295 | |
| | End Serial: | 491954027 | |
| | QS Units: | 1138733 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 33 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | SMB | |
| | Region: | N | |
| | Start Serial: | 491954028 | |
| | End Serial: | 492010106 | |
| | QS Units: | 56079 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 34 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | SMB | |
| | Region: | N | |
| | Start Serial: | 492143783 | |
| | End Serial: | 492644563 | |
| | QS Units: | 500781 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |

EXHIBITS106

| ID | Permit/Approval | | Permit Type |
|---|---|---|---|
| 35 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | SMB | |
| | Region: | N | |
| | Start Serial: | 492644564 | |
| | End Serial: | 492778238 | |
| | QS Units: | 133675 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 36 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | SMB | |
| | Region: | N | |
| | Start Serial: | 492778239 | |
| | End Serial: | 499354502 | |
| | QS Units: | 6576264 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |
| 37 | Holder name: | Peter Pan Seafood Inc. | BSAI Crab Processor Quota Share Holder |
| | Permit No.: | N/A | |
| | NMFS ID No. | 491 | |
| | Fishery: | WBT | |
| | Region: | U | |
| | Start Serial: | 3722960608 | |
| | End Serial: | 3752536279 | |
| | QS Units: | 29575672 | |
| | | | |
| | Issuing Agency: | NOAA NMFS, Alaska Region | |
| | Holder Address: | 3015 112TH Ave NE Suite 150 Bellevue, WA 98004 | |
| | Effective Date: | 2024/2025 | |

EXHIBITS107

| ACRONYM | TERM |
|---------|------|
| ADEC | Alaska Department of Environmental Conservation |
| AFA | American Fisheries Act |
| BBR | Bristol Bay red king crab |
| BSAI | Bering Sea/Aleutian Islands King and Tanner Crabs |
| BSS | Bering Sea snow crab |
| CAA | Clean Air Act |
| CDQ | Western Alaska Community Development Quota |
| EBT | Eastern Bering Sea Tanner crab |
| IFQ | Individual Fishing Quota |
| NPDES | National Pollutant Discharge Elimination System |
| PIK | Pribilof Islands red and blue king crab |
| QS | Quota Share |
| SDWA | Safe Drinking Water Act |
| SMB | St. Matthew blue king crab |
| WBT | Western Bering Sea Tanner crab |

EXHIBITS108

*Wells Fargo, Nat'l Assoc. v NW Fish Co, et al.*
Case No. 24-2-08809-1 SEA

**Bid Confirmation**

**Binding Amendment To Purchase and Sale Agreement**

Name of Bidder: Silver Bay Seafoods, LLC

Details of Bid: _____

increase cash component by $1.824 million, allocated as follows:

KWL   increase $500k to $2.6 million

Ballard Warehouse increase $1M to $2.75M

PAF   increase $324k to $1.324M

Time: 4:36 p.m.

Signed: *Cora Campbell*
Its Authorized Representative

1 -
134382\285395\LRE\46448531.1

## CERTIFICATE OF SERVICE

The undersigned declares under penalty of perjury, under the laws of the State of Washington, that the following is true and correct:

I hereby certify that on the 19th day of September, 2024, I caused to be served the foregoing NOTICE OF CONCLUSION OF AUCTION AND DETERMINATION OF SUCCESSFUL BID AND BACK-UP BID; on the following party at the following address:

| | |
|---|---|
| **Wells Fargo Bank, National Association**<br>Gregory R. Fox, WSBA # 30559<br>James B. Zack, WSBA #48122<br>Lane Powell, P.C.<br>1420 Fifth Avenue, Suite 4200<br>Seattle, WA 98101-2375<br>Telephone: (206) 223-7000<br>Facsimile: (206) 223-7107<br>E-Mail: FoxG@LanePowell.com<br>zackj@lanepowell.com | **Delta Western, LLC**<br>David C. Neu, WSBA #33143<br>Miller Nash LLP<br>2801 Alaskan Way, Suite 300<br>Seattle, WA 98121-1128<br>Telephone: (206) 777-7516<br>Facsimile: (206) 340-9599<br>E-Mail: david.neu@millernash.com |
| **North Coast Electric Company**<br>Nancy K Cary, WSBA # 32262<br>Hershner Hunter LLP<br>PO Box 1475<br>675 Oak Street, Suite 400<br>Eugene, OR 97401<br>Telephone: (541) 686-8511<br>Facsimile: (541) 344-2025<br>E-Mail: ncary@hershnerhunter.com | **Kirk Koch**<br>Erin S. Norgaard, WSBA #32789<br>Brian L. Dolman, WSBA #32365<br>Winthrop W. Hubbard , WSBA #56458<br>HKM Employment Attorneys, LLP<br>600 Stewart Street, Suite 901<br>Seattle, WA 98101<br>E-mail: enorgaard@hkm.com<br>bdolman@hkm.com<br>whubbard@hkm.com |
| **Attorney for Debtors**<br>Armand J. Kornfeld, WSBA #17214<br>Bush Kornfeld LLP<br>601 Union Street, Suite 5000<br>Seattle, Washington 98101<br>Phone: 206 292-2110<br>E-mail: jkornfeld@bskd.com | **Rodger May**<br>Christopher T. Wion, WSBA #33207<br>Molly J. Gibbons, WSBA #58357<br>Summit Law Group. PLLC<br>315 Fifth Avenue S., Suite 1000<br>Seattle, WA 98104<br>E-mail: chrisw@summitlaw.com<br>mollyg@summitlaw.com |
| **Cold Locker Storage & Processing, LLC**<br>John R. Rizzardi, WSBA #9388<br>Binah B. Yeung, WSBA # 44065<br>Cairncross & Hempelmann, P.S.<br>524 Second Avenue, Suite 500<br>Seattle, WA 98104<br>E-mail: jrizzardi@cairncross.com | **Koch Fisheries, LLC; Lone Sheldon, LLC; Northern Seas, Inc.; Ocean Fury, LLC; Pacman, LLC; Rollo Fisheries, LLC; and Winterhawk, LLC**<br>Daniel A. S. Foe, WSBA #42876<br>Aaron J. Naff, WSBA #51200<br>Mullavey, Prout, Grenley & Foe, LLP |

| | |
|---|---|
| byeung@cairncross.com | 2401 NW 65th Street<br>Seattle, WA 98127<br>Telephone: 206-789-2511<br>E-mail: dfoe@ballardlawyers.com<br>anaff@ballardlawyers.com |
| **Integrity Express Logistics**<br>J. Todd Tracy<br>The Tracy Law Group PLLC<br>1601 5th Avenue, Suite 610<br>Seattle, WA 98101<br>E-mail: todd@thetracylawgroup.com | **Victory Venture, LLC**<br>Laurie M. Thornton, WSBA #35030<br>Daniel J. Bugbee, WSBA #42412<br>DBS Law<br>155 NE 100th Street, Suite 205<br>Seattle, WA 98125<br>Tel: (206)489-3802<br>Fax: (206) 464-0125<br>E-mail: lthornton@lawdbs.com<br>dbugbee@lawdbs.com |
| **Kent Warehouse and Labeling, LLC**<br>Faye C. Rasch<br>Wenokur Riordan PLLC<br>600 Stewart Street, Suite 1300<br>Seattle, WA 98101<br>E-mail: faye@wrlawgroup.com | **Summer Bay, LLC and Fortune Sea, LLC**<br>R. Isaak Hurst, WSBA #43679<br>Lauren B. Mauer, WSBA #61503<br>International Maritime Group PLLC<br>701 Fifth Ave., 42nd Floor<br>Seattle, WA 98104<br>Telephone: 206-707-8338<br>E-mail: hurst@maritime.law<br>mauer@maritime.law |
| **OBI Seafoods, LLC**<br>Michael S. DeLeo, WSBA #22037<br>Gregory L. Russell, WSBA #17280<br>Peterson Russell Kelly Livengood PLLC<br>10900 NE 4th Street, Suite 1850<br>Bellevue, WA 98004-8341<br>Telephone: 425.462.4700<br>Facsimile: 425.451.0714<br>E-mail: mdeleo@prklaw.com<br>grussell@prklaw.com | **F/V Marahute, LLC; RLB Vessel, LLC; and F/V Winter Bay, LLC**<br>Markus B.G. Oberg, WSBA #34914<br>Le Gros, Buchanan & Paul<br>4025 Delridge Way SW, Suite 500<br>Seattle, WA 98106<br>Telephone: 206-623-4990<br>E-mail: moberg@legros.com |
| **Smith Berger Marine, Inc. and Alaska Marine Lines, Inc.**<br>Alan D. Smith, WSBA #24964<br>Perkins Coie LLP<br>1201 Third Avenue, Suite 4900<br>Seattle, WA 98101<br>Telephone: (206) 259-8000<br>E-mail: adsmith@perkinscoie.com | **Triple B Corporation, dba Charles Produce**<br>Jeffrey C. Misley, WSBA #33397<br>Joshua G. Flood, WSBA #62175<br>Sussman Shank LLP<br>1000 SW Broadway, Suite 1400<br>Portland, OR 97205<br>Email: jmisley@sussmanshank.com<br>jflood@sussmanshank.com |

| | |
|---|---|
| **Bristol Bay Borough**<br>Joseph N. Levesque<br>Landye Bennett Blumstein LLP<br>701 W 8th Ave, Ste 1100<br>Anchorage, AK 99501<br>Telephone: 907-276-5152<br>Facsimile: 907-276-8433<br>Email: josephl@lbblawyers.com | **Frontier Packaging, Inc.**<br>Laurie M. Thornton<br>Dominique R. Scalia<br>DBS Law<br>155 NE 100th Street, Suite 205<br>Seattle, WA 98125<br>Telephone: 206-489-3802<br>Facsimile: 206-973-8737<br>Email: lthornton@lawdbs.com<br>dscalia@lawdbs.com |
| **Fairweather Management Corp. dba Premier Packaging**<br>Michael J. Gearin, WSBA # 20982<br>K&L Gates, LLP<br>925 Fourth Avenue, Suite 2900 Seattle, Washington 98104<br>Tel: +1 206 623 7580<br>Fax: +1 206 623 7022<br>Email: Mike.Gearin@klgates.com | **BMO Bank, N.A.**<br>Shane P. Gale, WSBA # 57218<br>McCarthy & Holthus, LLP<br>108 1st Ave. S., Suite 400<br>Seattle, WA 98104<br>Telephone (206) 596-4841<br>Email: sgale@mccarthyholthus.com |
| **Healthcare Management Administrators, Inc.**<br>Bruce W. Leaverton, WSBA #15329<br>Medora A. Marisseau,WSBA #23114<br>Andrew J. Liese, WSBA #38313<br>Karr Tuttle Campbell<br>701 5th Avenue, Suite 3300<br>Seattle, Washington 98104<br>Phone: (206) 223-1313<br>Email: bleaverton@karrtuttle.com<br>mmarisseau@karrtuttle.com<br>aliese@karrtuttle.com | **RRG Global Partners Pisces LLP and NIF Seafood Holdings, LLC**<br>Bradley R. Duncan, WSBA #36436<br>Josh A. Rataezyk, WSBA #33046<br>Zachary A. Cooper, WSBA #53526<br>Snell & Wilmer L.L.P.<br>600 University Street, Suite 310<br>Seattle, WA 98101<br>Tel: 206.741.1420<br>Email: rataezyk@swlaw.com;<br>bduncan@swlaw.com;<br>zcooper@swlaw.com |

by: ☑ electronic service
☑ other (specify) via email _____

**AND TO:**

| | |
|---|---|
| AT&T Alascom<br>210 East Bluff Road<br>Anchorage, AK 99501-1100 | Heuker Brothers, Inc.<br>PO BOX 98<br>CASCADE LOCKS, OR, 97014 |
| Heuker, Inc.<br>PO BOX 98<br>CASCADE LOCKS, OR, 97014 | Telco Properties<br>201 E 56th Avenue<br>Anchorage, AK 99518 |

| Dave Bash<br>PO Box 76<br>King Cove, AK, 99612 | State of Alaska, Department of Natural Resources<br>Division of Mining, Land and Water<br>550 W 7th Avenue, Suite 900C<br>Anchorage, Alaska 99501-3579 |
| --- | --- |

By:     ☑     U.S. Postal Service, ordinary first class mail


_Roxanne M. Rebusit_
Roxanne M. Rebusit, Legal Assistant

# EXHIBIT 5

1
2
3
4
5
6
7

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

8
9

WELLS FARGO BANK, NATIONAL
ASSOCIATION, a national banking
association, in its capacity as Agent,

10                                       Petitioner,

11        v.

12   NORTHWEST FISH COMPANY, LLC, a
     Washington corporation; PETER PAN
13   SEAFOOD COMPANY, LLC, an Alaska
     limited liability company, ALASKA FISH
14   HOLDINGS, LLC, a Delaware limited
     liability company, and RAYMOND
15   MACHINE SHOP, LLC, a Washington
     limited liability company,
16
17                                      Respondents.

