HONORABLE JAMAL N. WHITEHEAD

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JOHN KETCHAM, an individual,

               Plaintiff,

      v.

RODGER MAY, an individual; and FISH TANK, LLC, an Alaska limited liability company,

               Defendants.

CASE NO. 2:25-cv-01291-JNW

**DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**

NOTED: December 17, 2025

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

**TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................................. 1

II.     FACTS & PROCEDURAL HISTORY ................................................................. 2

        A.      Peter Pan and Its Primary Creditors.......................................................... 2

        B.      Wells Fargo Puts the Company into Receivership ...................................... 3

        C.      The Receivership Court Authorizes the Receiver to Sell Company Assets
                at Auction .................................................................................................. 3

        D.      The Auction, May's Winning Bid, and Ketcham's Losing Bid ................. 4

        E.      Wells Fargo's Approval of the Sale Sealed the Deal and Tied Ketcham's
                Hands ......................................................................................................... 5

                1.      The Wells Fargo Subordination Agreement Strictly Delimits
                        Ketcham's Rights............................................................................. 5

                2.      The Ketcham Subordination Agreement Relied on by Ketcham................. 7

                3.      Ketcham's Rights & Remedies Under the KSA and Deed of Trust
                        Are Subject to and Constrained by the WFSA ............................. 7

        F.      The Receivership Court Enters the Sale Order Over Ketcham's Objections ......... 8

        G.      The Receivership Court Confirms the Amount of May's Priority Loans
                After Accounting for May's Partial Credit Bid at the Auction............................. 9

III.    ARGUMENT ...................................................................................................... 9

        A.      First Cause of Action:  Ketcham Fails to State a Claim for Breach of
                Contract..................................................................................................... 10

        B.      Second and Third Causes of Action:  Ketcham's Remaining Claims Fail
                Because they Are Dependent on His Claim for Breach......................................... 12

IV.     CONCLUSION.................................................................................................... 13

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED
COMPLAINT - i
CASE NO. 2:25-cv-01291-JNW

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## I.    INTRODUCTION

This is a dispute between two creditors of a now-defunct company, Peter Pan Seafoods Company, LLC ("Peter Pan").  Plaintiff John Ketcham's loan was secured by a single asset, a fish-processing facility in Port Moller, Alaska.  Defendant Rodger May's much larger loans were secured by all of Peter Pan's assets.  After Peter Pan was put into receivership by its senior-most lender, Wells Fargo Bank, May purchased the Port Moller facility (and other assets) at a court-approved auction.  Ketcham now alleges that purchase violated his rights.  He is mistaken.

Ketcham's lawsuit turns on contracts he signed in connection with his loan—and the contracts defeat his claims.  Long before the court-approved sale of Peter Pan's assets, Ketcham agreed to a comprehensive subordination framework that strictly limited his rights and remedies and elevated the rights of Wells Fargo and those who acted with bank approval, including May.

Two agreements signed on July 12, 2023 are dispositive.  First, the Wells Fargo Subordination Agreement ("WFSA") subordinates Ketcham's interest in the Port Moller facility to Wells Fargo's senior claims and prohibits Ketcham from opposing any sale of that collateral approved by Wells Fargo.  It also provides for Ketcham's automatic consent to any bank-approved sale and release of his lien.  Second, the Ketcham Subordination Agreement ("KSA")—the centerpiece of Ketcham's breach of contract theory and linchpin to all other claims—does not impose the restrictions on May that he now alleges and, in any event, expressly yields to the WFSA in the event of any conflict.

Against this backdrop, Ketcham's claims collapse.  May submitted the winning bid for Peter Pan's assets in a sale approved by Wells Fargo and the receivership court.  Ketcham can point to no provision of the KSA that barred May's participation in the auction and, in any event, the WFSA would override any such provision.  Likewise, Ketcham released his lien on the real property at Port Moller pursuant to the terms of the WFSA.  Ketcham now asks this Court to create rights he relinquished and undo obligations he undertook, but a party cannot state a viable claim by contradicting the very contracts on which he sues.

Summit Law Group, PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Because Ketcham's contract theory is foreclosed by the plain terms of the governing agreements—and because his remaining claims depend entirely on that defective theory— Ketcham's First Amended Complaint ("FAC") fails to state a claim and must be dismissed.

