HONORABLE JAMAL N. WHITEHEAD

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JOHN KETCHAM, an individual,

                    Plaintiff,

       v.

RODGER MAY, an individual; and FISH
TANK, LLC, an Alaska limited liability
company,

                    Defendants.

CASE NO. 2:25-cv-01291-JNW

**DECLARATION OF CHRISTOPHER T. WION IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

1.     I am a partner with Summit Law Group, PLLC, and an attorney licensed to practice in the State of Washington. I am over the age of 18 and am competent to testify to the following facts.

2.     I make this Declaration in support of Defendants' Motion to Dismiss ("Motion").

3.     Attached hereto as **Exhibit 1** is a true and correct copy of the July 12, 2023, Subordination and Intercreditor Agreement by and among John Ketcham, Peter Pan Seafood Company, LLC, Northwest Fish Company, LLC, Alaska Fish Holdings, LLC, Raymond Machine Shop, LLC and Wells Frago Bank, National Association, referred to in the Motion as either the "Wells Fargo Subordination Agreement" or "WFSA". As detailed in the Motion, the Wells Fargo Subordination Agreement is an incorporated part of the documents on which Ketcham bases his claims for relief, which documents are described below and attached as Exhibits 2 and 3 hereto.

DECLARATION OF CHRISTOPHER T. WION IN SUPPORT
OF DEFENDANTS' MOTION TO DISMISS - 1
CASE NO. 2:25-cv-01291-JNW

4.       Attached hereto as **Exhibit 2** is a true and correct copy of the July 12, 2023 Subordination Agreement by and between RRG Global Partners Pisces, L.P., Rodger May, NIF Seafood Lender, LLC, John Ketcham and Peter Pan Seafood Company, LLC, referred to in Ketcham's First Amended Complaint ("FAC") as the "Ketcham Subordination Agreement" (*see, e.g.,* FAC, ¶¶12-16, 31, 36, 44-47) and referred to in the Motion as either the "Ketcham Subordination Agreement" or "KSA".

5.       Attached hereto as **Exhibit 3** is a true and correct copy of the August 14, 2023, Deed of Trust filed in Recording District 305-Aleutian Islands, AK under recording number 2023-000209-0 and referred to as the "Ketcham Deed of Trust" in both the Motion and in Ketcham's FAC.  *See, e.g.,* FAC, ¶¶11, 13, 16, 32, 46.

I hereby certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signed this 19th day of November, 2025 at Seattle, Washington.

_____
Christopher T. Wion

4935-8505-2539, v. 1

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

# EXHIBIT 1

## SUBORDINATION AND INTERCREDITOR AGREEMENT

THIS SUBORDINATION AND INTERCREDITOR AGREEMENT (this "Agreement") is entered into as of this 12th day of July, 2023, by and among (i) **JOHN KETCHAM**, an individual residing in the State of California ("Subordinated Creditor"), (ii) **PETER PAN SEAFOOD COMPANY, LLC**, an Alaska limited liability company ("Peter Pan Borrower"), **NORTHWEST FISH COMPANY, LLC**, a Washington limited liability company ("Fish Borrower", and together with Peter Pan Borrower, collectively, the "Borrowers", and each individually, a "Borrower"), **ALASKA FISH HOLDINGS, LLC**, a Delaware limited liability company ("Holdings"), and **RAYMOND MACHINE SHOP, LLC**, a Washington limited liability company ("Raymond"; and together with Borrowers and Holdings, collectively, the "Companies" and each individually a "Company") and (iii) **WELLS FARGO BANK, NATIONAL ASSOCIATION**, a national banking association, as Agent for all Senior Lenders party to the Senior Credit Agreement described below and all Bank Product Providers.

## R E C I T A L S

A.    The Companies, Agent and Senior Lenders have entered into an Amended and Restated Credit Agreement dated as of July 19, 2022 (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Senior Credit Agreement"), pursuant to which, among other things, Senior Lenders have agreed, subject to the terms and conditions set forth in the Senior Credit Agreement, to make certain loans and financial accommodations to the Companies.  All of the Companies' obligations to Agent and Senior Lenders under the Senior Credit Agreement and the other Senior Debt Documents are secured by liens on and security interests in the Collateral (as hereinafter defined) other than the Specified Real Property Collateral.

B.    The Companies may from time to time obtain Bank Products (as hereinafter defined) and become liable for the Bank Product Obligations (as hereinafter defined) secured by liens and security interests in the Collateral.

C.    Peter Pan Borrower and Subordinated Creditor have entered into that certain Loan Agreement, dated as of July 12, 2023 (as the same may be amended, supplemented or otherwise modified from time to time as permitted hereunder, the "Subordinated Loan Agreement"), pursuant to which Subordinated Creditor has extended credit to Peter Pan Borrower as evidenced by that certain Subordinated Secured Promissory Note, dated as of July 12, 2023 in the original principal amount of $10,000,000.00, issued by Peter Pan Borrower in favor of Subordinated Creditor (as the same may be amended, supplemented or otherwise modified from time to time as permitted hereunder, the "Subordinated Note").  Peter Pan Borrower's obligations to Subordinated Creditor under the Subordinated Note is secured by liens and security interests in the Specified Real Property Collateral.

D.    Peter Pan Borrower, RRG Global Partners PISCES, L.P., a Delaware limited partnership ("RRG"), Rodger May, an individual residing in the State of Washington ("May"), and NIF Seafood Lender, LLC, a Delaware limited liability company ("NIF" and together with RRG, May and any other Person that becomes a subordinated creditor under the defined below Junior Subordination Agreement in accordance with the terms thereof, collectively, the "Junior

Subordinated Creditors" and each, a "<u>Junior Subordinated Creditor</u>") have entered into that certain Amended and Restated Loan Agreement, dated as of May 23, 2023 (as the same may be amended, supplemented or otherwise modified from time to time as permitted under the Junior Subordination Agreement, the "<u>Junior Subordinated Loan Agreement</u>"), pursuant to which Junior Subordinated Creditors have extended credit to Peter Pan Borrower as evidenced by the Subordinated Notes (as defined in the Junior Subordination Agreement, collectively, the "<u>Junior Subordinated Notes</u>"). Peter Pan Borrower's obligations to RRG, May and NIF under the Junior Subordinated Notes are secured by liens and security interests in the Collateral.

E.      Agent, the Junior Subordinated Creditors, and the Companies, have entered into that certain Amended and Restated Subordination and Intercreditor Agreement dated as of May 23, 2023 (as amended, supplemented or otherwise modified from time to time, the "<u>Junior Subordination Agreement</u>") in order to set forth the relative rights and priorities of Agent, Senior Lenders and Junior Subordinated Creditors under the Senior Debt Documents and the Subordinated Debt Documents (as defined in the Junior Subordination Agreement, the "<u>Junior Subordinated Debt Documents</u>").

F.      Junior Subordinated Creditors, Subordinated Creditor, and Peter Pan Borrower have entered into that certain Subordination Agreement dated as of July 12, 2023 (as amended, supplemented or otherwise modified from time to time, the "<u>Subordinated Creditors Subordination Agreement</u>") in order to set forth the relative rights and priorities of Junior Subordinated Creditor and Subordinated Creditor under the Junior Subordinated Debt Documents and the Subordinated Debt Documents.

G.      As an inducement to and as one of the conditions precedent to the agreement of Agent and Senior Lenders to continue the transactions contemplated by the Senior Credit Agreement, Agent and Senior Lenders have required the execution and delivery of this Agreement by Subordinated Creditor and the Companies in order to set forth the relative rights and priorities of Agent, Senior Lenders and Subordinated Creditor under the Senior Debt Documents and the Subordinated Debt Documents.

NOW, THEREFORE, in order to induce Agent and Senior Lenders to consummate the transactions contemplated by the Senior Credit Agreement, and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereto hereby agree as follows:

1.      **Definitions**.    The following terms shall have the following meanings in this Agreement:

"<u>Affiliate</u>" shall mean, as applied to any Person, any other Person who controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" means the possession, directly or indirectly through one or more intermediaries, of the power to direct the management and policies of a Person, whether through the ownership of equity interests, by contract, or otherwise; <u>provided</u>, <u>however</u>, that (a) any Person which owns directly or indirectly 10% or more of the equity interests having ordinary voting power for the election of directors or other members of the governing body of a Person or 10%

or more of the partnership or other ownership interests of a Person (other than as a limited partner of such Person) shall be deemed an Affiliate of such Person, and (b) each partnership in which a Person is a general partner shall be deemed an Affiliate of such Person.

"Agent" shall mean Wells Fargo Bank, National Association, as agent for the Senior Lenders and the Bank Product Providers, or any other Person appointed by the holders of the Senior Debt as administrative agent for purposes of the Senior Debt Documents and this Agreement.

"Bank Product" shall mean any financial accommodation extended to a Company or any of its subsidiaries by a Bank Product Provider including: (a) credit cards (including commercial cards (including so-called "purchase cards", "procurement cards" or "p-cards")), (b) payment card processing services, (c) debit cards, (d) stored value cards, (e) any cash management or related services, including treasury, depository, return items, overdraft, controlled disbursement, merchant store value cards, e-payables services, electronic funds transfer, interstate depository network, automatic clearing house transfer (including the Automated Clearing House processing of electronic funds transfers through the direct Federal Reserve Fedline system) and other cash management arrangements, or (f) interest rate, credit, commodity or equity swap, cap, floor, collar, forward foreign exchange transaction, currency swap, cross currency rate swap, currency option, or any combination of, or option with respect to, these or similar transactions, for the purpose of hedging exposure to fluctuations in interest or exchange rates, loan, credit exchange, security, or currency valuations or commodity prices.

"Bank Product Documents" shall mean those agreements entered into from time to time by a Company or any of its subsidiaries with a Bank Product Provider in connection with the obtaining of any of the Bank Products.

"Bank Product Obligations" shall mean all obligations, liabilities, contingent reimbursement obligations, fees, and expenses owing by a Company or any of its subsidiaries to any Bank Product Provider pursuant to or evidenced by the Bank Product Documents and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all such amounts that a Company or any of its subsidiaries are obligated to reimburse to Agent or any Senior Lender as a result of Agent or such Senior Lender purchasing participations from, or executing indemnities or reimbursement obligations to, a Bank Product Provider with respect to the Bank Products provided by such Bank Product Provider to a Company or any of its subsidiaries.

"Bank Product Provider" shall mean Wells Fargo Bank, National Association, any affiliate of Agent, any Senior Lender or any affiliate of any Senior Lender.

"Bankruptcy Code" shall mean Chapter 11 of Title 11 of the United States Code, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

"Collateral" shall mean all assets and property (whether real, personal, movable or immovable), now owned or hereafter acquired (including any assets or property acquired or created after the commencement of any Proceeding), of each Company.

"Disposition" shall mean, with respect to any interest in property, the sale, lease, license or other disposition of such interest in such property.

"Distribution" shall mean, with respect to any indebtedness or obligation, (a) any payment or distribution by any Person of cash, securities or other property, by set-off or otherwise, on account of such indebtedness or obligation, (b) any redemption, purchase or other acquisition of such indebtedness or obligation by any Person or (c) with respect to any unsecured indebtedness or obligations, the granting of any Lien or security interest to or for the benefit of the holders of such indebtedness or obligation in or upon any property of any Person.

"Enforcement Action" shall mean (a) to take from or for the account of any Company or any guarantor of the Subordinated Debt, by set-off or in any other manner, the whole or any part of any moneys which may now or hereafter be owing by any Company or any such guarantor with respect to the Subordinated Debt (including, without limitation, pursuant to the Subordinated Creditors Subordination Agreement), (b) to initiate or participate with others in any suit, action or proceeding against any Company or any such guarantor to (i) sue for or enforce payment of the whole or any part of the Subordinated Debt, (ii) commence or join with other Persons to commence a Proceeding with respect to any Company or any guarantor, or (iii) commence judicial enforcement of any of the rights and remedies under the Subordinated Debt Documents or applicable law with respect to the Subordinated Debt, (c) to accelerate the Subordinated Debt, (d) to take any action to enforce any rights or remedies with respect to the Subordinated Debt, any Company, any guarantor or any Collateral, (e) to exercise any put option or to cause any Company or any such guarantor to honor any redemption or mandatory prepayment obligation under any Subordinated Debt Document, (f) to exercise any rights or remedies of a secured party under the Subordinated Debt Documents or applicable law or take any action under the provisions of any state or federal law, including, without limitation, the Uniform Commercial Code, or under any contract or agreement, to enforce, foreclose upon, take possession of or sell any property or assets of any Company or any such guarantor or (g) to take any action under the Subordinated Creditors Subordination Agreement or to otherwise exercise, or commence judicial enforcement of, any of the rights and remedies under the Subordinated Creditors Subordination Agreement.

"Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory

or other), security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement, the interest of a lessor under a capital lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"Paid in Full," "Payment in Full," "paid in full" or "payment in full" shall mean, as of any date of determination with respect to the Senior Debt, that:  (a) all of such Senior Debt (other than (i) contingent indemnification obligations not yet due and payable or with respect to which a claim has not been asserted, (ii) obligations not yet due and payable with respect to letters of credit issued pursuant to the Senior Debt Documents (it being understood that such obligations include interest, fees, charges, costs and expenses that accrue subsequent to such date of determination in respect of undrawn or drawn letters of credit) and (iii) Bank Product Obligations not yet due and payable) has been paid in full in cash, (b) no Person has any further right to obtain any loans, letters of credit or other extensions of credit under the Senior Debt Documents, (c) any and all letters of credit issued under the Senior Debt Documents have been cancelled and returned (or backed by standby letters of credit (issued by a bank, and in form and substance, acceptable to Agent) or cash collateralized, in each case in an amount equal to 105% of the face amount of such letters of credit in accordance with the terms of such documents), (d) any and all Bank Product Obligations have been cancelled (or backed by standby letters of credit (issued by a bank, and in form and substance, acceptable to Agent) or cash collateralized, in each case in an amount reasonably determined by Agent as sufficient to satisfy the estimated credit exposure with respect to the Bank Product Obligations), and (e) any costs, expenses and contingent indemnification obligations which are not yet due and payable but with respect to which a claim has been or may reasonably be expected to be asserted by Agent or a Senior Lender, are backed by standby letters of credit (issued by a bank, and in form and substance, acceptable to Agent) or cash collateralized, in each case in an amount reasonably estimated by Agent to be the amount of costs, expenses and contingent indemnification obligations that may become due and payable.

"Permitted Refinancing" shall mean any refinancing or replacement of the Senior Debt under the WFB Loan Documents (or any Permitted Refinancing Senior Debt Documents).

"Permitted Refinancing Senior Debt Documents" shall mean any financing documentation which replaces the WFB Loan Documents (or any Permitted Refinancing Senior Debt Documents) and pursuant to which the Senior Debt under the WFB Loan Documents (or any Permitted Refinancing Senior Debt Documents) is refinanced or replaced, whether by the same or any other agent, lender or group of lenders, as such financing documentation may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in compliance with this Agreement.

"Permitted Subordinated PIK Payments" shall mean regularly scheduled payments of interest on the Subordinated Debt payable in kind (and not in cash) due and payable on a non-accelerated basis at the rate of 15% per annum on the last business day of each month in accordance with the terms of the Subordinated Debt Documents as in effect on the date hereof or as modified in accordance with the terms of this Agreement.

"Person" shall mean any natural person, corporation, general or limited partnership, limited liability company, firm, trust, association, government, governmental agency or other entity, whether acting in an individual, fiduciary or other capacity.

"Proceeding" shall mean any voluntary or involuntary insolvency, bankruptcy, receivership, custodianship, liquidation, dissolution, reorganization, assignment for the benefit of creditors, appointment of a custodian, receiver, trustee or other officer with similar powers or any other proceeding for the liquidation, dissolution or other winding up of a Person.

"Senior Debt" shall mean (a) all "Obligations" (as defined in the Senior Credit Agreement or any similar term in any Permitted Refinancing) and all other obligations, liabilities and indebtedness of every nature of the Companies from time to time owed to Agent or any Senior Secured Party under the Senior Debt Documents, including, without limitation, the principal amount of all debts, claims and indebtedness, accrued and unpaid interest and all fees, costs and expenses, whether primary, secondary, direct, contingent, fixed or otherwise, heretofore, now and from time to time hereafter owing, due or payable, whether before or after the filing of a Proceeding under the Bankruptcy Code together with any interest, fees, costs and expenses accruing thereon after the commencement of a Proceeding, without regard to whether or not such interest, fees, costs and expenses are allowed, and (b) all Bank Product Obligations.  Senior Debt shall be considered to be outstanding whenever any loan commitment under the Senior Debt Document is outstanding.

"Senior Debt Documents" shall mean the WFB Loan Documents and, after the consummation of any Permitted Refinancing, the Permitted Refinancing Senior Debt Documents.

"Senior Default" shall mean any "Event of Default" under the Senior Debt Documents.

"Senior Lenders" shall mean the holders of the Senior Debt (including, without limitation, all Bank Product Providers and Issuing Bank).

"Senior Secured Parties" shall mean Agent, Senior Lenders, Bank Product Providers and Issuing Bank.

"Specified Leases and Rents" shall mean the leases and rents described in the Specified Real Property Deeds of Trust.

"Specified Real Property" shall mean the real property legally described in and encumbered by each of the Specified Real Property Deeds of Trust.

"Specified Real Property Collateral" shall mean (i) the Specified Real Property and related fixtures subject to a Lien (or purported to be subject to a Lien) to secure all or any portion of the Subordinated Debt (including the fixtures described in the Specified Real Property Deeds of Trust, (ii) the Specified Leases and Rents, (iii) the "Trust Estate" described in each of the Specified Real Property Deeds of Trust and (iv) all substitutions, replacements, accessions, products, or proceeds of any of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to, or destruction of, or other involuntary conversion (including claims in respect of condemnation) of any kind or nature of any or all of the foregoing, in each case of the foregoing clauses (iv), to the extent not constituting Collateral to secure (or purport to secure) any of the Senior Debt.

"Specified Real Property Deeds of Trust" shall mean that certain Deed of Trust, Assignment of Rents and Security Agreement (and Fixture Filing) dated as of July 12, 2023 made by Peter Pan Borrower to the Subordinated Creditor with respect to certain real property located in Port Moller, Aleutians East Borough, Alaska, as the same may be amended, supplemented or otherwise modified from time to time as permitted hereunder.