Case No. 24-2-08809-1 SEA

**WELLS FARGO'S RESPONSE TO
SALE OBJECTIONS AND IN
SUPPORT OF SALE APPROVAL
ORDER**

18        Petitioner Wells Fargo Bank, National Association, as agent for certain lenders under the

19   Credit Agreement (as defined below) (in such capacity as agent, "Wells Fargo"), submits this

20   response in support of the entry of an order (the "Sale Approval Order") approving the sale of the

21   estate's assets to Rodger May as the highest and best bidder at the court-approved auction, and in

22   response to the objections of certain lien claimants (the "Lien Claimants"), creditors, and other

23   interested parties (together with the Lien Claimants, the "Objecting Parties").[1]

24
25

26   [1] Capitalized terms used herein without definition shall have the meanings ascribed to them in the Notice of
     Conclusion of Auction and Determination of Prevailing Bid and Back-Up Bid filed on September 19, 2024, and the
27   Purchase and Sale Agreement (the "PSA") attached thereto. Dkt. 199.

WELLS FARGO'S RESPONSE TO OBJECTIONS AND IN SUPPORT
OF SALE APPROVAL ORDER - 1

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

May Notice Exhibits' Page 185

105727.2184/9882098.4

# I.    **INTRODUCTION**

The Receiver and its professionals marketed the estate's assets for months, solicited written bids, and then conducted an exhaustive two-day auction pursuant to the terms of the Court's Bid Procedures Order. That process resulted in competitive bidding by multiple bidders, including two groups of bidders that submitted aggregate cash and credit bids for substantially all of the estate's assets (the "Aggregate Bidders"). Mr. May's aggregate bid of $37,324,000 (the "May Bid"), exceeded the competing aggregate bid of Silver Bay and Mr. Ketcham (the "Silver Bay/Ketcham Bid" and together with the May Bid, the "Aggregate Bids") by $250,000, and, if approved and closed, will result in the payment in full of the Credit Facility and all other senior claims against the Receivership Estate, including: (i) pre and post-petition claims of warehouseman, and (ii) the senior portion of the State of Alaska's tax lien (together with the Credit Facility, the "Senior Claims"), and (iii) millions of dollars of administrative claims. Importantly, both Aggregate Bidders properly conditioned their bids on payment of the Credit Facility in full, as required by applicable law, the Bid Procedures Order, and the terms of the Subordination Agreements between Wells Fargo and the bidder(s), and neither Aggregate Bid may be approved unless Wells Fargo and the Senior Claims are paid in full at Closing. Thus, the Court must both, approve the May Bid as the winning bid and the Silver Bay Bid as the back-up bid, and direct the distribution of sale proceeds to Wells Fargo and the other holders of the Senior Claims in the amount necessary to satisfy such claims and trigger the Aggregate Bidders' credit bidding rights.

A receivership auction that generates sufficient proceeds to pay senior secured claims and administrative claims in full, and leaves some other assets to be administered, is a rarity. As with almost every insolvency sale, there are disappointed creditors and constituencies given the claim priorities of RCW 7.60.230(1)(a), and the credit bidding rights of secured creditors pursuant to RCW 7.60.260(3) and other applicable law. The Objecting Parties' objections focus on the results of the auction and ignore the statutory reality giving rise to their disappointment. Such objections fail as a matter law given the Receiver's extensive marketing and auction process, selection of the highest bid, and the requirements of the Receivership Act.

WELLS FARGO'S RESPONSE TO OBJECTIONS AND IN SUPPORT OF SALE APPROVAL ORDER - 2

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

May Notice Exhibits' Page 186

105727.2184/9882098.4

The Objecting Parties' other arguments fail for the following reasons:

- The Court may not import equitable considerations to override the court approved bidding procedures and the statutory requirements of the Receivership Act; and

- The UCC allows a secured creditor to perfect its security interest through a central filing that describes its collateral as "all assets" contrary to the argument of the Lien Claimants. RCW 62A.9A-504(2). Wells Fargo's Security Agreement fully describes its Collateral by UCC category as contemplated for a security interest to attach pursuant to RCW 62A.9A.203(b)(3) and RCW 62A.9A.108(b). *See, also* AS § 45.29.108, .203, and .504; and

- The Lien Claimants' Statutory Liens were recorded after (i) the Deeds of Trust under which each of May and Silver Bay/Ketcham asserted their credit bids, and through which Wells Fargo is entitled to payment in full; and (ii) the Wells Fargo financing statements. As a result, such liens are junior to both Wells Fargo's security interest and the credit bids under the senior deeds of trust. See, RCW 62A.9A.317(a); AS § 45.29.317(a); AS § 34.35.340 and .391; and

- The PSA evidencing the May Bid allows the Court to order a bond to secure the Ketcham credit bid in the event that future litigation is resolved in favor of Ketcham, which bond would resolve the Ketcham objection.

It is imperative that the Court approve the sale and the distribution of sale proceeds to the holders of Senior Claims at Closing in order to allow the sale to timely close and avoid further dissipation of the Receivership Estate. Wells Fargo and the other Lenders have been financing this receivership case since April 22nd, and are not inclined to continue extending financing or allow the use of cash collateral past October 15th. Any failure to close the proposed sale by October 15th would likely result in a piecemeal liquidation that would net the estate and its creditors far less than the May Bid that's before the Court.

WELLS FARGO'S RESPONSE TO OBJECTIONS AND IN SUPPORT
OF SALE APPROVAL ORDER - 3

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

105727.2184/9882098.4

## II.    FACTUAL BACKGROUND

1.    The Credit Facility.

Respondents Northwest Fish Company, LLC, a Washington limited liability company, Peter Pan Seafood Company, LLC, an Alaska limited liability company, Alaska Fish Holdings, LLC, a Delaware limited liability company, and Raymond Machine Shop, LLC, a Washington limited liability company (collectively, "Debtors") are indebted to Wells Fargo, as Agent, Lenders (as defined below) and Lenders as Bank Product Providers (as defined in the Credit Facility) in connection with various revolving loans, letters of credit, and other financial accommodations (together, the "Credit Facility") extended to certain Debtors, in a current outstanding amount in excess of $24,000,000. Scott Decl., ¶ 9. The Credit Facility is governed by the terms and conditions of an Amended and Restated Credit Agreement dated as of July 19, 2022, by and among Agent, the lenders party thereto from time to time (together with Agent, "Lenders") and Debtors (as amended, restated, or otherwise modified from time to time, the "Credit Agreement"), as amended from time to time. Harrigian Decl., Ex. A (Credit Agreement).[2] The Credit Facility has matured.

To secure repayment of the Credit Facility, each Debtor reaffirmed and granted to Wells Fargo, as agent, a valid, first priority lien and security interest in substantially all of their personal property assets, including, without limitation, all of Debtors' accounts receivable and other rights to payment, general intangibles, inventory and equipment, and proceeds thereof (as more fully described therein, the "Collateral"), pursuant to, and as more fully described in, that certain Amended and Restated Security Agreement dated as of July 19, 2022, by and among Debtors, Wells Fargo, and the other parties party thereto from time to time (as amended, restated, or otherwise modified from time to time, the "Security Agreement") and the Credit Agreement. Harrigian Decl., Ex. B (Security Agreement). Wells Fargo's security interest in the Collateral is properly perfected by the filing of the following UCC financing statements:

---

[2] Declaration of Gary Harrigian in Support of Appointment of General Receiver filed April 22, 2024 ("Harrigian Decl."). Dkt. 7.

WELLS FARGO'S RESPONSE TO OBJECTIONS AND IN SUPPORT OF SALE APPROVAL ORDER - 4

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

May Notice Exhibits' Page 188

105727.2184/9882098.4

1

- UCC1 Financing Statement filed December 31, 2020, with the Washington Department of Licensing under file number 2020-366-4067-4, naming Northwest Fish Company, LLC, as debtor, and Wells Fargo Bank, National Association, as secured party;

- UCC1 Financing Statement filed December 31, 2020, with the Alaska Department of Natural Resources Recorder's Office under file number 2020-028186-8, naming Peter Pan Seafood Company, LLC, as debtor, and Wells Fargo Bank, National Association, as secured party;

- UCC1 Financing Statement filed December 31, 2020, with the Delaware Department of State under file number 20209307473, naming Alaska Fish Holdings, LLC, as debtor, and Wells Fargo Bank, National Association, as secured party; and

- UCC1 Financing Statement filed February 4, 2021, with the Washington Department of Licensing under file number 2021-035-4765-3, naming Raymond Machine Shop, LLC, as debtor, and Wells Fargo Bank, National Association, as secured party.

Harrigian Decl., Ex. C (Financing Statements).

2.    Subordination Agreements.

Rodger May ("Mr. May") is a party to that certain Amended and Restated Subordination and Intercreditor Agreement dated as of May 23, 2023, by and among RPG Global Partners Pisces, L.P. ("RPG"), Mr. May, NIF Seafood Lender, LLC ("NIF"), Debtors, and Wells Fargo (as amended, restated or otherwise modified from time to time, the "May Subordination Agreement"); and Ketcham ("Mr. Ketcham") is a party to that certain Subordination and Intercreditor Agreement dated as of July 12, 2023, by and among Mr. Ketcham (together with RPG, Mr. May, and NIF, the "Subordinated Creditors"), Debtors, and Wells Fargo (as amended, restated or otherwise modified from time to time, the "Ketcham Subordination Agreement" and together with the May Subordination Agreement, the "Subordination Agreements"), the terms of which govern the relative rights and priorities of Lenders and Subordinated Creditors under the parties respective loan documents evidencing the obligations of Debtors to Lenders and Subordinated Creditors, and memorialize Subordinated Creditors' agreement to turnover sale proceeds to Wells Fargo and

WELLS FARGO'S RESPONSE TO OBJECTIONS AND IN SUPPORT
OF SALE APPROVAL ORDER - 5

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

May Notice Exhibits' Page 189

105727.2184/9882098.4

refrain from interfering with Lender's rights and remedies. Second Harrigian Decl., Ex. A (May Subordination Agreement)[3]; *see*, *also*, Scott Decl., ¶ 3, Ex. A (Ketcham Subordination Agreement) (providing that Subordinated Creditors "will not accept, any Distribution with respect to the Subordinated Debt until the Senior Debt is paid in full"). Accordingly, both the May Bid and Ketchum/Silver Bay Bid must satisfy the obligations under the Credit Facility in full, and Wells Fargo holds the lien priority of the Subordinated Creditors with respect to the Alaska real estate.

        3.     <u>Deeds of Trust and Recorded Liens</u>.

        Mr. May holds a lien and security interest in certain real property owned by Peter Pan Seafood Company, LLC and located in Naknek, Port Moller, Sand Point, King Cove and Dillingham, Alaska (the "<u>May Real Estate Collateral</u>"), pursuant to and as more fully described in (i) that certain Deed of Trust, Assignment of Rents and Security Agreement (and Fixture Filing) dated as of May 23, 2023 (as amended, restated, or otherwise modified from time to time, the "<u>Naknek Deed of Trust</u>"), and recorded on May 23, 2023, in the Official Records of the Kvichak Recording District, Third Judicial District, State of Alaska, under instrument number 2023-000074-0; (ii) that certain Deed of Trust, Assignment of Rents and Security Agreement (and Fixture Filing) dated as of May 23, 2023 (as amended, restated, or otherwise modified from time to time, the "<u>Port Moller Deed of Trust</u>"), and recorded on May 23, 2023, in the Official Records of the Aleutian Islands Recording District, Third Judicial District, State of Alaska, under instrument number 2023-000120-0; (iii) that certain Deed of Trust, Assignment of Rents and Security Agreement (and Fixture Filing) dated as of May 23, 2023 (as amended, restated, or otherwise modified from time to time, the "<u>Sand Point Deed of Trust</u>"), and recorded on May 23, 2023, in the Official Records of the Aleutian Islands Recording District, Third Judicial District, State of Alaska, under instrument number 2023-000121-0; (iv) that certain Deed of Trust, Assignment of Rents and Security Agreement (and Fixture Filing) dated as of May 23, 2023 (as

---

[3] Declaration of Gary Harrigian in Support of Petitioner's Opposition to Creditor's Motion to Modify Order Appointing Receiver filed June 18, 2024 ("<u>Second Harrigian Decl.</u>"). Dkt. 76.

WELLS FARGO'S RESPONSE TO OBJECTIONS AND IN SUPPORT OF SALE APPROVAL ORDER - 6

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

105727.2184/9882098.4

May Notice Exhibits' Page 190

amended, restated, or otherwise modified from time to time, the "King Cove Deed of Trust"), and

recorded on May 23, 2023, in the Official Records of the Aleutian Islands Recording District,

Third Judicial District, State of Alaska, under instrument number 2023-000122-0; and (v) that

certain Deed of Trust, Assignment of Rents and Security Agreement (and Fixture Filing) dated as

of May 23, 2023 (as amended, restated, or otherwise modified from time to time, the "Dillingham

Deed of Trust"), and recorded on May 23, 2023, in the Official Records of the Bristol Bay

Recording District, Third Judicial District, State of Alaska, under instrument number 2023-

000125-0. Scott Decl., ¶¶ 4-8, Ex. B (Naknek Deed of Trust), C (Port Moller Deed of Trust), Ex.

D (Sand Point Deed of Trust), E (King Cove Deed of Trust), and F (Dillingham Deed of Trust).

The Naknek Deed of Trust, Port Moller Deed of Trust, Sand Point Deed of Trust, King Cove Deed

of Trust, and Dillingham Deed of Trust shall hereinafter collectively be referred to as the "Deeds

of Trust."