## II.    FACTS & PROCEDURAL HISTORY

### A.    Peter Pan and Its Primary Creditors

Peter Pan was once one of the largest seafood processing companies in North America, with significant assets and operations in Washington and Alaska.  Due to a perfect storm of factors largely impacting the entire industry since COVID, the company also accumulated substantial debts.  As of April 2024, the company owed more than $100 million to three of its largest secured creditors:  May, Ketcham, and Wells Fargo.

In 2023, May loaned Peter Pan <u>more than $31,500,000</u>.  Specifically, in or around February 2023, May loaned the company in excess of $14,500,000 (the "Pari Passu Loans"), followed by a second round in or around May 2023, of $17,000,000 (the "May Senior Priority Loans").  *See* Rodger May's Request for Judicial Notice ("May Notice"), Dkt. 10, Ex. 7, p.224; Ex. 8, p.236 *see also* Declaration of Christopher Wion ("Wion Decl."), Ex. 2, p.28.[1]  "The May Senior Priority Loans and Pari Passu Loans were secured with a lien on all of PPSF's asserts, including its personal property and real property, pursuant to deeds of trust recorded on May 23, 2023 and UCC-1 financing statements filed on March 28, 2023."  May Notice, Ex. 7, pp.224-225; Ex. 8, pp.236-237.

Also in 2023, Ketcham loaned <u>$10 million</u> to Peter Pan, secured by a deed of trust ("Ketcham Deed of Trust") on certain real property located in Port Moller, Alaska (the "Port Moller Real Property").  FAC, ¶11.

Wells Fargo's secured loans were even more substantial, exceeding <u>$60 million</u>.

---

[1] All 238 pages of the eight (8) exhibits to the May Notice have been numbered sequentially, with page numbers added to the footer.  The same convention is used for all 65 pages of the three (3) exhibits to the Wion Declaration.

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED
COMPLAINT - 2
CASE NO. 2:25-cv-01291-JNW

Summit Law Group, PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

**B.    Wells Fargo Puts the Company into Receivership**

In April 2024, Wells Fargo successfully put Peter Pan into receivership, in King County Superior Court Case No. 24-2-08809-1SEA (the "Receivership").  FAC, ¶17; May Notice, Ex. 1 (Order Appointing General Receiver).

The Receivership Court found that Peter Pan and its affiliates "lack the ability to pay their debts as they come due, or to continue operations in the ordinary course and to maintain and preserve the Collateral."  *Id.*, ¶C.  The Receivership Court appointed the Stapleton Group, Inc. to serve as general receiver ("Receiver"), "with respect to Debtors' operations …, assets and all tangible and intangible real and personal property, including but not limited to the Collateral …, wherever located and with respect to all products and proceeds thereof, with authority to take exclusive possession and control of the Assets pursuant to the terms of this Order and RCW 7.60 et. Seq. (the 'Receivership')."  *Id.*, ¶1.  The Receiver was authorized to "sell or lease the Assets, whether in bulk, or in parts, and whether as a going concern or by liquidation, and wherever located[.]"  *Id.*, ¶4.a.

**C.    The Receivership Court Authorizes the Receiver to Sell Company Assets at Auction**

On July 30, 2024, the Receiver filed Receiver's Motion for Order:  (1) Approving Bid and Auction Procedures; (2) Scheduling Hearing to Approve Sale of Assets; and (3) Approving Assumption and Assignment of Executory Contracts ("Bid Procedures Motion").  FAC, ¶18; *see also* May Notice, Ex. 2.  The Bid Procedures Motion states, among other things, that "Respondents [including Peter Pan], by and through the Receiver, seek to sell the Assets through a bid and auction process" and that the "sale(s) of the Assets shall be free and clear of any and all Liens[.]"  May Notice, Ex. 2, p.29.  The Bid Procedures Motion identified various Peter Pan facilities, including those located in Alaska (in Dillingham, King Cove, and Port Moller), as among the Assets being sold.  *See id.*, p.27; Schedule 1.

On August 21, the Receivership Court entered a 14-page order ("Bid Procedures Order") granting the Bid Procedures Motion "in its entirety."  FAC, ¶19; May Notice, Ex. 3.