"Subordinated Debt" shall mean all of the obligations of the Companies to Subordinated Creditor as described in, evidenced by or incurred pursuant to the Subordinated Debt Documents.

"Subordinated Debt Default" shall mean a default in the payment of the Subordinated Debt or in the performance of any term, covenant or condition contained in the Subordinated Debt Documents or any other occurrence permitting Subordinated Creditor to accelerate the payment of, put or cause the redemption of all or any portion of the Subordinated Debt or otherwise exercise post-default rights and remedies in respect of any of the Companies, any of the Collateral or under any Subordinated Debt Document or applicable law.

"Subordinated Debt Documents" shall mean the Subordinated Loan Agreement, the Subordinated Note, the Specified Real Property Deeds of Trust, any guaranty with respect to the Subordinated Debt, the Subordinated Creditors Subordination Agreement and all other documents, agreements and instruments now existing or hereinafter entered into in connection with the Subordinated Loan Agreement or the Subordinated Note.

"Trustee" shall mean Chicago Title Insurance Company, in its capacity as trustee under each of the Subordinated Deeds of Trust, and any substitute trustee(s) appointed in accordance with the procedures set forth in the Specified Real Property Deeds of Trust and applicable law, subject in each case to the limitations set forth in this Agreement.

"UCC" or "Uniform Commercial Code" shall mean the Uniform Commercial Code, as in effect from time to time in any applicable jurisdiction.

"WFB Loan Documents" shall mean the Senior Credit Agreement and all other agreements, documents and instruments executed from time to time in connection therewith, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

2.    **Subordination**.

2.1.    Subordination of Subordinated Debt to Senior Debt.    Each Company covenants and agrees, and Subordinated Creditor by his acceptance of the Subordinated Debt Documents (whether upon original issue or upon transfer or assignment) likewise covenants and agrees, notwithstanding anything to the contrary contained in any of the Subordinated Debt Documents, that the payment of any and all of the Subordinated Debt shall be subordinate and subject in right and time of payment, to the extent and in the manner hereinafter set forth, to the prior payment in full of the Senior Debt, regardless of whether the Senior Debt or any Lien securing the Senior Debt is declared or ruled to be invalid, unenforceable, subordinated, void or not allowed by any court of competent jurisdiction and regardless of any action taken or not taken by Agent with respect to any document (including any financing statement) required to be executed or filed for perfection of any such Lien securing the Senior Debt.  Each holder of Senior Debt, whether now outstanding or hereafter created, incurred, assumed or guaranteed, shall be deemed to have acquired Senior Debt in reliance upon the provisions contained in this Agreement.

2.2.    Liquidation, Dissolution, Bankruptcy.    In the event of any Proceeding involving any Company:

(a)    All Senior Debt shall first be paid in full before any Distribution, whether in cash, securities or other property, shall be made to Subordinated Creditor on account of any Subordinated Debt.

(b)    Any Distribution, whether in cash, securities or other property which would otherwise, but for the terms hereof, be payable or deliverable in respect of the Subordinated Debt shall be paid or delivered directly to Agent (to be held and/or applied by Agent in accordance with the terms of the Senior Debt Documents) until all Senior Debt is paid in full.  Subordinated Creditor irrevocably authorizes, empowers and directs any debtor, debtor in possession, receiver, trustee, liquidator, custodian, conservator or other Person having authority, to pay or otherwise deliver all such Distributions to Agent.  Subordinated Creditor also irrevocably authorizes and empowers Agent, in the name of Subordinated Creditor, to demand, sue for, collect and receive any and all such Distributions.

(c)    Subordinated Creditor agrees to execute, verify, deliver and file any proofs of claim in respect of the Subordinated Debt requested by Agent in connection with any such Proceeding and hereby irrevocably authorizes, empowers and appoints Agent his agent and attorney-in-fact to (i) execute, verify, deliver and file such proofs of claim upon the failure of Subordinated Creditor promptly to do so prior to 30 days before the expiration of the time to file any such proof of claim and (ii) vote such claim in any such Proceeding

upon the failure of Subordinated Creditor to do so prior to 15 days before the expiration of the time to vote any such claim; provided, Agent shall have no obligation to execute, verify, deliver, file and/or vote any such proof of claim. In the event that Agent votes any claim in accordance with the authority granted hereby, Subordinated Creditor shall not be entitled to change or withdraw such vote.

(d)     Subordinated Creditor agrees that it will not object to or oppose (and will be deemed to have consented to) any use of cash collateral consented to by Agent or any financing provided by any Senior Lender to any Company (or any financing provided by any other Person consented to by Agent) (collectively, "DIP Financing") on such terms and conditions as Agent, in its sole discretion, may decide. In connection therewith, any Company may grant to Agent and Senior Lenders or such other lender, as applicable, Liens and security interests upon all of the property of such Company, which Liens and security interests (i) shall secure payment of all Senior Debt (whether such Senior Debt arose prior to the commencement of any Proceeding or at any time thereafter) and all other financing provided by any Senior Lender or consented to by Agent during the Proceeding and (ii) shall be superior in priority to the Liens and security interests, if any, in favor of Subordinated Creditor on the property of such Company. If, in connection with any cash collateral use or DIP Financing, any Liens and security interests on the Collateral are subject to a surcharge or are subordinated to an administrative priority claim, a professional fee "carve out," or fees owed to the United States Trustee, then the Liens on the Collateral, if any, of Subordinated Creditor shall also be subordinated to such interest or claim and shall remain subordinated to the Liens and security interests on the Collateral (if any) of Agent consistent with this Agreement. In addition, if Agent objects to any use of cash collateral or financing in a Proceeding to a Company, then Subordinated Creditor will, in his capacity as a holder of secured claim, join such objection by Agent. Subordinated Creditor agrees that it will consent to (and will be deemed to have consented to), and not object to or oppose, a sale or other Disposition of any property securing all of any part of any Senior Debt or Subordinated Debt free and clear of security interests, Liens or other claims of Subordinated Creditor under the Bankruptcy Code, including Sections 363, 365 and 1129 of the Bankruptcy Code, if Agent has consented to such sale or Disposition. Subordinated Creditor agrees not to assert any right it may have in any Proceeding arising from any Company's use, sale or other Disposition of Collateral and agrees that it will not seek (or support any other Person seeking) to have any stay, whether automatic or otherwise, lifted with respect to any Collateral without the prior written consent of Agent. In addition, if Agent objects to any sale or Disposition of any Collateral, then Subordinated Creditor will, in his capacity as a holder of secured claim, join such objection by Agent. Subordinated Creditor agrees that Subordinated Creditor will not, and will not permit, any of his Affiliates to, directly or indirectly, provide, participate in or otherwise support, any financing in a Proceeding to any Company without the prior written consent of Agent. Subordinated Creditor will not object to or oppose any adequate protection sought by Agent or any Senior Lender or object to or oppose any motion by Agent to lift the automatic stay or any other stay in any Proceeding. Subordinated Creditor will not seek or assert any right it may have for adequate protection of his interest, if any, in any Collateral; provided, however, (i) Subordinated Creditor will seek and assert any rights it may have for adequate protection of his interest in the Specified Real Property Collateral to the extent and in the manner instructed by Agent (including as to the form of adequate protection), (ii) any such

adequate protection granted in favor of Subordinated Creditor in the form of additional or replacement Liens or cash payments shall be subject to the terms of this Agreement, and any Distribution payable or deliverable in respect thereof shall be paid and delivered directly to Agent (to be held and/or applied by Agent in accordance with the terms of the Senior Debt Documents), (iii) any such adequate protection granted in favor of Subordinated Creditor in the form of a superpriority or other administrative expense claim shall be subordinated to any superpriority or other administrative expense claim in favor of any Senior Secured Party (including any claim arising under Section 507(b) of the Bankruptcy Code) and subject to the terms of this Agreement and any Distribution payable or deliverable in respect thereof shall be paid and delivered directly to Agent (to be held and/or applied by Agent in accordance with the terms of the Senior Debt Documents) and (iv) Subordinated Creditor agrees that, to the extent consented to by Agent, any claim arising out of Section 507(b) in favor of Subordinated Creditor in respect of his interest in the Specified Real Property Collateral may be paid pursuant to a plan of reorganization arrangement or proposal in any combination of cash, securities or other property (as selected by Agent) as of the effective date of confirmation of such plan and any cash or other Distribution payable or deliverable in respect of such securities or other property shall be paid or delivered directly to Agent (to be held and/or applied by Agent in accordance with the terms of the Senior Debt Documents). Subordinated Creditor waives any claim it may now or hereafter have arising out of Agent's or Senior Lenders' election, in any Proceeding, of the application of Section 1111(b)(2) of the Bankruptcy Code, and/or any borrowing or grant of a security interest under Section 364 of the Bankruptcy Code by any Company, as debtor in possession. Subordinated Creditor further agrees that it shall not, without Agent's prior written consent, commence or continue any Proceeding, propose or vote in favor of any plan of reorganization, arrangement or proposal or file any motion, pleading or material in support of any motion or plan of reorganization, arrangement or proposal that is adverse to the interests of the Senior Secured Parties, materially impair the rights of the Senior Secured Parties, is inconsistent with the terms of this Agreement or is opposed by Senior Lenders or Agent, or oppose any plan of reorganization or liquidation supported by Agent. Subordinated Creditor shall not (or shall not cause or support, directly or indirectly, any other Person in doing the same) (i) oppose or object to the determination of the extent of any Liens held by the Senior Secured Parties or the value of any claims of the Senior Secured Parties under Section 506(a) of the Bankruptcy Code; (ii) oppose or object to the payment of interest and expenses of the Senior Secured Parties as provided under Sections 363 or 506(b) and (c) of the Bankruptcy Code; (iii) assert or enforce any claim under Section 506(c) of the Bankruptcy Code senior to or on a parity with the Senior Debt for costs or expenses of preserving or disposing of any Collateral; or (iv) object to, contest or oppose in any manner the exercise by the Agent or Senior Secured Parties of the right (or amount) to "credit bid" the Senior Debt pursuant to Section 363(k) of the Bankruptcy Code or other applicable law.

(e)    The Senior Debt shall continue to be treated as Senior Debt and the provisions of this Agreement shall continue to govern the relative rights and priorities of Senior Secured Parties and Subordinated Creditor even if all or part of the Senior Debt or the security interests securing the Senior Debt are subordinated, set aside, avoided, invalidated or disallowed in connection with any such Proceeding.

2.3.    <u>Subordinated Debt Payment Restrictions</u>.  Notwithstanding the terms of the Subordinated Debt Documents, and in addition to any other limitations set forth herein or therein, each Company hereby agrees that it may not make, and Subordinated Creditor hereby agrees that it will not accept, any Distribution with respect to the Subordinated Debt until the Senior Debt is paid in full other than any Distribution constituting a Permitted Subordinated PIK Payment, unless at the time of such Distribution there is a Proceeding involving any Company (in which event <u>subsection 2.2</u> of this Agreement shall apply).

2.4.    <u>Subordinated Debt Standstill Provisions; Subordinated Debt Default; Enforcement</u>.

(a)    Except as expressly permitted under Section 2.4(c) below, until the Senior Debt is paid in full, Subordinated Creditor shall not, without the prior written consent of Agent, take any Enforcement Action with respect to the Subordinated Debt, the Companies or Collateral or under any of the Subordinated Debt Documents or applicable law.  Any Distributions or other proceeds of any Enforcement Action obtained by any Subordinated Creditor (including any proceeds received in connection with an Enforcement Action in respect of the Specified Real Property Collateral, whether pursuant to Section 2.4(c) below or otherwise) shall in any event be held in trust by it for the benefit of Agent and Senior Lenders and promptly paid or delivered to Agent for the benefit of Senior Lenders in the form received until the Senior Debt is paid in full.

(b)    Subordinated Creditor hereby agree that (i) upon the occurrence of a Subordinated Debt Default, Subordinated Creditor will promptly provide written notice thereof to Agent (which notice incorporates a reasonably detailed description of such Subordinated Debt Default) and (ii) upon instruction by Agent, Subordinated Creditor will send the Companies notice of the occurrence of such Subordinated Debt Default and any other notice that Agent deems necessary or desirable in connection with any potential Enforcement Action in respect of the Subordinated Debt or any Collateral securing (or purporting to secure) the Subordinated Debt, in each case, in form and substance acceptable to Agent.

(c)    Upon instruction by Agent, Subordinated Creditor shall take any action that Agent deems necessary or desirable to create, preserve, protect or perfect his interests in respect of the Specified Real Property Collateral in the manner specified by Agent and such action will be deemed to have been consented to and directed by Subordinated Creditor. Upon instruction by Agent, Subordinated Creditor shall commence and diligently pursue in good faith one or more Enforcement Actions (as elected and determined by Agent) in respect of the Specified Real Property Collateral in the manner specified by Agent and such Enforcement Action(s) will be deemed to have been consented to and directed by Subordinated Creditor. Subordinated Creditor agrees that it will not substitute a successor for Trustee unless directed to do so by Agent. If directed to do so by Agent, Subordinated Creditor will promptly substitute a successor for the then current Trustee in accordance with the procedures set forth in the Specified Real Property Deeds of Trust and applicable law, with such successor for such Trustee to be as designated by Agent.

    2.5.   <u>Incorrect Payments</u>.  If any Distribution on account of the Subordinated Debt not permitted to be made by a Company or accepted by Subordinated Creditor under this Agreement is received by Subordinated Creditor, such Distribution shall not be commingled with any of the assets of Subordinated Creditor, shall be held in trust by Subordinated Creditor for the benefit of Senior Secured Parties and shall be promptly paid over to Agent for application (in accordance with the Senior Debt Documents ) to the payment of the Senior Debt then remaining unpaid, until all of the Senior Debt is paid in full.

    2.6.   <u>Subordination of Liens and Security Interests; Agreement Not to Contest; Sale of Collateral; Release of Liens</u>.  Until the Senior Debt has been paid in full, any Liens and security interests of Subordinated Creditor in the Collateral (including any judgment Liens obtained with respect to the Subordinated Debt) which may exist shall be and hereby are subordinated for all purposes and in all respects to the Liens and security interests of Agent and Senior Secured Parties in the Collateral, regardless of and notwithstanding (i) the time, manner or order of perfection of any such Liens and security interests, (ii) the validity, perfection or enforceability of such Liens and security interests, of Agent or (iii) any contrary provision of the UCC or any other applicable law or the Subordinated Debt Documents or any defect or deficiencies in, or failure to attach or perfect, the Liens securing the Senior Debt, or any circumstance whatsoever.  Subordinated Creditor agrees that it will not at any time (including during a Proceeding) (x) contest the extent, validity, perfection, priority or enforceability of the Senior Debt, the Senior Debt Documents, or the Liens and security interests of Agent and Senior Lenders in the Collateral securing the Senior Debt or (y) contest, protest or object to any exercise of rights and remedies taken by Agent or any Senior Secured Party. If, notwithstanding the prohibitions contained in this Agreement (including Section 3.2), any of the Subordinated Debt is secured by Liens or security interests in any of the Collateral (other than the Specified Real Property Collateral), such Lien or security interest, will be deemed immediately, unconditionally and automatically released without any action by any Person.  In the event that a Company desires to sell, lease, license or otherwise dispose of any interest in any of the Collateral (including the equity interests of a Company and any Specified Real Property Collateral) and Agent consents to such Disposition, Subordinated Creditor shall be deemed to have consented to such Disposition and such Disposition shall be free and clear of any Liens and security interests of Subordinated Creditor in such Collateral (and if such Disposition involves the equity interests of a Company, Subordinated Creditor shall release such Company from any guaranty, direct obligation or other obligation owing to Subordinated Creditor) and any purchaser of any Collateral may rely on this Agreement as evidence of Subordinated Creditor's consent to such Disposition and that such Disposition is free and clear of any Liens and security interests of Subordinated Creditor in such Collateral (and if such Disposition involves the equity interests of a Company, that such Company is released from any guaranty, direct obligation or other obligation owing to Subordinated Creditor).  Upon instruction by Agent, Subordinated Creditor shall release (and be deemed to have released) any Liens and security interests in any Specified Real Property Collateral in connection with an Enforcement Action described in Section 2.4(c).  Unless so instructed by Agent, Subordinated Creditor may not release any Lien or other interest in respect of the Specified Real Property Collateral. If Agent releases any of its Liens and security interest on any part of the Collateral (or such Liens and security interests are released by operation of law), whether in connection with an exercise of remedies or otherwise, then the Liens and security interest of Subordinated Creditor on such Collateral shall automatically, unconditionally and simultaneously be released (and if such release involves the equity interests of a Company, Subordinated Creditor

shall automatically, unconditionally and simultaneously be deemed to have released such Company from any guaranty, direct obligation or other obligation owing to Subordinated Creditor under the Subordinated Debt Documents). Subordinated Creditor shall (or shall cause his agent to) promptly execute and deliver to Agent such termination statements and releases as Agent shall request to effect the consents and release of the Liens and security interests of Subordinated Creditor in such Collateral, as applicable, in accordance with this subsection 2.6. In furtherance of the foregoing, Subordinated Creditor hereby irrevocably appoints Agent his attorney-in-fact, with full authority in the place and stead of Subordinated Creditor and in the name of Subordinated Creditor or otherwise, to execute and deliver any document or instrument which Subordinated Creditor may be required to deliver pursuant to this subsection 2.6.

2.7.    Sale, Transfer or other Disposition of Subordinated Debt.  Subordinated Creditor shall not sell, assign, pledge, dispose of or otherwise transfer all or any portion of the Subordinated Debt or any Subordinated Debt Document without Agent's prior written consent. Notwithstanding the failure of Subordinated Creditor to obtain Agent's prior written consent as required by the foregoing sentence, the subordination effected hereby shall survive any sale, assignment, pledge, disposition or other transfer of all or any portion of the Subordinated Debt, and the terms of this Agreement shall be binding upon the successors and assigns of Subordinated Creditor, as provided in Section 9 hereof.