　　　　The Lien Claimants recorded their liens on the following dates:

| Date | Recording Number | Lien Claimant | Statute |
|---|---|---|---|
| November 14, 2023 | 2023-000265-0 | Arctic Lady Enterprises | AS § 34.35.391 |
| November 14, 2023[4] | 2023-000259-0 | Arctic Lady Enterprises | AS § 34.35.391 |
| November 30, 2023 | 2023-000287-0 | Northern Seas, Inc. | AS § 34.35.391 |
| December 18, 2023[5] | 2023-000311-0 | Inter-Cooperative Exchange, et al. | AS § 34.35.391 |
| December 19, 2023 | 2023-000315-0 | F/V Marahute, LLC | AS § 34.35.391 |
| December 19, 2023 | 2023-000316-0 | F/V Marahute, LLC | AS § 34.35.391 |
| December 22, 2023 | 2023-000320-0 | Ocean Fury, LLC | AS § 34.35.391 |
| January 2, 2024 | 2024-000001-0 | CPH Association, et al. | AS § 34.35.391 |
| January 18, 2024 | 2024-000023-0 | Koch Fisheries, LLC | AS § 34.35.320 |
| January 18, 2024 | 2024-000021-0 | Ocean Fury, LLC | AS § 34.35.320 |
| January 18, 2024 | 2024-000022-0 | Rollo Fisheries, LLC | AS § 34.35.320 |
| April 15, 2024 | 2024-000084-0 | Winterhawk LLC | AS § 34.35.320 |
| April 17, 2024 | 2024-000145-0 | Lone Sheldon LLC | AS § 34.35.320 |
| April 25, 2024 | 2024-000094-0 | Pacman LLC | AS § 34.35.320 |

All of the above-referenced recorded liens are junior in time to the Deeds of Trust, and to Wells

Fargo's UCC1 financing statements.

---

[4] Released November 14, 2023, AFN 2023-000266-0
[5] Released February 20, 2024, AFN 2024-000050-0

WELLS FARGO'S RESPONSE TO OBJECTIONS AND IN SUPPORT OF SALE APPROVAL ORDER - 7

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

May Notice Exhibits' Page 191

105727.2184/9882098.4

4.      Receivership Status.

Lenders have extended post-petition financing to the Receivership Estate since commencement of the case on April 22, 2024, and the post-petition credit facility matured on September 30, 2024. Lenders are not willing to continue financing the case and are not inclined to allow the use of any cash Collateral past October 15, 2024. Scott Decl., ¶ 10.

## III.    REPLY

### A.    Lien Claimants' statutory liens are subordinate to Wells Fargo's secured claim.

The Lien Claimants object to the distribution of sale proceeds to Wells Fargo at Closing based on their claim that their statutory liens hold priority over Wells Fargo's security interest. The subject statutory liens are asserted under Alaska's Packer's and Processor's Lien (the "Processor's Lien") and Fishermen's Lien statutes (the "Fishermen's Liens," and together with the Processor's Lien, the "Statutory Liens"). AS §§ 34.35.320 and 34.35.391 (together the "Lien Statutes"). The Statutory Liens are only "prior, and superior to a mortgage, attachment, claim, or demand made or recorded in the recording district in which the property is located **after**" the commencement of the lien. AS §§ 34.35.340(a)(1) and 34.35.391(c) (emphasis added); Alaska Stat. Ann § 45.29.317(a)(2); *In re Kemp Pac. Fisheries, Inc.*, 136 B.R. 268, 271 (W.D. Wash. 1990), *aff'd sub nom. In re Kemp Pac. Fisheries*, 952 F.2d 406 (9th Cir. 1991), and *aff'd sub nom. Flyco, Inc. v. Kemp Pac. Fisheries, Inc.*, 952 F.2d 406 (9th Cir. 1991) (holding that Fisherman's Liens arising under Alaska law does not prime a prior perfected security interest). In other words, the Statutory Liens only have priority over any mortgage, attachment, claim, or demand that is made or recorded **after** the commencement of the Liens, and Fishermen's Liens commence on the date the subject fish is delivered which must be within 90 days of recording, and, in Processor's Liens commence on the date the subject services commence, which must be within six months of the recording of the lien. *Id.*; AS §§ 34.35.325 (requiring recording within six months) and 34.35.391(b) (requiring recording within 90 days of date fish is sold); *see also*, *In re Adak Fisheries, LLC*, 459 B.R. 731, 737 (Bankr. D. Alaska 2010) (holding that if the fisherman fails to record a claim of lien within 90 days of each fish ticket, the lien for that delivery would lapse.)

WELLS FARGO'S RESPONSE TO OBJECTIONS AND IN SUPPORT
OF SALE APPROVAL ORDER - 8

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

May Notice Exhibits' Page 192

105727.2184/9882098.4

1    The first Fishermen's Lien was recorded by a Lien Claimant on November 14, 2023,

2    making the earliest statutory lien priority date, August 16, 2023 (*i.e.,* 90 days prior to the recording

3    date).[6] The first Processor's Lien was recorded by a Lien Claimant on January 18, 2024, making

4    the earliest statutory lien priority date for Processor's Liens, July 22, 2023. Wells Fargo's UCC1

5    financing statements were filed on December 31, 2020, and February 4, 2021, well prior to the

6    Lien Claimants' earliest priority dates of July 22, 2023, and August 16, 2023. Thus, Wells Fargo's

7    security interest primes all of the Statutory Liens. *See, also*, RCW 62A.9A.317(a) (providing that

8    secured creditor entitled to priority over lien creditor with lien arising after perfection of security

9    interest); AS § 45.29.317(a)(2) (same).

10   **B.    The Deeds of Trust also prime the Fishermen's Liens.**

11   Subordinated Creditors recorded their Deeds of Trust in the respective recording districts

12   on May 23, 2023. As stated above, the earliest Statutory Lien priority date is July 22, 2023. Thus,

13   the Statutory Liens are also inferior and subordinate to the Subordinated Creditors' Deeds of Trust,

14   and were extinguished by the May credit bids under those Deeds of Trust. AS §§ 34.35.340(a)(1)

15   and 34.35.391(c); RCW 7.60.260(3); RCW 7.60.230(1)(a). Pursuant to the terms of the

16   Subordination Agreements, Wells Fargo is entitled to any and all sale proceeds otherwise payable

17   to the Subordinated Creditors under their Deeds of Trust, which right also primes the Statutory

18   Liens.

19   **C.    Wells Fargo's security interest is properly perfected by its central UCC Filings.**

20   Certain Lien Claimants mistakenly argue that Wells Fargo does not hold a perfected

21   security interest in equipment and other personal property assets because its UCC financing

22   statements reference "all assets" and were filed centrally in Alaska, Washington, and Delaware,

23   rather than in local counties and recording districts. *See*, Arctic Lady Enterprises Conditional

24   Objection at p. 3; Lienholders Conditional Objection to Sale Approval Order(s) pp. 4-5. First,

---

[6] We note that multiple Statutory Liens are deficient on their face or have been released. For example, the November 30, 2023, Northern Seas, Inc. lien is for fish sold more than 90 days before the recording date. Other liens have similar deficiencies and are not fully perfected.

WELLS FARGO'S RESPONSE TO OBJECTIONS AND IN SUPPORT
OF SALE APPROVAL ORDER - 9

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

105727.2184/9882098.4

1   Article 9 of the UCC allows a secured creditor to perfect its security interest by describing its

2   collateral as "all assets" in its financing statement. RCW 62A.9A-504(2) ("a financing statement

3   sufficiently indicates the collateral that it covers if the financing statement provides (2) an

4   indication that the financing statement covers all assets…"). The Lien Claimants argument to the

5   contrary is simply wrong. Secondly, in order to perfect a security interest under Article 9 in both

6   Alaska and Washington, a secured creditor must file its UCC financing statement with "the central

7   filing office" of each state, which is "the Department of Natural Resources" in Alaska, and "the

8   Department of Licensing" in Washington. AS § 45.29.501(a)(2); RCW 62A.9A-501(a)(2). Wells

9   Fargo complied with Section 501 of Alaska's Article 9 and filed its financing statement with the

10  Alaska Department of Natural Resources, thereby perfecting its security interest in all equipment,

11  fixtures, and other assets. There is no requirement in Chapter 29 of the Alaska Code for the

12  recording of a financing statement in individual recording districts in order to perfect against

13  equipment and fixtures. Finally, Chapter 29 of the Alaska Code expressly provides that a secured

14  creditor holding a perfected security interest takes priority over any other lien arising after

15  perfection of its perfected security interest. AS § 45.29.317(a)(2); see also, *In re Kemp Pac.*

16  *Fisheries, Inc.*, 136 B.R. 268, 271 (W.D. Wash. 1990), *aff'd sub nom. In re Kemp Pac. Fisheries*,

17  952 F.2d 406 (9th Cir. 1991), and *aff'd sub nom. Flyco, Inc. v. Kemp Pac. Fisheries, Inc.*, 952 F.2d

18  406 (9th Cir. 1991). The Lien Claimants' argument to the contrary ignores Alaska law and the

19  proper place to perfect a security interest under Chapter 29 of the Alaska Code.

20  **D.    Wells Fargo's UCC1s provided statutory notice of its senior security interest**.

21          Certain Lienholders argue that Wells Fargo's amendment and restatement of its Credit

22  Agreement is somehow relevant to the priority of its security interest. *See*, Lienholders Conditional

23  Objection to Sale Approval at p. 5. Article 9 clearly and unequivocally entitles a secured creditor

24  to file its UCC1 at any time, whether before or after the execution of a security agreement or its

25  initial advance, and such filing is sufficient to put other creditors on notice and to perfect a security

26  interest in presently owned and thereafter acquired collateral. AS §§ 45.29.502(d); Official

27  Comment 2 to 9-502 ("The financing statement may be filed before the security interest attaches

WELLS FARGO'S RESPONSE TO OBJECTIONS AND IN SUPPORT
OF SALE APPROVAL ORDER - 10

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

105727.2184/9882098.4

1    or thereafter" and what's contemplated by central financial statement filings is "notice filing"

2    where "further inquiry from" subsequent searches is necessary). The amendment and restatement

3    of the Credit Agreement is wholly irrelevant to the relative priorities of Wells Fargo's security

4    interests and the Statutory Liens.

5    **E.    The ICE Parties are not secured creditors and cannot assert priority.**

6        Inter-Cooperative Exchange ("ICE"), Lady Alaska Enterprises LLC, and Wade D. Veeser

7    (collectively "ICE Parties") assert that they hold Fishermen's Liens. Dkt. 232, 234. However, on

8    February 20, 2024, the ICE Parties, "for good and valuable consideration," released their liens and

9    acknowledged "full and final satisfaction." *See*, Release (AFN 2024-000050-0). While the ICE

10   Parties later filed a withdrawal of the release, there is no statutory basis for reinstating a released

11   lien. *See In re Motors Liquidation Co.*, 777 F.3d 100, 105 (2d Cir. 2015) (rejecting availability of

12   relief that entailed "undoing" a release of liens, even where the release was mistaken).

13   **F.    NSEDC is an unsecured creditor and cannot assert that its claim has priority**

14       Norton Sound Economic Development Corporation ("NSEDC") argues that proceeds

15   should be held until creditors' priority is established. Dkt. 217. However, NSEDC is an unsecured

16   creditor and has no basis to object to distributions to secured creditors. *See* Dkt. 127; RCW

17   7.60.230(1).

18   **G.    Equitable subordination is not a cognizable form of relief.**

19       Certain creditors request that the Court deny the sale to Mr. May on equitable grounds

20   and/or equitable subordination grounds. *See, e.g.,* NSEDC Objection. Dkt. 217. However,

21   principles of equity cannot override the express terms of the Act, which defer to the Receiver's

22   business judgment, limit sale objections based on price, and entitle secured creditors, like Mr. May,

23   to credit bid. RCW 7.60.260(2), (3). Moreover, equitable subordination is not an available remedy

24   outside of federal bankruptcy law. *Straightshot Commc'ns Inc. v. Telekenex, Inc.*, 2010 WL

25   4793538 (W.D. Wash. Nov. 19, 2010) (citing *Arena Dev. Grp., LLC v. Naegele Commc'ns, Inc.*,

26   2007 WL 2506431, at *7 (D. Minn. Aug. 30, 2007) ("[d]eclaratory relief for recharacterization of

27   debt to equity and equitable subordination are not cognizable causes of action in federal district

WELLS FARGO'S RESPONSE TO OBJECTIONS AND IN SUPPORT
OF SALE APPROVAL ORDER - 11

May Notice Exhibits' Page 195

105727.2184/9882098.4

court.")); *Isuzu Motors Am., LLC v. Jackson*, 2014 WL 4216287, at *4 (D. Haw. Aug. 25, 2014) (*citing HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d Cir.1995) ("[t]he doctrine of equitable subordination … simply does not apply to state-law fraudulent conveyance claims. Equitable subordination is distinctly a power of federal bankruptcy courts, as courts of equity, to subordinate the claims of one creditor to those of others.") Equitable subordination of May's claim is simply not an available remedy, regardless of his prepetition conduct.

### H.     Neither Aggregate Bid may be approved without providing for payment in full of the Credit Facility and other Senior Claims at Closing.