S<small>UMMIT</small> L<small>AW</small> G<small>ROUP</small>, PLLC
315 F<small>IFTH</small> A<small>VENUE</small> S<small>OUTH</small>, S<small>UITE</small> 1000
S<small>EATTLE</small>, W<small>ASHINGTON</small> 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

**D.      The Auction, May's Winning Bid, and Ketcham's Losing Bid**

On September 16-18, the "Auction" took place.  FAC, ¶27.  At the Auction, May submitted a package bid for all of Peter Pan's Assets, consisting of both a cash component and a credit component, totaling $37,324,000.  FAC, ¶28.  For his part, Ketcham submitted a credit bid for the Port Moller Property in the amount of $11,743,320 as well as an alternative package bid for all Assets, by combining his credit bid with a cash bid from Silver Bay Seafoods.  FAC, ¶¶24-25.

The Receiver deemed May's package bid for all Assets to be the prevailing bid at the conclusion of the Auction.  FAC, ¶33.

On September 19, the Receiver filed a Notice of Conclusion of Auction and Determination of Prevailing Bid and Back-up Bid ("Sale Notice").  May Notice, Ex. 4.  The Sale Notice identifies May as the "Prevailing Bidder" and explains that:

> [the Receiver] has concluded the action contemplated by the Bid Procedures Order and has determined that the bid in the amount of $37,324,000 submitted by Rodger May (the "Prevailing Bidder") constitutes the Prevailing Bid, and that the bid in the amount of $37,067,320 submitted by Silver Bay Seafoods, L.L.C. (the "Back-Up Bidder"[2]) constitutes the Back-Up Bid.

*Id*., pp.69-70.

The Sale Notice attaches May's Purchase and Sale Agreement as Exhibit A ("May PSA").  *See id*.  The May PSA includes a "Purchase Price Allocation table" (May Notice, Ex. 4, Table 1 pp.77-78) listing an allocation of $9,000,000 in cash for the Port Moller (a) real property & fixtures, plus (b) equipment & machinery, and reflecting that May did NOT credit bid for those assets:



| | |
|---|---|
| | Total Purchase Price: ~~$1,000,000~~ |
| | *(Real Property & Fixtures)* |
| Port Moller Processing Plant, including all real property, equipment, machinery, and fixtures, but excluding supplies | Cash Amount:  $250,000 |
| | Credit Bid: |
| | Total Purchase Price: $250,000 |
| | *(Equipment & Machinery)* |
| | Cash Amount:  $8,750,000 |
| | Credit Bid: |
| | Total Purchase Price: $8,750,000 |

---

[2] To be more precise, the Back-Up Bid actually refers to the joint bid submitted by Ketcham and Silver Bay.

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED
COMPLAINT - 4
CASE NO. 2:25-cv-01291-JNW

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**E.    Wells Fargo's Approval of the Sale Sealed the Deal and Tied Ketcham's Hands**

When Wells Fargo petitioned for appointment of the Receiver, the bank made sure to preserve all of its rights as Peter Pan's senior secured creditor.  May Notice, Ex. 1, ¶32 ("This Order shall not stay or otherwise impact Agent's [Wells Fargo's] enforcement of its security interest in the Collateral and rights under the Security Instruments.")

On October 1, Wells Fargo filed a brief "in support of the entry of an order … approving the sale of the estate's assets to Rodger May as the highest and best bidder at the court-approved auction[.]"  May Notice, Ex. 5.  Wells Fargo extensively referenced certain subordination agreements governing Wells Fargo's, May's, and Ketcham's "relative rights and priorities" and requested "that the Court approve the Prevailing Bid and authorize and direct the Receiver to satisfy [Wells Fargo's] Senior Claims at Closing."  May Notice, Ex. 5, pp.185, 189.

**1.    The Wells Fargo Subordination Agreement Strictly Delimits Ketcham's Rights**

On July 12, 2023, Ketcham entered into a Subordination and Intercreditor Agreement with Wells Fargo (the "Wells Fargo Subordination Agreement" or "WFSA").  Wion Decl., Ex. 1.  The WFSA subordinates Ketcham's debt to Wells Fargo's senior debt.  *Id.*, §2.