2.8.    Legends.  Until the termination of this Agreement in accordance with Section 15 hereof, Subordinated Creditor will cause to be clearly, conspicuously and prominently inserted on the face of each Subordinated Note and any other Subordinated Debt Document, as well as any renewals or replacements thereof, the following legend:

"This [**agreement/instrument**] and the rights and obligations evidenced hereby are subordinate in the manner and to the extent set forth in that certain Subordination and Intercreditor Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Subordination Agreement") dated as of July 12, 2023 among JOHN KETCHAM, PETER PAN SEAFOOD COMPANY, LLC, an Alaska limited liability company ("Peter Pan Borrower"), NORTHWEST FISH COMPANY, LLC, a Washington limited liability company ("Fish Borrower", and together with Peter Pan Borrower, collectively, the "Borrowers", and each individually, a "Borrower"), ALASKA FISH HOLDINGS, LLC, a Delaware limited liability company ("Holdings"), RAYMOND MACHINE SHOP, LLC, a Washington limited liability company ("Raymond"; and together with Borrowers and Holdings, collectively, the "Companies" and each individually a "Company"), and WELLS FARGO BANK, NATIONAL ASSOCIATION ("Agent"), to the indebtedness (including interest) owed by the Companies pursuant to that certain Amended and Restated Credit Agreement dated as of July 19, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among the Companies, Agent and the lenders from time to time party thereto and the other Senior Debt Documents (as defined in the Subordination Agreement), as such Credit Agreement and other Senior Debt Documents have been and hereafter may be amended, restated, amended and restated, supplemented or otherwise modified from time to time and to indebtedness refinancing the indebtedness under

those agreements as contemplated by the Subordination Agreement; and each holder of this instrument, by its acceptance hereof, irrevocably agrees to be bound by the provisions of the Subordination Agreement."

2.9.   <u>Obligations Hereunder Not Affected</u>.   All rights and interest of Senior Secured Parties hereunder, and all agreements and obligations of Subordinated Creditor and Companies hereunder, shall remain in full force and effect irrespective of: (a) any lack of validity or enforceability of any document evidencing any of the Senior Debt; (b) any change in the time, manner or place of payment of, or any other term of, all or any of the Senior Debt, or any other permitted amendment or waiver of or any release or consent to departure from any of the Senior Debt Documents; (c) any exchange, subordination, release or non-perfection of any collateral for all or any of the Senior Debt; (d) any failure of any Senior Secured Party to assert any claim or to enforce any right or remedy against any other party hereto under the provisions of this Agreement or any Senior Debt Document other than this Agreement; (e) any reduction, limitation, impairment or termination of the Senior Debt for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to (and Companies and Subordinated Creditor hereby waive any right to or claim of) any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of invalidity, illegality, nongenuiness, irregularity, compromise, unenforceability of, or any other event or occurrence affecting, any Senior Debt; and (f) any other circumstance which might otherwise constitute a defense available to, or a discharge of, Companies in respect of the Senior Debt or Subordinated Debt in respect of this Agreement.

Subordinated Creditor acknowledges and agrees that Senior Secured Parties may in accordance with the terms of the Senior Debt Documents, without notice or demand and without affecting or impairing Subordinated Creditor's obligations hereunder, (i) modify the Senior Debt Documents; (ii) take or hold security for the payment of the Senior Debt and exchange, enforce, foreclose upon, waive and release any such security; (iii) apply such security and direct the order or manner of sale thereof as Agent and Senior Lenders in their sole discretion, may determine; (iv) release and substitute one or more endorsers, warrantors, borrowers or other obligors; and (v) exercise or refrain from exercising any rights against any Company or any other Person.   The Senior Debt shall continue to be treated as Senior Debt and the provisions of this Agreement shall continue to govern the relative rights and priorities of Senior Secured Parties and Subordinated Creditor even if all or part of the Senior Debt or the security interests securing the Senior Debt are subordinated, set aside, avoided, invalidated or disallowed.

2.10.   <u>Marshaling; Application of Proceeds</u>.   Subordinated Creditor hereby waives any rights it may have under applicable law to assert the doctrine of marshaling or to otherwise require any Senior Secured Party to marshal any property of any Company or of any guarantor or other obligor of the Senior Debt for the benefit of Subordinated Creditor.   In the event of any Disposition (including a casualty loss or taking through eminent domain) of the Collateral, the proceeds resulting therefrom (including insurance proceeds) shall be applied to the Senior Debt in the order and manner set forth in the Senior Debt Documents until such time as the Senior Debt is Paid in Full. Without limitation of the foregoing, notwithstanding anything to the contrary otherwise stated herein, each of the parties hereto hereby acknowledge and agree that all proceeds of any exercise of remedies with respect to the Specified Real Property Collateral shall be paid (i) first, to the Senior Agent for application to the Senior Debt in the order and manner set forth in the Senior Debt Documents until such time as the Senior Debt is Paid in Full and (ii) second, to

Subordinated Creditor for application to the Subordinated Debt until such time as the Subordinated Debt is paid in full.

2.11.  <u>Rights Relating to Agent's Actions with respect to the Collateral</u>. Subordinated Creditor hereby waives, to the extent permitted by applicable law, any rights which it may have to enjoin or otherwise obtain a judicial or administrative order preventing Senior Secured Parties from taking, or refraining from taking, any action with respect to all or any part of the Collateral.  Without limitation of the foregoing, Subordinated Creditor hereby agrees (a) that it has no right to direct or object to the manner in which a Senior Secured Party applies the proceeds of the Collateral resulting from the exercise by Senior Secured Parties of rights and remedies under the Senior Debt Documents to the Senior Debt, (b) that it waives any right to object to any action or inaction by any Senior Secured Party with respect to exercising its rights or remedies under the Senior Debt Documents or with respect to the Collateral (including in connection with any foreclosure or enforcement of Liens in respect of Collateral), and (c) no Senior Secured Party has assumed any obligation to act as the agent for Subordinated Creditor with respect to the Collateral. Subordinated Creditor shall not object to any proposed retention or acceptance of Collateral by a Senior Secured Party in full or partial satisfaction of such Senior Secured Party's Senior Debt and agrees that any such retention or acceptance by a Senior Secured Party shall be free and clear of Subordinated Creditors' security interests and Liens.

2.12.  <u>Insurance Proceeds</u>.  Until the Senior Debt has been Paid in Full, Agent shall have the sole and exclusive right, as against Subordinated Creditors, to adjust settlement of insurance claims in the event of any covered loss, theft or destruction of such Collateral; provided that, with respect to any insurance claims in the event of any covered loss, theft or destruction of any Specified Real Property Collateral, Subordinated Creditor will adjust settlement of such insurance claims in the manner instructed by Agent.  All proceeds of such insurance shall inure to Senior Secured Parties, to the extent of the Senior Debt, and Subordinated Creditor shall cooperate (if necessary) in a reasonable manner in effecting the payment of insurance proceeds to the holders of Senior Debt (or any representative thereof).  In the event the requisite holders of Senior Debt (or any representative thereof), in their or its sole discretion or pursuant to agreement with any Company, permits such Company to utilize the proceeds of insurance, the consent of the holders of Senior Debt (or any representative thereof) shall be deemed to include the consent of Subordinated Creditors.

2.13.  <u>Exchange of Subordinated Debt</u>.  The Subordinated Debt shall not be exchanged for or otherwise converted into equity without the prior written consent of Agent.

2.14.  <u>Access and Use Rights</u>.

(a)  If Subordinated Creditor, or any agent, representative or affiliate of Subordinated Creditor or any receiver, shall, after any Subordinated Debt Default, obtain possession or physical control of any Specified Real Property Collateral or any of the tangible personal property located on any premises constituting Specified Real Property, Subordinated Creditor shall promptly notify Agent in writing of that fact, and Agent may at any time thereafter notify Subordinated Creditor in writing if and when Agent desires to exercise its access rights under this Section 2.14.  In addition, if Agent, or any agent, representative or affiliate of Agent, or any receiver, shall obtain possession or physical

control of any of the real properties constituting Specified Real Property or any of the tangible personal property located on any premises constituting Specified Real Property, then Agent may at any time thereafter notify Subordinated Creditor in writing that Agent is exercising its access rights under this Agreement under either circumstance.  Upon delivery of such notice by Agent to Subordinated Creditors, the parties shall confer in good faith to coordinate with respect to Agent's exercise of such access rights.

(b)     Without limiting any rights Agent or any Senior Secured Party may otherwise have under applicable law or by agreement and whether or not Subordinated Creditor has commenced and is continuing to undertake any enforcement action or other exercise of remedies, Agent or any other party acting with the consent, or on behalf, of Agent, shall have an irrevocable, non-exclusive right to have access to, and a royalty-free and rent-free license and right to use and access the Specified Real Property Collateral (including, without limitation, equipment, fixtures and real property and equipment) at any time to access any Collateral that (A) is stored or located in or on, (B) has become an accession with respect to, or (C) has been commingled with, any Specified Real Property Collateral, and (ii) in order to assemble, inspect, copy or download information stored on, take actions to perfect its lien on, process raw materials or work-in-process into finished inventory, take possession of, move, package, prepare and advertise for sale or disposition, sell, store, collect, take actions to protect, secure and otherwise enforce the rights of Agent in and to the Collateral, or otherwise deal with the Collateral, in each case without the involvement of or interference by Subordinated Creditor. The rights of Agent under this Section 2.14 shall continue notwithstanding any foreclosure, sale or other Disposition of any Specified Real Property Collateral by Subordinated Creditor.

(c)     Agent will not be liable for any diminution in the value of any Specified Real Property Collateral caused by the absence or removal of any Collateral therefrom, provided that Agent shall take all commercially reasonable efforts to avoid causing any material physical damage to the Specific Real Property Collateral directly resulting from Agent's removal of any such Collateral (ordinary wear and tear expected).  In no event shall Agent have any liability to Subordinated Creditor pursuant to this Section 2.14 as a result of any condition (including any environmental condition, claim or liability) on or with respect to the Specified Real Property Collateral existing (whether existing prior to the date of the exercise by Agent of its rights under this Section 2.14 or otherwise) and Agent shall have no duty or liability to maintain the Specified Real Property Collateral in a condition or manner better than that in which it was maintained prior to the use thereof by Agent, or for any diminution in the value of the Specified Real Property Collateral resulting from the use of the Specified Real Property Collateral by Agent in the manner specified under this Section 2.14 and subject to the terms hereof.

(d)     Agent shall not be obligated to pay any amounts to Subordinated Creditor (or any Person claiming by, through or under the Subordinated Creditor, including any purchaser of the Specified Real Property Collateral) or to any Company, for or in respect of the use by Agent of the Specified Real Property Collateral.

(e)     Subordinated Creditor (i) will cooperate with Agent in its efforts pursuant to Section 2.14 to enforce its Lien  in the Collateral and to finish any work-in-process and

assemble the Collateral, (ii) will not hinder or restrict in any respect Agent from enforcing its Lien in the Collateral or from finishing any work-in-process or assembling the Collateral pursuant to Section 2.14, and (iii) will, subject to the rights of any landlords under real estate leases, permit Agent, its employees, agents, advisers and representatives to exercise the rights described in Section 2.14.

(f)    For the avoidance of doubt, and without limiting the generality of the other provisions of this Agreement, it is hereby acknowledged and agreed that Agent shall have the right to bring an action to enforce its rights under this Section 2.14 including an action seeking possession of the applicable Collateral or specific performance of this Section 2.14.

3.    **Modifications**.

3.1.    <u>Modifications to Senior Debt Documents</u>.  Senior Lenders may at any time and from time to time without the consent of or notice to Subordinated Creditor, without incurring liability to Subordinated Creditor and without impairing or releasing the obligations of Subordinated Creditor under this Agreement, change the manner or place of payment or extend the time of payment of or renew or alter any of the terms of the Senior Debt, or amend in any manner any agreement, note, guaranty or other instrument evidencing or securing or otherwise relating to the Senior Debt.

3.2.    <u>Modifications to Subordinated Debt Documents</u>.  Until the Senior Debt has been paid in full, and notwithstanding anything to the contrary contained in the Subordinated Debt Documents, Subordinated Creditor shall not, without the prior written consent of Agent, amend, modify or supplement the Subordinated Debt Documents (including, without limitation, the Subordinated Creditors Subordination Agreement).  Without limiting the foregoing, (x) other than Peter Pan Borrower, no other person or entity shall (a) become obligated in respect of the Subordinated Debt, whether as a borrower, guarantor, surety or otherwise, or (b) otherwise provide any credit support in favor of the Subordinated Debt and (y) other than the Specified Real Property Collateral, none of the Subordinated Debt shall be secured by (or purported to be secured by) any Collateral or any other property, in each case in the case of clauses (a) and (b) without the prior written consent of Agent.

4.    **Representations and Warranties**.

4.1.    <u>Representations and Warranties of Subordinated Creditors</u>. Ketcham hereby represents and warrants to Agent and Senior Lenders that as of the date hereof:  (a) Ketcham is an individual residing in the State of California; (b) Ketcham has the capacity to enter into, execute, deliver and carry out the terms of this Agreement; (c) the execution of this Agreement by Ketcham will not violate or conflict with any material agreement binding upon Ketcham or any law, regulation or order or require any consent or approval which has not been obtained; (d) this Agreement is the legal, valid and binding obligation of Ketcham, enforceable against Ketcham in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors'

rights generally and by equitable principles; and (e) Ketcham is the sole owner, beneficially and of record, of the Subordinated Debt Documents and the Subordinated Debt.

4.2.    Representations and Warranties of Agent.  Agent hereby represents and warrants to Subordinated Creditor that as of the date hereof:  (a) Agent is a national banking association; (b) Agent has the power and authority to enter into, execute, deliver and carry out the terms of this Agreement, all of which have been duly authorized by all proper and necessary action; (c) the execution of this Agreement by Agent will not violate or conflict with the organizational documents of Agent, any material agreement binding upon Agent or any law, regulation or order or require any consent or approval which has not been obtained; and (d) this Agreement is the legal, valid and binding obligation of Agent, enforceable against Agent in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally or by equitable principles.

5.    **Subrogation; Recovery**.  Subordinated Creditor will not exercise (i) any right of subrogation that it may now or hereafter have or obtain in respect of the rights of Agent or any other Senior Secured Party against any Company, any guarantor of any of the Senior Debt or any of the Collateral or (ii) any right to participate in any claim or remedy of Agent and any other Senior Secured Party against any Company, any guarantor of any of the Senior Debt or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, in each case until all of the Senior Debt has been Paid in Full.  If Agent or any Senior Lender is required to disgorge any proceeds of Collateral, payment or other amount received by such Person (whether because such proceeds, payment or other amount is invalidated, declared to be fraudulent or preferential or otherwise) or turn over or otherwise pay any amount (a "Recovery") to the estate or to any creditor or representative of a Company or any other Person, then the Senior Debt shall be reinstated (to the extent of such Recovery) as if such Senior Debt had never been paid and to the extent Subordinated Creditor has received proceeds, payments or other amounts to which Subordinated Creditor would not have been entitled under this Agreement had such reinstatement occurred prior to receipt of such proceeds, payments or other amounts, Subordinated Creditor shall turn over such proceeds, payments or other amounts to Agent for reapplication to the Senior Debt.  A Distribution made pursuant to this Agreement to Agent or Senior Lenders which otherwise would have been made to a Subordinated Creditor is not, as among the Companies, Subordinated Creditors, a payment by the Companies to or on account of the Senior Debt.

6.    **Modification**.  Any modification or waiver of any provision of this Agreement, or any consent to any departure by any party from the terms hereof, shall not be effective in any event unless the same is in writing and signed by Agent and Subordinated Creditors, and then such modification, waiver or consent shall be effective only in the specific instance and for the specific purpose given.  Any notice to or demand on any party hereto in any event not specifically required hereunder shall not entitle the party receiving such notice or demand to any other or further notice or demand in the same, similar or other circumstances unless specifically required hereunder.

7.    **Further Assurances**.  Each party to this Agreement promptly will execute and deliver such further instruments and agreements and do such further acts and things as may be

reasonably requested in writing by any other party hereto that may be necessary or desirable in order to effect fully the purposes of this Agreement.

8. **Notices**.  Unless otherwise specifically provided herein, any notice delivered under this Agreement shall be in writing addressed to the respective party as set forth below and may be personally served, electronic mail or sent by overnight courier service or certified or registered United States mail.  All notices or demands sent in accordance with this Section shall be deemed received on the earlier of the date of actual receipt or three Business Days after the deposit thereof in the mail; provided, that, (a) notices sent by overnight courier service shall be deemed to have been given when received, (b) notices by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient) and (c) notices by electronic mail shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgment).

Notices shall be addressed as follows:

If to Ketcham:

John Ketcham
626 Adelaide Dr., Santa Monica, CA 90402
Email:  johnkketcham@gmail.com

With a copy to:

Holmes Weddle & Barcott, P.C.
3101 Western Avenue, Suite 500
Seattle, WA 98121
Attention:  John Casperson
Email:  jcasperson@hwb-law.com

If to a Company:

c/o Alaska Fish Holdings, LLC
4317 South 188th Street
SeaTac, Washington  98188
Attention:  Lisa May
Email:  lisamay67@gmail.com

With a copy to:

Stoel Rives LLP
510 L Street, Suite 500
Anchorage, AK 99501-1959
Attention:  John Kauffman
Email:  john.kauffman@stoel.com

If to Agent or Senior Lenders:

Wells Fargo Bank, National Association
1800 Century Park East, Suite 1300
Los Angeles, CA 90067
Attention:  Regional Credit Manager
Email:  gary.harrigian@wellsfargo.com

With a copy to:

Goldberg Kohn Ltd.
55 East Monroe Street, Suite 3300
Chicago, Illinois  60603
Attention:  William A. Starshak, Esq.
Email:  william.starshak@goldbergkohn.com

or in any case, to such other address as the party addressed shall have previously designated by written notice to the serving party, given in accordance with this <u>Section 8</u>.

9.    **Successors and Assigns; Permitted Refinancing**.  This Agreement shall inure to the benefit of, and shall be binding upon, the respective successors and assigns of Agent, Senior Lenders, Subordinated Creditor and the Companies.  To the extent permitted under the Senior Debt Documents, Senior Lenders may, from time to time, without notice to Subordinated Creditor, assign or transfer any or all of the Senior Debt or any interest therein to any Person and, notwithstanding any such assignment or transfer, or any subsequent assignment or transfer, the Senior Debt shall, subject to the terms hereof, be and remain Senior Debt for purposes of this Agreement, and every permitted assignee or transferee of any of the Senior Debt or of any interest therein shall, to the extent of the interest of such permitted assignee or transferee in the Senior Debt, be entitled to rely upon and be the third party beneficiary of the subordination provided under this Agreement and shall be entitled to enforce the terms and provisions hereof to the same extent as if such assignee or transferee were initially a party hereto.  Subordinated Creditor agrees that any party that consummates a Permitted Refinancing may rely on and enforce this Agreement.  Subordinated Creditor further agrees that he will, at the request of Agent, enter into an agreement, in the form of this Agreement, <u>mutatis mutandis</u>, with the party that consummates the Permitted Refinancing; provided, that the failure of Subordinated Creditor to execute such an agreement shall not affect such party's right to rely on and enforce the terms of this Agreement.