Ketcham and other Objecting Parties object to the May Bid based on his exercise of the credit bidding rights provided to him by the Act and the Bid Procedures. RCW 7.60.260(3). Regardless of May's pre-petition conduct, Mr. May complied with the Bid Procedures and the Receiver determined May to be the Prevailing Bidder. Importantly, both May and Ketcham's right to credit bid is contingent upon Wells Fargo's statutory right to full payment of its Senior Claim:

> A secured creditor who purchases the property from a receiver may offset against the purchase price its allowed secured claim against the property, provided that the secured creditor tenders **cash sufficient to satisfy in full all secured claims** payable out of the proceeds of sale having priority over the secured creditor's secured claim.

RCW 7.60.260(3) (emphasis added). Both Aggregate Bidders properly provided for the payment in full of Wells Fargo at Closing. Any order approving either cash or credit bid must require the payment in full of the Senior Claims at Closing pursuant to the bidders' exercise of their subordinate credit bidding rights.

### I.     The sale must close by October 15, 2024.

Wells Fargo appreciates the concerns of the Objecting Parties. However, Wells Fargo has funded this receivership, to the benefit of the entire creditor body, and will not continue to provide financing. Closing this sale expeditiously is in the best interests of the Receivership Estate, the entire creditor body, the State of Alaska, and importantly, the communities affected by the plant closures.

---

WELLS FARGO'S RESPONSE TO OBJECTIONS AND IN SUPPORT
OF SALE APPROVAL ORDER - 12

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

105727.2184/9882098.4

1    **J.     Approval of the sale will not impact OBI or KWL's rights.**

2         OBI Seafoods, LLC ("OBI") and Kent Warehouse and Labeling, LLC ("KWL") assert

3    various rights and arguments based upon the status of the membership interest subject to the

4    sale.  Dkt. 210, 221.  While Wells Fargo disagrees with OBI and KWL's position and reserves all

5    rights, the sale is "as is, where is" and is subject to the terms of the underlying operating agreement.

6                          **IV.     <u>CONCLUSION</u>**

7         For the foregoing reasons, Wells Fargo respectfully requests that the Court approve the

8    Prevailing Bid and authorize and direct the Receiver to satisfy the Senior Claims at Closing.

9         DATED this 1st day of October, 2024.

10                          LANE POWELL PC

11

12                          By*/s/Gregory R. Fox*
                              Gregory R. Fox, WSBA No. 30559
13                            Todd M. Brannon, WSBA No. 59755
                              Alena Ivanov, WSBA No. 59900
14                          Attorneys for Petitioner Wells Fargo Bank, National
                            Association
15

16                          *I certify that this memorandum contains 4,192
                            words, in compliance with the Local Civil Rules.*
17

18

19

20

21

22

23

24

25

26

27

WELLS FARGO'S RESPONSE TO OBJECTIONS AND IN SUPPORT
OF SALE APPROVAL ORDER - 13

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

May Notice Exhibits' Page 197

105727.2184/9882098.4

# EXHIBIT 6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Ex Parte
October 3, 2024
1:30 PM

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

FOR THE COUNTY OF KING

WELLS FARGO BANK, NATIONAL
ASSOCIATION, a national banking
association, in its capacity as Agent

             Petitioner,

    vs.

NORTHWEST FISH COMPANY, LLC, a
Washington corporation; PETER PAN
SEAFOOD COMPANY, LLC, an Alaska
limited liability company, ALASKA FISH
HOLDINGS, LLC, a Delaware limited
liability company, and RAYMOND
MACHINE SHOP, LLC, a Washington
limited liability company,

           Respondents.

No. 17-2-02462-7SEA

ORDER (1) APPROVING THE
PREVAILING BIDDER, THE
PREVAILING BID AND THE TERMS
OF THE PURCHASE AND SALE
AGREEMENT, (2) APPROVING THE
SALE OF ASSETS FREE AND
CLEAR OF LIENS, CLAIMS,
SECURITY INTERESTS,
ENCUMBRANCES, AND RIGHTS OF
REDEMPTION, (3) APPROVING
ASSUMPTION AND ASSIGNMENT
OF EXECUTORY CONTRACTS, (4)
APPROVING THE BACK-UP BID
AND THE BACK-UP BIDDER, AND
(5) GRANTING RELATED RELIEF

     THIS MATTER came on for hearing in support of entry of a Sale Approval Order, as

described and defined in this Court's Order: *(1) Approving Bid and Auction Procedures; (2)*

*Scheduling Hearing to Approve Sale of Assets; and (3) Approving Assumption and Assignment*

*of Executory Contracts* ("Auction and Sale Procedures Order").

ORDER APPROVING SALE OF ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, ENCUMBRANCES AND INTERESTS, AND GRANTING OTHER
RELIEF - 1
PDX\119661\221130\AP\20425220.1
134382\285395\46525492.v5

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981

THE COURT, having held the Sale Approval Hearing[1] on October 3, 2024 (the "Sale Approval Hearing"), and having considered the Auction and Sale Procedures Order, Notice of Conclusion of Auction and Determination of Prevailing Bid, and Back-Up Bid and exhibits attached thereto, the filings in support of and against the Prevailing Bid, the arguments of counsel, and the files and records herein, and being fully advised, and all parties in interest having been heard or having had the opportunity to be heard regarding the Sale Approval Hearing and the relief requested herein; and due and sufficient notice of the Sale Approval Hearing to consider approval of the sale pursuant to the PSA (the "Sale") and the relief sought in connection therewith having been given under the particular circumstances and in accordance with the Auction and Sale Procedures Order; and it appearing that no other or further notice need be provided; and it appearing that the relief requested herein with respect to the Sale as in the best interests of the receivership estate (the "Receivership Estate"), its creditors and other parties in interest; and upon the entire record of the Sale Approval Hearing and this case, and after due deliberation thereon, and good cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT**:

A.    Stapleton Group, Inc. ("Receiver"), gave appropriate notice of the Auction and Sale Procedures Order, Notice of Conclusion of Auction and Determination of Prevailing Bid, and Back-Up Bid and the Sale Approval Hearing.  No other or further notice in connection with the entry of this Order is or shall be required.

B.    The relief requested herein is appropriate.

---

[1] Capitalized terms not otherwise defined in this Order have the meaning ascribed to them in the Auction and Sale Procedures Order or, as applicable, the Purchase and Sale Agreement executed between the Seller and Buyer, dated as of September 19, 2024 ("PSA"), a copy of which is attached Exhibit A to the Notice of Conclusion of Auction and Determination of Prevailing Bid and Back-Up Bid.  In the event that a term is defined in both the Auction and Sale Procedures Order and the PSA, the definition set forth in the Auction and Sale Procedures Order shall control.

ORDER APPROVING SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, AND GRANTING OTHER RELIEF - 2

PDX\119661\221130\AP\20425220.1
134382\285395\46525492.v5

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981

C.      On August 21, 2024, the Court entered that certain Order (1) Approving Bid and Auction Procedures, (2) Scheduling Hearing To Approve Sale of Assets, and (3) Approving Assumption and Assignment of Executory Contracts (the "Auction and Sale Procedures Order"). Pursuant to the Auction and Sale Procedures Order, the Court authorized the Receiver to accept bids and, if necessary, hold an Auction for the sale of the Assets, all on the terms described therein. As demonstrated by (i) the record and other evidence proffered or adduced at the Sale Approval Hearing and (ii) the representations of counsel made on the record at the Sale Approval Hearing, the Receiver has conducted the sale process in compliance with the Auction and Sale Procedures Order, the Auction was duly noticed and conducted in a non-collusive, fair and good faith manner, and the Receiver afforded qualified purchasers a full and fair opportunity to make higher and better offers.

D.      The Receiver received 12 Qualified Bids and all of the Qualified Bidders participated in the auction.

E.      Based upon the record, the representations of counsel, and any evidence introduced at the Sale Approval Hearing, (i) proper, timely, adequate and sufficient notice of the Auction and Sale Procedures Order, Notice of Conclusion of Auction and Determination of Prevailing Bid, and Back-Up Bid, the Sale Approval Hearing, the assumption and assignment procedures for the Assumed Contracts (including the objection deadline with respect to any cure amount) and the assumption and assignment of the Assumed Contracts and the cure amounts has been provided in accordance with applicable law (including the provisions of RCW 7.60.005, *et seq.* (the "Act"), specifically Section 7.60.190 thereof), in accordance with the Order Appointing General Receiver entered on April 25, 2024 (and as

ORDER APPROVING SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, AND GRANTING OTHER RELIEF - 3
PDX\119661\221130\AP\20425220.1
134382\285395\46525492.v5

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981

May Notice Exhibits' Page 201

amended) and in compliance with the Auction and Sale Procedures Order, (ii) such notice was good and sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice is or shall be required.

F.    The Receiver, on behalf of Seller (i) has full authority to execute the PSA and all other documents contemplated thereby, and (ii) has all of the authority necessary to consummate the transactions contemplated by the PSA, and no consents or approvals, other than those expressly provided for in the PSA, are required for the Receiver, on behalf of Seller, to consummate such transactions.

G.    Consummation of the Sale of the Property at this time is in the best interests of the Receivership Estate, its creditors, and other parties in interest.

H.    The Receiver conducted an Auction on September 16-18, 2024. The Prevailing Bid at the Auction was submitted by Rodger May ("Final Buyer"). The aggregate purchase price for the Prevailing Bid is, in addition to the Assumed Liabilities, THIRTY SEVEN MILLION THREE HUNDRED TWENTY-FOUR THOUSAND DOLLARS ($37,324,000.00). The Cash Component is TWENTY FIVE MILLION THREE HUNDRED TWENTY-FOUR THOUSAND AND 00/100 DOLLARS ($25,324,000.00), subject to adjustment at Closing pursuant to Section 2.3 of the PSA and the Credit Component is TWELVE MILLION AND 00/100 DOLLARS ($12,000,000.00). The Property (as that term is defined in the PSA) that is the subject of the Prevailing Bid is substantially all of the assets of Seller, excluding certain other assets that may be liquidated or subsequently sold by the Receiver.

ORDER APPROVING SALE OF ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, ENCUMBRANCES AND INTERESTS, AND GRANTING OTHER
RELIEF - 4
PDX\119661\221130\AP\20425220.1
134382\285395\46525492.v5

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981

May Notice Exhibits' Page 202

I.      The PSA was negotiated, proposed and entered into by Seller and the Final Buyer without collusion, in good faith, and from arm's-length bargaining positions. Neither the Seller nor the Final Buyer have engaged in any conduct that would cause or permit the PSA to be avoided under applicable law. The PSA and the consideration to be received from Final Buyer is fair and reasonable.

J.      The Back-Up Bid at the Auction was submitted, jointly and severally, by Silver Bay Seafoods, L.L.C. ("Silver Bay") and John Ketcham ("Ketcham") (together, the "Back-Up Bidder").[2] The Assets that are the subject of the Back-Up Bid are substantially all of the assets of Seller, excluding certain other assets that may be liquidated or subsequently sold by the Receiver. The aggregate purchase price for the Back-Up Bid is, in addition to the Assumed Liabilities, THIRTY SEVEN MILLION SIXTY SEVEN THOUSAND AND THREE HUNDRED TWENTY DOLLARS ($37,067,320.00). The cash amount is TWENTY FIVE MILLION THREE HUNDRED TWENTY FOUR THOUSAND AND 00/100 DOLLARS ($25,324,000.00) and the credit bid amount is ELEVEN MILLION SEVEN HUNDRED FORTY THREE THOUSAND AND THREE HUNDRED TWENTY DOLLARS ($11,743,320.00), subject to adjustments, prorations and closing adjustments as set forth in the Back-Up PSA. The combination of and potential stand-alone bids made by Silver Bay and Ketcham for purposes of making the Back-Up Bid, was disclosed at the Auction. The Back-Up Bid, and the consideration to be received from the Back-Up Bidder in the event that it becomes a Final Buyer, is fair and reasonable.

---

[2] Pursuant to Section 33 of the Purchase and Sale Agreement of the Back-Up Bidder, the bids of Silver Bay and Ketcham ("Back-Up PSA") could be submitted as stand-alone bids.

ORDER APPROVING SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, AND GRANTING OTHER RELIEF - 5

PDX\119661\221130\AP\20425220.1
134382\285395\46525492.v5

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981

K.     On September 19, 2024, the Receiver's Notice of Conclusion of Auction and Determination of Prevailing Bid and Back-Up Bid (the "Prevailing Bid Notice") was filed and served in accordance with and as required by paragraph 3(f) of the Auction and Sale Procedures Order.  The Prevailing Bid Notice, among other things, provides notice to the counterparties to the Assumed Contracts of the Seller's intent to assume and assign the Assumed Contracts to the Final Buyer.

L.     The Court finds that the Receiver has articulated good and sufficient business reasons justifying the Sale.  Such business reasons include, but are not limited to, the following:  (i) the PSA constitutes the highest and best offer for the Property, and (ii) the PSA and the closing thereon will present the best opportunity to realize the value of the Property and avoid further decline and devaluation of the Property.

M.     Final Buyer and the Backup-Up Bidder were Qualified Bidders and Qualified Participants for the Auction.

N.     The Final Buyer is a good faith purchaser for value and, as such, is entitled to all of the protections afforded under Section 7.60.260 of the Act and any other applicable or similar law.  The Final Buyer has been and will be acting in good faith within the meaning of Section 7.60.260 of the Act in closing the transactions contemplated by the PSA.