Under § 2.2, Ketcham agreed not to oppose any sale of Peter Pan's assets "free and clear of security interests [or] Liens" approved by Wells Fargo or otherwise assert any rights he might have in connection with such a sale:

**Section 2.2 (Liquidation, Dissolution, Bankruptcy)**

In the event of any Proceeding involving any Company:

…

(d)…Subordinated Creditor [Ketcham] agrees that it will consent to (and will be deemed to have consented to), and not object to or oppose, a sale or other Disposition of any property securing all of [sic] any part of any Senior Debt or Subordinated Debt free and clear of security interests, Liens or other claims of Subordinated Creditor under the Bankruptcy Code, including Sections 363, 365 and 1129 of the Bankruptcy Code, if Agent [Wells Fargo] has consented to such sale or Disposition.  Subordinated Creditor agrees

not to assert any right it may have in any Proceeding arising from any Company's use, sale or other Disposition of Collateral[.]

Section 2.4 is a standstill provision prohibiting Ketcham from taking any "Enforcement Action"[3] based on his junior creditor rights unless authorized by Wells Fargo:

**Section 2.4 (Subordinated Debt Standstill Provisions; Subordinated Debt Default; Enforcement)**

(a) Except [if instructed by Wells Fargo] under Section 2.4(c), until the Senior Debt is paid in full, Subordinated Creditor [Ketcham] shall not, without the prior written consent of Agent [Wells Fargo], take any Enforcement Action with respect to the Subordinated Debt, the Company or Collateral or under any of the Subordinated Debt Documents or applicable law.

Section 2.6 reflects Ketcham's automatic release of his lien upon Peter Pan's sale of the Port Moller Real Property approved by Wells Fargo, enforceable by any purchaser of the property:

**Section 2.6 (Subordination of Liens and Security Interests; Agreement Not to Contest; Sale of Collateral; Release of Liens)**

In the event that a Company desires to sell, lease, license or otherwise dispose of any interest in any of the Collateral (including the equity interests of a Company and any Specified Real Property Collateral[4]) and Agent [Wells Fargo] consents to such Disposition, Subordinated Creditor [Ketcham] shall be deemed to have consented to such Disposition and such Disposition shall be free and clear of any Liens and security interests of Subordinated Creditor in such Collateral...and any purchaser of any Collateral may rely on this Agreement as evidence of Subordinated Creditor's consent to such Disposition and that such Disposition is free and clear of any Liens and security interests of Subordinated Creditor in such Collateral[.]

…

If Agent releases any of its Liens and security interest on any part of the Collateral (or such Liens and security interests are released by operation of law), whether in connection with an exercise of

---

[3] "Enforcement Action" includes: "(b) to initiate or participate with others in any suit, action or proceeding against any Company"; "(d) to take any action to enforce any rights or remedies with respect to the Subordinated Debt"; "(g) to take any action under the Subordinated Creditors Subordination Agreement [*i.e.*, the Ketcham Subordination Agreement] or to exercise, or commence judicial enforcement, of any of the rights and remedies under the Subordinated Creditors Subordination Agreement." WFSA, p.4.

[4] "Specified Real Property Collateral" refers to the Port Moller real property purportedly subject to Ketcham's lien. WFSA, p.7.

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT - 6
CASE NO. 2:25-cv-01291-JNW

Summit Law Group, PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

remedies or otherwise, then the Liens and security interest of Subordinated Creditor on such Collateral shall automatically, unconditionally and simultaneously be released[.]

### 2.    The Ketcham Subordination Agreement Relied on by Ketcham

The WFSA repeatedly references a *separate* subordination agreement between Ketcham and May.  *See, e.g.*, Wion Decl., Ex. 1, ¶¶D-F.  Both Ketcham's Complaint and this Motion refer to that agreement as the "Ketcham Subordination Agreement" (or "KSA").  FAC, ¶12.  Like the WFSA, the KSA was executed on July 12, 2023.  *Id.*  The KSA is the agreement on which Ketcham bases his claim for breach of contract.  FAC, ¶¶43-48; Wion Decl., Ex. 2.

The KSA provides for subordination of May's existing Peter Pan loans <u>other than</u> his $17,000,000 in Priority Loans.  Wion Decl., Ex. 2, §3 ("The term 'Subordinated Indebtedness' shall mean all Existing Indebtedness other than the 'Priority Loans' in aggregate principal amount of $17,000,000[.]").  The KSA also provides for subordination of the lien created by May's "Existing Deed of Trust" on the Port Moller Real Property to the lien on that same property arising from the Ketcham Deed of Trust.  *Id.*, §4.