10.    **Relative Rights**.  This Agreement shall define the relative rights of Senior Secured Parties and Subordinated Creditors.  Nothing in this Agreement shall (a) impair, as among the Companies and Senior Secured Parties and as between the Companies and Subordinated Creditors, the obligation of the Companies with respect to the payment of the Senior Debt and the Subordinated Debt in accordance with their respective terms or (b) affect the relative rights of Senior Secured Parties or Subordinated Creditor with respect to any other creditors of any Company.

11.    **Conflict**.  In the event of any conflict between any term, covenant or condition of this Agreement and any term, covenant or condition of any of the Subordinated Debt Documents, the provisions of this Agreement shall control and govern.

12.    **Headings**.  The paragraph headings used in this Agreement are for convenience only and shall not affect the interpretation of any of the provisions hereof.

13.    **Counterparts**.  This Agreement may be executed in any number of identical counterpart copies, and by different parties on separate counterparts, each of which, when executed and delivered, shall be an original, but all of which, when taken together, shall constitute one and the same agreement.  Execution of any such counterpart may be by means of (a) an electronic signature that complies with the federal Electronic Signatures in Global and National Commerce Act, state enactments of the Uniform Electronic Transactions Act, or any other relevant and applicable electronic signatures law; (b) an original manual signature; or (c) a faxed, scanned, or photocopied manual signature (including Tagged Image Format File (TIFF) or Portable Document Format (PDF)).  Each electronic signature or faxed, scanned, or photocopied manual signature shall for all purposes have the same validity, legal effect, and admissibility in evidence as an original manual signature.

14.    **Severability**.  In the event that any provision of this Agreement is deemed to be invalid, illegal or unenforceable by reason of the operation of any law or by reason of the interpretation placed thereon by any court or governmental authority, the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby, and the affected provision shall be modified to the minimum extent permitted by law so as most fully to achieve the intention of this Agreement.

15.    **Continuation of Subordination; Termination of Agreement**.  This Agreement shall be applicable both before and after the commencement of any Proceeding and all converted or succeeding cases in respect thereof.  Accordingly, the provisions of this Agreement are intended to be and shall be enforceable as a subordination agreement within the meaning of Section 510 of the Bankruptcy Code.  This Agreement shall remain in full force and effect until the payment in full of the Senior Debt after which this Agreement shall terminate without further action on the part of the parties hereto; provided, that if any payment is, subsequent to such termination, recovered from any holder of Senior Debt, this Agreement shall be reinstated; provided, further that a Permitted Refinancing shall not be deemed to be payment in full of the Senior Debt.

16.    **APPLICABLE LAW.  THIS AGREEMENT SHALL BE GOVERNED BY AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES.**

17.    **CONSENT TO JURISDICTION**.  SUBORDINATED CREDITOR AND EACH COMPANY HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE CITY OF NEW YORK, STATE OF NEW YORK AND IRREVOCABLY AGREES THAT, SUBJECT TO AGENT'S ELECTION, ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE LITIGATED IN SUCH COURTS.  SUBORDINATED CREDITOR AND EACH COMPANY

EXPRESSLY SUBMITS AND CONSENTS TO THE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS. SUBORDINATED CREDITOR AND EACH COMPANY HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON IT BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO SUBORDINATED CREDITOR AND EACH COMPANY AT THEIR RESPECTIVE ADDRESSES SET FORTH IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE 10 DAYS AFTER THE SAME HAS BEEN POSTED.

18.    **WAIVER OF JURY TRIAL**.    SUBORDINATED CREDITOR, EACH COMPANY AND AGENT HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OF THE SUBORDINATED DEBT DOCUMENTS OR ANY OF THE SENIOR DEBT DOCUMENTS.    SUBORDINATED CREDITOR, EACH COMPANY AND AGENT ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE SENIOR DEBT DOCUMENTS AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS.    SUBORDINATED CREDITOR, EACH COMPANY AND AGENT WARRANTS AND REPRESENTS THAT EACH HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.

19.    **Additional Subordinated Creditor**.  The Companies and Ketcham shall cause any Person that becomes a party to the Subordinated Loan Agreement as a Lender to execute a joinder (in form and substance satisfactory to Agent) to this Agreement to bind such Person to this Agreement as a Subordinated Creditor.

20.    **Prevailing Parties**.  In the event it becomes necessary for any Senior Secured Party or Subordinated Creditor to commence or become a party to any proceeding or action to enforce the provisions of this Agreement, the court or body before which the same shall be tried shall award to the prevailing party all costs and expenses thereof, including reasonable attorneys' fees, the usual and customary and lawfully recoverable court costs, and all other expenses in connection therewith.

21.    **Conflict**.  In the event of any conflict between any term, covenant or condition of this Agreement and any term, covenant or condition of any of the Subordinated Creditors Subordination Agreement, the Subordinated Debt Documents, or Senior Debt Documents, the provisions of this Agreement shall control and govern.

[Signature Pages Follow]

**COMPANIES**:

NORTHWEST FISH COMPANY, LLC, a Washington
limited liability company, as a Borrower

By: *Rodger May*
_____
Name: Rodger May
Title: President

PETER PAN SEAFOOD COMPANY, LLC, an Alaska
limited liability company, as a Borrower

By: *Rodger May*
_____
Name: Rodger May
Title: President

ALASKA FISH HOLDINGS, LLC, a Delaware limited
liability company, as a Guarantor

By: *Rodger May*
_____
Name: Rodger May
Title: President

RAYMOND MACHINE SHOP, LLC, a Washington
limited liability company, as a Guarantor

By: *Rodger May*
_____
Name: Rodger May
Title: President

IN WITNESS WHEREOF, Subordinated Creditors, the Companies and Agent have caused this Agreement to be executed as of the date first above written.

**SUBORDINATED CREDITORS**:

By: _John Ketcham_____

**JOHN KETCHAM**, an individual

**AGENT**:

**WELLS FARGO BANK, NATIONAL ASSOCIATION**, as Agent

By _____

Name: Cameron Scott

Title Director

# EXHIBIT 2

## SUBORDINATION AGREEMENT

This Subordination Agreement (this "Agreement") is entered into as of July 12, 2023, by and between RRG GLOBAL PARTNERS PISCES, L.P., a Delaware limited partnership ("RRG"), RODGER MAY, ("May"), NIF SEAFOOD LENDER, LLC, a Delaware limited liability company ("NIF" and together with RRG and May, the "Existing Lenders" and each, an "Existing Lender" with the Existing Lenders also referred to herein as the "Subordinating Parties" and each, a "Subordinating Party"), JOHN KETCHAM (the "Ketcham Lender"), and PETER PAN SEAFOOD COMPANY, LLC, an Alaska limited liability company (the "Borrower").  Unless otherwise defined herein, capitalized terms used herein shall have the meaning provided such terms in the Ketcham Lender Loan Agreement referred to below.

## RECITALS

WHEREAS, the Ketcham Lender is making a loan to Borrower pursuant to and in accordance with, that certain Loan Agreement dated as of the date hereof, between Ketcham Lender and the Borrower (as amended, modified or supplemented from time to time, the "Ketcham Loan Agreement") and is evidenced by the Note; and

WHEREAS, the Existing Lenders made loans to the Borrower pursuant to and in accordance with, that certain Loan Agreement dated as of February 28, 2023, as Amended and Restated as of May 23, 2023 (as amended, modified or supplemented from time to time, the "Existing Loan Agreement") by and among the Borrower and the Existing Lenders and is evidenced by (i) that certain Amended and Restated Subordinated Promissory Note, dated as of May 23, 2023 in the principal amount of $31,655,812 (plus paid in kind interest), issued by Borrower in favor of May (the "May Note"), (ii) that certain Amended and Restated Subordinated Promissory Note, dated as of May 23, 2023 in the principal amount of $7,550,267 (plus paid in kind interest), issued by Borrower in favor of RRG (the "RRG Note"), and (iii) that certain Amended and Restated Subordinated Promissory Note, dated as of May 23, 2023 in the principal amount of $8,400,000 (plus paid in kind interest), issued by Borrower in favor of NIF (the "NIF Note" and together with the May Note and the RRG Note, the "Existing Notes" and the foregoing amounts outstanding thereunder the "Existing Indebtedness"); and

WHEREAS, the Existing Notes are secured by a lien and security interest in the Port Moller Real Property pursuant to that certain Deed of Trust, Assignment of Rents and Security Agreement (and Fixture Filing) dated as of May 23, 2023 and recorded on May 23, 2023 by the Recording District 305 – Aleutian Islands, Alaska under recording number 2023-000120-0 granted by Borrower to Chicago Title Insurance Company as trustee (the "Trustee") in favor of the Existing Lenders (the "Existing Deed of Trust");

WHEREAS, the Note will be secured by a lien and security interest in the Port Moller Real Property pursuant to that certain Deed of Trust, Assignment of Rents and Security Agreement (and Fixture Filing) dated as the date hereof which will be recorded in Recording District 305 – Aleutian Islands, Alaska in favor of the Ketcham Lender (the "Ketcham Deed of Trust", and together with the Ketcham Loan Agreement and such other documents executed in connection therewith, the "Ketcham Loan Documents");

WHEREAS, the Ketcham Lender requires, as a term and condition of its loan to Borrower under the Ketcham Lender Loan Agreement, that the Ketcham Deed of Trust be senior to the Existing Deed of Trust, and that all Subordinated Indebtedness (as defined below) under the Existing Loan Agreement owing to the Existing Lenders, be subordinate and subject in right and time of payment, to the extent set forth herein, to the prior payment in full of all indebtedness under the Ketcham Loan Agreement.

NOW, THEREFORE, the Existing Lenders, the Ketcham Lender and the Borrower agree as follows:

1.      In order to induce the Ketcham Lender to make financial accommodations to Borrower provided for in the Ketcham Loan Agreement and the Note, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Borrower and the Existing Lenders hereby agree with the Ketcham Lender that, so long as any Ketcham Indebtedness or Existing Indebtedness (as each are hereinafter defined, including all existing and hereafter arising indebtedness, obligations and liabilities of Borrower to the Existing Lenders, howsoever created, arising or evidenced, whether direct, indirect or contingent, and all claims, rights, causes of action, judgments and decrees in respect of the foregoing, including, without limitation, arising out of, or in connection with the Existing Loan or the Existing Notes) is outstanding, each such party will comply with such of the following provisions as are applicable to it.

2.      The term "Ketcham Indebtedness" shall mean any and all loans, advances, extensions of credit to, and all other indebtedness, obligations and liabilities, now existing or hereafter arising, direct, indirect or contingent, of Borrower now or hereafter owing to the Ketcham Lender, outstanding from time to time, whether pursuant to the Ketcham Loan Agreement, the Note or otherwise, together with interest thereon and all fees, expenses and other amounts (including costs of collection and reasonable attorneys' fees) at any time owing to the Ketcham Lender, whether arising in connection with the Ketcham Lender Loan Agreement, the Note or such other indebtedness and all guaranties of the foregoing.

3.      The term "Subordinated Indebtedness" shall mean all Existing Indebtedness other than the "Priority Loans" in aggregate principal amount of $17,000,000 (plus paid in kind interest) as identified and defined in the Existing Loan Agreement.

4.      The Existing Lenders subordinate their lien on the Port Moller Real Property created by the Existing Deed of Trust to the lien created by the Ketcham Deed of Trust. Each Subordinating Party further covenants and agrees, notwithstanding anything to the contrary contained in any of the Existing Loan Agreement, Existing Notes or Existing Deed of Trust, that the payment of any and all of the Subordinated Indebtedness shall be subordinate and subject in right and time of payment, to the extent and in the manner hereinafter set forth, to the prior payment in full of the Ketcham Indebtedness, regardless of whether the Ketcham Indebtedness or any lien securing the Ketcham Indebtedness is declared or ruled to be invalid, unenforceable, subordinated, void or not allowed by any court of competent jurisdiction and regardless of any action taken or not taken by the Ketcham Lender with respect to any document (including any financing statement) required to be executed or filed for perfection of any such lien securing the Ketcham Indebtedness. The Ketcham Lender, and any holder of any Ketcham Indebtedness, whether now

outstanding or hereafter created, incurred, assumed or guaranteed, shall be deemed to have acquired the Ketcham Indebtedness in reliance upon the provisions contained in this Agreement.

     5.     Subject to the Ketcham Subordination Agreement, in the event of any voluntary or involuntary insolvency, bankruptcy, receivership, custodianship, liquidation, dissolution, reorganization, assignment for the benefit of creditors, appointment of a custodian, receiver, trustee or other officer with similar powers or any other proceeding for the liquidation, dissolution or other winding up of any natural person, corporation, general or limited partnership, limited liability company, firm, trust, association, government, governmental agency or other entity, whether acting in an individual, fiduciary or other capacity ("Person"), involving Borrower (a "Proceeding"):

     a.    All Ketcham Indebtedness shall first be paid in full before any Distribution with respect to the Subordinated Indebtedness, whether in cash, securities or other property, shall be made directly or indirectly to any Subordinating Party. "Distribution" shall mean, with respect to any indebtedness or obligation, (a) any payment or distribution by any Person of cash, securities or other property, by set-off or otherwise, on account of such indebtedness or obligation, (b) any redemption, purchase or other acquisition of such indebtedness or obligation by any Person or (c) with respect to any unsecured indebtedness or obligations, the granting of any lien or security interest to or for the benefit of the holders of such indebtedness or obligation in or upon any property of any Person.

     b.    Any Distribution, whether in cash, securities or other property which would otherwise, but for the terms hereof, be payable or deliverable in respect of the Subordinated Indebtedness shall be paid or delivered directly to the Ketcham Lender until all Ketcham Indebtedness is paid in full. Each Subordinating Party irrevocably authorizes, empowers and directs any debtor, debtor in possession, receiver, trustee, liquidator, custodian, conservator or other Person having authority, to pay or otherwise deliver all such Distributions received with respect to the Subordinated Indebtedness to the Ketcham Lender. Each Subordinating Party also irrevocably authorizes and empowers the Ketcham Lender, in the name of such Subordinating Party, to demand, sue for, collect and receive any and all such Distributions.

     c.    Each Subordinating Party agrees to execute, verify, deliver and file any proofs of claim in respect of the Subordinated Indebtedness requested by the Ketcham Lender in connection with any such Proceeding and hereby irrevocably authorizes, empowers and appoints the Ketcham Lender, his agent, and attorney-in-fact to (i) execute, verify, deliver and file such proofs of claim upon the failure of Subordinating Party promptly to do so prior to 30 days before the expiration of the time to file any such proof of claim and (ii) vote such claim in any such Proceeding upon the failure of Subordinating Party to do so prior to 15 days before the expiration of the time to vote any such claim; provided, the Ketcham Lender shall have no obligation to execute, verify, deliver, file and/or vote any such proof of claim. In the event that the Ketcham Lender votes any

claim in accordance with the authority granted hereby, the Subordinating Party shall not be entitled to change or withdraw such vote.

d.   The Ketcham Indebtedness shall continue to be treated as senior secured indebtedness with respect to the Subordinated Indebtedness and the provisions of this Agreement shall continue to govern the relative rights and priorities of the Ketcham Lender and Subordinating Parties even if all or part of the Ketcham Indebtedness or the security interests securing the Ketcham Indebtedness are subordinated, set aside, avoided, invalidated or disallowed in connection with any such Proceeding.

6.   Notwithstanding the terms of the Existing Loan Agreement, Existing Notes, or Existing Deed of Trust, and in addition to any other limitations set forth herein or therein, Borrower hereby agrees that it may not make, and each Subordinating Party hereby agrees that it may not accept, any Distribution with respect to the Subordinated Indebtedness until the Ketcham Indebtedness is paid in full, unless at the time of such Distribution there is a Proceeding involving any Subordinating Party (in which event Section 5 of this Agreement shall apply).

7.   The lien under the Existing Deed of Trust shall be and shall remain, at all times, and in each and every respect, subject and subordinate to the lien of the Ketcham Deed of Trust and the Note, and to any and all renewals, amendments, modifications, supplements, extensions, consolidations, and replacements thereof, including without limitation, amendments which increase the amount of the Ketcham Indebtedness.

8.   Except as otherwise agreed to in writing by Senior Secured Party (defined below), Ketcham Lender and Existing Lenders, each of the parties hereto hereby acknowledge and agree that all proceeds of any exercise of remedies with respect to the Ketcham Deed of Trust or Existing Deed of Trust shall be paid (i) first, to the Senior Secured Party (defined below) for application to the Senior Debt (as defined in the defined below Ketcham Subordination Agreement) in the order and manner set forth in the Senior Debt Documents (as defined in the Ketcham Subordination Agreement) until such time as the Senior Debt is Paid in Full (as defined in the Ketcham Subordination Agreement), (ii) second, to Ketcham Lender for application to the Ketcham Indebtedness Debt until such time as the Ketcham Indebtedness is paid in full, (iii) third, to Existing Lenders for application to the Existing Indebtedness until such time as the Existing Indebtedness is paid in full, and (iv) fourth, to such parties entitled to the remainder of any such proceeds under applicable law.