O.     The consideration provided by the Final Buyer for the Property pursuant to the PSA (i) is fair and reasonable under the circumstances, (ii) is the highest and best offer received by Seller for the Property, (iii) will provide a greater recovery for the Receivership Estate and its creditors than would be provided by any other practical available alternative, and

ORDER APPROVING SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, AND GRANTING OTHER RELIEF - 6
PDX\119661\221130\AP\20425220.1
134382\285395\46525492.v5

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981

May Notice Exhibits' Page 204

(iv) constitutes reasonably equivalent value and fair consideration under the Act and under the laws of the United States, any state, territory, possession or the District of Columbia.

P.     The Receiver may sell and transfer the Property free and clear of all liens, claims, security interests, and encumbrances of any type or nature, and of all rights of redemption (collectively, "Liens"), except the Permitted Exceptions (as defined in the PSA), pursuant to the Act because, with respect to each creditor asserting a lien, claim, security interest, encumbrance, or right of redemption, one or more of the standards set forth in 7.60.260 of the Act has been satisfied. For clarification, any and all deeds of trust, assignments of rents, security agreements, lis pendens, fish packer's liens, processor's liens, fishermen's liens, mechanics liens, the order appointing general receiver, and other liens and encumbrances for money owed set forth on the Preliminary Commitments and/or Surveys shall be deemed Liens, and not Permitted Exceptions, for purposes hereof and shall be terminated and of no further force and effect with respect to the Property and Final Buyer's right and title to the Property from and after Closing, with such Liens to attach to the proceeds of the sale, in the disposition of the Property, in the same order, priority, and validity as the Liens had with respect to the Property as existed on April 22, 2024.

Q.     Debtors are indebted to Wells Fargo Bank, National Association, as agent, Lenders (as defined below) and Bank Product Providers (as defined below) in connection with various revolving loans, letters of credit, and other financial accommodations (the "Credit Facility," and together with the Bank Product Obligations defined below, the "Bank Obligations") extended to or for the benefit of the Debtors, which Credit Facility is governed by the terms and conditions of an Amended and Restated Credit Agreement dated as of July

ORDER APPROVING SALE OF ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, ENCUMBRANCES AND INTERESTS, AND GRANTING OTHER
RELIEF - 7
PDX\119661\221130\AP\20425220.1
134382\285395\46525492.v5

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981

May Notice Exhibits' Page 205

19, 2022, by and among Wells Fargo as agent ("Agent"), the lenders party thereto from time to time (together with Agent, "Lenders") and Debtors (as amended, restated, or otherwise modified from time to time, the "Credit Agreement").  In connection with the Credit Facility, certain Lenders and/or their affiliates provided certain financial products and accommodations to Debtors (as such financial products and accommodations are more fully defined in the Credit Agreement, "Bank Products," and the Lenders or their affiliates providing such Bank Products, the "Bank Product Providers," the agreements entered into from time to time in respect of any Bank Products, the "Bank Product Agreements," and the obligations, liabilities, reimbursement obligations, fees or expenses owing by Debtors to any Bank Product Provider in respect of any Bank Product shall be hereinafter referred to as the "Bank Product Obligations").

R.     The Bank Obligations are secured by substantially all assets of the Debtors and such Lien is senior and prior to all other Liens and claims except the State of Alaska's statutory claim on account of levied and outstanding Fisheries Business Tax liability (together with the Bank Obligations, the "Senior Secured Claims," and the balance of such Senior Secured Claims on the Closing date, the "Senior Secured Claim Balance"), and the Senior Secured Claims must be paid in full at Closing pursuant to the Act, PSA, and the terms of the Auction and Sale Procedures Order.

S.     At Closing, the net sale proceeds shall be paid to satisfy the Senior Secured Claim Balance, with such additional net sale proceeds held by the Receiver in an amount as needed to pay the estimated Administrative Claims.

ORDER APPROVING SALE OF ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, ENCUMBRANCES AND INTERESTS, AND GRANTING OTHER
RELIEF - 8
PDX\119661\221130\AP\20425220.1
134382\285395\46525492.v5

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981

T.    The (i) transfer of the Property to the Final Buyer and (ii) assignment to the Final Buyer of the Assumed Contracts, will not subject the Final Buyer to any liability whatsoever arising under or relating to the Property prior to the Outside Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust, successor or transferee liability. The Receiver has demonstrated that it is an exercise of its sound business judgment to assume and assign the Assumed Contracts to the Final Buyer in connection with the consummation of the Sale, and the assumption and assignment of the Assumed Contracts is the best interests of the Receiver, Seller, the Receivership Estate and its creditors. The Assumed Contracts being assigned to the Final Buyer are an integral part of the Property being purchased by the Final Buyer and, accordingly, such assumption and assignment of Assumed Contracts is reasonable, enhances the value of the Receivership Estate, and does not constitute unfair discrimination.

U.    The PSA was not entered into for the purpose of hindering, delaying or defrauding creditors under the laws of the United States, any state, territory, possession or the District of Columbia.

V.    Immediately prior to the Closing, no common identity of incorporators, directors or stockholders existed between the Final Buyer, on the one hand and the Receiver, on the other hand. Pursuant to the PSA, Final Buyer is not purchasing all of the Receiver's assets and the Final Buyer is not holding itself out to the public as a continuation of the Seller and/or Receivership Estate. The Sale does not amount to a consolidation, merger or *de facto*

ORDER APPROVING SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, AND GRANTING OTHER RELIEF - 9
PDX\119661\221130\AP\20425220.1
134382\285395\46525492.v5

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981

May Notice Exhibits' Page 207

merger of Final Buyer and the Seller and/or the Receivership Estate, there is not substantial continuity between Final Buyer and the Seller, there is no continuity of enterprise between the Final Buyer and the Receiver and/or Seller, the Final Buyer is not a mere continuation of the Seller or the Receivership Estate, and the Final Buyer does not constitute a successor to the Receiver or the Receivership Estate under any theory of successor liability.

W.     The transfer of the Property to the Final Buyer will be a legal, valid, and effective transfer of the Property, and will vest Final Buyer with all right, title, and interest of the Receivership Estate to the Property free and clear of all Liens and of all rights of redemption.

X.     The terms of the PSA, including any amendments, supplements, and modifications thereto, are fair and reasonable in all respects and the terms of this Order shall not modify the terms of the PSA.

It is therefore **ORDERED, ADJUDGED, AND DECREED EFFECTIVE IMMEDIATELY THAT**:

1.     The Receiver's designation of Rodger May as the Prevailing Bidder and the PSA as the Prevailing Bid is GRANTED in its entirety.

2.     Any responses or objections to entry of the Sale Approval Order that have not already been withdrawn or consensually resolved between the affected parties are hereby overruled on the merits and denied with prejudice.

3.     The PSA, substantially in the form attached as Exhibit A to the Prevailing Bid Notice, including any amendments, supplements and modifications thereto, and all of the terms and conditions therein, is hereby approved in all respects.

ORDER APPROVING SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, AND GRANTING OTHER RELIEF - 10
PDX\119661\221130\AP\20425220.1
134382\285395\46525492.v5

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981

May Notice Exhibits' Page 208

4.      Seller is authorized to sell the Property to Final Buyer, as-is, where-is, free and clear of all Liens and of all rights of redemption pursuant to the Act, including without limitation Section 7.60.260, and on the terms set forth in the PSA, as may be amended.

5.      At Closing, Seller is authorized and directed to disburse the net sale proceeds in such amounts necessary to  satisfy the Senior Secured Claim Balance, with such additional net sale proceeds held by the Receiver in an amount reasonably estimated to pay Administrative Claims.

6.      Except as otherwise specifically provided in the PSA, the Final Buyer shall not be liable for any claims against the Receiver, the Seller, the Receivership Estate and/or any of their respective predecessors or affiliates, and the Final Buyer shall have no successor or vicarious liabilities of any kind or character (including, without limitation, any products liability or other claims with respect to any inventory or other Property sold, shipped or delivered on or prior to the Closing Date), whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Receiver, the Seller, the Receivership Estate or any obligations of or claims against the Receiver, the Seller or the Receivership Estate arising at any time, except for the Assumed Liabilities and Assumed Contracts, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the Property prior to the Closing Date.

7.      This Order authorizes Final Buyer and the Receiver, on behalf of Seller, to enforce the PSA, as may be amended, and to consummate the transactions contemplated

ORDER APPROVING SALE OF ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, ENCUMBRANCES AND INTERESTS, AND GRANTING OTHER
RELIEF - 11
PDX\119661\221130\AP\20425220.1
134382\285395\46525492.v5

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981

May Notice Exhibits' Page 209

thereby, and the Seller's and Final Buyer's execution, delivery and performance of the documents related to the transactions are approved.

8.    The transactions are undertaken by the Final Buyer in good faith, as that term is used in Section 7.60.260 of the Act and, accordingly, the reversal or modification on appeal of the authorization provided by this Order to consummate the Sale shall not affect the validity of the Sale to the Final Buyer. The Final Buyer is a purchaser in good faith of the Property, and is entitled to all of the protections afforded by Section 7.60.260 of the Act.

9.    The Receiver and the Seller are authorized to assume and assign the Assumed Contracts and the Intellectual Property Rights (as defined in the PSA) pursuant to RCW 7.60, notwithstanding any provisions that restrict the assignability thereof. The Seller and the Receiver are hereby authorized and directed to (a) assume and assign to the Final Buyer, effective upon the Closing Date of the Sale, the Assumed Contracts free and clear of all Liens and rights of redemption of any kind or nature whatsoever and (b) execute and deliver to the Final Buyer such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts to the Final Buyer.

10.    Pursuant to Section 7.60.260(2) of the Act, upon and after the Closing Date, claims arising out of any Liens and rights of redemption shall be released as against the Property, and shall attach to the net proceeds of the Sale to the same extent, validity and priority as such Liens attached to the Property as the Liens had with respect to the Property as existed on April 22, 2024.

11.    The Receiver is hereby authorized to execute, deliver, file, or record such contracts, instruments, releases and other agreements or documents and take such other actions

ORDER APPROVING SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, AND GRANTING OTHER RELIEF - 12
PDX\119661\221130\AP\20425220.1
134382\285395\46525492.v5

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981

May Notice Exhibits' Page 210

as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Order and the PSA.

12.    On the Closing Date, this Order will be construed and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Property or a bill of sale transferring good and marketable title in such Property to the Final Buyer.  On the Closing Date, this Order also shall be construed and constitute for any and all purposes a complete and general assignment of all right, title and interest of the Seller and the Receivership Estate to the Final Buyer in Assumed Contracts.

13.    All entities who are presently, or on the Closing Date may be, in possession of some or all of the Property are hereby directed to surrender possession of the Property to the Final Buyer on the Closing Date.

14.    Except for the Assumed Liabilities, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade, products liability and other creditors, holding Liens and rights of redemption of any kind or nature whatsoever against or in the Receiver, Seller, the Receivership Estate, or the Property (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated now existing or hereinafter arising), arising under or out of, in connection with, or in any way relating to, the Receiver, Seller, the Receivership Estate, the Property, or the transfer of the Property to the Final Buyer, hereby are forever barred, estopped, and permanently enjoined from asserting against the Final Buyer, its successors or assigns, its property, or the Property, such persons' or entities' encumbrances, claims, security interests, Liens and rights of redemption. For the avoidance of

ORDER APPROVING SALE OF ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, ENCUMBRANCES AND INTERESTS, AND GRANTING OTHER
RELIEF - 13
PDX\119661\221130\AP\20425220.1
134382\285395\46525492.v5

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981

May Notice Exhibits' Page 211

doubt, Final Buyer's acquisition of the KWL Interest is subject to the right of first refusal of both OBI and KWL.

15.     As specifically provided in the PSA, the Receiver will cooperate with the Final Buyer and the Final Buyer will cooperate with the Receiver, in a commercially reasonable manner, in each case to ensure that the transactions are consummated, and the Receiver will make such modifications or supplements to any bill of sale or other document executed in connection with the Closing that is or are reasonably required to facilitate such consummation as contemplated by the PSA.

16.     The Final Buyer shall have no liability or responsibility for any liability or other obligation of the Receiver or the Receivership Estate arising under or related to the Property other than for the Assumed Liabilities and the Assumed Contracts to the extent provided under the PSA. Without limiting the generality of the foregoing, and except as otherwise specifically provided in the PSA, the Final Buyer shall not be liable for any claims against the Receiver or the Receivership Estate, or any of their predecessors or affiliates, and the Final Buyer shall have no successor liabilities (including without limitation product or other liability with respect to any inventory or other assets sold, shipped or delivered prior to the Closing Date) of any kind or character whether known or unknown as of the Closing Date, now existing or hereinafter arising, whether fixed or contingent, with respect to the Receiver or the Receivership Estate or any obligations of the Receiver or the Receivership Estate arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, or in connection with, or in any way relating to the operation of the Business prior to the Closing Date and all parties are hereby forever barred, estopped

ORDER APPROVING SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, AND GRANTING OTHER RELIEF - 14
PDX\119661\221130\AP\20425220.1
134382\285395\46525492.v5

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981

May Notice Exhibits' Page 212

and permanently enjoined from asserting any such claims against the Final Buyer, its successors and assigns or against the Property.