In his Complaint, Ketcham also makes passing references to KSA Sections 7, 8, 9.a, and 11.  FAC, ¶¶13-16, 36.  While each of these provisions is addressed below, Ketcham's core claim for breach of contract appears to be based on KSA Section 13, which references Ketcham's "rights and remedies" under his Deed of Trust (FAC, ¶¶15, 46):

> <u>Section 13:</u>
>
> The Subordinating Parties agree that they will not take any action that will impede, interfere with or restrict or restrain the exercise by the Ketcham Lender of rights and remedies under the Ketcham Deed of Trust and will take such commercially reasonable actions as the holder of the Existing Deed of Trust as may be reasonably necessary or appropriate to effectuate the subordination provided in this Agreement.

### 3.    Ketcham's Rights & Remedies Under the KSA and Deed of Trust Are Subject to and Constrained by the WFSA

The Ketcham Deed of Trust, executed on the same day as the KSA and the WFSA,

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED
COMPLAINT - 7
CASE NO. 2:25-cv-01291-JNW

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

purports to create a lien on the Port Moller Real Property.  FAC, ¶11; Wion Decl., Ex. 3.

However, by its own terms, <u>all</u> of Ketcham's rights and remedies under the Deed of Trust are

subject to the Wells Fargo Subordination Agreement:

> Anything herein to the contrary notwithstanding, this Deed of Trust, the liens and rights granted to Trustee or Beneficiary pursuant to this Deed of Trust, and the exercise of any right or remedy of Trustee or Beneficiary with respect hereto, are subject to the provisions of that certain Subordination and Intercreditor Agreement … by and among the Beneficiary, Grantor and Wells Fargo Bank….

Wion Decl., Ex. 3, §6.01.  *See also id*., §6.02 (the terms of the WFSA "shall govern and control"

in the event of any conflict).

Likewise, both the WFSA and the KSA explicitly state that "in the event of any conflict

between any term, covenant or condition" in the WFSA and the KSA, the provisions of the WFSA

"shall control and govern."  Wion Decl., Ex. 1, §21; Ex. 2, §14[5].

**F.    The Receivership Court Enters the Sale Order Over Ketcham's Objections**

Despite the terms of the WFSA barring Ketcham's objection to any sale supported by

Wells Fargo, Ketcham objected to the sale to May.  FAC, ¶¶30-33.

On October 3, 2024, the Receivership Court issued its "Sale Order" approving May's

package bid.  FAC, ¶35; May Notice, Ex. 6.  The Sale Order finds and concludes that:

> The transfer of the Property to the Final Buyer will be a legal, valid, and effective transfer of the Property, and will vest Final Buyer with all right, title, and interest of the Receivership Estate to the Property free and clear of all Liens and of all rights of redemption.
>
> ….
>
> Seller is authorized to sell the Property to Final Buyer, as-is, where-is, free and clear of all Liens….

May Notice, Ex. 6, pp.10-11.  The Sale Order also approved the May PSA "in all respects" and

allowed May "to take any and all actions permitted by the PSA."  *Id*., pp.208, 215.

---

[5] Confusingly, while both Ketcham's FAC and this Motion refer to the agreement between May-Ketcham as the "Ketcham Subordination Agreement", the Ketcham Subordination Agreement itself uses that very same term to refer to the agreement between Wells Fargo-Ketcham (designated here as the "Wells Fargo Subordination Agreement").

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED
COMPLAINT - 8
CASE NO. 2:25-cv-01291-JNW

Summit Law Group, PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

**G.**    **The Receivership Court Confirms the Amount of May's Priority Loans After Accounting for May's Partial Credit Bid at the Auction**

On November 20, 2024, the Receiver filed its Omnibus Motion Allowing Claims and Claim Amounts and Establishing Relative Priority of Secured and Other Claims ("Omnibus Motion"). May Notice, Ex. 7. The Omnibus Motion recites that the balance of May's Senior Priority Loans stood at $20,528,207 on the date of the Auction, which amount was "reduced by $9,520,000" as a result of May's having applied a portion of his Senior Priority Loans to credit bid at the Auction. *Id*., p.224, n.5. The motion further recites that "the $11,008,207 outstanding balance of the May Senior Priority Loans … is a senior secured claim against all remaining asserts[.]" *Id*., p.228. The Receivership Court granted the Omnibus Motion, confirming the amount and priority of the May Senior Priority Loans. Wion Decl., Ex. 8, p.236.