9.   Subordinated Indebtedness Standstill Provisions; Subordinated Indebtedness Default; Enforcement.

a.   Until the Ketcham Indebtedness is paid in full, no Existing Lender shall, without the prior written consent of the Ketcham Lender, take any Enforcement Action with respect to the Subordinated Indebtedness or the Port Moller Real Property or under the Existing Deed of Trust.  Any Distributions or other proceeds of any Enforcement Action obtained by any Subordinating Party with respect to the Subordinated Indebtedness shall in any event be held in trust by it for the benefit of the Ketcham Lender and promptly paid or delivered to the

Ketcham Lender in the form received until the Ketcham Indebtedness is paid in full. "Enforcement Action" shall mean (a) to take from or for the account of any Subordinating Party or any guarantor of the Subordinated Indebtedness, by set-off or in any other manner, the whole or any part of any moneys which may now or hereafter be owing by any Subordinating Party or any such guarantor with respect to the Subordinated Indebtedness, (b) to initiate or participate with others in any suit, action or proceeding against any Subordinating Party or any such guarantor to (i) sue for or enforce payment of the whole or any part of the Subordinated Indebtedness, (ii) commence or join with other Persons to commence a Proceeding with respect to any Subordinating Party or any guarantor with respect to the Subordinated Indebtedness, or (iii) commence judicial enforcement of any of the rights and remedies under the Existing Loan agreement or Existing Notes or applicable law with respect to the Subordinated Indebtedness, (c) to accelerate the Subordinated Indebtedness, (d) to take any action to enforce any rights or remedies with respect to the Subordinated Indebtedness, (e) to exercise any put option or to cause any Subordinating Party or any such guarantor to honor any redemption or mandatory prepayment obligation with respect to the Subordinated Indebtedness, or (f) to exercise any rights or remedies of a secured party with respect to the Subordinated Indebtedness under the Existing Loan Agreement or Existing Notes or applicable law or take any action under the provisions of any state or federal law, including, without limitation, the Uniform Commercial Code, or under any contract or agreement, to enforce, foreclose upon, take possession of or sell any property or assets of any Subordinating Party or any such guarantor in each case in respect of the Subordinated Indebtedness.

b.  If any Distribution on account of the Subordinated Indebtedness not permitted to be made by a Subordinating Party or accepted by a Subordinating Party under this Agreement is received by any other Subordinating Party, such Distribution shall not be commingled with any of the assets of such receiving party, shall be held in trust by such receiving party for the benefit of the Ketcham Lender and shall be promptly paid over to the Ketcham Lender for application (in accordance with the Ketcham Lender Loan Agreement) to the payment of the Ketcham Indebtedness then remaining unpaid, until all of the Ketcham Indebtedness is paid in full.

10.    The Existing Lenders shall not sell, assign, pledge, dispose of or otherwise transfer all or any portion of the Subordinated Indebtedness without the Ketcham Lender's prior written consent. Notwithstanding the failure of the Existing Lenders to obtain the Ketcham Lender's prior written consent as required by the foregoing sentence, the subordination effected hereby shall survive any sale, assignment, pledge, disposition or other transfer of all or any portion of the Subordinated Indebtedness, and the terms of this Agreement shall be binding upon the successors and assigns of the Existing Lenders, as provided in Section 18 hereof.

11.    All rights and interest of the Ketcham Lender hereunder, and all agreements and obligations of the Subordinating Parties hereunder, shall remain in full force and effect irrespective of: (a) any lack of validity or enforceability of any document evidencing any of the Ketcham

Indebtedness; (b) any change in the time, manner or place of payment of, or any other term of, all or any of the Ketcham Indebtedness, or any other permitted amendment or waiver of or any release or consent to departure from any of the Ketcham Loan Documents; (c) any exchange, subordination, release or non-perfection of any collateral for all or any of the Ketcham Indebtedness; (d) any failure of the Ketcham Lender to assert any claim or to enforce any right or remedy against any other party hereto under the provisions of this Agreement or any Ketcham Loan Document other than this Agreement; (e) any reduction, limitation, impairment or termination of the Ketcham Indebtedness for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to (and the Subordinating Parties hereby waive any right to or claim of) any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of invalidity, illegality, nongenuiness, irregularity, compromise, unenforceability of, or any other event or occurrence affecting, any Ketcham Indebtedness; and (f) any other circumstance which might otherwise constitute a defense available to, or a discharge of, Borrower in respect of the Ketcham Indebtedness or Subordinated  Indebtedness in respect of this Agreement.

The Subordinating Parties acknowledge and agree that the Ketcham Lender may in accordance with the terms of the Senior Debt Documents, but subject to the Ketcham Subordination Agreement, without notice or demand and without affecting or impairing the Subordinating Parties' obligations hereunder, (i) modify the Ketcham Loan Documents; (ii) take or hold security for the payment of the Ketcham Indebtedness and exchange, enforce, foreclose upon, waive and release any such security; (iii) apply such security and direct the order or manner of sale thereof as the Ketcham Lender in his sole discretion, may determine; (iv) release and substitute one or more endorsers, warrantors, borrowers or other obligors; and (v) exercise or refrain from exercising any rights against Borrower or any other Person.  The Ketcham Indebtedness shall continue to be treated as senior secured debt with respect to the Subordinated Indebtedness and the provisions of this Agreement shall continue to govern the relative rights and priorities of the Ketcham Lender and the Subordinating Parties even if all or part of the Ketcham Indebtedness or the security interests securing the Ketcham Indebtedness are subordinated, set aside, avoided, invalidated or disallowed.

12.     Each Existing Lender and the Ketcham Lender agree that they will provide each other with written notice of the occurrence of default by Borrower under their respective loan instruments, which notice shall be sent no later than fifteen (15) days after an Existing Lender or the Ketcham Lender has made a determination that a default has occurred.  Each Existing Lender and the Ketcham Lender agree not to foreclose on the Port Moller Real Property or accept a deed in lieu of foreclosure without providing no less than forty-five (45) days prior written notice to the other such lender and an opportunity for that lender to cure such default.

13.     The Subordinating Parties agree that they will not take any action that will impede, interfere with or restrict or restrain the exercise by the Ketcham Lender of rights and remedies under the Ketcham Deed of Trust and will take such commercially reasonable actions as the holder of the Existing Deed of Trust as may be reasonably necessary or appropriate to effectuate the subordination provided in this Agreement.

14.     The Ketcham Lender and each Subordinating Party acknowledges and agrees that the terms and provisions of this Agreement (including, without limitation, the rights and remedies

of the Ketcham Lender and each Existing Lender) are subject to, as applicable, the terms and provisions of (i) that certain Subordination and Intercreditor Agreement dated as of the date hereof (as amended, supplemented, or otherwise modified from time to time in accordance with its terms, the "Ketcham Subordination Agreement"), among the Ketcham Lender, Wells Fargo Bank, National Association, a national banking association, as agent for certain lenders ("Senior Secured Party"), Borrower, and the other parties party thereto, and (ii) that certain Amended and Restated Subordination and Intercreditor Agreement dated as of May 23, 2023 (as amended, supplemented, or otherwise modified from time to time in accordance with its terms, the "Existing Subordination Agreement"), among the Existing Lenders, Senior Secured Party, Borrower, and the other parties party thereto. The Ketcham Lender further agrees not to take any action under this Agreement or to otherwise exercise, or commence judicial enforcement of, any of the rights and remedies under this Agreement or to accept or demand any Distribution (as defined in the Ketcham Subordination Agreement) on account of the Existing Indebtedness until the Senior Debt is Paid in Full (as each such term is defined in the Ketcham Subordination Agreement). Notwithstanding anything to the contrary, the Ketcham Lender and each Subordinating Party acknowledges and agrees that in the event of any conflict between any term, covenant or condition of this Agreement and any term, covenant or condition of any of the Ketcham Subordination Agreement, the Existing Subordination Agreement, the Subordinated Debt Documents (as defined in the Ketcham Subordination Agreement), the Subordinated Debt Documents (as defined in the Existing Subordination Agreement), or the Senior Debt Documents (as defined in the Ketcham Subordination Agreement), the provisions of the Ketcham Subordination Agreement shall control and govern. Senior Secured Party is an intended third-party beneficiary of the provisions of this Section and shall have the right to enforce the provisions of this Section against the parties hereto as if it was a party. Without the Senior Secured Party's prior written consent, this Section shall not be amended or otherwise modified, and this Agreement shall not be amended or otherwise modified to have such an effect, until the Senior Debt is Paid in Full.

15.    Unless otherwise specifically provided herein, any notice delivered under this Agreement shall be in writing addressed to the respective party as set forth below and may be personally served, electronic mail or sent by overnight courier service or certified or registered United States mail. All notices or demands sent in accordance with this Agreement shall be deemed received on the earlier of the date of actual receipt or five (5) days after the deposit thereof in the mail; provided, that, (a) notices sent by overnight courier service shall be deemed to have been given when received, and (b) notices by electronic mail shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgment).

Notices shall be addressed as follows:

If to RRG:

RRG Global Partners Pisces, L.P.
5701 Truxtun Avenue, Suite 200
Bakersfield, California 93309
Attention:  Ari Swiller
Email:  aswiller@renewablegroup.com

If to May:

Rodger May
17837 1st Ave South, PMB 310
Normandy Park, Washington 98148
Email:  RodgerM@ppsf.com

If to NIF:

NIF Seafood Lender, LLC
3800 Centerpoint Drive, Suite 1100
Anchorage, Alaska 99503
Attention:  Robert A. Gillam
Email:  rgillam@mckinleymgmt.com

If to Borrower:

c/o Alaska Fish Holdings, LLC
4317 South 188th Street
SeaTac, Washington  98188
Attention:  Lisa May
Email:  lisamay67@gmail.com

With a copy to:

Stoel Rives LLP
510 L Street, Suite 500
Anchorage, AK 99501-1959
Attention:  John Kauffman
Email:  john.kauffman@stoel.com

If to Ketcham Lender:

John Ketcham
626 Adelaide Dr.
Santa Monica, CA 90402
Email: johnkketcham@gmail.com

With a copy to:

Holmes Weddle & Barcott, P.C.
3101 Western Avenue, Suite 500
Seattle, WA 98121
Attention: John Casperson
Email: jcasperson@hwb-law.com

16.     The Subordinating Parties will execute such further documents or instruments and take such further action as the Ketcham Lender may reasonably request from time to time request to carry out the intent of this Agreement.

17.     This Agreement shall be binding upon the Subordinating Parties and upon the heirs, legal representatives, successors and assigns of each Subordinating Party and the successors and assigns of the Ketcham Lender.

18.     This Agreement shall be governed by and construed under the laws of the State of in which the Port Moller Real Property is located in.

**19.     <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE KETCHAM LENDER AND SUBORDINATING PARTIES, TO THE FULL EXTENT NOW OR HEREAFTER PERMITTED BY APPLICABLE LAW, HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS.  EACH OF THE PARTIES HERETO REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

20.     This Agreement and any supplements or amendments hereto represents the entire agreement and understanding concerning the subject matter hereof among the parties hereto, and supersedes all other prior agreements, understandings, negotiations and discussions, representations, warranties, commitments, proposals, offers and contracts concerning the subject matter hereof, whether oral or written.  In the event of any inconsistency between the terms of this Agreement and any schedule or exhibit hereto, the terms of this Agreement shall govern.

21.     This Agreement may be executed in counterparts and by facsimile or other electronic signatures, each of which when so executed, shall be deemed an original, but all of which shall constitute but one and the same instrument.

22.     Wherever possible each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the undersigned have caused this Subordination Agreement to be duly executed and delivered as of the date set forth above.

**EXISTING LENDERS:**

RRG GLOBAL PARTNERS PISCES, L.P.

By: _Ari Swiller_____
Name: J. Ari Swiller
Title: Authorized Signatory


By: _____
**RODGER MAY**, an individual


NIF SEAFOOD LENDER, LLC

By:    MCKINLEY ALASKA PRIVATE INVESTMENT, LLC – SERIES 1, its Manager

By:    McKinley Management, LLC, its Manager


By: _____
Name: Robert A. Gillam
Title: President and Chief Executive Officer


**KETCHAM LENDER:**


By: _____
**JOHN KETCHAM**, an Individual


THE UNDERSIGNED BORROWER ACCEPTS AND
CONSENTS TO THE TERMS OF THIS AGREEMENT:


# PETER PAN SEAFOOD COMPANY, LLC

By:_____
Name: Rodger May
Title: President

IN WITNESS WHEREOF, the undersigned have caused this Subordination Agreement to be duly executed and delivered as of the date set forth above.

**EXISTING LENDERS:**

RRG GLOBAL PARTNERS PISCES, L.P.

By: _____
Name: J. Ari Swiller
Title: Authorized Signatory

By: *Rodger May*_____
**RODGER MAY**, an individual

NIF SEAFOOD LENDER, LLC

By:    MCKINLEY ALASKA PRIVATE INVESTMENT, LLC – SERIES 1, its Manager

By:    McKinley Management, LLC, its Manager

By: _____
Name: Robert A. Gillam
Title: President and Chief Executive Officer

**KETCHAM LENDER:**

By: _____
**JOHN KETCHAM**, an Individual

THE UNDERSIGNED BORROWER ACCEPTS AND
CONSENTS TO THE TERMS OF THIS AGREEMENT:

# PETER PAN SEAFOOD COMPANY, LLC

By: *Rodger May*_____
Name: Rodger May
Title: President

IN WITNESS WHEREOF, the undersigned have caused this Subordination Agreement to be duly executed and delivered as of the date set forth above.

**EXISTING LENDERS:**

RRG GLOBAL PARTNERS PISCES, L.P.

By: _____
Name: J. Ari Swiller
Title: Authorized Signatory

By: _____
**RODGER MAY**, an individual

NIF SEAFOOD LENDER, LLC

By:     MCKINLEY ALASKA PRIVATE INVESTMENT, LLC – SERIES 1, its Manager

By:     McKinley Management, LLC, its Manager

By: _____
Name: Robert A. Gillam
Title: President and Chief Executive Officer

**KETCHAM LENDER:**

By: _____
**JOHN KETCHAM**, an Individual

THE UNDERSIGNED BORROWER ACCEPTS AND
CONSENTS TO THE TERMS OF THIS AGREEMENT:

# PETER PAN SEAFOOD COMPANY, LLC

By:_____
Name: Rodger May
Title: President

IN WITNESS WHEREOF, the undersigned have caused this Subordination Agreement to be duly executed and delivered as of the date set forth above.

**EXISTING LENDERS:**

RRG GLOBAL PARTNERS PISCES, L.P.

By: _____
Name: J. Ari Swiller
Title: Authorized Signatory


By: _____
**RODGER MAY**, an individual


NIF SEAFOOD LENDER, LLC

By:     MCKINLEY ALASKA PRIVATE INVESTMENT, LLC – SERIES 1, its Manager

By:     McKinley Management, LLC, its Manager


By: _____
Name: Robert A. Gillam
Title: President and Chief Executive Officer


**KETCHAM LENDER:**

By: *John Ketcham* _____
**JOHN KETCHAM**, an Individual


THE UNDERSIGNED BORROWER ACCEPTS AND
CONSENTS TO THE TERMS OF THIS AGREEMENT:


# PETER PAN SEAFOOD COMPANY, LLC

By: _____
Name: Rodger May
Title: President

# EXHIBIT 3

A
L
A
S
K
A

**2023–000209–0**

Recording Dist: 305 - Aleutian Islands
8/14/2023 11:25 AM Pages: 1 of 24

**AFTER RECORDING RETURN TO:**

**Peter Pan Seafood Company, LLC**
**Attn: Kevin Bixler**
**3015 112th Ave. NE**
**Ste 150**
**Bellevue, WA 98004-8001**

---

| | |
|---|---|
| **Document Title**: | Deed of Trust, Assignment of Rents and Security Agreement (and Fixture Filing) |
| **Grantor**: | Peter Pan Seafood Company, LLC, a Washington limited liability company |
| **Trustee**: | Chicago Title Insurance Company |
| **Beneficiary**: | John Ketcham |
| **Tax Parcel No.** | N/A |

---

THIS DOCUMENT SECURES A PROMISSORY NOTE WHICH MAY CONTAIN PROVISIONS FOR ADVANCES OF PRINCIPAL, FOR ADJUSTMENTS IN THE INTEREST RATE, CHARGES AND PAYMENT AMOUNTS AND A BALLOON PAYMENT.

THIS INSTRUMENT CONSTITUTES A SECURITY AGREEMENT AS THAT TERM IS DEFINED IN THE UNIFORM COMMERCIAL CODE. PORTIONS OF THE COLLATERAL ARE GOODS THAT ARE OR ARE TO BECOME FIXTURES ON THE PROPERTY DESCRIBED HEREIN.  THIS INSTRUMENT IS INTENDED TO SERVE AS A FIXTURE FILING AND IS TO BE RECORDED IN THE REAL PROPERTY RECORDS OF EACH COUNTY IN WHICH SAID LAND OR ANY PORTION THEREOF IS LOCATED AND INDEXED AS BOTH A DEED OF TRUST AND A FIXTURE FILING.

## DEED OF TRUST, ASSIGNMENT OF RENTS
## AND SECURITY AGREEMENT (AND FIXTURE FILING)

THIS DEED OF TRUST, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT (AND FIXTURE FILING) (this "**Deed of Trust**") is made effective as of the 12th day of July, 2023, made by Peter Pan Seafood Company, LLC, a Washington limited liability company, whose address is 3035 112th Ave. NE, Suite 150, Bellevue, Washington 98004 (hereinafter called "**Grantor**") to Chicago Title Insurance Company, whose address is 701 5th Avenue, Suite 2700, Seattle, WA 98104, hereinafter called "**Trustee**"), for the benefit of John Ketcham, whose address is 626 Adelaide Dr., Santa Monica, CA 90402 ("**Beneficiary**").

### W I T N E S E T H:

That, in consideration for Beneficiary's willingness to enter into the Promissory Note described herein, the mutual promises contained herein, and for other good and valuable consideration, the receipt of which is hereby acknowledged, Grantor does hereby irrevocably GRANT, BARGAIN, SELL, and CONVEY TO TRUSTEE IN TRUST, WITH POWER OF SALE, that property located in Port Moller, Aleutians East Borough, Alaska and legally described as:

**See Exhibit A.**

all of which is herein called the "**Property**."