17.     This Court shall retain exclusive jurisdiction to enforce and implement the terms and provisions of the PSA and this Order, all amendments thereto and any waivers and consents thereunder, and of each of the agreements executed in connections therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Property to the Final Buyer free and clear of Liens and rights of redemption, or compel the performance of other obligations owed by the Receiver, (b) compel delivery of the Purchase Price or performance of other obligations owed to the Receiver and Seller, (c) resolve any disputes arising under or related to the PSA, (d) interpret, implement, and enforce the provisions of this Order, and (e) protect the Final Buyer against (i) any claims of successor or products liability related to the Property or Assumed Contracts, or (ii) any Liens and rights of redemption asserted against the Receiver, the Receivership Estate or the Property, of any kind or nature whatsoever, (f) require delivery of any Property or proceeds thereof by the Seller to the Final Buyer, and (g) to resolve the Ketcham-May Port Moller Dispute, if necessary.

18.     The terms and provisions of the PSA and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Receiver, Seller, and their respective affiliates, successors and assigns, their estates, and their creditors, the Final Buyer, and its respective affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting interests in the Property to be sold to the Final Buyer pursuant to the PSA.

ORDER APPROVING SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, AND GRANTING OTHER RELIEF - 15
PDX\119661\221130\AP\20425220.1
134382\285395\46525492.v5

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981

May Notice Exhibits' Page 213

19.     Nothing contained in any order entered in this case subsequent to entry of this Order shall conflict with or derogate from the provisions of the PSA or the terms of this Order.

20.     (IF SO ORDERED BY THE COURT: At Closing, the Final Buyer shall provide a surety bond in the amount of $_____ in favor of John Ketcham as the beneficiary, as cash equivalent security pending this Court's resolution of the Ketcham-May Port Moller Dispute.

21.     Silver Bay Seafoods, L.L.C. and John Ketcham are hereby approved as the Back-Up Bidder, and their Qualified Bid (as modified at the Auction) is hereby approved as the Back-Up Bid.  If for any reason the Final Buyer fails to consummate the transaction contemplated by its Prevailing Bid, the Back-Up Bidder shall (a) automatically be deemed to be the Final Buyer without further notice or order of this Court, (b) be obligated and authorized to consummate the transactions provided in its Back-Up Bid on the terms thereof, and (c) be entitled to the buyer protections described in this Order and under applicable law.

22.     If for any reason Final Buyer is unable or unwilling to consummate the Sale because of breach or failure, without legal excuse, to perform on the part of the Final Buyer (as set forth in the PSA) (a) it will forfeit its Good Faith Deposit to Seller and Seller, through the Receiver, may pursue any and all of their options at law and in equity with respect to such breach (as set forth in the PSA), and (b) the Qualified Bidder making the Back-Up Bid shall be deemed to be the Final Buyer, the purchase price shall be the amount of such Back-Up Bid, and Seller shall be authorized to effectuate the sale(s) without further notice or order of this Court.

23.     The Sale shall not be subject to any bulk sales laws.

ORDER APPROVING SALE OF ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, ENCUMBRANCES AND INTERESTS, AND GRANTING OTHER
RELIEF - 16
PDX\119661\221130\AP\20425220.1
134382\285395\46525492.v5

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981

May Notice Exhibits' Page 214

24.     This Order shall be effective and enforceable immediately upon entry, and any stay of orders provided for in the Act and any other applicable law or rule shall not apply and is otherwise waived.

25.     To the extent applicable, the automatic stay pursuant to Section 7.60.110 of the Act is hereby lifted with respect to the Receiver to the extent necessary, without further order of the Court (a) to allow the Final Buyer to give the Receiver any notice provided for in the PSA, and (b) to allow the Final Buyer to take any and all actions permitted by the PSA.

Dated this ___**3**___ day of October, 2024

By: _____
COMMISSIONER PT

Steve Olsen
Ex Parte
Court Commissioner Pro Tem

ORDER APPROVING SALE OF ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, ENCUMBRANCES AND INTERESTS, AND GRANTING OTHER
RELIEF - 17
PDX\119661\221130\AP\20425220.1
134382\285395\46525492.v5

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981

1

2

3

Presented by:

SCHWABE WILLIAMSON & WYATT,
P.C.

4

5

6

7

*/s/   Lawrence R. Ream*
Lawrence R. Ream, WSBA #18159
Email: lream@schwabe.com
Davis Leigh, WSBA #58825
Email: dbleigh@schwabe.com
1420 5th Avenue, Suite 3400
Seattle, WA 98101

8

9

Attorneys for General Receiver, Stapleton
Group, Inc.

10

11

SUMMIT LAW GROUP, PLLC

12

13

14

15

*/s/ Christopher T. Wion*
Christopher T. Wion, WSBA #33207
chrisw@summitlaw.com
Molly J. Gibbons, WSBA #58357
mollyg@summitlaw.com
315 Fifth Avenue S., Suite 1000
Seattle, WA 98104-2682

16

17

18

19

20

21

22

23

24

25

26

ORDER APPROVING SALE OF ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, ENCUMBRANCES AND INTERESTS, AND GRANTING OTHER
RELIEF - 18
PDX\119661\221130\AP\20425220.1
134382\285395\46525492.v5

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981

# EXHIBIT 7

ØŠÒÖ

ŒŒ Ú×Œ ŒŒ ÁÚT
SŒŐÚÚ VÝ
ÙÚÜ ŒÜÚÜÜ ŠÖÙS
ÒŠÒÖ
ÔŒÚÒ Œ Œ È ǀ ÚŒ

Ex Parte
Date of Hearing: December 23, 2024
Time of Hearing: 1:30 PM

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

FOR THE COUNTY OF KING

| | |
|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, a national banking association, in its capacity as Agent,<br><br>Petitioner,<br><br>vs.<br><br>NORTHWEST FISH COMPANY, LLC, a Washington corporation; PETER PAN SEAFOOD COMPANY, LLC, an Alaska limited liability company, ALASKA FISH HOLDINGS, LLC, a Delaware limited liability company, and RAYMOND MACHINE SHOP, LLC, a Washington limited liability company,<br><br>Respondents. | No. 24-2-08809-1 SEA<br><br>RECEIVER'S OMNIBUS MOTION ALLOWING CLAIMS AND CLAIM AMOUNTS AND ESTABLISHING RELATIVE PRIORITY OF SECURED AND OTHER CLAIMS |

## I.    RELIEF REQUESTED

Stapleton Group, LLC (f/k/a Stapleton Group, Inc.) ("Receiver"), duly appointed general receiver for Northwest Fish Company, LLC; Peter Pan Seafood Company, LLC; Alaska Fish Holdings, LLC; and Raymond Machine Shop, LLC (collectively, "PPSF" or "Respondents"), has determined the relative priority of the claims made against the Receivership Estate. To that end, the Receiver seeks an order of this Court, pursuant to RCW

7.60.230, confirming the Receiver's priority determinations and allowing all claims and claim amounts, as follows herein and as described on Exhibit A ("Claims Exhibit") to the Declaration of David Stapleton in support of this motion ("Stapleton Decl.").

## II.    STATEMENT OF FACTS

### A.    Background

Respondents and Wells Fargo Bank, National Association, as Agent ("Wells Fargo") entered into a series of revolving loans, letters of credit, and other financial accommodations in 2022 (the "Credit Facility"). *See* Declaration of Cameron Scott, Dkt. No. 242, ¶ 9. Respondents defaulted on certain of their obligations owed to Wells Fargo under the Credit Facility. Following this default, Wells Fargo filed a petition for the appointment of Receiver as a general receiver over the Respondents. *See* Dkt. No. 1. On April 25, 2024, the Court granted Wells Fargo's petition and entered the Order Appointing General Receiver (the "Order Appointing Receiver"). *See* Dkt. No. 22. The Order Appointing Receiver was subsequently modified on June 25, 2024 (the "Amended Order Appointing Receiver"). *See* Dkt. No. 85.

Following its appointment through the Order Appointing Receiver, the Receiver began the process of identifying, marketing, and selling the assets of PPSF to pay its creditors. Receiver retained an investment banker, Hilco Corporate Finance, LLC ("HCF"), to assist in its effort to market PPSF's assets to potential buyers. *See* Dkt. No. 108, ¶ 3. An early priority identified by the Receiver in consultation with HCF was accomplishing a sale of certain canned inventory known as the "Brite Stack Assets." *See* Dkt. No. 107. Failure to quickly sell the Brite Stack Assets could have exposed PPSF to significant legal risk due to performance obligations owed by PPSF to the United States Department of Agriculture under a delivery contract which PPSF lacked sufficient inventory to perform. *See* Dkt, No. 109, ¶¶ 5-6. With the Court's approval, the Receiver successfully marketed and sold the Brite Stack Assets for approximately $27.4 million to Silver Bay Seafoods, averting potential liability

against the receivership estate and raising funds for distribution to creditors. *See* Dkt. No. 163.

Following the sale of the Brite Stack Assets, the Receiver concluded that a sale of substantially all of PPSF's remaining assets would be in the best interests of the estate's creditors. On July 30, 2024, the Receiver moved to establish bid and auction procedures and approve the sale of substantially all of PPSF's assets. *See* Dkt. No. 141. Notably, there were *no* objections filed in response to the Receiver's motion. On August 21, 2024, the Court entered its order approving the Receiver's proposed bid and auction procedures, and scheduled a sale approval hearing for October 3, 2024. *See* Dkt. No. 191 (the "Bid Procedures Order"). In support of the auction process, the Receiver and HCF created and administered an extensive sales process by (1) identifying and categorizing the assets of PPSF for sale, (2) targeting, qualifying, and soliciting prospective buyers, and (3) preparing a virtual data room with data accessible by prospective buyers under a non-disclosure agreement. Declaration of Jake DiIorio, Dkt. 142, ¶ 21. As a result of these efforts, the Receiver and HCF solicited 58 qualified buyer targets, negotiated 19 non-disclosure agreements, received 14 indications of interest, and vetted 12 qualified bidders, all of whom actively participated in the auction. Declaration of Jake DiIorio, Dkt. 250, ¶ 3.

Because creditors Wells Fargo, May, Rodger May ("May"), RRG Global Partners Pisces LP ("RRG"), NIF Seafood Holdings, LLC ("NIF"), and John Ketcham ("Ketcham") expressed interest in submitting bids that could include a credit bid component, Receiver examined the relative priority of asserted secured claims so that the specific cash necessary for each creditor to credit bid could be assessed under the second sentence of RCW 7.60.260(3).[1]

---

[1] "A secured creditor who purchases the property from a receiver may offset against the purchase price its allowed secured claim against the property, provided that the secured creditor tenders cash sufficient to satisfy in full all secured claims payable out of the proceeds of sale having priority over the secured creditor's secured claim."

**B.**     **Auction**

Pursuant to the Bid Procedures Order, the Receiver conducted an auction on September 16–18, 2024 for the sale of substantially all of PPSF's remaining assets. *See id.* The Receiver established robust auction procedures, in adherence with the Bid Procedures Order, to ensure maximum value. As a condition to allowing a sale to proceed, Wells Fargo required that any bid for substantially all assets include a cash payment for the full amount of its secured claim ("Wells Fargo Claim"), the funding of a reserve to pay Wells Fargo's obligations as the petitioning creditor ("Wells Fargo Reserve") (the Wells Fargo Claim and the Wells Fargo Reserve are collectively referred to as the "Wells Fargo Secured Claim"), and any claims senior in priority to the Wells Fargo Secured Claim (collectively, the "Minimum Cash Component"). At the beginning of the Auction, Receiver distributed a bid waterfall to all participants that described, *inter alia*, the Minimum Cash Component, along with estimated totals for each component, consisting of:

| Component | Estimated Amount |
|---|---|
| State of Alaska FBT (as defined below) | $3,320,000 |
| Wells Fargo Reserve[2] | $8,181,000 |
| Wells Fargo Claim | $29,192,000 |

At the Auction, the Receiver received (1) a bid from May in the amount of $37,324,000 that included cash to pay the Minimum Cash Component in full and a credit bid component on assets other than the Port Moller Plant, which Receiver accepted and designated the Prevailing Bid and (2) a joint bid from Ketcham and Silver Bay Seafoods in the amount of $37,067,320 that included cash to pay the Minimum Cash Component in full and a credit bid

---

[2]   The Wells Fargo Reserve consisted of estimated wind down costs and professional fees of the receivership, which have priority of distribution over the Wells Fargo Claim because Wells Fargo obtained the appointment of the Receiver. RCW 7.60.230(1)(b) ("[E]xpenses incurred during the administration of the estate have priority over the secured claim of any creditor obtaining or consenting to the appointment of the receiver").

component on the Port Moller Plant, which Receiver accepted and designated the Back-Up Bid. *See* Notice of Conclusion of Auction and Determination of Prevailing Bid and Back-Up Bid filed on September 19, 2024, Dkt. No. 199 ("Auction Conclusion Notice"). In recognition of the continuing Ketcham-May Port Moller Dispute (as defined below), Receiver conditioned its acceptance of May's bid as the Prevailing Bid on May committing to post a bond in an amount determined by this Court to be sufficient to protect Ketcham's disputed contractual subordination rights. Though this Court ultimately declined to require May to post such a bond, the Court retained jurisdiction to resolve the Ketcham-May Port Moller Dispute (as defined below). *See* Sale Approval Order, ¶ 17.