### III.  ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Ashcroft*, 556 U.S. at 678. Rather, a complaint must contain factual allegations "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 555). When considering a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the court may consider the pleadings, documents attached to pleadings, documents incorporated therein or necessarily relied upon, and matters of judicial notice – including "matters of public record" that could not reasonably be disputed. *See United States ex rel. Lee v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011); *Swartz v. KPMG  LLP*, 476 F.3d 756, 763 (9th Cir. 2007).   "A dismissal under Rule 12(b)(6) for failure to state a claim can be based on either: (1) the lack of a cognizable legal theory; or (2) the absence of sufficient factual allegations to support a cognizable legal

1  theory." *Feins v. Goldwater Bank NA*, No. CV-22-00932-PHX-JJT, 2022 WL 17552440 (D. Ariz.

2  Dec. 9, 2022) (citing *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).

3       Ketcham's First Amended Complaint fails to state any claim satisfying this standard.  In

4  light of the plain terms of the operative agreements incorporated by reference therein and necessarily

5  relied on, as well as matters of public record subject to judicial notice, Ketcham's claims must be

6  dismissed.

7  **A.    First Cause of Action:  Ketcham Fails to State a Claim for Breach of Contract**

8       Ketcham's claim that May breached the Ketcham Subordination Agreement fails for at

9  least two reasons.  First, there is nothing in the KSA that restricted May from bidding on the Port

10  Moller Real Property at the Receiver's court-authorized Auction, because May did not credit bid

11  his subordinated debt.  Second, even if it did, the Wells Fargo Subordination Agreement

12  superseded any such restriction.

13       In his Complaint, Ketcham cites six provisions of the KSA – Sections 4, 7, 8, 9.a, 11, and

14  13.  FAC, ¶¶ 13-16, 36.  Ketcham fails to state a claim that May breached any of these provisions.

15       KSA Sections 4 and 7 address subordination of May's lien on the Port Moller Real

16  Property.  FAC, ¶ 13; KSA, §§ 4, 7.  Not only does Ketcham fail to allege that May used his

17  existing lien on the Port Moller Real Property to credit bid at the Auction, the public filings in the

18  Receivership would dispose of such allegation; he paid cash for that asset.  *See supra*, Section

19  II.D.  For the other Peter Pan assets that May acquired at the Auction, May used credit tied to his

20  Priority Loans that was never subordinated – the KSA expressly defines "Subordinated

21  Indebtedness" to exclude May's $17,000,000 in Priority Loans.  Wion Decl., Ex. 2, §3.  Ketcham

22  fails to state a claim for breach of KSA §4 or §7.

23       KSA Sections 8 and 9.a address Ketcham's and May's relative rights to the *proceeds* from

24  the sale of the Port Moller Real Property.  FAC, ¶¶ 14, 36; KSA, §§ 8, 9.a.  However, Ketcham

25  does not allege that May received any proceeds.  Rather, Ketcham alleges that *the Receiver* (and

26

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

by extension, the Receivership Court) "has refused, despite requests, to specifically allocate any cash proceeds to the Port Moller Property or to Ketcham's first-priority lien…."  FAC, ¶ 36.

Ketcham's suggestion that May's purchase of the Port Moller Real Property at the Auction was a "Distribution" prohibited by KSA § 9.a, also misses the mark.  FAC, ¶¶36, 45.  Section 9.a relates to Distributions "with respect to the Subordinated Indebtedness" which is inapplicable to May's cash purchase of the Port Moller Real Property and his credit bid for non-Port Moller assets using Priority Loans exempt from subordination.  Wion Decl., Ex. 2. §9.a ("Any Distributions or other proceeds of any Enforcement Action obtained by any Subordinating Party <u>with respect to the Subordinated Indebtedness</u> shall in any event be held in trust for the benefit of the Ketcham Lender….") (emphasis added).  Ketcham fails to state a claim for breach of KSA §8 or §9.a.

<u>KSA Section 11</u> does not establish any substantive right or obligation that Ketcham asserts May breached; §11 addresses only timing issues – *when* the rights and obligations established elsewhere in the KSA come into, or remain in, effect.  FAC, ¶16; Wion Decl., Ex. 2, §11.  Ketcham fails to state a claim for breach of KSA §11.