TOGETHER WITH all rents, issues, profits, royalties, income and other benefits derived from the Property (collectively called "**Rents**"), subject to the right, power and authority hereinafter given to Grantor to collect and apply such rents;

TOGETHER WITH all leasehold estate, right, title and interest of Grantor in and to all leases or subleases covering the Property or any portion thereof now or hereafter existing or entered into; and all right, title and interest of Grantor thereunder, including, without limitation, all cash or security deposits, advance rentals, and deposits or payments of similar nature;

TOGETHER WITH all right, title and interest of Grantor in and to all options to purchase or lease the Property or any portion thereof or interest therein, and any greater estate in the Property owned or hereafter acquired;

TOGETHER WITH all interests, estate or other claims, both in law and in equity, which Grantor now has or may hereafter acquire in the Property;

TOGETHER WITH all easements, rights-of-way and rights used in connection therewith or as a means of access thereto, and all tenements, hereditaments and appurtenances thereof and thereto, and all water rights and shares of stock evidencing the same;

TOGETHER WITH all right, title and interest of Grantor, now owned or hereafter acquired, in and to any land lying within the right-of-way of any street, open or proposed, adjoining the Property; and any and all sidewalks, alleys, and strips and gores of land adjacent to or used in



connection with the Property;

TOGETHER WITH any and all buildings and improvements now or hereafter erected thereon, including, but not limited to, the fixtures attached to said buildings and improvements (collectively, the "**Improvements**");

TOGETHER WITH all the estate, interest, right, title, other claim or demand, including claims or demands with respect to the proceeds of insurance in effect with respect thereto, which Grantor now has or may hereafter acquire in the Property, and any and all awards made for the taking by eminent domain or by any proceeding or purchase in lieu thereof of the whole or any part of the Trust Estate, including, without limitation, any awards resulting from a change of grade of streets and awards for severance damages;

TOGETHER WITH all of Grantor's rights further to encumber said Property for debt, except by such encumbrance which, by its actual terms and specifically expressed intent, shall be and at all times remain subject and subordinate to: (i) any and all tenancies in existence when such encumbrance becomes effective and (ii) any tenancies thereafter created; Grantor hereby (i) representing as a special inducement to Beneficiary to make this loan that as of the date hereof there are no encumbrances to secure debt junior to this deed of trust except for the Existing Deed of Trust defined in Article VI below and (ii) covenanting that there are to be none as of the date when this deed of trust becomes of record, except in either case encumbrances having the prior written approval of Beneficiary; and

TOGETHER WITH all of Grantor's rights to enter into any lease or lease agreement which would create a tenancy that is or may become subordinate in any respect to any mortgage or deed of trust other than this Deed of Trust.

The entire estate, property, and interest hereby conveyed to Trustee may hereafter be referred to collectively as the "**Trust Estate.**"

FOR THE PURPOSE OF SECURING:

1.      Payment of indebtedness in the total original principal amount of up to Ten Million Dollars ($10,000,000.00), with interest thereon at a fixed rate, together with all costs and fees, including attorneys' fees incurred by Beneficiary in enforcing the obligations of Grantor, evidenced by (i) that certain Promissory Note, dated as of July 12, 2023 issued by Grantor in favor of Beneficiary (as the same may be amended, supplemented or otherwise modified from time to time as permitted hereunder, the "**Note**", which has been delivered pursuant to that certain Loan Agreement dated as of July 12, 2023,  (the "**Loan Agreement**") by and among Grantor and Beneficiary. The Note and the Loan Agreement, by this reference, are made a part hereof, and any and all modifications, extensions and renewals thereof.

2.      In addition to the Note, all obligations, debts and liabilities, plus interest thereon, of Grantor to Beneficiary, as well as all claims by Beneficiary against Grantor, whether now existing or hereafter arising, related to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise.

eRecorded Document

3.    Payment of all sums which may become due from Grantor or advances by Beneficiary or its successor, with interest thereon at the rate set forth in the Note, which include but are not limited to, fire and other hazard insurance and taxes upon the real property herein described, according to the terms of this Deed of Trust; payment by the Grantor of all attorneys' fees and costs incurred by the Trustee or Beneficiary in foreclosing this Deed of Trust or realizing upon any of the collateral for the obligations which this Deed of Trust secures; payment by Grantor of all attorneys' fees and costs incurred by Trustee or Beneficiary in defending the priority or validity of this Deed of Trust or the title to the Property; payment by Grantor of all sums advanced by Beneficiary to or on behalf of Grantor for the purpose of clearing encumbrances or defects from the title to the Property described in this Deed of Trust where Beneficiary, in good faith, believes such encumbrances to be superior to the lien of the Deed of Trust, including, without limitation, payment of ad valorem taxes and mechanics' or materialmen's liens which may have gained priority over the lien of this Deed of Trust; payment by Grantor of all attorneys' fees and costs incurred by Trustee or Beneficiary in any bankruptcy proceedings or any reorganization or arrangement proceeding under the Bankruptcy Act affecting Grantor, this Deed of Trust, or the covenant of Grantor herein contained or incorporated herein by reference and payment of all other sums advanced by Beneficiary to protect the Trust Estate, with interest thereon at the rate set forth in the Note.

4.    Payment of all other sums, with interest thereon, which may hereafter be loaned to Grantor, its successors, or assigns, by Beneficiary, when evidenced by a promissory note or notes reciting that they are secured by this Deed of Trust.

This Deed of Trust, the Note, the Loan Agreement, and any other instrument given to evidence or further secure the payment and performance of any obligation secured hereby may hereafter be referred to as the "**Loan Instruments**."

TO PROTECT THE SECURITY OF THIS DEED OF TRUST, GRANTOR HEREBY COVENANTS AND AGREES AS FOLLOWS:

### ARTICLE I
### COVENANTS AND AGREEMENTS OF GRANTOR

Grantor hereby covenants and agrees:

1.01.    <u>Warranties of Title and Authority</u>.  Grantor hereby represents and warrants that it is lawfully seized of an indefeasible fee title to the Property; that it has the authority and right to execute and deliver this Deed of Trust; that it shall defend the title to the Property against all claims and demands whatsoever; that the Property is free and clear of any and all liens, claims, encumbrances, restrictions, encroachments, and interest whatsoever in favor of any third party except for the lien under the Existing Deed of Trust; and that any and all obligations it may have incurred in connection with the Property are current and without default.

1.02.    <u>Payment of Secured Obligations</u>.  To pay when due the principal of, and the interest on, the indebtedness evidenced by the Note; charges, fees, and all other sums as provided in the Loan Instruments; and the principal of, and interest on, any future advances secured by this Deed of Trust.

1.03.    <u>Maintenance, Repair, Alterations</u>.  To keep the Trust Estate in good condition and repair; not to remove, demolish, or substantially alter (except such alterations as may be required by laws, ordinances, or regulations) any of the Improvements; to complete promptly and in a good and workmanlike manner any building or other improvement which may be constructed on the Property and promptly restore in like manner any Improvement which may be damaged or destroyed thereon; to pay when due all claims for labor performed and materials furnished therefor; to comply with all laws, ordinances, regulations, covenants, conditions, and restrictions now or hereafter affecting the Trust Estate or any part thereof or requiring any alterations or improvements; not to commit or permit any waste or deterioration of the Trust Estate; to keep and maintain abutting grounds, sidewalks, roads, parking and landscape areas in good and neat order and repair; to comply with the provisions of any Lease; not to commit, suffer, nor permit any act to be done in or upon the Trust Estate in violation of any law, ordinance, or regulation.

1.04.    <u>Required Insurance</u>.  At all times to provide, maintain, and keep in force, or cause to be provided, maintained, and kept in force, the following policies of insurance:

a.    Insurance against loss or damage to the Improvements by fire and any of the risks covered by insurance of the type known as "broad form of extended coverage," in an amount not less than the greater of (i) the original amount of the Note, (ii) one hundred percent (100%) of the full replacement cost of the Improvements (exclusive of the cost of excavations, foundations, and footings below the lowest basement floor), or (iii) an amount sufficient to prevent Grantor and/or Beneficiary from becoming a co-insurer within the terms of the applicable policies; and with not more than One Thousand Dollars ($1,000.00) deductible from the loss payable for any casualty.  The policies of insurance carried in accordance with this subparagraph a. shall contain the "Replacement Cost Endorsement";

b.    General liability insurance (in connection with which Beneficiary is to be a named insured) against claims for bodily injury or death or for damage or injury to property occurring upon, in or about the Trust Estate, in such amount as may be required by Beneficiary but in no event less than Five Million Dollars ($5,000,000.00) for bodily injury and Five Million Dollars ($5,000,000.00) for property damage.  Such insurance shall be in form satisfactory to Beneficiary;

c.    Such other insurance and in such amounts as may, from time to time, be reasonably required by Beneficiary against the same or other hazards; and

d.    All policies of insurance required by the terms of this Deed of Trust shall contain an endorsement or agreement by the insurer that any loss shall be payable in accordance with the terms of such policy notwithstanding any act or negligence of Grantor which might otherwise result in forfeiture of said insurance and the further agreement of the insurer waiving all rights of set-off, counterclaim, or deductions against Grantor.

1.05.    <u>Delivery of Policies; Payment of Premiums</u>.  That all policies of insurance shall be issued by companies and in amounts in each company satisfactory to Beneficiary. All policies of insurance shall have attached thereto a lender's loss payable endorsement for the benefit of Beneficiary in form satisfactory to Beneficiary. Grantor shall furnish Beneficiary with an original policy of all policies of required insurance. If Beneficiary consents to Grantor providing any of the

required insurance through blanket policies carried by Grantor and covering more than one (1) location, then Grantor shall furnish Beneficiary with a certificate of insurance for each such policy setting forth the coverage, the limits of liability, the name of the carrier, the policy number, and the expiration date. At least thirty (30) days prior to the expiration of each such policy, Grantor shall furnish Beneficiary with evidence satisfactory to Beneficiary of the payment of premium and the re- issuance of a policy continuing insurance in force as required by this Deed of Trust. All such policies shall contain a provision that such policies will not be cancelled or materially amended, which term shall include any reduction in the scope or limits of coverage without at least thirty (30) days' prior written notice to Beneficiary. In the event Grantor fails to provide, maintain, keep in force, or deliver and furnish to Beneficiary the policies of insurance required by this section, Beneficiary may procure such insurance or single-interest insurance for such risks covering Beneficiary's interest, and Grantor will pay all premiums thereon promptly upon demand by Beneficiary and, until such payment is made by Grantor, the amount of all such premiums shall be secured by this Deed of Trust.

1.06. <u>Assignment of Policies Upon Foreclosure</u>. In the event of foreclosure of this Deed of Trust or other transfer of title or assignment of the Trust Estate in extinguishment, in whole or in part, of the debt secured hereby, all right, title, and interest of Grantor in and to all policies of insurance required by Section 1.04 shall inure to the benefit of and pass to the successor in interest to Grantor or the purchaser or grantee of the Trust Estate.

1.07. <u>Indemnification; Subrogation; Waiver of Offset</u>.

a. If Beneficiary is made a party defendant to any litigation concerning this Deed of Trust or the Trust Estate or any part thereof or interest therein, or the occupancy thereof by Grantor, then Grantor shall indemnify, defend, and hold Beneficiary harmless from all liability by reason of said litigation, including reasonable attorney's fees and expenses incurred by Beneficiary in any such litigation, whether or not any such litigation is prosecuted to judgment. If Beneficiary commences an action against Grantor to enforce any of the terms hereof or because of the breach by Grantor of any of the terms hereof or for the recovery of any sum secured hereby, Grantor shall pay to Beneficiary reasonable attorney's fees and expenses, and such fees and expenses shall be deemed to have accrued on the commencement of such action, and shall be enforceable whether or not such action is prosecuted to judgment. If Grantor breaches any term of this Deed of Trust, Beneficiary may employ an attorney or attorneys to protect its rights hereunder and, in the event of such employment following any breach by Grantor, Grantor shall pay Beneficiary reasonable attorney's fees and expenses incurred by Beneficiary, whether or not an action is actually commenced against Grantor by reason of breach.

b. Grantor waives any and all right to claim or recover against Beneficiary, its officers, employees, agents, and representatives, for loss of or damage to Grantor, the Trust Estate, Grantor's property, or the property of others under Grantor's control from any cause insured against or required to be insured against by the provisions of this Deed of Trust.

c. All sums payable by Grantor hereunder shall be paid without notice, demand, counterclaim, setoff, deduction, or defense and without abatement, suspension, deferment, diminution, or reduction; and the obligations and liabilities of Grantor

hereunder shall in no way be released, discharged, or otherwise affected (except as expressly provided herein) by reason of (i) any damage to or destruction of or any condemnation or similar taking of the Trust Estate or any part thereof; (ii) any restriction or prevention of or interference with any use of the Trust Estate or any part thereof; (iii) any title defect or encumbrance or any eviction from the Property or the Improvements or any part thereof by title paramount or otherwise; (iv) any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation, or other like proceeding relating to Beneficiary, or any action taken with respect to this Deed of Trust by any trustee or receiver of Beneficiary, or by any court, in any such proceeding; (v) any claim which Grantor has or might have against Beneficiary; (vi) any default or failure on the part of Beneficiary to perform or comply with any of the terms hereof or of any other agreement with Grantor; or (vii) any other occurrence whatsoever, whether similar or dissimilar to the foregoing and whether or not Grantor shall have notice or knowledge of any of the foregoing. Except as expressly provided herein, Grantor waives all rights now or hereafter conferred by statute or otherwise to any abatement, suspension, deferment, diminution, or reduction of any sum secured hereby and payable by Grantor.

1.08. <u>Taxes and Impositions</u>.

a.     Grantor agrees to pay or cause to be paid, at least ten (10) days prior to delinquency, all real property taxes and assessments, general and special, and all other taxes and assessments of any kind or nature whatsoever, including, without limitation nongovernmental levies or charges resulting from covenants, conditions, and restrictions affecting the Trust Estate, which are assessed or imposed upon the Trust Estate or become due and payable, and which create, may create, or appear to create a lien upon the Trust Estate or any portion thereof (all of which taxes, assessments, and other governmental charges of like nature are hereinafter referred to as "**Impositions**"); <u>provided</u>, <u>however</u>, that if, by law, any such Imposition is payable or may, at the option of the taxpayer, be paid in installments, Grantor may pay or cause to be paid the same, together with any accrued interest on the unpaid balance of such Imposition, in installments as the same become due; and before any fine, penalty, interest, or cost may be added thereto for the nonpayment of any such installment and interest.

b.     If, at any time after the date hereof, there shall be assessed or imposed (i) a tax or assessment on the Trust Estate in lieu of or in addition to the Impositions payable by Grantor pursuant to subparagraph a. hereof; or (ii) a license fee, tax, or assessment imposed on Beneficiary and measured by or based in whole or in part upon the amount of the outstanding obligations secured hereby, then all such taxes, assessments, or fees shall be deemed to be included within the term "Impositions" as defined in subparagraph a. hereof; and Grantor shall pay and discharge or cause to be paid and discharged the same as herein provided with respect to the payment of Impositions or, at the option of Beneficiary, all obligations secured hereby, together with all accrued interest thereon, shall immediately become due and payable. Anything to the contrary herein notwithstanding, Grantor shall have no obligation to pay any franchise, estate, inheritance, income, excess profits, or similar tax levied on Beneficiary or on the obligations secured hereby.

120146662.5 0072097-00004

eRecorded Document

c.    Subject to the provisions of subparagraph d. of this Section 1.08, Grantor covenants to furnish to Beneficiary, within forty-five (45) days after the date upon which any such Imposition is due and payable by Grantor, official receipts of the appropriate taxing authority or other proof satisfactory to Beneficiary evidencing the payments thereof.

d.    Grantor shall have the right, before any delinquency occurs, to contest or object to the amount or validity of any such Imposition by appropriate legal proceedings, but this shall not be deemed or construed in any way as relieving, modifying, or extending Grantor's covenant to pay or cause to be paid any such Imposition at the time and in the manner provided in this Section 1.08, unless Grantor has given prior written notice to Beneficiary of Grantor's intent to so contest or object to an Imposition; and unless, at Beneficiary's sole option, (i) Grantor shall demonstrate to Beneficiary's satisfaction that the legal proceedings shall conclusively operate to prevent the sale of the Trust Estate or any part thereof to satisfy such Imposition prior to final determination of such Proceedings; or (ii) Grantor shall furnish a good and sufficient bond or surety as requested by and satisfactory to Beneficiary; or (iii) Grantor shall have provided a good and sufficient undertaking as may be required or permitted by law to accomplish a stay of such proceedings.

e.    Intentionally Omitted.

f.    Grantor covenants and agrees not to suffer, permit, or initiate the joint assessment of the real and personal property, or any other procedure whereby the lien of the real property taxes and the lien of the personal property taxes shall be assessed, levied or charged to the Trust Estate as a single lien.

g.    If requested by Beneficiary, Grantor shall cause to be furnished to Beneficiary a tax reporting service covering the Trust Estate of the type, duration and with a company satisfactory to Beneficiary.

1.09.    Utilities.  To pay or cause to be paid when due all utility charges which are incurred by Grantor for the benefit of the Trust Estate or which may become a charge or lien against the Trust Estate for gas, electricity, water or sewer services furnished to the Trust Estate and all other assessments or charges of a similar nature, whether public or private, affecting the Trust Estate or any portion thereof, whether or not such taxes, assessments or charges are liens thereon.

1.10.    Actions Affecting Trust Estate.  To appear in and contest any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee; and to pay all costs and expenses, including cost of evidence of title and attorney's fees, in any such action or proceeding in which Beneficiary or Trustee may appear.

1.11.    Actions by Trustee and/or Beneficiary to Preserve Trust Estate.  That should Grantor fail to make or cause to be made any payment or to do or cause to be done any act as and in the manner provided in any of the Loan Instruments, Beneficiary and/or Trustee, each in its own discretion, without obligation so to do and without notice to or demand upon Grantor and without releasing Grantor from any obligation, may make or do the same in such manner and to such extent as either may deem necessary to protect the security hereof. In connection therewith (without

-7-
eRecorded Document

limiting their general powers), Beneficiary and/or Trustee shall have and are hereby given the right, but not the obligation, (i) to enter upon and take possession of the Trust Estate; (ii) to make additions, alterations, repairs and improvements to the Trust Estate which they or either of them may consider necessary or proper to keep the Trust Estate in good condition and repair; (iii) to appear and participate in any action or proceeding affecting or which may affect the security hereof or the rights or powers of Beneficiary or Trustee; (iv) to pay, purchase, contest or compromise any encumbrance, claim, charge, lien or debt which in the judgment of either may affect or appears to affect the security of this Deed of Trust or be prior or superior hereto; and (v) in exercising such powers, to pay necessary expenses, including employment of counsel or other necessary or desirable consultants. Grantor hereby agrees to pay on demand, with interest at the rate set forth herein, all of the Beneficiary's costs, charges and expenses incurred by Beneficiary in connection with the exercise by Beneficiary of the foregoing rights, including without limitation, costs of evidence of title, court costs, appraisals, surveys and attorneys' fees. All costs, charges and expenses so incurred, together with interest thereon as aforesaid, shall be secured by the lien of this Deed of Trust.