### C. Sale

On October 3, 2024, following oral argument, this Court issued its *Order Approving Sale of Assets Free and Clear of Liens, Claims, Encumbrances and Interests, and Granting Other Relief* (the "Sale Approval Order"). *See* Dkt. No. 264. The Sale Approval Order approved the Prevailing Bid and authorized the Receiver to consummate the sale to the Prevailing Bidder ("Sale"), and, following the Sale, to pay the Minimum Cash Component. *See* Sale Approval Order, ¶¶ R–S. The Sale closed on October 16, 2024.

### D. Priority of Secured Claims

1. Wells Fargo

To secure repayment of the Credit Facility, Respondents granted Wells Fargo a valid, first priority lien on substantially all personal property assets. Wells Fargo's lien was perfected through filing four UCC-1 financing statements on December 31, 2020 and February 4, 2021. *See* Declaration of Gary Harrigian, Dkt. No. 7, Ex. C.

The Receiver determined the Wells Fargo Secured Claim to be a valid and perfected lien on all of Respondents' personal property assets, with priority ahead of all other creditors, other than the State of Alaska's Fisheries Business Taxes, described below. Moreover, as described below, May, NIF, RRG, and Ketcham each agreed that in order for their respective

credit bid rights to arise, the Wells Fargo Secured Claim and all other senior liens must first be paid in full.

Through the operation of the Order Appointing Receiver, Wells Fargo provided cash to fund the day-to-day operations of the Receivership through advances against the Credit Facility, while sweeping any excess funds or collected receivables to reduce the Wells Fargo Secured Claim, which also continued to accrue interest at the contractual rate under the Credit Facility. As a condition to allowing a sale to proceed, Wells Fargo required that any bid for substantially all assets include a cash payment covering the Minimum Cash Component. In accordance with the Sale Approval Order, the Minimum Cash Component was paid at the closing of the sale.

      2.    <u>State of Alaska's Tax Liens</u>

Pursuant to title 43, chapter 75 of the Alaska Statutes, the State of Alaska levies Fisheries Business Taxes ("FBTs") on persons engaged in certain business activities. To comply with AS 43.75.055, on December 29, 2015, Peter Pan Seafoods, Inc. (predecessor in interest to PPSF) recorded a Deed of Trust in Lieu of Cash Bond in favor of the State of Alaska securing the collection of FBTs owed to the state on its real estate at King Cove ("FBT Deed of Trust"). In connection with its acquisition of the business assets of Peter Pan Seafoods, Inc., on December 31, 2020, PPSF recorded an Amendment, Assignment and Assumption of the FBT Deed of Trust. The Receiver determined the secured claim of the State of Alaska for FBTs ("FBT Claim") to be a valid and perfected lien on all of PPSF's personal and real property with priority ahead of all other claims—including the Wells Fargo Secured Claim—under the FBT Deed of Trust and AS 43.10.042(a).[3] In accordance with the Sale Approval Order, the FBT Claim was paid at the closing of the sale.

---

[3] "However, regardless of the date the liens are recorded, <u>a lien arising out of a tax due under AS</u> 43.56 and <u>43.75</u>, including the penalties and interest on the tax, <u>is a lien prior, paramount, and superior to all other liens</u>, mortgages, hypothecations, conveyances, and assignments, <u>upon all the real and personal property of the person liable for the tax</u>, and

On July 15, 2024, the State of Alaska recorded an Alaska Department of Revenue Tax Lien in the Anchorage recording district as No. 2024-018560-0 ("DOR Tax Lien"). The recorded DOR Tax Lien further secured the FBT Claim as well as the State of Alaska's claims based on additional taxes described as Seafood Marketing Assessment, Reg Seafood Development Tax, and Salmon Enhancement Tax ("Remaining State Tax Claim"). The Receiver determined the secured Remaining State Tax Claim to be a valid and perfected lien on all of PPSF's assets, however, the lien is inferior to all other validly perfected liens on PPSF's assets pursuant to AS 43.10.042(a). Given the limited assets remaining in the Receivership Estate, and the $11,008,207 outstanding balance of the May Senior Priority Loan that is a senior secured claim against all remaining assets, it is not likely that any distribution will be made on account of the Remaining State Tax Claim.

      3.    <u>The Owners</u>

      *a.*    *Secured Loans to PPSF*

In or around February 2023, May, RRG, and NIF (collectively, the "Owners") determined that it was necessary to extend loans to PPSF to alleviate concerns about the availability of operating cash. *Interested Parties' Response to Receiver's Conclusion of Auction and Determination of Prevailing Bid and Back-Up Bid*, Dkt. 227, p.4. A first round of lending to PPSF resulted in loans from May in the principal amount of $14,560,812, by RRG of $9,662,747, and by NIF[4] of $8,444,000 (collectively, the "Pari Passu Loans"). May then made additional loans in the principal amount of $17,000,000 between the months of May and July 2023 ("May Senior Priority Loans"). The May Senior Priority Loans and Pari Passu Loans were secured with a lien on all of PPSF's assets, including its personal property and real

---

upon all the real and personal property used with the permission of the owner to carry on the business that is subject to the tax." (emphasis added).

[4]   NIF's loans to PPSF were made by its affiliate NIF Seafood Lender, LLC.

property, pursuant to deeds of trust recorded on May 23, 2023 and UCC-1 financing statements filed on March 28, 2023.

### b.    *May Senior Priority Loans*

In connection with May advancing the May Senior Priority Loans to PPSF, both the Owners and Ketcham agreed that the May Senior Priority Loans amount totaled $17,000,000 in principal plus accrued interest would have priority over each of the Owners' respective Pari Passu Loans (including May's Pari Passu Loan). *See* Stapleton Decl., Exhibit B; Declaration of John Ketcham, Dkt. 230, Exhibit C. The May Senior Priority Loans were secured by a valid and perfected lien on all of PPSF's assets with priority ahead of the Owners' Pari Passu Loans and all other junior or unsecured creditors' claims. Prior to the auction, the Owners agreed that once the Minimum Cash Component was paid in cash, May had the right to credit bid the full amount of the May Senior Priority Loan before any of the Owners could credit bid the respective amounts of their Pari Passu Loans.

### c.    *May Proof of Claim*

On June 21, 2024, May timely served a proof of claim on the Receiver. *See* Stapleton Decl., Ex. C. May asserted four categories of claims: (1) an unsecured employment claim of approximately $66,666.66; (2) a secured claim for May's Pari Passu Loans consisting of $14,655,812, plus accrued interest; (3) a secured claim for the May Senior Priority Loans consisting of $17,250,000, plus accrued interest; and (4) a secured claim for legal fees associated with May's *Pari Passu* Loans and the May Senior Priority Loans totaling $85,560.00. *Id.*, at 4-5. However, upon investigation of these categories of claims, Receiver has determined that the correct principal amount for the May Senior Priority Loan amount is $17,000,000, resulting in a total accrued claim on the date of the auction of $20,528,207. The Receiver also believes that the claimed $85,560 for legal fees is not validly secured by a lien

and should be reclassified as unsecured. The May Senior Priority Loan amount has been further reduced by $9,520,000[5] through the inclusion of that amount as a credit bid through the Sale.

> d.    Owners' Pari Passu Loans

The Owners' Pari Passu Loans were secured by a valid and perfected lien on all of PPSF's assets with priority behind the FBT Claim, the Wells Fargo Secured Claim, and the May Senior Priority Loans, and ahead of all other creditors' claims. Given the limited assets remaining in the Receivership Estate, and the $11,008,207 outstanding balance of the May Senior Priority Loans that is a senior secured claim against all remaining assets, it is not likely that any distribution will be made for the Owners' Pari Passu Loans.

> 4.    John Ketcham

When still additional funding was needed for PPSF to continue operating, John Ketcham ("Ketcham") agreed to provide $10,000,000 of additional financing ("Ketcham Loan") to PPSF pursuant to a Loan Agreement dated July 12, 2023. *See* IP Objection, p.4. The Ketcham Loan was secured with a lien on PPSF's real property located at Port Moller ("Port Moller Plant"), evidenced by a deed of trust recorded in the Aleutian Islands, Alaska recording district on August 14, 2023 ("Ketcham Deed of Trust"), subsequent to the earlier May 23, 2023 recording of the deed of trust securing the May Senior Priority Loans and Pari Passu Loans with the Port Moller Plant.

In connection with the Ketcham Loan and Ketcham Deed of Trust, Ketcham and the Owners entered into a subordination agreement ("Ketcham Subordination Agreement") that is the subject of dispute between Ketcham and May ("Ketcham-May Port Moller Dispute"). Notwithstanding the persisting dispute, Ketcham and the Owners—including May—agreed

---

[5]    While the APA contemplated the Purchase Price ($37,324,000) consisting of a $25,324,000 cash component and a $12,000,000 credit bid component, it also included a provision that would shift some of the credit bid component to cash if more cash was needed to meet the Minimum Cash Component (as defined in the APA). At Closing the Minimum Cash Component equaled $27,804,000, adjusting the final credit bid component to $9,520,000.

that on account of the Ketcham Subordination Agreement, once the Minimum Cash Component was paid in cash, Ketcham would be able to credit bid the amount of his secured claim towards the purchase of the Port Moller Plant, assuming satisfaction of all relevant requirements of RCW 7.60.260. In the Sale Approval Order, this Court retained exclusive jurisdiction "to resolve the Ketcham-May Port Moller Dispute, if necessary." Sale Approval Order, ¶ 17.

The Ketcham Loan was secured by a valid and perfected lien on the Port Moller Plant recorded subsequent to the perfection of the FBT Claim, the Wells Fargo Secured Claim, the May Senior Priority Loans, and the Pari Passu Loans and ahead of all other creditors, but subject to the resolution of the Ketcham-May Port Moller Dispute. Given that the Court has retained jurisdiction to resolve the Ketcham-May Port Moller Dispute, payment to Ketcham on the Ketcham Loan is subject to further determination by this Court.

5.    <u>Fishermen's Liens</u>

Several claimants recorded claims of a fishermen's lien codified at AR 34.35.391. As provided by the statute, such a lien arises as soon as a fisherman delivers fish to a buyer and receives a fish ticket or record of purchase, and attaches to all property of the buyer. AS 34.35.391(a). The lien for each fish delivery is automatically perfected for 90 days after the delivery date, and that perfection is preserved if a claim of lien is recorded in the recording district where the fish was delivered. However, for each fish delivery, if no claim of lien is recorded within the 90 days after that delivery, the lien is no longer perfected and also is deemed to have lapsed entirely. AS 34.35.391(b); *see also Muir Milach Mgmt., LLC v. Kenneth Battley, et al. (In re Adak Fisheries, LLC)*, 459 B.R. 731, 737 (Bankr. D. Alaska 2010) ("If [fishermen's lien claimant] Muir failed to record a claim of lien within 90 days of the date of each fish ticket, its lien for that fish delivery would lapse."). Accordingly, for a fishermen's lien to have priority of payment over a third party's lien, the fish must have been delivered to PPSF prior to the attachment and perfection of the third party lien, *and* the fishermen's lien

must have been preserved by recording a claim of lien within 90 days of the delivery of the fish.

None of the claimants that have either filed proofs of claim asserting a fishermen's lien or recorded notices of a fishermen's lien meet both of those conditions, and as such all have either lapsed or are junior in priority to the liens of the FBT, the Wells Fargo Secured Claims, the May Senior Secured Loans, the Pari Passu Loans, and the Ketcham Loan. *See* Claims Exhibit. Moreover, given the limited assets remaining in the Receivership Estate, and the $11,008,207 outstanding balance of the May Senior Priority Loans that is a senior secured claim against all remaining assets, it is not likely that any distribution will be made to claimants asserting a fishermen's lien.

6.    Packer and Processor Liens

Several claimants recorded claims of packer's and processor's liens codified at AR 34.35.320–385. As provided by the statute, a lien arises in favor of a "person who contributes to the preparation of fish or aquatic animals for food, fish, meal, fertilizer, oil, or other article of commerce by furnishing material or labor for it." AS 34.35.320(a). Such liens attach to both "the fish product or output of the processing plant for which material or labor was furnished, and the plant itself, for the value of labor and material." *In re King Fischer Fisheries, LLC*, 2005 WL 6960221, at *2 (B.A.P. 9th Cir. June 17, 2005) (interpreting AS 34.35.320(a)). However, to claim the benefit of such a lien, a claimant must record notice of that lien within 90 days of the completion of the work or furnishing of material. AS 34.35.330. Furthermore, any such lien only covers work completed or material furnished within the six months prior to the date of recording. AS 34.35.325.

Of the claimants asserting packer's and processor's liens, only one (Coastal Transportation) timely recorded notice—it recorded its notice of lien on December 11, 2023, within 90 days of the completion of the services it provided to PPSF on October 24, 2023.[6]

[6]    While Coastal Transportation also provided services to PPSF prior to October 24, 2023, it

*See* Claims Exhibit. Based on the October 24, 2023 lien attachment date, the Coastal Transportation lien is junior in priority to the liens of the FBT Claim, Wells Fargo Secured Claim, May Senior Secured Loans, the Pari Passu Loans, and the Ketcham Loan. *See id.* Given the limited assets remaining in the Receivership Estate, and the $11,008,207 outstanding balance of the May Senior Priority Loans that is a senior secured claim against all remaining assets, it is not likely that any distribution will be made to claimants asserting packer's and processor's liens. *See* Claims Exhibit.