<u>Which leaves only KSA Section 13</u> – the provision Ketcham claims barred May from bidding on the Port Moller Real Property at the Auction.  FAC, ¶¶15, 46.  The relevant portion of §13 provides that "[t]he Subordinating Parties agree that they will not take any action that will impede, interfere with or restrict or restrain the exercise by the Ketcham Lender of rights and remedies under the Ketcham Deed of Trust[.]"  Wion Decl., Ex. 2, §13.

*First*, to the extent that the Deed of Trust created a lien that allowed Ketcham to credit bid on the Port Moller Real Property, it is undisputed that Ketcham exercised that right.  FAC, ¶24 ("On September 10. 2024, Ketcham submitted his credit bid for the Port Moller Property in the amount of $11,743,320.")  The Receiver accepted Ketcham's credit bid as presented – May did not impede the bid, interfere with the bid, restrict the bid, or restrain the bid.  The Receiver simply determined (and the Receivership Court agreed) that May's Package Bid for all assets at the Auction was the highest and best option for the estate.  The <u>right to bid</u> at a receiver's sale under

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED
COMPLAINT - 11
CASE NO. 2:25-cv-01291-JNW

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

1  RCW 7.60.260(3) is not the same as the <u>right to win</u>, where higher and better bids are available.

2  Receivership sales are intended to maximize value for the debtor's estate and any restriction on the

3  ability of a party to participate in a receiver's public auction would undermine that goal.

4      *Second*, even if the Deed of Trust could be interpreted as establishing an absolute right to

5  prohibit May from bidding on the Port Moller Real Property at all, such a right would directly

6  conflict with the superseding terms of the Wells Fargo Subordination Agreement.  Namely, §2.2,

7  §2.4, and §2.6 of the WFSA provided for Ketcham's automatic consent to any sale of Peter Pan's

8  property approved by Wells Fargo and prohibited Ketcham from objecting to, opposing, or

9  otherwise challenging such a sale based on his junior creditor rights.  *See supra*, Sections II.E.1, 3.

10  **B.     Second and Third Causes of Action:  Ketcham's Remaining Claims Fail Because they
         Are Dependent on His Claim for Breach**

11

12      Because Ketcham fails to state a claim for breach of contract, his remaining claims also fail

13  and must be dismissed.

14      For Ketcham's <u>second cause of action</u>, seeking reinstatement of his lien on the Port Moller

15  Real Property, Ketcham relies on §11 of the KSA.  FAC, ¶¶50-52.  Even if Ketcham were correct

16  that §11 somehow preserved his lien despite the court-approved sale of that property to May "free

17  and clear" of *all* liens, such a provision would directly conflict with, and be superseded by, the

18  contrary provisions of the WFSA.  Specifically, §2.2 and §2.6 of the WFSA provide for the

19  automatic release of Ketcham's lien upon any sale of the Port Moller Real Property approved by

20  Wells Fargo.  *See supra*, Section II.E.1.

21      For Ketcham's <u>third cause of action</u>, seeking to void the transfer of the Port Moller Real

22  Property to May's assignee, Defendant Fish Tank, Ketcham mistakenly presupposes the success of

23  his contract arguments against May.  FAC, ¶54.  However, because Ketcham has failed to state a

24  claim against May for breach of the KSA, Ketcham has failed to allege anything wrongful about

25  May's transfer of the property to Fish Tank following the Sale Order.  Both the May PSA and the

26  Sale Order expressly authorized such assignment.  May Notice, Ex. 4, p.88-89; Ex. 6, pp.208, 215.

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED
COMPLAINT - 12
CASE NO. 2:25-cv-01291-JNW

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

## IV.  CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiff's First Amended Complaint, with prejudice.

*I certify that this memorandum contains 4,356 words, in compliance with the Local Civil Rules.*

DATED this 19th day of November, 2025.

SUMMIT LAW GROUP, PLLC
*Attorneys for Defendants Rodger May and Fish Tank, LLC*

By *s/ Christopher T. Wion*
Christopher T. Wion, WSBA #33207
chrisw@summitlaw.com

By *s/ Molly J. Gibbons*
Molly J. Gibbons, WSBA #58357
mollyg@summitlaw.com
315 Fifth Avenue S., Suite 1000
Seattle, WA 98104-2682
Tel: 206-676-7000

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED
COMPLAINT - 13
CASE NO. 2:25-cv-01291-JNW

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001