    1.12.  <u>Additional Security</u>. That in the event Beneficiary at any time holds additional security for any of the obligations secured hereby, it may enforce the sale thereof or otherwise realize upon the same, at its option, either before or concurrently herewith or after a sale is made hereunder.

    1.13.  <u>Appointment of Successor Trustee</u>. That the Beneficiary may substitute a trustee or trustees to execute the trust hereby created, and when such substitution has been filed for record in the Office of the Auditor or Recorder, as the case may be, of the County in which the Trust Estate is located, it shall be conclusive evidence of the appointment of such trustee or trustees, and such new trustee or trustees shall succeed to all of the powers and duties of the trustee or trustees named herein.

    1.14.  <u>Successors and Assigns</u>. That this Deed of Trust applies to, inures to the benefit of and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, successors and assigns. In this Deed of Trust, whenever the context so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

    1.15.  <u>Inspections</u>. That Beneficiary, or its agents, representatives or workmen, are authorized to enter at any reasonable time upon or in any part of the Trust Estate for the purpose of inspecting the same and for the purpose of performing any of the acts it is authorized to perform under the terms of any of the Loan Instruments.

    1.16.  <u>Liens</u>. To pay and promptly discharge or cause to be paid and discharged, at Grantor's cost and expense, all liens, encumbrances and charges upon the Trust Estate, or any part thereof or interest therein which have priority over this Deed of Trust; provided that the existence of any mechanic's, laborer's, materialman's, supplier's or vendor's lien or right thereto shall not constitute a violation of this section if payment is not yet due under the contract which is the foundation thereof and if such contract does not postpone payment for more than fifty-five (55) days after the performance thereof. Grantor shall have the right to contest in good faith the validity of any such lien, encumbrance or charge, provided Grantor shall first deposit with Beneficiary a bond or other security satisfactory to Beneficiary in such amounts as Beneficiary shall reasonably

require, but not more than one and one-half (150%) of the amount of the claim, and provided further that Grantor shall thereafter diligently proceed to cause such lien, encumbrance or charge to be removed and discharged. If Grantor shall fail to discharge any such lien, encumbrance or charge, then, in addition to any other right or remedy of Beneficiary, Beneficiary may, but shall not be obligated to, discharge the same, either by paying the amount claimed to be due, or by procuring the discharge of such lien by depositing in court a bond or the amount claimed or otherwise giving security for such claim, or in such manner as is or may be prescribed by law.

1.17.    <u>Trustee's Powers</u>.  At any time, or from time to time, without liability therefor and without notice, upon written request of Beneficiary and presentation of this Deed of Trust and the Note secured hereby for endorsement, and without affecting the personal liability of any person for payment of the indebtedness secured hereby or the effect of this Deed of Trust upon the remainder of said Trust Estate, Trustee may (i) reconvey any part of said Trust Estate; (ii) consent in writing to the making of any map or plat thereof; (iii) join in granting any easement thereon; or (iv) join in any extension agreement or any agreement subordinating the lien or charge hereof.

1.18.    <u>Beneficiary's Powers</u>.  Without affecting the liability of any other person liable for the payment of any obligation herein mentioned, and without affecting the lien or charge of this Deed of Trust upon any portion of the Property not then or theretofore released as security for the full amount of all unpaid obligations, Beneficiary may, from time to time at the request of any one of the Grantors, or their successors or assigns and without notice (i) release any person so liable; (ii) extend the maturity or alter any of the terms of any such obligation; (iii) grant other indulgences; (iv) release or reconvey, or cause to be released or reconveyed at any time at Beneficiary's option any parcel or portion of the Trust Estate so long as the release or reconveyance does not materially affect the security value of the Trust Estate; (v) take or release any other or additional security for any obligation herein mentioned; or (vi) make compositions or other arrangements with debtors in relation thereto.  By accepting payment of any obligation herein mentioned after its due date, Beneficiary does not waive its right either to require prompt payment when due of all other obligations herein mentioned or to declare default for failure so to pay.

1.19.    <u>Accounting</u>.  Grantor will keep and maintain or will cause to be kept and maintained in accordance with sound accounting practice accurate and proper books of record and account relating to the Trust Estate.  Grantor shall permit Beneficiary to examine the books of account and other records of the Grantor, to discuss the affairs, finances and accounts of the Grantor and to be informed as to the same by Grantor, all at such reasonable times and intervals as Beneficiary may desire.

1.20.    <u>Trade Names</u>.  At the request of Beneficiary, Grantor shall execute a certificate in form satisfactory to Beneficiary listing the trade names under which Grantor intends to operate the Trust Estate, and representing and warranting that Grantor does business under no other trade names with respect to the Trust Estate. Grantor shall immediately notify Beneficiary in writing of any change in said trade names, and will, upon request of Beneficiary, execute any additional financing statements and other certificates revised to reflect the change in trade name.

eRecorded Document

1.21.   <u>Insurance Proceeds</u>.  That after the happening of any casualty to the Trust Estate or any part thereof, Grantor shall give prompt written notice thereof to Beneficiary.

a.     In the event of any damage or destruction of the Improvements, Beneficiary shall have the option in its sole discretion of applying all or part of the insurance proceeds (i) to any indebtedness secured hereby and in such order as Beneficiary may determine; (ii) to the restoration of the Improvements; or (iii) to Grantor.

b.     In the event of such loss or damage, all proceeds of insurance shall be payable to Beneficiary, and Grantor hereby authorizes and directs any affected insurance company to make payment of such proceeds directly to Beneficiary.  Beneficiary is hereby authorized and empowered by Grantor to settle, adjust or compromise any claims for loss, damage or destruction under any policy or policies of insurance.

c.     Except to the extent that insurance proceeds are received by Beneficiary and applied to the indebtedness secured hereby, nothing herein contained shall be deemed to excuse Grantor from repairing or maintaining the Trust Estate as provided in Section 1.03 hereof or restoring all damage or destruction to the Trust Estate, regardless of whether or not there are insurance proceeds available or whether any such proceeds are sufficient in amount, and the application or release by Beneficiary of any insurance proceeds shall not cure or waive any default or notice of default under this Deed of Trust or invalidate any act done pursuant to such notice.

1.22.   <u>Eminent Domain</u>.  That should the Trust Estate, or any part thereof or interest therein, be taken or damaged by reason of any public improvement or condemnation proceeding or in any other manner ("**Condemnation**") or should Grantor receive any notice or other information regarding such proceeding, Grantor shall give prompt written notice thereof to Beneficiary.

a.     To the extent of Grantor's indebtedness and liability to Beneficiary pursuant to the Loan Instruments, Beneficiary shall be entitled to all compensation, awards and other payments or relief therefor, and shall be entitled at its option to commence, appear in and prosecute in its own name any action or proceedings.  Beneficiary shall also be entitled to make any compromise or settlement in connection with such taking or damage. All such compensation, awards, damages, rights of action and proceeds awarded to Grantor (the "**Proceeds**") are hereby assigned to Beneficiary and Grantor agrees to execute such further assignments of the Proceeds as Beneficiary or Trustee may require.

b.     In the event any portion of the Trust Estate is so taken or damaged, Beneficiary shall have the option, in its sole and absolute discretion, to apply all such proceeds, after deducting therefrom all costs and expenses (regardless of the particular nature thereof and whether incurred with or without suit), including reasonable attorneys' fees, incurred by it in connection with such Proceeds, upon any indebtedness secured hereby and in such order as Beneficiary may determine, or to apply all such Proceeds, after such deductions, to the restoration of the Trust Estate upon such conditions as Beneficiary may determine.  Notwithstanding any of the foregoing, the proceeds, less any administrative and legal costs and fees incurred by Beneficiary, shall be used to reimburse

120146662.5 0072097-00004

eRecorded Document

Grantor for the cost of restoration of the Improvements, provided that restoration is economically and legally feasible in the reasonable judgment of the Beneficiary and, provided further, that Grantor is not nor has been in default under any of the Loan Instruments. Such application or release shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

1.23. <u>Repayment of Advances</u>. Upon receipt of notice, Grantor shall repay immediately all sums expended or advanced hereunder by or on behalf of Beneficiary or Trustee, with interest from the date of such advance or expenditure at the rate contained in the Note, and the repayment thereof shall be secured hereby. Failure to repay such expenditure or advance and interest thereon within ten (10) days of such notice will, at Beneficiary's option, constitute an event of default hereunder; or Beneficiary may, at its option, commence an action against Grantor for the recovery of such expenditure or advance and interest thereon, and in such event Grantor agrees to pay, in addition to the amount of such expenditure or advance, all costs and expenses incurred in such action, together with a reasonable attorney's fee.

**ARTICLE II**
**ASSIGNMENT OF RENTS, ISSUES AND PROFITS**

2.01. <u>Assignment of Rents and Profits Under All Leases and Rental Agreements</u>. Grantor absolutely and irrevocably assigns to Beneficiary the rents, issues and profits of the Trust Estate, and all of the right, title and interest of the Grantor in and under all leases and rental agreements now or hereafter affecting said Trust Estate are hereby assigned and transferred to the Beneficiary. So long as no default shall exist in compliance with any covenants, terms, conditions or obligations hereof or of any other instrument at any time executed with respect to this Deed of Trust, Grantor may collect assigned rents and profits as the same fall due, but upon the occurrence of any such default, all right of Grantor to collect or receive rents or profits shall wholly terminate. All rents, issues or profits receivable from or in respect to said Trust Estate which Grantor shall be permitted to collect hereunder shall be received by it in trust to pay the usual and reasonable operating expenses of, and the taxes upon, said Trust Estate and the sums owing to Beneficiary as they become due and payable as provided in this Deed of Trust or in the said Note or in any modification of either.

Grantor hereby agrees:

a. It will promptly perform and observe all the terms, covenants and conditions required to be performed and observed by it, as landlord under all leases and rental agreements and will do all things necessary to preserve and keep unimpaired its rights thereunder and will maintain all leases and rental agreements in full force and effect and will enforce the same and will take such action to that end as Beneficiary may request;

b. It will not create, nor permit any lien, charge or encumbrance upon its interest as landlord of the leases or rental agreements except the lien of this Deed of Trust and except as provided in this Deed of Trust;

120146662.5 0072097-00004

eRecorded Document

c.    It will not, without the written consent of the Beneficiary, collect or permit the collection of any rental payment under any of the leases or rental agreements for a period of more than one (1) month in advance of the date on which such payment is due.

All leases or rental agreements of the whole or any part of the Trust Estate shall be subject and subordinate to the lien of this Deed of Trust unless Beneficiary consents in writing to the priority of certain leases or rental agreements. Beneficiary may, at its option, require that specific leases be made superior to the lien of this Deed of Trust. Grantor shall pay all costs incident to making such leases superior to such lien, including attorneys' fees. In the event of any default hereunder and the exercise by Beneficiary of its rights hereby granted, Grantor agrees that payments made by tenants or occupants to Beneficiary shall, as to such tenants, be considered as though made to Grantor and in discharge of tenants' obligations as such to Grantor. Nothing herein contained shall be construed as obliging Beneficiary to perform any of Grantor's covenants under any lease or rental agreement. Grantor shall execute and deliver to Beneficiary upon demand any further or supplemental assignments deemed desirable by Beneficiary in order to further carry out and confirm the intentions of this paragraph and upon failure of the Grantor so to comply, Beneficiary may, in addition to any other rights or remedies, at its option, declare all obligations secured by this Deed of Trust to be immediately due and payable.

2.02.    Leases.  Grantor agrees as follows:

a.    To permit no assignment of any lease, or any subletting thereunder unless the right to assign or sublet is expressly reserved by the lessee under such lease.

b.    That save and except for taxes and assessments provided to be paid by Grantor as specified in Section 1.08 Grantor will not create or suffer or permit to be created, subsequent to the date of the execution and delivery of this Deed of Trust, any lien or encumbrance which may be or become superior to any lease affecting said Trust Estate.

c.    That if any part of the automobile parking areas included within said Trust Estate is taken by condemnation or before said areas are otherwise reduced, and provided such loss of parking materially impairs the utility or value of the Trust Estate, Grantor will provide parking facilities in kind, size and location to comply with all leases, and before making any contract for such substitute parking facilities, Grantor will furnish to Beneficiary satisfactory assurance of completion thereof, free of liens and in conformity with all governmental zoning and regulations.

2.03.    Security, Rents, Profits and Zoning.  The Grantor shall not, without first obtaining the Beneficiary's written consent, assign any of the rents or profits of the Trust Estate or collect any rent for more than one (1) month in advance or change the general nature of the occupancy or initiate or acquiesce in any zoning reclassification, or do or suffer any act or thing which would impair the security for said debt or the Beneficiary's lien upon said Trust Estate or the rents thereof. In the event of breach of any requirement of this paragraph, the Beneficiary may, in addition to any other rights or remedies, at any time thereafter declare the whole of said principal sum immediately due and payable.

eRecorded Document

## ARTICLE III
## FIXTURE FILING

3.01.  Fixture Filing.  Certain of the Trust Estate is or will become "fixtures" as that term is defined under the Alaska Uniform Commercial Code (as amended or recodified from time to time, the "**UCC**").  This Deed of Trust constitutes a fixture filing under the UCC.  For purposes of this fixture filing, "Debtor" is Grantor and the "Secured Party" is Beneficiary.

## ARTICLE IV
## REMEDIES UPON DEFAULT

4.01.  Events of Default.  Any of the following events shall be deemed an event of default hereunder:

a.    Default shall be made in the payment of any installment of principal or interest on the Note or any other sum secured hereby when due; or

b.    Grantor shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors; or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of Grantor or of all or any part of the Trust Estate, or of any or all of the royalties, revenues, rents, issues or profits thereof, or shall make any general assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due; or

c.    A court of competent jurisdiction shall enter an order, judgment or decree approving a petition filed against Grantor seeking any reorganization, dissolution or similar relief under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors, and such order, judgment or decree shall remain unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive) from the first date of entry thereof; or any trustee, receiver or liquidator of Grantor or of all or any part of the Trust Estate, or of any or all of the royalties, revenues, rents, issues or profits thereof, shall be appointed without the consent or acquiescence of Grantor and such appointment shall remain unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive); or

d.    A writ of execution or attachment or any similar process shall be issued or levied against all or any part of or interest in the Trust Estate, or any judgment involving monetary damages shall be entered against Grantor which shall become a lien on the Trust Estate or any portion thereof or interest therein and such execution, attachment or similar process or judgment is not released, bonded, satisfied, vacated or stayed within sixty (60) days after its entry or levy; or

e.    If Grantor shall transfer, assign, alienate, mortgage, encumber, pledge, hypothecate or grant an interest in the Trust Estate without Beneficiary's prior written consent unless otherwise allowed by the terms of this Deed of Trust; or

-13-

eRecorded Document

f.    If there is any change in ownership of thirty percent (30%) or more of the equity interests in Borrower, without Beneficiary's prior written consent; or

g.    There has occurred a breach of or default under any term, covenant, agreement, condition, provision, representation or warranty contained in any of the Loan Instruments or any part thereof, not referred to in this Section 4.01, which continues beyond any notice and cure period applicable thereto.

4.02.    <u>Acceleration Upon Default, Additional Remedies</u>.    In the event of any event of default, Beneficiary may declare all indebtedness secured hereby to be due and payable and the same shall thereupon become due and payable without any presentment, demand, protest or notice of any kind.  Thereafter, Beneficiary may:

a.    Either in person or by agent, with or without bringing any action or proceeding, or by a receiver appointed by a court and without regard to the adequacy of its security, enter upon and take possession of the Trust Estate, or any part thereof, in its own name or in the name of Trustee, and do any acts which it deems necessary or desirable to preserve the value, marketability or rentability of the Trust Estate, or part thereof or interest therein, increase the income therefrom or protect the security hereof and, with or without taking possession of the Trust Estate, sue for or otherwise collect the rents, issues and profits thereof, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection including attorney's fees, upon any indebtedness secured hereby, all in such order as Beneficiary may determine. The entering upon and taking possession of the Trust Estate, the collection of such rents, issues and profits and the application thereof as aforesaid, shall not cure or waive any default or notice of default hereunder or invalidate any act done in response to such default or pursuant to such notice of default and, notwithstanding the continuance in possession of the Trust Estate or the collection, receipt and application of rents, issues or profits, Trustee or Beneficiary shall be entitled to exercise every right provided for in any of the Loan Instruments or by law upon occurrence of any event of default, including the right to exercise the power of sale;

b.    Commence an action to foreclose this Deed of Trust as a mortgage, appoint a receiver, or specifically enforce any of the covenants hereof;

c.    Exercise any or all of the remedies available to a secured party under the Uniform Commercial Code of Alaska, including, but not limited to:

(1)    Either personally or by means of a court appointed receiver, take possession of all or any of the Trust Estate and exclude therefrom Grantor and all others claiming under Grantor, and thereafter hold, store, use, operate, manage, maintain and control, make repairs, replacements, alterations, additions and improvements to and exercise all rights and powers of Grantor in respect to the Trust Estate or any part thereof. In the event Beneficiary demands or attempts to take possession of the Trust Estate in the exercise of any rights under any of the Loan Instruments, Grantor promises and agrees to promptly turn over and deliver complete possession thereof to Beneficiary;

120146662.5 0072097-00004

eRecorded Document

(2)     Without notice to or demand upon Grantor, make such payments and do such acts as Beneficiary may deem necessary to protect its security interest in the Trust Estate, including without limitation, paying, purchasing, contesting or compromising any encumbrance, charge or lien which is prior to or superior to the security interest granted hereunder, and in exercising any such powers or authority to pay all expenses incurred in connection therewith;

(3)     Intentionally Omitted;

(4)     Intentionally Omitted;

(5)     Intentionally Omitted; and

d.     Execute or cause the Trustee to execute a written notice of such default and of his election to cause to be sold the Trust Estate to satisfy the obligations hereof and shall cause such notice to be recorded in the office of the Auditor or Recorder, as the case may be, of the recording district in which the Trust Estate is located.