       7.   <u>Warehouse Liens</u>

All warehouse liens have either been paid or been granted relief from the automatic stay to foreclose their liens on their collateral. For the latter, any remaining portion of the claim is unsecured. *See* Claims Exhibit.

       8.   <u>Toyota Claim</u>

Toyota Industries Commercial Finance ("Toyota") filed a proof of claim asserting a claim of $129,506.27 secured by three forklifts and related attachments, all of which are owned by Toyota and were leased to PPSF pursuant to lease agreements. PPSF has turned Toyota's collateral over to Toyota and will be rejecting the lease agreements, turning Toyota's claim into an unsecured claim for breach of the leases. *See* Claims Exhibit.

     **E.**   **<u>Allowance of Unpaid Claims</u>**

It is Receiver's determination that the total distribution to all remaining unpaid claims will likely be $0, other than some portion of the May Senior Priority Loans and, subject to the resolution of the Ketcham-May Port Moller Dispute, the Ketcham Loan. Accordingly, it is in the best interests of the Receivership Estate that all remaining unpaid claims be allowed as set forth by proof of claim or, where no proof of claim has been filed, as scheduled by the Receiver, provided that, should this Court overrule the Receiver's determination as to lien

received payment in full prior to the appointment of the Receiver on account of all such services.

priority, the Receiver retains the right to object to the amount and validity of any such affected claims.

### III.    DISCUSSION

### A.    The Court Should Affirm the Receiver's Priority Determinations

RCW 7.60.230 governs priority and the payments of claims in a receivership. The statute delineates eight classes of claims. The claimants under RCW 7.60.230(1)(a-c) are paid "in accordance with their respective priorities under applicable law." RCW 7.60.230(1)(a). All other claims are paid on a pro rata basis. RCW 7.60.230(1). The first priority claims are secured creditors with liens that are duly perfected under applicable law. RCW 7.60.230(1)(a). These claims are subject to the Receiver's "reasonable, necessary expenses of preserving, protecting, or disposing of the property to the extent of any benefit to the creditors." *Id.* Importantly, however, if the proceeds from the sale of the collateral securing the loan do not cover the amount of the secured creditor's claim, then that secured creditor's claim is converted to an unsecured claim under RCW 7.60.230(1)(h). *Id.*

The second priority claims are the administrative claims. RCW 7.60.230(1)(b). Administrative claims have priority "over the secured claim of any creditor obtaining or consenting to the appointment of the receiver." *Id.* The third priority of claims are unperfected liens. RCW 7.60.230(1)(c). The fourth through eighth priority of claims address various types of unsecured claims, with the final class being the general unsecured claimant class. RCW 7.60.230(1)(d-h).

The Receiver has undertaken a detailed assessment of all secured claims asserted against the estate to determine their relative priority and right to any distributions from the Receivership Estate. See Claims Exhibit. In this case, given the limited assets remaining in the Receivership Estate, and the $11,008,207 outstanding balance of the May Senior Priority Loans that is a senior secured claim against all remaining assets, all other claims secured by a valid and perfected lien are nonetheless unsecured.

**B.**    **The Court Should Allow All Claims and Claim Amounts**

RCW 7.60.210-220 governs allowance of claims. Any claim that is executed and served in accordance with RCW 7.60.210 "constitutes prima facie evidence of the validity and amount of the claim." RCW 7.60.210(4). Further: "[c]laims properly served upon the general receiver and not disallowed by the court are entitled to share in distributions from the estate in accordance with the priorities provided for by this chapter or otherwise by law." RCW 7.60.220(1). Finally, claims may be allowed, and estate property may be distributed, on written notice. RCW 7.60.190(6)(a, b).

The Receiver requests that the Court issue an order allowing all claims and in the amounts set forth on the Claims Exhibit.

## IV.    CONCLUSION

The Receiver has sold substantially all of PPSF's assets, with only a small number of residual assets remaining. Because the value of the liens against the assets far exceeds the value obtained in the auction, the majority of the secured claims in this case will likely be deemed unsecured and receive no distribution. In fact, the only secured claims at all likely to receive further distributions under RCW 7.60.230(a)(1) are the May Senior Priority Loans and, subject to the resolution of the Ketcham-May Port Moller Dispute, the Ketcham Loan. The Receiver requests the Court enter an order setting the priority of and allowing the claim amounts in accordance with its proposed determinations herein.

/ / / / / /

/ / / / / /

/ / / / / /

*I hereby certify that this motios contains 4,139 words, in accordance with the Local Civil Rules.*

Dated this 20th day of November, 2024.

SCHWABE, WILLIAMSON & WYATT, P.C.

By: <u>*/s/ Lawrence R. Ream*</u>
   Lawrence R. Ream, WSBA #18159
   Email: lream@schwabe.com
   Davis Leigh, WSBA #58825
   Email: dbleigh@schwabe.com
   Molly J. Henry, WSBA #40818
   Email: mhenry@schwabe.com
   Daniel R. Kubitz, WSBA #55512
   Email: dkubitz@schwabe.com
   1420 5th Avenue, Suite 3400
   Seattle, WA 98101
   Telephone: 206-622-1711
   Facsimile: 206-292-0460

   *Receiver, Stapleton Group, Inc.*

# EXHIBIT 8

EXP01

**FILED**

KING COUNTY, WASHINGTON

JAN 0 8 2025

SUPERIOR COURT CLERK
BY Daniel Zeno
DEPUTY

Ex Parte Commissioner
Hearing Date: January 6, 2025
Hearing Time: 1:30 p.m.

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

FOR THE COUNTY OF KING

| | |
|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, a national banking association, in its capacity as Agent, | No. 24-2-08809-1 SEA |
| Petitioner, | **[CLERK'S ACTION REQUIRED]** |
| vs. | [PROPOSED] ORDER REGARDING RECEIVER'S OMNIBUS MOTION ALLOWING CLAIMS AND CLAIM AMOUNTS AND ESTABLISHING RELATIVE PRIORITY OF SECURED AND OTHER CLAIMS |
| NORTHWEST FISH COMPANY, LLC, a Washington corporation; PETER PAN SEAFOOD COMPANY, LLC, an Alaska limited liability company, ALASKA FISH HOLDINGS, LLC, a Delaware limited liability company, and RAYMOND MACHINE SHOP, LLC, a Washington limited liability company, | |
| Respondents. | |

THIS MATTER is before the Court on Receiver's Omnibus Motion Allowing Claims
and Claim Amounts and Establishing Relative Priority of Secured and Other Claims. The
Court has reviewed the following:

    1.    Receiver's Omnibus Motion Allowing Claims and Claim Amounts and
Establishing Relative Priority of Secured and Other Claims, Dkt. No. 336;

    2.    Declaration of David Stapleton in Support of Receiver's Omnibus Motion

ORDER REGARDING RECEIVER'S OMNIBUS MOTION
ALLOWING CLAIMS AND CLAIM AMOUNTS AND
ESTABLISHING RELATIVE PRIORITY OF SECURED AND OTHER
CLAIMS - 1

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

134382\285395\46680977.4

Allowing Claims and Claim Amounts and Establishing Relative Priority of Secured and Other Claims, with exhibits thereto, Dkt. No. 337;

     3.    Declaration of Gary Harrigian, Dkt. No. 7, with exhibits thereto;

     4.    Declaration of Jake DiIorio, Dkt. No. 142;

     5.    Declaration of John Ketcham, Dkt. No. 230, with exhibits thereto;

     6.    Declaration of Cameron Scott, Dkt. No. 242;

     7.    Declaration of J Ari Swiller, Dkt. No. 229;

     8.    Declaration of Robert Gillam, Dkt. No. 231;

     9.    Limited Objection to Receiver's Omnibus Motion Allowing Claims by John Ketcham, RRG and NIF, Dkt. No. 362;

     10.    Declaration of Josh Rataezyk in support of Limited Objection, Dkt. No. 363;

     11.    Rodger May's Response to Receiver's Omnibus Motion Allowing Claims, Dkt. No. 365;

     12.    Receiver's Reply in support of Omnibus Motion Allowing Claims; Dkt. No. 366;

     13.    Declaration of Jake DiIoro, Dkt. No. 367;

     14.    Rodger May's Supplemental Brief re Receiver Omnibus Motion Allowing Claims, Dkt. No. 369;

     15.    Supplemental Response re Receiver's Omnibus Motion Allowing Claims by John Ketcham, RRG and NIF, Dkt. No. 385;

     16.    Declaration of Josh Rataezyk in support of Supplemental Response. Dkt. No. 386;

     17.    Declaration of J. Ari Swiller in support of Supplemental Response. Dkt. No. 387;

     18.    Receiver's Supplemental Briefing in support of Omnibus Motion Allowing

ORDER REGARDING RECEIVER'S OMNIBUS MOTION
ALLOWING CLAIMS AND CLAIM AMOUNTS AND
ESTABLISHING RELATIVE PRIORITY OF SECURED AND OTHER
CLAIMS - 2

SCHWABE, WILLIAMSON & WYATT P C
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

134382\285395\46680977.4

May Notice Exhibits' Page 235

Claims:

19.    Rodger May's Supplemental Response re Receiver's Omnibus Motion Allowing Claims; and

20.    Declaration of Rodger May in support of Supplemental Response.

The Court is familiar with the files and records of this case, and heard argument on Receiver's Omnibus Motion on both December 23, 2024 and January 6, 2025. The Court is fully advised as to the premises of the Motion.

NOW, THEREFORE, it is hereby ORDERED, ADJUDGED, and DECREED that Receiver's Omnibus Motion Allowing Claims and Claim Amounts and Establishing Relative Priority of Secured and Other Claims (the "Motion") is GRANTED in part and DENIED in part as provided in this Order. The Court now FINDS THAT:

A.    The notice provided constitutes sufficient and adequate notice. No other or further notice in connection with the entry of this Order is or shall be required.

B.    Any objections to the Motion, if not withdrawn, are overruled, with the exception of Mr. May's limited objection.

C.    The Receiver's requested relief is appropriate and in the best interests of the Receivership Estate, except as to the proposed resolution of unsecured claims for which no proof of claim was submitted.

The Court further ORDERS:

1.    All unsecured claims for which no proof of claim was submitted are DISALLOWED.

2.    All other claims set forth in the Claims Exhibit, attached as Exhibit A to the Declaration of David Stapleton, and as described in the Motion, are CONFIRMED and ALLOWED in the claim amount described therein. The priority of those claims, as set forth in the Motion and the Claims Exhibit, is CONFIRMED, *provided that, notwithstanding any*

ORDER REGARDING RECEIVER'S OMNIBUS MOTION
ALLOWING CLAIMS AND CLAIM AMOUNTS AND
ESTABLISHING RELATIVE PRIORITY OF SECURED AND OTHER
CLAIMS - 3

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

134382\285395\46680977.4

May Notice Exhibits' Page 236

1  *other provision of this order*, Triple B Corporation dba Rogge Company, Highliner Food

2  Services ("Triple B") is the holder of an allowed trust claim in the amount of $16,964.81

3  pursuant to the Perishable Agricultural Commodities Act, 1930, 7 U.S.C. §§ 499a *et seq.*, for

4  the portion of its claim arising from sales of perishable agricultural commodities, and the

5  Receiver shall pay such claim to Triple B before payment of any other claims allowed by this

6  Order.

7  　　　3.　　For the avoidance of doubt and as detailed further in Receiver's Motion, the

8  relative priority of outstanding claims shall be as follows:

9  　　　　　a.　**First**, expenses incurred during the administration of the Receivership

10  　　　　　　　Estate, subject to court approval where required;

11  　　　　　b.　**Second**, the May Senior Priority Loans, to the extent secured;

12  　　　　　c.　**Third,** the Pari Passu Loans, to the extent secured; and

13  　　　　　d.　**Fourth,** all other allowed claims, subject to further determination of

14  　　　　　　　relative lien priorities among them if any and as needed.

15  　　　4.　　This Order shall be effective immediately upon its entry.

16  Dated this ___ day of _____, 2025.

17

18  　　　　　　　　　　　　　　　Commissioner Jonathon Lack
　　　　　　　　　　The Honorable _____

19  　　　　　　　　　　King County Superior Court Judge/Commissioner

20

21

22

23

24

25

26

ORDER REGARDING RECEIVER'S OMNIBUS MOTION
ALLOWING CLAIMS AND CLAIM AMOUNTS AND
ESTABLISHING RELATIVE PRIORITY OF SECURED AND OTHER
CLAIMS - 4

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

134382\285395\46680977.4

1

Presented by:

2

SCHWABE, WILLIAMSON & WYATT, P.C.

3

4

By:    /s/ Daniel R. Kubitz

5    Lawrence R. Ream, WSBA #18159
Email: lream@schwabe.com

6    Davis Leigh, WSBA #58825
Email: dbleigh@schwabe.com

7    Molly J. Henry, WSBA #40818
Email: mhenry@schwabe.com

8    Daniel R. Kubitz, WSBA #55512
Email: dkubitz@schwabe.com

9    1420 5th Avenue, Suite 3400
Seattle, WA 98101

10    Telephone: 206-622-1711
Facsimile: 206-292-0460

11

Receiver, Stapleton Group, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER REGARDING RECEIVER'S OMNIBUS MOTION
ALLOWING CLAIMS AND CLAIM AMOUNTS AND
ESTABLISHING RELATIVE PRIORITY OF SECURED AND OTHER
CLAIMS - 5

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone 206-622-1711

134382/285395/46680977.4