4.03.   Foreclosure by Power of Sale.  Should Beneficiary elect to foreclose by exercise of the power of sale herein contained, Beneficiary shall notify Trustee and shall deposit with Trustee this Deed of Trust and the Note and such receipts and evidence of expenditures made and secured hereby as Trustee may require.

a.     Upon receipt of such notice from Beneficiary, Trustee shall cause to be given such Notice of Default as then required by law. Trustee shall, without demand on Grantor, after lapse of such time as may then be required by law and after Notice of Sale having been given as required by law, sell the Trust Estate at the time and place of sale fixed by it in said Notice of Sale, either as a whole, or in separate lots or parcels or items as Trustee shall deem expedient, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States payable at the time of sale. Trustee shall deliver to such purchaser or purchasers thereof its good and sufficient deed or deeds conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including, without limitation, Grantor, Trustee or Beneficiary, may purchase at such sale.

b.     After deducting all costs, fees and expenses of Trustee and of this Trust, including costs of evidence of title and reasonable counsel fees in connection with sale, Trustee shall apply the proceeds of sale to payment of all sums expended under the terms hereof, not then repaid, with accrued interest, all other sums then secured hereby and the remainder, if any, to the person or persons legally entitled thereto.

4.04.   Appointment of Receiver.  If any event of default described in Section 4.01 of this Deed of Trust shall have occurred and be continuing, Beneficiary, as a matter of right and without notice to Grantor or anyone claiming under Grantor, and without regard to the then value of the Trust Estate or the interest of Grantor therein, shall have the right to apply to any court having jurisdiction to appoint a receiver or receivers of the Trust Estate, and Grantor hereby irrevocably consents to such appointment and waives notice of any application therefor.  Any such receiver or

120146662.5 0072097-00004

eRecorded Document

receivers shall have all the usual powers and duties of receivers in like or similar cases and all the powers and duties of Beneficiary in case of entry as provided in Section 4.02.a. and shall continue as such and exercise all such powers until the date of confirmation of sale of the Trust Estate unless such receivership is sooner terminated.

4.05.   <u>Remedies Not Exclusive</u>.   Trustee and Beneficiary, and each of them, shall be entitled to enforce payment and performance of any indebtedness or obligations secured hereby and to exercise all rights and powers under this Deed of Trust or under any Loan Instrument or other agreement or any laws now or hereafter in force, notwithstanding some or all of the said indebtedness and obligations secured hereby may now or hereafter be otherwise secured, whether by mortgage, deed of trust, pledge, lien, assignment or otherwise. Neither the acceptance of this Deed of Trust nor its enforcement whether by court action or pursuant to the power of sale or other powers herein contained, shall prejudice or in any manner affect Trustee's or Beneficiary's right to realize upon or enforce any other security now or hereafter held by Trustee or Beneficiary, it being agreed that Trustee and Beneficiary, and each of them, shall be entitled to enforce this Deed of Trust and any other security now or hereafter held by Beneficiary or Trustee in such order and manner as they or either of them may in their absolute discretion determine. No remedy herein conferred upon or reserved to Trustee or Beneficiary is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute. Every power or remedy given by any of the Loan Instruments to Trustee or Beneficiary or to which either of them may be otherwise entitled, may be exercised, concurrently or independently, from time to time and as often as may be deemed expedient by Trustee or Beneficiary and either of them may pursue inconsistent remedies.

4.06.   <u>Sale of Trust Estate Pursuant to a Foreclosure</u>.   In case of a sale pursuant to a foreclosure of this Deed of Trust, the said premises, real, personal or mixed, may be sold as an entirety or in parcels, by one sale or by several sales held at one time or at different times, all as Trustee, in its unrestricted discretion, may elect, and the Grantor for and on behalf of itself and all persons claiming by, through or under it, waives any and all rights to have the property and estates comprising the Trust Estate marshaled upon any foreclosure sale and agrees that upon foreclosure, the Trust Estate may be sold as an entirety and not in parcels.

4.07.   <u>Restoration of Former Positions</u>.   In case Beneficiary shall proceed to enforce any right under this Deed of Trust and the proceedings for enforcement thereof shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Beneficiary, then and in every such case the Beneficiary, the Trustee and the Grantor shall, subject to any determination in such proceedings, severally and respectively be restored to their former positions and rights hereunder, and thereafter all rights and remedies and powers of the Beneficiary and the Trustee shall continue as though no such proceeding had been taken.

4.08.   <u>Sale, Transfer, Vacation or Encumbrance of Property Prohibited</u>.   So long as any obligation secured hereby remains unpaid, the Grantor covenants and agrees that neither said Property nor any portion thereof nor interest therein shall be sold, conveyed, transferred, encumbered or leased (other than a lease of any portion of the space in the Property without an option to purchase) by the Grantor, or any one of them, without the Beneficiary's prior written consent. If title to said Property or any portion or interest in said Property shall pass from the

eRecorded Document

Grantor, or any one of them, by deed or otherwise, voluntarily or involuntarily or if said Property or any portion or interest therein is sold on contract, or if the Property or any portion or interest therein is vacated, or if said Property or any portion or interest therein is further encumbered or if said Property is leased as herein defined without the consent of Beneficiary, such change in title or occupancy or further encumbrance or lease shall be deemed to increase the risk of the Beneficiary, and the Beneficiary may declare all sums secured hereby immediately due and payable, or may, at its sole option, consent to such change in title or occupancy and increase the interest rate on the indebtedness hereby secured. In the event Beneficiary accelerates said indebtedness pursuant to the terms of this paragraph, Grantor shall pay, in addition to the indebtedness, the prepayment bonus as set forth in the Note.

The execution and delivery by the Grantor of any joint venture agreement, partnership agreement, declaration of trust, option agreement or other instrument whereunder any other person or corporation may become entitled, directly or indirectly, to the possession or enjoyment of the Trust Estate, or the income or other benefits derived or to be derived therefrom, shall in each case be deemed to be a conveyance or assignment of the Grantor's interest in the Trust Estate for the purposes of this section, and shall require the prior written consent of the Beneficiary. In the event ownership of the Property or any portion thereof becomes vested in a person other than the Grantor herein named, Beneficiary may, without notice to the Grantor herein named, whether or not Beneficiary has given written consent to such change in ownership, deal with such successor or successors in interest with reference to this Deed of Trust and the obligations secured hereby, in the same manner as with the Grantor herein named, without in any way vitiating or discharging Grantor's liability hereunder or the obligations hereby secured.

4.09.    Request for Notice.  Grantor hereby requests a copy of any notice of default and that any notice of sale hereunder be mailed to it at the address set forth in the first paragraph of this Deed of Trust.

### ARTICLE V
### MISCELLANEOUS

5.01.    Intentionally Omitted.

5.02.    Governing Law.  This Deed of Trust shall be governed by the laws of the State of Alaska. In the event that any provision or clause of any of the Loan Instruments conflicts with applicable laws, such conflicts shall not affect other provisions of such Loan Instruments which can be given effect without the conflicting provision, and to this end the provisions of the Loan Instruments are declared to be severable. This instrument cannot be waived, changed, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of any waiver, change, discharge or termination is sought.

5.03.    Limitation of Interest.  It is the intent of Grantor and Beneficiary in the execution of this Deed of Trust and the Note and all other instruments securing the Note to contract are not subject to the usury laws of the State of Alaska governing the loan evidenced by the Note.  Grantor expressly acknowledges that the monies received in return for the Loan Agreement and/or the Promissory Note are to be used for commercial and/or investment purposes and that the usury laws of the State of Alaska do not apply to this transaction.

5.04.   Statements by Grantor.  Grantor, within ten (10) days after being given notice by mail, will furnish to Beneficiary a written statement stating the unpaid principal of and interest on the Note and any other amounts secured by this Deed of Trust and stating whether any offset or defense exists against such principal and interest.

5.05.   Reconveyance by Trustee.  Upon written request of Beneficiary stating that all sums secured hereby have been paid, and upon surrender of this Deed of Trust and the Note to Trustee for cancellation and retention and upon payment by Grantor of Trustee's fees, Trustee shall reconvey to Grantor, or the person or persons legally entitled thereto, without warranty, any portion of the Trust Estate then held hereunder.  The recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof.  The grantee in any reconveyance may be described as "the person or persons legally entitled thereto."

5.06.   Notices.  Whenever Beneficiary, Grantor or Trustee shall desire to give or serve any notice, demand, request or other communication with respect to this Deed of Trust, each such notice, demand, request or other communication shall be in writing and shall be effective only if the same is delivered by personal service or mailed by registered or certified mail, postage prepaid, return receipt requested, addressed to the address set forth at the beginning of this Deed of Trust. Any party may at any time change its address for such notices by delivering or mailing to the other parties hereto, as aforesaid, a notice of such change.

5.07.   Acceptance by Trustee.  Trustee accepts this trust when this Deed of Trust, duly executed and acknowledged, is made a public record as provided by law.

5.08.   Captions.  The captions or headings at the beginning of each section hereof are for the convenience of the parties and are not a part of this Deed of Trust.

5.09.   Invalidity of Certain Provisions.  If the lien of this Deed of Trust is invalid or unenforceable as to any part of the debt, or if the lien is invalid or unenforceable as to any part of the Trust Estate, the unsecured or partially secured portion of the debt shall be completely paid prior to the payment of the remaining and secured or partially secured portion of the debt, and all payments made on the debt, whether voluntary or under foreclosure or other enforcement action or procedure, shall be considered to have been first paid on and applied to the full payment of that portion of the debt which is not secured or fully secured by the lien of this Deed of Trust.  Further, the invalidity or unenforceability of any portion or provision of this Deed of Trust shall in no way affect the validity or enforceability of the remainder hereof.

5.10.   Subrogation.  To the extent that proceeds of the Note are used to pay any outstanding lien, charge or prior encumbrance against the Trust Estate, such proceeds have been or will be advanced by Beneficiary at Grantor's request and Beneficiary shall be subrogated to any and all rights and liens owed by any owner or holder of such outstanding liens, charges and prior encumbrances, irrespective of whether said liens, charges or encumbrances are released.

5.11.   No Merger.  If both the lessor's and lessee's estates under any lease or portion thereof which constitutes a part of the Trust Estate shall at any time become vested in one (1) owner, this Deed of Trust and the lien created hereby shall not be destroyed or terminated by application of the doctrine of merger and, in such event, Beneficiary shall continue to have and

120146662.5 0072097-00004

eRecorded Document

enjoy all of the rights and privileges of Beneficiary as to the separate estates. In addition, upon the foreclosure of the lien created by this Deed of Trust on the Trust Estate pursuant to the provisions hereof, any leases or subleases then existing and created by Grantor shall not be destroyed or terminated by application of the law of merger or as a matter of law or as a result of such foreclosure unless Beneficiary or any purchaser at any such foreclosure sale shall so elect.  No act by or on behalf of Beneficiary or any such purchaser shall constitute a termination of any lease or sublease unless Beneficiary or such purchaser shall give written notice thereof to such tenant or subtenant.

5.12.    <u>Use</u>.  The Property which is the subject of this Deed of Trust is used for commercial purposes and is not used principally or primarily for agricultural or farming purposes.

5.13.    <u>Late Charge</u>.  In the event that any payment or portion thereof (other than the final payment due on the Maturity Date (as defined in the Note) is not paid within ten (10) days after the date it is due, Beneficiary may collect, and the Grantor agrees to pay with such payment, a "late charge" of ten cents ($.10) for each dollar so overdue as liquidated damages for the additional expense of handling such delinquent payments. Such late charge represents the reasonable estimate of Beneficiary and Grantor of a fair, average compensation due to the failure of Grantor to make timely payments. Such late charge shall be paid without prejudice to the right of Beneficiary to collect any other amounts provided to be paid or to declare a default hereunder.

5.14.    <u>Hazardous Waste</u>.

a.    Grantor represents and warrants to Beneficiary that to the best of Grantor's knowledge, after due and diligent inquiry, no hazardous or toxic waste or substances are being stored on the Property or any adjacent property nor have any such waste or substances been stored or used on the Property or any adjacent property prior to Grantor's ownership, possession or control of the Property.  Grantor agrees to provide written notice to Beneficiary immediately upon Grantor becoming aware that the Property or any adjacent property is being or has been contaminated with hazardous or toxic waste or substances. Grantor will not cause nor permit any activities on the Property which directly or indirectly could result in the Property becoming contaminated with hazardous or toxic waste or substances. For purposes of this Deed of Trust, the term "hazardous or toxic waste or substances" means any substance or material defined or designated as hazardous or toxic wastes, hazardous or toxic material, a hazardous, toxic or radioactive substance or other similar term by any applicable federal, state or local statute, regulation or ordinance now or hereafter in effect.

b.    Grantor covenants and agrees that in the event at any time there is discovered hazardous or toxic waste or substances on, in or under the Property which becomes contaminated with hazardous or toxic waste or substances as a result of activities on or hazardous or toxic waste or substances from the Property, Beneficiary shall be permitted to incur and pay any and all costs and expenses necessary or reasonably required to perform site tests and to completely clean-up said hazardous or toxic waste or substances, whether or not the clean-up is required by any governmental authority, and which tests and clean-up shall not require prior notice to Grantor and all such costs and expenses shall be repaid to Beneficiary by Grantor. Grantor hereby gives Beneficiary and

eRecorded Document

its agent(s) the unrestricted right to enter the Property at any time to perform site tests for hazardous or toxic waste or substances and to clean-up said hazardous or toxic waste or substances.

5.15.   Compliance with Americans With Disabilities Act.   Grantor represents and warrants to Beneficiary that Grantor has not and will not cause nor permit any activities on the Property which directly or indirectly could result in the violation of the Americans With Disabilities Act of 1990 (Pub. L. 101-336), 42 U.S.C. 12101-12213 and 47 U.S.C. 225 and 611, and any and all regulations thereunder and any similar state or local laws, regulations or ordinances ("ADA") with respect to the Property.

a.   Grantor acknowledges that, as between it and Beneficiary, it will be solely responsible for compliance with the ADA regarding the Property. Grantor's obligations under this paragraph are unconditional and shall not be limited by any nonrecourse or other limitations of liability provided for in the Loan Instruments.

b.   In the event Grantor shall, at any time, be or have been in default under the Note, this Deed of Trust, or under the Loan Instruments, or in the event Beneficiary shall have reasonable cause to believe that Grantor has breached the warranties herein, or in the event there is otherwise reasonable cause to believe that there has or may have been a violation of ADA, then Beneficiary, at Grantor's sole expense, shall have the right, but not the obligation, to enter upon the Property, either by itself or through an agent, for the purpose of conducting a compliance audit or assessment of the Property.  The costs of such audit or assessment shall be payable by Grantor to Beneficiary on demand, and shall bear interest at the Note rate, as modified. It is expressly agreed and understood by Grantor that the occurrence of a default, or the cause to believe a violation of ADA has occurred, shall be deemed to increase Beneficiary's risk hereunder, thereby creating a need for Beneficiary to have the information to be contained in such audit or assessment.

5.16.   Time of Essence.   The parties hereto agree that time is of the essence and that all obligations hereunder shall be timely performed on the dates on which complete performance is specified according to the provisions of this agreement.

## ARTICLE VI
## PRIORITY OF LIEN

6.01.   Intercreditor Agreement.   Anything herein to the contrary notwithstanding, this Deed of Trust, the liens and rights granted to Trustee or Beneficiary pursuant to this Deed of Trust, and the exercise of any right or remedy of Trustee or Beneficiary with respect hereto, are subject to the provisions of that certain Subordination and Intercreditor Agreement, dated on or about the date hereof by and among Beneficiary, Grantor and Wells Fargo Bank, National Association (as amended, supplemented or otherwise modified or replaced from time to time, the "**Intercreditor Agreement**").

6.02.   Deed of Trust Subordination Agreement.   Grantor previously executed and delivered to certain beneficiaries named therein ("**Existing Beneficiaries**") that certain Deed of Trust, Assignment of Rents and Security Agreement (and Fixture Filing) dated as of May 23, 2023 and

120146662.5 0072097-00004                                -20-
eRecorded Document                      Wion Decl. Exhibits' Page 62

21 of 24
305-2023-000209-0

recorded on May 23, 2023 by the Recording District 305 – Aleutian Islands, Alaska under recording number 2023-000120-0 encumbering the Property (the "**Existing Deed of Trust**"). Grantor, the Existing Beneficiaries, and the Beneficiary have entered into that certain Subordination Agreement dated on or about the date hereof (as amended, supplemented or otherwise modified or replaced from time to time, the "**Deed of Trust Subordination Agreement**"). Pursuant to the terms of the Deed of Trust Subordination Agreement, the lien created by the Existing Deed of Trust is and will remain subordinated to the lien of this Deed of Trust. If any terms in this Deed of Trust or the Deed of Trust Subordination Agreement conflict, the terms of the Deed of Trust Subordination Agreement shall govern and control provided, however that in the event of any conflict between the terms of the Intercreditor Agreement, the Deed of Trust Subordination Agreement and this Deed of Trust, the terms of the Intercreditor Agreement shall govern and control.

**[signature page follows]**

IN WITNESS WHEREOF, Grantor has executed this Deed of Trust as of the day and year first above written.

**PETER PAN SEAFOOD COMPANY, LLC,**
a Washington limited liability company

By: _____
Name: Rodger May
Title: President

STATE OF WASHINGTON )
                                          ) ss.
COUNTY OF KING          )

This record was acknowledged before me on July 7, 2023, by Rodger May, as President of Peter Pan Seafood Company, LLC, a Washington limited liability company.

_____
Notary Public in and for the state of Washington
My commission expires  8·1·2024

Signature page to Deed of Trust for Alaska Port Moller Property



# EXHIBIT A

- AMENDED UNITED STATES SURVEY NO. 1147, according to the original plat thereof, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska.

- ALASKA TIDELANDS SURVEY NO. 92, according to Plat No. 64-130, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska.

- UNITED STATES SURVEY NO. 662, according to the original plat thereof, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska. EXCEPTING THEREFROM that portion conveyed to the State of Alaska Department of Transportation and Public Facilities by Deed recorded May 28, 1996 in Book 43 at Page 893.

- UNITED STATES SURVEY NO. 663, according to the original plat thereof, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska. EXCEPTING THEREFROM those portions conveyed to the State of Alaska Department of Transportation and Public Facilities by Deeds recorded January 5, 1979 in Book 18 at Page 824 and May 28, 1996 in Book 43 at Page 888.

- UNITED STATES SURVEY NUMBERS 237, 664, 665, 744, 746, 1104, 1148, 1215 AND 1218, according to the original plats thereof, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska.

- LOTS ONE (1) AND FOUR (4), PORT MOLLER CANNERY SUBDIVISION, all according to Plat No. 2018-6, located in the Aleutian Islands Recording District, Third Judicial District, State of Alaska.